# EXHIBIT D

```
00001
 1     ROUGH DRAFT -- Since this deposition is in rough
   draft form, please be aware that there may be a discrepancy
 2  regarding page and line number when comparing the rough
   draft, rough draft disc, and the final transcript.
 3     Also, please be aware that the uncertified rough
   draft transcript may contain untranslated steno, reporter's
 4  note in brackets or misspelled proper names, incorrect or
   missing Q/A symbols or punctuation, and/or nonsensical
 5  English word combinations.  All such entries will be
   corrected on the final, certified transcript.
 6

 7             * * * * * *

 8
 9  [Start 3:01]
10  [BY MR. BORISON:] [Carol Strong]
11     Q.  Good afternoon.  My name is Scott Borison.  I
12  represent the plaintiff in this case.  I'm going to ask you
13  a series of questions.  Do you have any experience being
14  deposed before?
15     A.  No.
16     Q.  Okay.  I'm probably not going to be a able to watch
17  you and see that the voice come later.  There's a delay.
18        Anyway, I'm just going to ask you questions.  If
19  there's a question I ask that you don't understand, just
20  please let me know.  We do ask that you give verbal
21  responses to the questions so that the court reporter can
22  take it down.  And if for some reason you need a break, just
23  please let us know.  For anything else, we'll just address
24  as it pops up.  Okay?
25     A.  Okay.
00002
 1     Q.  And my understanding is you are employed by Total
 2  Renal Care, Inc.; is that correct?
 3     A.  I am employed by DaVita.  And Total Renal Care is,
 4  yes, it's a part of DaVita.  I'm sorry.
 5     Q.  It's okay.  And your job is a payroll project
 6  specialist?
 7     A.  Yes.
 8     Q.  And how long have you been in that position?
 9     A.  Since I started with DaVita in August of 2017.
10     Q.  Okay.  And you had given -- actually let me bring up
11  a document.  [**] [13]
12        [Shares screen]
13     Q.  Hopefully you can see the document on the screen.
14     A.  Yes.
15     Q.  And do you recognize this document?
16     A.  Yes.
17     Q.  And that was a declaration that you made in
18  connection with this case, correct?
19     A.  Yes.
```

20    Q.  So in the first paragraph one on the third sentence
21  it says, [*] The statements contained herein are based on my
22  personal knowledge and the documents maintained by DaVita.
23  The documents that you were referring rear to that are
24  maintained by DaVita, can you tell me what those documents
25  were?
00003
 1    A.  That would just -- as far as this, would just be the
 2  documents from the reports that were pulled out of the
 3  payroll system in the timekeeping system to create these
 4  calculations.
 5    Q.  And the payroll system, is that a proprietary to a
 6  DaVita system?
 7    A.  Workday is the system.  Is our payroll system is
 8  Workday.
 9    Q.  Okay.  And as part after that system, you're able to
10  generate reports based on queries, correct?
11    A.  Correct.
12    Q.  And so later if you look at paragraph 4, which I'm
13  scroll down to, that was based on you creating a query for
14  the system to generate certain information, correct?
15    A.  Well, there was a little more to it than just
16  creating a query out of Workday.  To come up with the
17  calculations, there were reports that were pulled out of
18  Workday, our payroll system, and also out of our timekeeping
19  system, which is Peoplenet and then the information -- it
20  was a large volume of data that was then incorporated
21  together to create the projection of this calculation.
22    Q.  Okay.  Well, let's take it step by step.  So one of
23  the components of your calculation was the total hours
24  worked by employees, correct?
25    A.  Yes, by Washington non-exempt employees.
00004
 1    Q.  So you limit it first to non-exempt employees,
 2  right?
 3    A.  Yes.
 4    Q.  And then you further limit to people, employees in
 5  the state of Washington, correct?
 6    A.  Correct.
 7    Q.  And if you had not limited it to the State of
 8  Washington, would it generate a report for all of the
 9  employees in the United States?
10    A.  A report could be generated for that.
11    Q.  And that report would show you the total hours
12  worked by people employed by DaVita or its subsidiaries in
13  the United States, correct?
14    A.  Yes, it would require multiple reports.  Just for
15  Washington, it created multiple reports.  It's a large
16  volume of data.
17    Q.  When you say multiple reports, are you talking about
18  -- I guess to generate the number of hours worked, just for
19  the number of hours worked, that would be one set of
20  information but then you would also need to know what the
21  base rate for each person was, correct?

22   A.  That would be a separate set of reports just to pull
23   the hours worked, that's actually coming out of the time
24   keeping system.  And because of the volume of data that
25   comes out of the timekeeping system, even just with the
00005
 1   Washington information, there were multiple reports that had
 2   to be pulled.  Those were not reports that I pulled
 3   personally.  They were reports that I had to request because
 4   they're coming -- because it's coming from -- it's a large
 5   volume of data.  So it has to be -- things can only be
 6   pulled into a CFV file, a certain amount of data.
 7        So once it reaches a limit, then the person pulling
 8   the reports needs to determine how many reports so that they
 9   can pull it in separate chunks.
10   Q.  But it's one --
11   A.  And then I would marry the data together.
12   Q.  Right.  So it's sort of one report.  But for
13   purposes of pulling it down into a single file, there's a
14   limit to how many can go in a single file; is that what
15   you're saying?
16   A.  I did not pull the report myself, but that seems --
17   I'm not sure.  I'm not sure.  I received it in multiple
18   reports.
19   Q.  All right.
20   A.  I received it as multiple reports, not as one
21   report.
22   Q.  So you had multiple reports.  And when you just
23   combined, did you combine the totals from each of the
24   multiple reports to come up with the total hours?
25   A.  No, because the -- I combined them altogether, the
00006
 1   hours.  The hours had to be combined by teammates as well as
 2   by the rate of pay that the teammate had during that time
 3   period.
 4   Q.  Okay.  So you combined the hours plus the pay in a
 5   single report; is that what you're saying?
 6   A.  I did eventually get it to that, yes, you're
 7   correct.
 8   Q.  Okay.  And I understand that you were relying on
 9   other people to sort of pull some of the base information
10   like the total hours worked, correct?
11   A.  Yes.
12   Q.  Okay.  So how long did this project take you?
13   A.  I honestly don't remember.
14   Q.  Are we --
15   A.  This is the type of work that I do primarily and I'm
16   not sure how long this particular project took.
17   Q.  Are we talking weeks or days?
18      MS. PETERSEN:  Objection, calls for speculation.
19   Q.  Okay.  I'm sorry.  Let me tell you, so occasionally
20   from time to time she'll make an objection.  Unless she
21   tells you not to answer, she puts the objection for the
22   record and then we just go forward.
23   A.  I don't remember.

```
24     Q.  Would there be any records that would refresh your
25  recollection as to how much time you spent on this?
00007
 1     A.  I can't think of anything that would give me an
 2  accurate time frame for the amount of time that it took.
 3     Q.  Okay.  So the components, though, were basically the
 4  hours, rate pay.  And then once you had the hours and the
 5  rate pay, then you had to multiply by the point 5, right?
 6     A.  Actually, it came down to that.  But what I had done
 7  was come up with a total and then did a total based on the
 8  1.5 times and then came up with a difference.  But the net
 9  would be the same, the difference of a point 5.
10     Q.  You came up with a total of all the pay, all the
11  base pays into one number; is that what you're saying?
12     A.  Yes.
13     Q.  Okay.  And then how did you pick the dates that you
14  use; like for instance in paragraph 3 it says -- let me go
15  back a sec.  So you were able to access DaVita's records
16  because this included not only employees of Total Renal Care
17  but also other entities under DaVita; is that correct?
18     A.  Correct.
19     Q.  And so do all the entities share the same systems in
20  place, Workday and the Peoplenet?
21     A.  Yes.
22     Q.  Okay.  So and then you used a specific period.  The
23  first period that you identify in paragraph 3 is [*] January
24  31st, 2020 to October 31st, 2020.  How did you determine
25  what dates to use?
00008
 1     A.  That's the dates that were requested.
 2     Q.  Okay.  And then in so paragraph 4 was for that time
 3  period that we just mentioned, which was January 31st, 2020
 4  to October 31, 2020, correct?
 5     A.  Yes.
 6     Q.  In then in paragraph 5 you say, [*] on March 31st,
 7  2020 DaVita changed its Disaster Relief Policy.  Where did
 8  you get that day?
 9     A.  The March 31st?
10     Q.  Yeah.
11     A.  The March 31st, 2020 was the date that the Disaster
12  Relief Policy was updated.
13     Q.  And how was it changed on that date?
14     A.  I don't recall.
15     Q.  Do you recall what documents you looked at to make
16  that determination?
17     A.  No.
18     Q.  Okay.  So let me ask you, during this time frame you
19  were employed by DaVita.  And between January 2020 and
20  today, did you receive additional pay from DaVita over and
21  above your regular base rate or any overtime you might have
22  been entitled to otherwise?
23     A.  Did I personally receive additional pay; is that the
24  question?
25     Q.  Yes.
```

```
00009
 1     A.  Yes.
 2     Q.  Okay.  Was that the DaVita Lives Award?
 3     A.  Yes.
 4     Q.  And how was that calculated for you, do you know?
 5     A.  It was a weekly amount.  It was $100 per week for
 6  me.  I was a full-time employee.
 7     Q.  And do you know when you first started -- were you
 8  involved in the calculation for implementing that program as
 9  part of your job?
10     A.  No.
11     Q.  Do you know when you first started receiving the
12  $100 a week?
13     A.  I don't remember the exact time frame, no.
14     Q.  Do you know how long you received the extra money?
15     A.  I'm not a hundred percent certain.
16     Q.  Do you know why you received the extra money?
17     A.  It was due to the pandemic to help the teammates.
18  DaVita had chosen to help the teammates to give us
19  additional pay during that time.
20     Q.  And you weren't involved in implementing it.  Were
21  you involved -- did you discuss it with anybody?
22     A.  I'm not sure I understand what you mean.  I'm not
23  sure I understand the question.
24     Q.  So my question is, and I'm not saying -- did you
25  discuss it with any of your supervisors?
00010
 1     A.  I don't recall whether I discussed it specifically
 2  with my supervisors.  I was notified that we would be paid
 3  this additional amount.  I don't remember exactly.
 4     Q.  Do you remember discussing it with any of your other
 5  co-workers -- or in your terminology, co-teammates?
 6     A.  I don't recall discussing it specifically with any
 7  other teammates.
 8     Q.  Okay.  And you said you were notified of it.  Do you
 9  recall how you were notified of it?
10     A.  I believe the first time I had heard about it was
11  when Javier mentioned it in the call.
12     Q.  Okay.  And Javier is who?
13     A.  The CEO of DaVita.
14     Q.  Okay.  And you mentioned you got $100 a week because
15  you were full time.  There was less pay paid to people who
16  were half time?
17     A.  Yes.
18     Q.  And so the other question I have for you is, so in
19  paragraph 6 where you did it between January 31st, 2020 and
20  March 31st was based on paragraph 5, correct?
21     A.  I didn't specifically base it on that.  I based it
22  on the request that was presented to me.  That might be why
23  it's the March 31st date.  But I was just given dates; from
24  this date to this date to do the calculations or the
25  projections.
00011
 1     Q.  Okay.  And if you could go back and enlarge this
```

```
 2  report to all non-exempt people and as a United States
 3  employee, correct?
 4     A.  Yes.
 5     Q.  And that would be using DaVita's records, correct?
 6     A.  Yes.
 7     Q.  And you have access to their records?
 8     A.  Yes.
 9     Q.  Are all the -- I mean is there any segregation of
10  the payroll records between DaVita and, for instance, Total
11  Renal Care?
12     A.  I'm not sure I understand.
13     Q.  Is there --
14     A.  Would I be able to tell the difference or -- the
15  data is all held in one, in one location.
16     Q.  Okay.  You phrased it much better than me.  Yes,
17  that's basically what I was asking you; is all the data
18  combined or is there segregation to the data by company.
19  And the answer is they're all combined; is that correct?
20     A.  Well, there is -- it does say the company.  But
21  everything is in one system together.
22     Q.  Okay.  I guess just sort of -- the payroll system,
23  does it designate who the particular person might work for?
24     A.  Are you asking if I could determine whether the
25  paying, whether it was being paid out of the Total Renal
00012
 1  Care as opposed to another subsidiary?
 2     Q.  Yes.
 3     A.  Yes.
 4     Q.  And how would you tell that?
 5     A.  There is a designation for that, so it could be
 6  differentiated.
 7     Q.  And speaking of designation was there a designation
 8  assigned to the $100 a week payment?
 9     A.  All DaVita teammates received the $100.
10     Q.  Right.  No, but I'm saying was there any sort of
11  designation in connection with that payment to all of the
12  teammates?
13        MS. PETERSEN:  Are we referring to the Village Lives
14  Award?
15        MR. BORISON:  Yes.  Sorry.
16     A.  I would be able to identify the teammate.  Any
17  teammate who is being paid under that, all of their earnings
18  would be paid under that, the same designation.
19     Q.  Okay.  I guess what I'm saying is usually when you
20  look at someone's pay stub, you would show their base pay;
21  you would show something if they're entitled to overtime.
22  Was there a separate category created for the $100 a week;
23  that's my question
24     A.  Yes, yes.
25     Q.  What was that category called?
00013
 1     A.  I don't recall the specific name.
 2     Q.  But that would be on anybody's pay stub?
 3     A.  Yes.
```

```
 4     Q.  Okay.  When you said you were asked to prepare this
 5  report, were you asked by a verbal request or was there an
 6  email sent to you?  How did you know you were being asked to
 7  prepare this report?
 8         MS. PETERSEN:  Objection to the extent that it calls
 9  for attorney-client privileged information.
10         You can answer if it doesn't require you to reveal
11  that, Ms. Strong.
12     A.  I received a request from the attorney via email.
13     Q.  And if you looked at that email versus the date of
14  your declaration, you would know at least the time frame
15  between when you started and when you ended, correct?
16         MS. PETERSEN:  Objection, calls for attorney-client
17  privileged information.
18         Ms. Strong, I'm instructing you not to answer this
19  question.
20     A.  Okay.  I'm not going to answer on the advice of the
21  attorney.
22     Q.  Okay.  Well, let me ask you a question.  After you
23  were asked to prepare this report, did you contact anybody
24  else to obtain the information?  For instance you said that
25  you looked at -- you got other people to provide you some of
  00014
 1  the hours worked.  Did you send emails to those people
 2  requesting the hours worked?
 3     A.  I don't recall how the request was made, whether it
 4  was through our request system or email system.
 5     Q.  Okay.  When you say request system, can you tell me
 6  what you mean by request system?
 7     A.  DaVita has a system where you can request reports or
 8  other things that's called TMSS from another department or
 9  from within your same department.
10     Q.  I'm sorry.  What did you call the -- TMS or --I
11  couldn't really hear you
12     A.  TMSS.
13     Q.  Tom, Mary, Scott, Frank?
14     A.  Tom, Mary, Scott, Sally.
15     Q.  Sorry.  So you don't know whether you would have
16  sent an email to the other people or went through that
17  system to request the information we talked about which was
18  the hours worked in Peoplenet, correct?
19     A.  Yes.  I'm not even one hundred percent sure that I
20  was the one that made that request.
21     Q.  Well, do you know what was requested for the hours
22  worked?
23         MS. PETERSEN:  Counsel, we're starting to veer into,
24  again, the territory of attorney-client privileged
25  information.  This is a situation in which, you know, this
  00015
 1  is a representative of the company who is acting as an agent
 2  for the legal department.  So I'm trying to not create
 3  obstacles here where they don't need to exist.  But I think
 4  you're quite close to essentially asking, you know, what
 5  counsel asked Ms. Strong or other agents of the company to
```

```
 6   gather.
 7         MR. BORISON:  Well, I'm trying to put a frame a time
 8   frame on this.  She said she doesn't recall so I'm exploring
 9   whether there's other ways for her to determine the time
10   frame.
11         If you want to provide the time frame, we don't have
12   to discuss it.  But I think I'm entitled to, and I'm not
13   asking for any conversations with counsel.  I'm asking her,
14   she prepared the declaration and submitted the declaration
15   to the court.  It has certain information in it.  And to the
16   extent that she relied on information that was obtained from
17   another person as a basis for her declaration, I'm entitled
18   to know what that information -- if she knew what that
19   information was and the criteria used.
20         MS. PETERSEN:  The witness has testified, though,
21   that she was asked to run specific reports with particular
22   time frames and that's what she did.  She's asked and
23   answered that question.
24         MR. BORISON:  No.  I asked her about how she got the
25   hours.  She said she was provided that information by
  00016
 1   another department, so I just disagree with that.
 2         MS. PETERSEN:  I think we're talking about something
 3   different.  You're talking about total hours worked; I'm
 4   talk about the time frames, correct?
 5         MR. BORISON:  Well, it's all part of -- she prepared
 6   the declaration that was based on certain information.  I'm
 7   trying to establish the time frame of putting together that
 8   information.  I understand that she also obtained some of
 9   the information that she used for her calculations from
10   another department.  And the reason I'm asking is if she
11   communicated with them, that would give us a start time.
12         MS. PETERSEN:  Would give us a start time?  I'm
13   afraid I don't understand what you mean.
14         MR. BORISON:  When she started this project.  And
15   really we're not going to debate this.  She can answer the
16   questions.  If you want to instruct her not to answer that
17   she can't clarify what her declaration was based on, we can
18   deal with that.  But the bottom line is she provided the
19   declaration.  I'm entitled to ask about what the source is
20   of the information that she provided the declaration off of.
21         MS. PETERSEN:  Yes, and the witness is answering
22   questions with regard to, you know, on what she based the
23   declaration.
24         So, again, I'm not trying to throw up obstacles
25   where they not exist.  I just want to make sure that to the
  00017
 1   extent that you're asking about the kind of direction behind
 2   certain time frames that were given, etc., that that is
 3   attorney-client privilege.
 4         MR. BORISON:  Let me -- maybe we're talking about
 5   different things.  When you say the time frames, I think
 6   you're talking about the January to the October.
 7         MS. PETERSEN:  Correct.
```

```
 8       MR. BORISON:  I'm talking something more basic.  How
 9  long did it take her to prepare this report, that's all I'm
10  looking for.  I'm not trying to delve into who told her what
11  dates to use.
12       MS. PETERSEN:  So I think if we're talking about
13  kind of this limited area that you just clarified in terms
14  of when she began the process, I'm not objecting to that.
15  But, again, to the extent that we're going into the what
16  instructions were provided --
17       MR. BORISON:  You had on your mind that time frame
18  because it's set out in a declaration.  I wasn't asking
19  about that.  I agree.  I had already asked her.  She said
20  someone gave them to her and that's what she based on.  I
21  wasn't going behind that.  I just want to know how long the
22  report took for her to generate.
23       MS. PETERSEN:  I see.
24       Ms. Strong, if you're able to answer that question,
25  then, yes, please go ahead.
   00018
 1     A.  Could you repeat the question, please?
 2     Q.  All I'm asking for is a time frame of when you
 3  started to when you produced the final declaration; what
 4  time frame that was.  You had earlier testified you weren't
 5  sure.
 6       The reason I was asking questions about
 7  communications you had, was to see if it would jog your
 8  memory as to when you started it versus when you ended.  We
 9  know when you ended because sometime prior to November 23rd
10  on the date you signed this, you completed the report.  What
11  I don't know is when it began.
12       MS. PETERSEN:  Objection, vague.
13       But you can answer that question if you understand,
14  Ms. Strong.
15     A.  I don't recall the specific date; the date goes
16  through October 31st, the data that was pulled.
17     Q.  All right.  So you're saying it would have been
18  sometime after October 31st because the report included
19  October 31st numbers; is that correct?
20     A.  Yes.
21     Q.  Okay.  We'll move on from there, okay.  Did you
22  prepare any other reports at the same time?  For instance,
23  did you expand your report to include beyond the State of
24  Washington?
25     A.  I'm sorry.  Could you repeat that?  Did I expand the
   00019
 1  report?  I'm --
 2     Q.  Let me rephrase it.
 3     A.  Okay.
 4     Q.  Your declaration reflects Washington State teammates
 5  for the time periods designated.  And in order to do that my
 6  understanding was that you limited specifically to
 7  Washington State teammates; is that correct?
 8     A.  Yes.
 9     Q.  Did you do any other states or all of the United
```

```
10  States reports?
11     A.  Yes.
12     Q.  You prepared a report as to the entire United
13  States?
14     A.  Yes.
15     Q.  Okay.  And that's already prepared.  So if you had
16  to, you could go to that report and provide the same
17  information as to the entire United States; is that correct?
18     A.  Yes.
19     Q.  Okay.  Except for the time frames snafu, which we're
20  not going to revisit -- just kidding -- when you were being
21  paid the $100 a week extra, were you working in the office
22  or remotely?
23     A.  I was working remotely.
24     Q.  And your job doesn't entail providing direct
25  services and the patients, correct?
  00020
 1     A.  No.
 2     Q.  You're strictly an accounting function?
 3     A.  Yes.
 4     Q.  Okay.
 5        MR. BORISON:  Chelsea, let's take five minutes if
 6  that's okay with you.  As you can, I don't waste a lot of
 7  time, but I would like a few minutes to see what else I need
 8  to cover.
 9        MS. PETERSEN:  Absolutely.  Sounds good.
10        MR. BORISON:  We'll take five minutes.  Thank you,
11  Ms. Strong.
12        (Brief recess.)
13        MR. BORISON:  I have no further questions, Ms.
14  Strong.  I appreciate your time.
15        MS. PETERSEN:  No questions for me.  Thank you.
16        (Concluded at 3:41 p.m.)
17        (Signature reserved.)
18  [sig/cert/corr]
19
20
21
22
23
24
25
```