# EXHIBIT E

00001

1      ROUGH DRAFT -- Since this deposition is in rough

draft form, please be aware that there may be a discrepancy

2  regarding page and line number when comparing the rough

draft, rough draft disc, and the final transcript.

3      Also, please be aware that the uncertified rough

draft transcript may contain untranslated steno, reporter's

4  note in brackets or misspelled proper names, incorrect or

missing Q/A symbols or punctuation, and/or nonsensical

5  English word combinations.  All such entries will be

corrected on the final, certified transcript.

6

            *   *   *   *   *   *

7

8  [BY MR. JONES:] [Prockish]

9    Q.  Ms. Prockish, I'm Craig Jones and I represent Mr.

10  Hesketh in this lawsuit.  We're here to take your deposition

11  today.  Have you ever given a deposition before?

12    A.  Yes, I have in a previous role.

13    Q.  Okay.  And how many depositions have you given

14  previously?

15    A.  One.

16    Q.  And what was the occasion for you to have sat for a

17  deposition?

18    A.  It was in connection with my role with my previous

19  employer.

20    Q.  Okay.  And previous employer gives me an idea of the

21  role that that person played but not the name.  So would you

22  give me the name of your previous employer.

23   A.  Municipality of Anchorage.

24   Q.  I'm sorry?

25   A.  Municipality of Anchorage in Alaska.

00002

1    Q.   Alaska, okay.  Would you just give me an idea of

2   what that was about.  I mean were you just a witness; were

3   you a party to that litigation?  Give me some sense of what

4   it was.

5    A.   I was a payroll manager at the time.  And so based

6   on my role, I was asked to give testimony, be deposed.

7    Q.   Be deposed, right.  So it's sort of like -- well,

8   you have something to do with payroll here, don't you?

9    A.   Yes, sir, I'm the payroll director.

10    Q.   Now, how long ago was that deposition, Ms. Prockish?

11    A.   Roughly ten years ago.  I don't recall the exact

12   date.

13    Q.   Okay.  Well, you probably still remember some of the

14   ground rules but let me go over them again if you don't

15   mind.  I'd like for you to answer out loud.  Don't say

16   uh-huh or huh-uh because if you do our court reporter

17   Christina, who is very good, may not pick it up correctly

18   because we are doing this remotely by Zoom.  Would you do

19   that for me, please?

20    A.   Yes.

21    Q.   Secondly, I would like, while you're probably going

22   to understand what I'm asking you before I finish saying it

23   out loud, but if you hesitate just a second before you begin

24   your answer, I would appreciate it; because you see once we

25   finish your testimony here today, the court will type it up

00003

1   into booklet form.  And if you began your answer one word

2   before I finish my question the way that court reporters are

3   trained to show that we were both speaking at the same time

4   is that she'll put half of the question on one line, your

5   answer on the second line, and the other half of the

6   question on the third line.  It will kind of make for rough

7   reading when we go over this.  Would you do that for me,

8   please?

9     A.  Yes, sir.

10    Q.  This is very important.  If I should ask you a

11  question and you don't understand it, I don't want you to

12  answer the question.  I want you to tell me that you don't

13  understand it and I'll rephrase it.  And we'll stay here as

14  long as we can until we understand each other.  Would you do

15  that me for me, please?

16    A.  Yes, sir.

17    Q.  Now, conversely if I ask you a question and you

18  answer it, I'm going to assume that you understood the

19  question and that your answer was directed to the question

20  that I asked; is that fair?

21    A.  Yes, it is.

22    Q.  Okay.  Do you recognize and understand that even

23  though you are not in a courtroom today, that you're under

24  oath today as if you were in a courtroom subject to the

25  penalties of perjury?

00004

1    A.  Yes, I do.

2    Q.  I want you to understand that I have taken an oath

3  to represent my client.  And to represent my client as has

4  your attorney -- I say your attorney -- the attorney here

5  representing your employer as is Ms. Henry.  And this is

6  probably going to be the only time that I have to speak with

7  you before we go to trial on these matters.  So the reason

8  that I bring that up is that the -- you realize that you

9  have a duty of truthfulness; is that correct?

10    A.  Yes.

11    Q.  And you came here today, I presume, to be true to

12  that duty, correct?

13    A.  Correct.

14    Q.  But witnesses also have something more than a simple

15  duty to be truthful.  They also have a duty to be frank;

16  that is that they should frankly address their answer to the

17  question that is asked and give a fair and full answer.  Are

18  you prepared to do that today?

19    A.  Yes, I am.

20    Q.  Thank you.  Let me tell you how I take a deposition.

21  So as you can tell, I'm not a hide the ball kind of lawyer.

22  I'm going to ask you a few questions about yourself, general

23  background questions, a little bit about your education, and

24  your work history, and then I'm going to ask you a few

25  questions about what you may or may not know about this case

00005

1  and then, you know, the attorney for the defendants may or

2  not have some follow-up questions.  Okay?

3   A.  Yes.

4   Q.  So we're going to start out by asking you to give us

5  your full name, please.

6   A.  Toni Rachelle Prockish.

7   Q.  Where do you reside?

8   A.  I reside in Auburn, Washington.

9   Q.  And are you at your home right now?

10   A.  I'm actually at DaVita's office in Federal Way.

11   Q.  In where?

12   A.  Federal Way, Washington at a DaVita business office.

13   Q.  And are you in your office?

14   A.  Yes, I am.

15   Q.  Okay.  And I want you to give me a thumbnail sketch

16  of your educational background.  Let's just start with high

17  school, when and where you graduated, and you just bring me

18  forward.  All right?

19   A.  Sure.  I graduated from Bartlett High School in

20  Anchorage, Alaska in 1992; after graduating from high

21  school, I went to the University of Oregon in Eugene until

22  1996 when I graduated with an accounting and finance degree.

23   Q.  Okay.  And if you would, would you do the same; give

24  me a thumbnail sketch of your work history, starting with --

25  let's say after you finished college and bring us forward;

00006

1  is that okay?

2    A.  Sure.  Happy to do so.  Once I graduated from

3  college, I had a temporary position in the accounting

4  department at the Anchorage School District for six months.

5  After that temporary role, I moved to a CPA firm for a

6  period of a year and a half.  I then returned to the

7  Anchorage School District from August of 1998 through the

8  beginning of 2002 when I went to Chugach, which is a native

9  corporation.  I was employed there for four months as an

10  accountant.  I then moved to the Municipality of Anchorage

11  where I spent my time of almost 12 years there as a payroll

12  accountant, payroll supervisor, and then finally a payroll

13  manager.  And my last employer has been DaVita as payroll

14  director for the last six-and-a-half years.

15    Q.  And where have you been, for lack of a better term,

16  stationed with DaVita; the same place all the six-and-a-half

17  years?

18    A.  That's correct, Federal Way, Washington.

19    Q.  Okay.  And is that the office that you're in right

20  now?

21    A.  Yes, sir.

22    Q.  So what are -- I'm sure that you have lots and lots

23  of duties.  I wanted to ask you this if I could back up.

24      Did you ever obtain your CPA certificate?  Are you

25  certified --

00007

1    A.  No, I did not.

2    Q.  What are your duties generally as the payroll

3    director -- well, I guess I should ask you this, who is your

4    payroll employer?

5    A.  I am employed by Total Renal Care.

6    Q.  Which takes us backwards now.  Have you been

7    employed by Total Renal Care for six-and-a-half years?

8    A.  Yes.

9    Q.  You said earlier that you were employed by DaVita;

10   but your payroll employer is Total Renal Care, true?

11    A.  That is the payroll entity for which I am paid

12   under.

13   Q.  Now --

14   A.  Which is under the DaVita umbrella.

15   Q.  Do you know anything about the corporate structure

16   in DaVita?

17   A.  Yes.

18   Q.  Can you give me a thumbnail sketch of the corporate

19   structure of DaVita?

20    A.  Yes.  We have roughly 30 plus payroll entities that

21   fall under the DaVita umbrella for which we pay teammates.

22   Q.  Give me a general understanding of what your duties

23   are as the payroll director of -- well, is your title the

24   payroll director for Total Renal Care or just payroll

25   director?

00008

1    A.  My title is director of payroll.

2    Q.  Director of payroll.  For Total Renal Care?

3    A.  For all DaVita entities.

4    Q.  What are the duties of director of payroll?

5    A.  Oversight over the U.S. payroll for the 30 plus

6    payroll entities and teammates.

7    Q.  Would you say a little more about that?  What do you

8    mean by oversight?

9    A.  My team is comprised of multiple lanes, one of which

10   is a call center.  So if a teammate or manager or a third

11   party vendor has a question, they call into my service

12   center and have their questions addressed.  I also have a

13   team of liaisons that are responsible for processing all HR

14   related transaction before they go into the payroll system

15   for processing.  Under my purview is also a payroll tax

16   team, a payroll accounting team.  I have admins on my team

17   as well.  I have an assistance team that's responsible for

18   maintenance and upkeep of our timekeeping and payroll system

19   and then I also have a team of coordinators that's

20   responsible for processing of our payroll.

21   Q.  Right.  So what kind of timekeeping system is

22   utilized by DaVita?

23   A.  DaVita utilizes Peoplenet.

24   Q.  Say more about that, please.  Peoplenet, N-E-T?

25   A.  Yes, correct.

00009

1    Q.  Okay.  What is Peoplenet?

2    A.  It is a tool that collects time data as well as

3   attendance data for teammates in order for them to be paid.

4    Q.  All right.  You're familiar with Peoplenet?

5    A.  Yes, sir.

6    Q.  So what kind of reports do you get from Peoplenet?

7   For instance, let's start with time and attendance reports.

8   Do you get those?  Can you get those, generate those?

9       MS. PETERSEN:  Object to the form.

10      MR. JONES:  What's your objection to form, Counsel?

11      MS. PETERSEN:  Compound.

12    Q.  Let me clean it up for you a little bit, Ms.

13   Prockish.  Counsel is right.

14      Can Peoplenet generate reports that detail time and

15   attendance for DaVita employees?

16    A.  Yes.

17    Q.  How often are those reports generated?

18    A.  It depends on the request.  We can pull the data on

19   a daily basis, a weekly biweekly.  It depends on the

20   request.

21    Q.  So if an DaVita becomes ill and has to take a sick

22   day, that would be entered into the Peoplenet system and a

23   record would be kept if this particular employee was ill on

24   this particular day, true?

25    A.  We do require that time off is entered into the

00010

1  Peoplenet timekeeping system.  We do not track whether or

2  not the teammate is sick or if it's a personal day.

3     Q.  Tell me your understanding of how that works.  Are

4  teammates given sick days?

5     A.  If you are a per diem teammate or a teammate in a

6  director and above position, you do accrue or have a balance

7  of sick leave.  All other teammates have a PTO balance.

8     Q.  You said PTO?

9     A.  Yes, paid time off.

10    Q.  Okay.  So their paid time off for whatever reason,

11 correct?

12    A.  That's correct.

13    Q.  All right.  Now, do you know how much an employee

14 would start out; how many PTO days they would have in their

15 first year with DaVita?  Or do you have to work a period of

16 time before you are considered to have earned those PTO?

17    A.  PTO starts accruing from day one and is dependent

18 upon the hours worked by the teammates.

19    Q.  Okay.  Is there a formula?

20    A.  Yes, there is a formula.

21    Q.  What is the formula?

22    A.  I do not have that information readily available.

23 It is listed in our teammate policy.

24    Q.  You're not familiar with it?

25    A.  I am familiar with it.  I don't recollect what each

00011

1   accrual is based on years of service.

2      Q.  Okay.  Thank you, Ms. Prockish.  I forgot to talk

3   about this.  If you don't remember something, that's the

4   correct answer.  It's not a memory test and it's really not.

5   Also it's not a marathon.  So anytime that you need break,

6   even if you need a comfort break, if you need to just stand

7   up and stretch your legs or maybe you need go to the powder,

8   room, whatever, you just tell me and then we're going to

9   accommodate you.  Okay?

10     A.  Thank you.

11     Q.  You're welcome.  I understand from a previous

12   deposition that certain offices under the DaVita umbrella

13   were closed in -- well, let me break that down.  I

14   understand from testimony from a previous deposition that

15   certain employees under -- the companies under the DaVita

16   umbrella, began around the middle of March to work remotely.

17   Do you know what I'm talking about -- in the middle of March

18   2020?

19     A.  Yes, I do.

20     Q.  All right.  Did you work remotely in 2020 anytime?

21     A.  Yes, I did.

22     Q.  Tell me about that.

23     A.  The majority of my time was sent working remotely.

24     Q.  Okay.  So when did that start?

25     A.  I started working remote the end of March, early

00012

1  April of 2020.  I don't recollect the exact day.

2      Q.  So you've been in that office for six-and-a-half

3  years, correct?

4      A.  That's correct.

5      Q.  And it sounds to me like under your supervision that

6  you have a substantial staff; is that true?

7      A.  Yes, that's correct.

8      Q.  How many people do you supervise?

9      A.  Just over 50.

10     Q.  And where are these 50 located?

11     A.  Their business office is in Federal Way, Washington

12  where I am currently residing.

13     Q.  What is the address of your office in Federal Way,

14  Washington?

15     A.  32275 32nd Avenue south.

16     Q.  I'm going to call that 32nd Avenue, if you don't

17  mind.  So could we understand each other that I'm talking

18  about the office that you're in right now we'll refer to it

19  as the office at 32nd Avenue?

20     A.  Yes.

21     Q.  Okay.  So are the 50 staff members, for lack of a

22  better term, that you supervise, are their offices in the

23  32nd Avenue building in Federal Way?

24     A.  Yes.

25     Q.  Okay.  And since you've been there for

00013

1  six-and-a-half years, has your staff that you supervise been

2  in the same building as your office?

3    A.  Yes.

4    Q.  And that building at 32nd Avenue is where you and

5  the staff members that you supervise conduct their regular

6  duties; is that correct?

7    A.  Yes.

8    Q.  Until sometime around March of 2020 and that

9  changed; is that correct?

10    A.  Yes, that is correct.

11    Q.  And what changed?

12    A.  The coronavirus pandemic occurred in mid -- hit us

13  in mid March of 2020 and the majority of my teammates

14  started working remotely from their home.

15    Q.  Okay.  And what was it that prevented them from

16  coming to the 32nd Avenue building in Federal Way?

17    A.  The shelter in place order by our governor.

18    Q.  So their regular duties, then, in the building at

19  32nd Federal Way -- I got that all backwards.  Do you mind

20  if I start over again?

21    A.  Please.

22    Q.  The shelter in place order then in effect prevented

23  them from performing their regular duties at their normal

24  offices on 32nd Avenue in Federal Way, Washington, true?

25    A.  Yes, unless they had a letter signed by our chief

00014

1  accounting officer indicating that they were an essential

2  worker that required them to come into the building to

3  perform their work.

4      Q.  Do you have such a letter?

5      A.  I did, yes.

6      Q.  Did you still work remotely?

7      A.  I did.  But on certain occasions when it was

8  necessary for me to come into the office, I did.

9      Q.  And my understanding is that the shelter in place

10  order took place because of the infectious nature of

11  COVID-19; is that your understanding?

12      A.  Yes, that is my understanding.

13      Q.  Before the shelter in place order, did you keep

14  regular office hours as part of your duties for your

15  employer?

16      A.  Yes, I had regular office hours but worked long

17  after those regular hours on occasion.

18      Q.  I know the feeling.  So it sounds like you were a

19  dedicated -- that you are a dedicated employee to Total

20  Renal Care and I appreciate that.  But when we're talking

21  about your regular duties, I mean when you signed on, did

22  someone tell you now, you know, tell you your regular duties

23  are going to be 60 to 70 to 80 hours a week or something

24  like that.  Did they tell that you or did they tell you that

25  your regular duty hours were going to be 8 to 5?  Help me

00015

1  understand.

2     A.  I knew, based on the nature of my employment, that I

3  would have standard hours.  However, I would likely exceed

4  those on a regular basis due to job requirements.

5     Q.  Right.  Well, because -- I get it.  You have got a

6  big job, but it's bigger at certain times of the year than

7  it is in others; isn't that true?

8     A.  Yes.

9     Q.  Tax season, right?

10    A.  Every two weeks when we process payroll.

11    Q.  That's right.  And, okay, so your tax season happens

12  every 14 days, then, right?  I get it.

13    A.  Essentially, yes.

14    Q.  Okay.  Now, how do you know -- I say you -- what is

15  the name of your department?

16    A.  The payroll department.

17    Q.  Okay.  I suspected that.  But, you know, in my

18  business you learn not to assume anything, okay.  So I'm

19  going to refer to it as the payroll department, okay?

20    A.  Okay.

21    Q.  Now, Ms. Prockish, how does your department know

22  what to pay a particular employee of one of these 30

23  companies that the payroll department does payroll for?

24    A.  Payments to teammates are based on the information

25  that is incorporated into the Peoplenet time and attendance

00016

1  system as well as any additional compensation that's

2  processed through Workday which is our payroll platform.

3     Q.  Okay.  Now, here's something new that I would like

4  to understand.  If you can, help me, please.  We have a

5  system that is referred to as Peoplenet, right?

6     A.  Yes, our time and attendance system.

7     Q.  That's time and attendance.  And what was the other

8  system?

9     A.  Workday.

10    Q.  W-O-R-K-D-A-Y?

11    A.  Yes.

12    Q.  One word or two?

13    A.  One.

14    Q.  What is that?

15    A.  Workday is our human capital management system where

16  our payroll is processed.  The system also has compensation

17  data in it as well used for talent management, teammate

18  reviews, HR transactions such as hiring, promotions,

19  demotions any job changes.

20    Q.  Okay.  Thank you.  Do you know Carol Strong?

21    A.  Yes, Carol is on my team.

22    Q.  And you refer to your team.  Can you say more about

23  what you mean by your team?

24    A.  My team are the individuals I spoke about earlier as

25  they cross lanes in the payroll department, so the service

00017

1  center is the liaison.  All of those lanes compose my team.

2     Q.  All right.  What is Ms. Strong's position in your

3  team?

4     A.  Carol is a project specialist.

5     Q.  What is that?

6     A.  She is responsible for assisting us in gathering

7  data related to time and attendance and payroll as requested

8  by various departments within the organization and other

9  duties as assigned.

10    Q.  All right.  How long has Carol been a part of your

11  team?

12    A.  Three plus years.

13        MR. JONES:  Can we put Exhibit 13 on the screen.

14  Chelsea, are we doing this?

15        MS. HENRY:  I'm going to work on it here.

16        MR. JONES:  Chelsea, how are we doing this?  Are we

17  attaching the exhibits to the depositions?  I know they've

18  been previously provided to you but I missed out on the

19  early part of these depositions.  What's the established

20  protocol, please?

21        MS. PETERSEN:  Scott, can tell you probably more

22  than I can.  But we were provided with a master list of

23  exhibits.  I can't tell you if 13 has yet been introduced.

24        MR. JONES:  Can we have this agreement?  I'm going

25  to attach 13 to her deposition.  And we'll make a record

00018

1  just what you said -- you said it in as few words that can

2  be said, is that we have presubmitted some exhibits to

3  opposing counsel and they've been previously numbered.  So

4  if they're out of number and if anyone reads this, I want

5  them to be able to read the instructions first, okay.

6      MS. PETERSEN:  If I can interject for just a minute,

7  we did receive a master exhibit list.  I believe that there

8  may be some exhibits that were not provided to us.

9  Thirteen, in particular I don't believe was previously

10  provided.  So exhibits, I believe, 1 through 12 were

11  previously provided.  Thirteen through 16, as I'm seeing on

12  the screen right now were not previously provided.  So those

13  have not yet been identified.

14      MR. JONES:  It's Ms. Strong's -- I'll tell you

15  right.  It's Ms. Strong's affidavit that was attached, I

16  believe, to Total Renal Care's answer.  And I know all

17  that's backwards.  It's just the way that it happened.

18      MS. PETERSEN:  There's no affidavit.  It's a

19  declaration.  It was attached to the removal papers, not the

20  answer.  There's only one Strong declaration and I believe

21  that's what you're referring to.

22      MR. JONES:  Thank you for correcting me on that.

23  You're absolutely correct.  Well, let's attach this as

24  Exhibit 13 to Ms. Prockish's deposition.

25      Q.  The way we'll proceed is that, you know, we'll put

00019

1  it on the screen for you Ms. Prockish because we're all in

2  different rooms.

3      [Shares screen]

4   Q.  This is an affidavit.

5      MR. JONES:  If you could put it up Christina, I

6  would appreciate it.

7      MS. HENRY:  It is up there.  Can you see it?

8      MR. JONES:  Yeah.  I just need to get some stuff out

9  of the way.

10      MS. PETERSEN:  Counsel, the exhibit is not visible.

11      (Discussion off the record.)

12      MS. PETERSEN:  Counsel, it would be helpful, since

13  it is a compressed screen, if you could potentially scroll

14  to show the entirety of the document.

15      MS. HENRY:  Sure.

16      MS. PETERSEN:  Thank you.

17   Q.  All right.  Now, Ms. Prockish, this is a declaration

18  that was attached to Total Renal Care's removal document.

19  That's lawyer stuff in this case.  I want to go to the

20  second page of the declaration page, please.  And I want to

21  direct your attention to paragraph 5 of Carol Strong's

22  declaration.  And it reads like this, [*] on March 31, 2020

23  DaVita changed its Disaster Relief Policy.  Do you see what

24  I just read?

25   A.  Yes, sir.

00020

1   Q.  All right.  Do you know what the Disaster Relief

2   Policy is?

3   A.  Yes.

4   Q.  How do you know?

5   A.  I was involved in the creation of the policy back in

6   2017 at the time of Hurricane Harvey.

7   Q.  And let's talk a little bit about your involvement

8   in the creation of the policy.  How is it that you were

9   involved in the creation of the policy back in 2017?

10  A.  Back in 2017 when Hurricane Harvey hit there was a

11  conversation with local leaders and people services on what

12  we should do to help compensate teammates.  And during that

13  process a teammate had brought forth a local practice that

14  discussed how teammates were paid in a disaster.  It was not

15  an official teammate policy at the time.

16  Q.  Let's stop right there.  Again, this is 2017, right?

17  A.  Yes.

18  Q.  Let's see if we could put some names to these -- to

19  the pronouns here.  Who is it that you were involved with in

20  creating the Disaster Relief Policy?

21  A.  Well, I don't remember exact names.  I do recall

22  that it was a number of teammates from people services as

23  well as myself, my direct manager, and my manager's manager.

24  Q.  Name, please.  I don't know who -- let me just say

25  this, when you say your manager or your direct manager, I

00021

1  don't know who that is.  If you don't mind -- I don't mind

2  you describing them as managers but if you could give me the

3  names also, I would appreciate it.  So can we go back and

4  I'll give you another shot at that.

5     A.  My manager was Lin Whatcott L-I-N W-H-A-T-C-O-T-T

6  and his manager was Scott Stewart.

7     Q.  Scott who?

8     A.  Stewart S-T-E-W-A-R-T.

9     Q.  Okay.  So let's go into a little detail about how

10  this all kind of sort of came about.  You said that in

11  Hurricane Harvey that there was a teammate that came forward

12  that was talking about some things that were being done in

13  the area where that teammate was.  Why don't you tell me who

14  the teammate who came forward was?

15     A.  I do not have that teammate's name.

16     Q.  Do you remember anything about the teammate?

17     A.  No, I do not.  The document was not provided to me

18  directly by the teammate.

19     Q.  Oh, okay.  How did this teammate communicate with

20  you?

21     A.  The teammate did not communicate directly with me.

22  It was brought to people services' attention.

23     Q.  Okay.

24       MS. PETERSEN:  Counsel, not to interrupt, can I ask

25  a favor?  If we're not currently referencing the exhibit, is

00022

1  it possible to take that down?  Sorry.  It's just that

2  otherwise I actually can't see the witness speaking.

3      MR. JONES:  Let me just ask her this and then we

4  take it -- let's put it back up.

5      MS. HENRY:  Okay.

6      MS. PETERSEN:  Thank you.

7      MS. HENRY:  I'll put it back up.

8      [Shares screen]

9    Q.  Paragraph 5 says, [*] on March 31, 2020 DaVita

10  changed its Disaster Relief Policy.  Do you see that?

11    A.  Yes.

12    Q.  Do you know what changed that Ms. Strong is

13  referring to?

14    A.  Yes.

15    Q.  Would you tell me?

16    A.  There was a paragraph added clarifying the policy

17  where the pandemic did not apply.

18    Q.  Is that the paragraph that's called the COVID-19

19  crisis?

20    A.  I don't have the policy in front of me, so I can't

21  say yes or no to that.

22    Q.  Just tell me what you remember.

23    A.  I don't remember the header.

24    Q.  Okay.

25      MR. JONES:  Christina, if you don't mind, let's put

00023

1   Exhibit 8 up.  [**]

2       [Shares screen]

3       MR. JONES:  We'll attach this as Exhibit 8.  And

4   I'll, for the record, identify it as previously being Bates

5   stamped TRC 000203 through 000204.  Are you with me,

6   Chelsea?

7       MS. PETERSEN:  I am.

8       MR. JONES:  Let's back it up a little bit if we can,

9   Christina.

10      MS. HENRY:  So am I going to the page?  Is that what

11  you want me to do?

12      MR. JONES:  Go to page 49.

13      MS. HENRY:  Okay.

14      Q.  Do you see here, this is page 49 of the DaVita

15  teammate handbook.  Have you seen this document before?  Are

16  you familiar with it?

17      A.  Yes, I am.

18      Q.  Section 4.12 of the Disaster Relief Policy, does

19  that look like the policy that we're talking about that you

20  were involved with creating?

21      A.  Yes.

22      Q.  And then we scroll down and we see a paragraph that

23  says [*] COVID-19 crisis.  Is that the paragraph that was

24  added to the DaVita Disaster Relief Policy on 31 March 2020?

25      A.  Yes.

00024

1   Q.  All right.

2       MR. JONES:  You can take it down now.

3   Q.  So before we did that -- and I kind of took it out

4   of order so we could like get those documents off the

5   screen.  We were talking about the creation of the Disaster

6   Relief Policy.  And how did this unknown or rather

7   unremembered teammember's idea, how was it first brought to

8   your attention?

9   A.  It was in conversation with people services.

10  Q.  Okay.  What are people services?

11  A.  People services is our Human Resources department.

12  Q.  Who within people services did you have the

13  conversation with?

14  A.  It was a broad number of teammates.  The chief of

15  staff.

16  Q.  Name?

17  A.  Jeff Reib.

18  Q.  Who's staff was Jeff Reib -- is it Reib or Reed?

19  A.  Reib, R-E-I-B.  I may have the I and the E switched.

20  Q.  Who's staff is he chief of?

21  A.  At the time Erik Seversen was the chief people

22  officer.

23  Q.  Seversen?

24  A.  Yes, sir.  S-E-V-E-R-S-E-N, and I believe his name

25  was E-R-I-K.

00025

1   Q.  Got you.  All right.  So was it Mr. Jeff Reib who

2   first brought the suggestion by the unremembered team member

3   to your attention?

4      A.  Jeff wasn't the only one that was in people

5   services.

6   Q.  There can only be one first.  Let's back up, okay.

7   I'm sorry.  I didn't mean to interrupt you.  I just wanted

8   to kind of get us back on track.  I'm talking about the

9   first person that brought this suggested policy that

10   ultimately ended up being the Disaster Relief Policy.  Who

11   was the first person who brought it to you are attention?

12      MS. PETERSEN:  Objection.  That misstates the prior

13   testimony.

14   Q.  I'm sorry.  You can answer.

15      MS. PETERSEN:  You can --

16      A.  I do not recall

17      MS. PETERSEN:  -- answer.  Sorry.  The hazards of

18   Zoom calls here.  You can answer with if you understood.

19   Q.  You don't recall?

20      A.  No.

21   Q.  Okay.  How was it brought to your attention?

22      A.  The information was brought to my attention by a

23   teammate in people services.  I don't recall who the

24   teammate was.

25   Q.  All right.  Well, give me some context.  Tell me

00026

1  what you remember about it and how it came up.

2     A.  I remember being in a meeting with the group of

3  individuals from people services and they indicated that a

4  teammate had brought forth a local policy or practice that

5  had been implemented prior when there was a natural

6  disaster.

7     Q.  Okay.  Why were you in that meeting?

8     A.  To discuss how to support our teammates in need

9  during the crisis.

10    Q.  And who else was in the meeting that you recall?

11    A.  I don't recall specific names, no.

12    Q.  At all?  None?

13    A.  No.

14    Q.  Was Mr. Reib there?

15    A.  I can't say for certain.

16    Q.  Where was the meeting?  Where was it taking place?

17    A.  It was a conference call.  I was in my office.

18    Q.  Do you keep a calendar?

19    A.  My Outlook calendar, yes.

20    Q.  All right.  And do you keep it to yourself or do you

21  have a secretary that keeps it?

22    A.  I manage my own calendar.

23    Q.  How long have you utilized Outlook?

24    A.  I'm sorry.  I didn't hear the entire question.

25    Q.  Yeah, I know.  I was trying to get the sun out of

00027

1  here.  I realized you probably -- it looks like I'm like in

2  a dark corner here.

3        How long have you utilized Outlook?

4    A.  Since I've been employed with DaVita.

5    Q.  Okay.  And have you gone -- have you had any type of

6  failure about the Outlook calendar function?

7    A.  Not that I generally recall, no.

8    Q.  But  you should have six-and-a-half years of

9  calendars preserved in Outlook, true?

10   A.  No, that is not true.

11   Q.  Why not?

12   A.  DaVita has a retention policy.  And as of the end of

13  March our calendars were cleaned up based on that retention

14  policy.

15   Q.  March of this year?

16   A.  Yes, sir.

17   Q.  How many times that you've been with DaVita, have

18  your calendars been cleaned up?

19   A.  This is the first time that I'm aware of.

20   Q.  Who told to you clean your calendar up?

21   A.  It was a village wide email that went out indicating

22  that our meetings could only be one year of duration and our

23  calendars would be cleaned up for appointments going back

24  and that were longer than a year.

25   Q.  By cleaned up you mean erased?

00028

1   A.  Yes.

2   Q.  Did you do that?

3   A.  Did I erase my calendar?

4   Q.  That's my question.

5   A.  No, I did not erase my calendar.

6   Q.  Who did?

7   A.  I would presume it was our IT department.

8   Q.  So do you still have your email?

9   A.  I still have my email in my Outlook, yes.

10   Q.  I want you to preserve that email.  I want to make

11  sure you get it to Ms. Prockish with all of the metadata

12  without changing it at all.  Can you do that for me?  I'm

13  sorry.  I said your name.  Let me start over.

14       I need you to get that to defense counsel, Ms.

15  Prockish -- is what I meant to say -- with its incorporated

16  metadata without changing any of it.  Can you do that for

17  me, please?

18       MS. PETERSEN:  To the witness, I'm not asking that

19  you provide me with your email and metadata.  Absolutely

20  preservation steps will be taken.  But I am not asking you

21  to give me your data.

22       MR. JONES:  Well, she can give it to me if you don't

23  mind.

24       MS. PETERSEN:  Counsel.

25       MR. JONES:  Just preserve it, Ms. Prockish, please.

00029

1    Q. So you have this meeting, this conference call,

2  right in 2017 after Hurricane Harvey, right. And you come

3  to understand that there's a local practice -- and I'm

4  assuming Texas? Would that be --

5      MS. PETERSEN: Object to form.

6    Q. Do you understand that the local practice that you

7  were informed about was in the Texas area. I think that's

8  where Harvey struck?

9    A. I presumed that the teammate was in Texas.

10    Q. Okay. So you have a conference call. Give me the

11  gist of the conference call. Was this to discuss a

12  potential policy? Was it to announce a policy that already

13  had been vetted and completed? Was it to set up a team to

14  vet the policy? What was the topic and the outcome of the

15  conference call?

16    A. Well, there wasn't just one conference call to

17  discuss how we can support our teammates during this natural

18  disaster. There were a number of conference calls to

19  discuss that and the paperwork that the teammate had brought

20  forth.

21    Q. What paperwork was that?

22    A. Out of the documents that I previously referenced

23  indicating how teammates were paid in a natural disaster --

24  the local policy, not a teammate policy.

25    Q. Let me see if I understand this. So that we don't

00030

1   jump around, I'm going to take you chronologically through

2   what you remember, Ms. Prockish, okay.  I think to me that's

3   the most logical way to do it.

4          So you're in this conference call and a teammate

5   whom you presume from the Texas area brought forth some

6   paperwork and it was a local practice.  And that paperwork

7   documented the policy more or less that ultimately became

8   the Disaster Relief Policy of the DaVita teammate handbook;

9   is that correct?

10         MS. PETERSEN:  Objection, assumes facts not in

11   evidence.

12         Go ahead.  You can answer.

13     Q.  I'm not assuming anything.  Let's understand, first

14   of all, what lawyers do, Ms. Prockish.  Since there's no

15   judge here, if we were in court, any objections would go to

16   the judge and the judge would resolve them right there and

17   then we would move on.  Because there's not a judge here,

18   what happens is that lawyers if they feel that they have an

19   objection to the question, they preserve the objection and

20   then generally you can answer the question unless instructed

21   not to by counsel.  Not me, I can't instruct you one way or

22   the other.

23         So let's go back to this.  Tell me about what you

24   recall about the paperwork that this unremembered teammate

25   brought forward concerning the local practice.  Did you ever

00031

1  see it?

2     A.  No, I did not.

3     Q.  How did you know then that it ultimately ended up

4  being the policy and not the Disaster Relief Policy?  That

5  wasn't your testimony.  I'm giving you the opportunity to

6  give it to me again because I misunderstood it.

7     A.  The information contained in that local practice did

8  not end up in the Disaster Relief Policy.  It was not the

9  precipitous or the -- it wasn't used in its totality to

10  become the Disaster Relief Policy.

11    Q.  Do you remember anything about that policy that the

12  unremembered teammate brought forward; anything about the

13  substance of it?

14    A.  It indicated how teammates were paid, if they were

15  to receive overtime or double-time compensation.

16    Q.  Okay.  I want to know everything you remember about

17  it because if we end up in court I don't want to go to court

18  and say, well -- and you remember something about this

19  document and I say, well, why don't you tell me that in the

20  deposition.  And you tell me, well, you didn't ask me.  You

21  understand?  I'm asking you right now.  Tell me everything

22  you remember about it.

23    A.  I shared what I remember.

24    Q.  That's all?

25    A.  Yes.

00032

1    Q.  So how did the policy that is the Disaster Relief

2   Policy that was adopted by DaVita, how did the substance of

3   that policy come about?

4    A.  The policy came about through discussions with

5   people services, myself, Lin Whatcott, and Scott Stewart on

6   how to best handle situations where teammates are not able

7   to perform their regular duties.

8    Q.  Okay.

9    MR. JONES:  Now let's put up Exhibit 5.  We'll

10   attach exhibit 5 to Ms. Prockish's deposition.  [**]

11    [Shares screen]

12    MS. PETERSEN:  Counsel, while we're pausing for a

13   second, we have been going for an hour -- not that we need a

14   break immediately or anything like that -- but I would

15   suggest that in the next five minutes or so if we can take a

16   quick break, that would be helpful.

17    MR. JONES:  This is a perfect time.  So then my IT

18   person, Ms. Henry, can catch up.

19    [Shares screen]

20    Q.  Before we take a break, let me ask you these

21   questions if you don't mind, Ms. Prokish, okay.

22    What kind of communications devices do you have

23   available within arm's length reach now?  Do you have a cell

24   phone?

25    A.  Yes.

00033

1    Q.  Have you communicated with anyone on that cell phone

2    since this deposition began?

3    A.  No.

4    Q.  Do you have any other devices, communication devices

5    within arm's reach?

6    A.  My office phone for which I'm using right now to

7    communicate.

8    Q.  You're using your office phone to communicate

9    through Zoom, right?

10    A.  Yes.

11    Q.  How many -- well, if your office is taking that

12    picture, it's better than my very expensive computer here.

13    I take it you have a desk top or is this a laptop that I'm

14    seeing you through?

15    A.  I'm utilizing a laptop.

16    Q.  Okay.  How many computers do you have in your office

17    right now?

18    A.  I have one computer.

19    Q.  That's the laptop that you're using to Zoom in on,

20    right?

21    A.  Correct.

22    MR. JONES:  Comfort break?

23    MS. PETERSEN:  Okay.

24    (Brief recess.)

25    Q.  Now, Ms. Prockish, when we took a break, we were

00034

1  talking about the creation of the Disaster Relief Policy.  I

2  want to take you back to that.  Who is the author of the

3  Disaster Relief Policy as originally written?

4      A.  It was a collaborative effort between people

5  services and myself.

6      Q.  Okay.

7      A.  Once it was drafted, it was sent to legal for

8  review.

9      Q.  So it was a collaborative effort by people services

10  and yourself, okay.  Why were you involved in it?

11      A.  I was involved as it related to the way in which

12  teammates were going to be compensated.

13      Q.  Okay.  Well, I would like the details of that,

14  please.  Let's go to page 49 of the exhibit.  [**]

15      MS. PETERSEN:  Sorry.  Is this the 2020 -- is this

16  Exhibit 5?  I'm not sure which exhibit this is.

17      MS. HENRY:  This is exhibit 5.

18      MS. PETERSEN:  Okay.

19      MR. JONES:  And this is the dated effective January

20  20, 2020.

21      MS. PETERSEN:  For January 1, 2020, okay.  Thank

22  you.

23      MR. JONES:  January 1, 2020.

24      Q.  So you say this is a collaborative effort between

25  yourself and people services.  That doesn't really help me

00035

1  to understand who wrote this, okay.  Did you write any part

2  of the Disaster Relief Policy as it was originally

3  configured?

4     A.  As indicated, it was a collaborative effort in the

5  --

6     Q.  What does that mean?  I'm sorry.  I didn't mean to

7  cut you off.  Were you finished?

8     A.  The collaborative effort indicates that the verbiage

9  was created and reviewed as a team.  I believe people

10  services took the lead at that time on the majority of the

11  policy.  However, when it came to the area that speaks to

12  how teammates are compensated, I was involved in the

13  drafting of that verbiage.

14     Q.  I would like to know -- all I've been provided is

15  the DaVita Disaster Relief Policy effective January 1, 2020

16  and then one effective after that because there was an

17  addition of that paragraph.  This is the one of January 1,

18  2020.  And my question is this, is this Disaster Relief

19  Policy different than the original Disaster Relief Policy

20  that you participated in drafting?

21     A.  Yes.  There has been an addition to this policy

22  since it was originally implemented in 2017.

23     Q.  Okay.  Can you tell me what addition was made to the

24  policy?

25     A.  The information related to the volunteer travelers,

00036

1  which I believe is on page 51 towards the tail end.

2     Q. That's 51.  Let's back up to 50.

3     A. It is the third to last paragraph that has been

4  added.

5     Q. Is that that paragraph that is highlighted?

6     A. Yes.

7        MR. JONES:  Christina, let's highlight that

8  paragraph and if we can highlight it -- there you go.  Thank

9  you.

10     Q. So it says, [*] non-extent traveling teammates, as

11  part of the disaster relief volunteer group who provide

12  shift coverage at sites assigned by local leadership will be

13  paid a 50 percent premium for all compensable straight time

14  hours, including travel time.  That paragraph is highlighted

15  on Exhibit 5.  Was not in the original version of the

16  Disaster Relief Policy; is that correct?

17     A. That is correct.

18     Q. All right.  Other than that paragraph that we have

19  highlighted on Exhibit 5 of page 50, were there any changes

20  to the Disaster Relief Policy from the point that it was

21  originally drafted and adopted by DaVita until at least

22  January 1 of 2020?

23     A. To my knowledge, no substantive changes were made.

24     Q. Okay.  Now, this is what I want to do now.  I want

25  you to look through this policy, Disaster Relief Policy, and

00037

1   I want you to tell me what parts of this Disaster Relief

2   Policy that you drafted in 2017?

3       A.  As indicated, it was a collaborative effort and we

4   developed the policy together and so I would have provided

5   feedback and verbiage as it related to PTO requirements as

6   well as the compensation section.

7       Q.  Okay.  We're going to use feedback and verbiage.  I

8   want you to tell me -- is there any feedback reflected in

9   the Disaster Relief Policy found at pages 49 and 50 of

10  Exhibit 5?

11      A.  I don't understand the question.  Would you please

12  rephrase?

13      Q.  I asked you to identify what portions of the

14  Disaster Relief Policy originally that you drafted.  Your

15  response was, this was a collaborative effort.  I provided

16  feedback and verbiage for certain parts of the Disaster

17  Relief Policy.  Now, it's no secret.  I'm trying to identify

18  what words on these pages that you would say were your words

19  -- or that rather you drafted.  But I'm going to go through

20  and I'm going to be very careful about the terms because

21  you're very careful about the terms.  And I'm going to use

22  the terms that you used and we're going to identify whether

23  that the feedback that you gave is in connection with the

24  Disaster Relief Policy as found on pages 49 and 50.  Is that

25  feedback found on 49 or 50 of Exhibit 5?

00038

1   A.  I don't recall exactly where my feedback was

2   provided in 2017.

3   Q.  All right.  Let's talk about the verbiage, the

4   verbiage that you provided.  Is that verbiage reflected on

5   pages 49 and 50 of Exhibit 5?

6   A.  Again, I don't recall the exact verbiage I provided.

7   It may have been in a draft and then subsequently changed

8   when the policy was published once it was reviewed by the

9   legal time.

10   Q.  Well, okay.  Do you see -- I didn't ask you for the

11   exact verbiage, okay, so I'm going to ask you a different

12   question.  Do you recognize anything on pages 49 or 50 of

13   Exhibit 5 that you think might have been the verbiage that

14   you contributed to the Disaster Relief Policy that was

15   originally created?

16   A.  Yes.

17   Q.  Okay.  See, we're making progress.  Now, I want you

18   to identify that for me, please.

19   A.  That area would have included when a teammate was

20   responsible for utilizing PTO.

21   Q.  What we're going to do is because this document is

22   not in front of you.

23   MR. JONES:  Christina, if you could back it up,

24   please, to 49.  Thank you.

25   Q.  Now, you see under 4.12, Disaster Relief Policy, I

00039

1  want you to look at those words on page 49.  Do you

2  recognize anything that -- or do you see anything that you

3  would recognize as being your verbiage that you contributed

4  to the Disaster Relief Policy that was originally drafted?

5    A.  No.

6    Q.  Let's go to page 50, please.  Now, page 50 at the

7  top left-hand corner, you'll see there's a part of the

8  paragraph, a full paragraph that is above, that is on top of

9  the emergency time frame.  Do you understand what I'm

10  talking about?

11    A.  Yes.

12    Q.  Do you see any of the verbiage that you might have

13  contributed that is contained in the words in that section?

14    A.  No.

15    Q.  Let's go to the section called emergency time frame.

16  Do you recognize any of your verbiage that's reflected in

17  that section titled [*] emergency time frame?

18    A.  No.

19    Q.  Let's go to [*] pay practices for non-exempt

20  teammates and we're going to focus first on those words that

21  are in the left column.  Do you see any of your -- any of

22  those words that reflect your verbiage that you contributed

23  to the Disaster Relief Policy?

24    A.  [*] Regularly scheduled hours at their base hourly

25  rate of pay.

00040

1    Q.  Okay.  So I'm going to underline this on my copy.

2    So you contributed these words and that would be in the

3    first full paragraph under pay practices for non-exempt

4    teammates, true?

5        MS. PETERSEN:  Counsel, objection.  It misstates

6    prior testimony.  She didn't say she contributed those

7    words.

8        MR. JONES:  Do you want me to swear you in?  Then I

9    would ask you to stop testifying and stop coaching the

10   witness.  It is absolutely a violation of the local rules.

11       MS. PETERSEN:  I strongly disagree, but my objection

12   still stands.

13   Q.  Ms. Prockish, let's go back and look at the first

14   paragraph under [*] pay practices for non-exempt teammates.

15   But before we go there, during the break did you speak with

16   anyone, either remotely or directly?

17   A.  Yes.

18   Q.  Who did you speak with?

19   A.  Counsel.

20   Q.  Which counsel?  Name the counsel by name.

21   A.  Chelsea and Colleen.

22   Q.  Chelsea and Colleen, the same Chelsea and Colleen

23   that are on this Zoom call?

24   A.  Yes.

25   Q.  Do they tell you anything?

00041

1     MS. PETERSEN:  Objection, attorney-client privilege.

2  I'm instructing the witness not to answer.

3     Q.  I'm not asking you what they told you.  I'm asking

4  you if they told you something.

5     MS. PETERSEN:  That wasn't the question.

6     Go ahead.

7     MR. JONES:  But it is a question now, Counsel.  Now

8  let's not argue on the record.

9     Q.  I'm asking you if they told you something.  Did

10  they?

11    A.  Yes.

12    Q.  All right.  Were you shown any documents, either

13  electronically or remotely?

14    A.  No.

15    Q.  Now, did -- what is it that these two lawyers told

16  you during this comfort break during this deposition?

17    MS. PETERSEN:  Objection.  Do not answer that

18  question, attorney-client privileged information.

19    Q.  Did they relay to you any facts?

20    MS. PETERSEN:  Same objection.

21    Do not respond.

22    Q.  Are you refusing to respond?  I'm not picking on

23  you, Ms. Prockish.  It's just we have a make a record that

24  counsel has instructed you not to answer and that you're not

25  answering on behalf of counsel.  You're not in trouble.

00042

1  It's just purely something we have to do.  Okay?  So I'm

2  going to ask you this question, do you refuse to answer my

3  question?

4     A.  Based on counsel's advice, I am not answering the

5  question.

6     Q.  Thank you.  Now, did anything that these two lawyers

7  told you during the break, did it refresh your memory?  I'm

8  not asking what they told you.  I'm asking whether you heard

9  something from them that refreshed your memory?

10    A.  No.

11    Q.  Did they tell you not to answer any questions?

12       MS. PETERSEN:  Objection.

13       Do not answer that question.  Attorney-client

14  privilege.

15    Q.  Are you refusing to answer upon the instruction of

16  counsel?

17    A.  Yes.

18    Q.  Do you have any type of messenger, or something

19  similar to that, on your laptop?

20    A.  Yes.

21    Q.  Have you been in communication with either one of

22  these two counsel during the course of this deposition

23  through any certain messaging service or any type of

24  communication device during the course of this deposition?

25    A.  No, I have not.

00043

1    Q.  Now, we were talking about pay practices for

2    non-exempt teammates, and that's the first paragraph under

3    pay practices for non-exempt teammates.

4        MR. JONES:  Christina, if you don't mind, let's

5    unhighlight that paragraph so that the only highlighted

6    paragraph will be -- let's go to the next page.

7        MS. HENRY:  Do you want to be on 50 or 49?

8        MR. JONES:  Fifty, please.

9        MS. HENRY:  Oh, sorry.  So you want me to take these

10   off, okay.

11       MR. JONES:  The one that was highlighted was the one

12   that was added after the original --

13       MS. HENRY:  Okay.

14       MR. JONES:  Let's leave that one highlighted,

15   please.  Thank you.  So now we know what was the original

16   verbiage.

17       Q.  Let's go to the first paragraph under [*] pay

18   practices for non-exempt teammates.  Tell me what words in

19   that paragraph reflect your verbiage that you believe you

20   contributed to the original version of the Disaster Relief

21   Policy?

22       A.  The regularly scheduled hours at their base rate of

23   pay looks like verbiage I would have contributed.

24       Q.  Let's go to the next full paragraph which spills

25   over into the next columns that begins, [*] if a facility.

00044

1  Do you see any verbiage that you would have contributed to

2  the policy?

3      A.  [*] Regularly scheduled hours.

4      Q.  Anything else?

5      A.  No.

6      Q.  All right.  Now if we look at the next full

7  paragraph.  It is on the right-hand column.  It begins, [*]

8  if a designated facility or business office.  Any verbiage

9  you provided in that paragraph?

10     A.  The verbiage that appears, I would have contributed

11  to is [*] Scheduled hours will be paid premium pay for all

12  hours worked.  Premium pay will be at one-and-one-half times

13  the teammate's base rate of pay.

14     Q.  Start over again, please.  I'm going to underline it

15  on my copy.

16     A.  [*] Scheduled hours will be paid premium pay for all

17  hours worked.  And then again [*] premium pay will be

18  one-and-one-half times the teammate's base rate of pay.

19     Q.  And so let's go to the next paragraph.  That is the

20  paragraph that was added later, right?

21     A.  Yes.

22     Q.  That is later than 2017, true?

23     A.  Correct.

24     Q.  Did you draft that paragraph?

25     A.  It was a collaborative effort, again, with people

00045

1   services, myself, and Amy [Gimnus], payroll support manager.

2      Q.  Let's go to an alternate paragraph in this policy

3   that's next to last that begins, [*] if a designated.  Do

4   you recognize any of your verbiage in that paragraph?

5      A.  No.

6      Q.  The last paragraph starting, [*] non-exempt

7   teammates.  Do you recognize any of your verbiage in that

8   paragraph?

9      A.  Yes.  [*] Teammates must report time worked via

10   timestamps in the timekeeping system and will be paid

11   accordingly.

12      Q.  So we have gone over every paragraph in the Disaster

13   Relief Policy.  Do you recognize any words that reflect any

14   feedback that you gave regarding the original Disaster

15   Relief Policy?

16      A.  I don't recall.

17      Q.  Well, it's a little different question than that.

18   Let me reask it again if you don't mind, okay.

19         Do you recognize any words in the Disaster Relief

20   Policy that reflect your feedback that you may have given

21   during the original drafting of this policy?

22      A.  No verbiage is standing out to me.

23      Q.  Okay.  I'm going to take that to mean that you don't

24   recognize any words in the Disaster Relief Policy that

25   reflects your feedback.  Now, if I'm incorrect, I'm going to

00046

1  give you the opportunity to correct.  Am I incorrect?

2     A.  No, you are not incorrect.

3     Q.  Thank you.  So I'm looking at a handful of words

4  here that you recognize and attribute to this.  So who would

5  have created or would have been responsible for the rest of

6  the words in the Disaster Relief Policy?

7        MS. PETERSEN:  Objection, asked and answered.  You

8  can answer if you can.

9     A.  People services.

10    Q.  People services is a title of an organizational

11  section of a fictitious person, I can't take people services

12  and put them under oath and ask people services questions.

13  I'm looking for people of people services.  I'm going to ask

14  it again and I'll it a little bit differently so it will be

15  clear.

16        What other people contributed to the words in the

17  Disaster Relief Policy that we see here as Exhibit 5 besides

18  yourself?

19        MS. PETERSEN:  Objection, asked and answered.  You

20  can answer if you can.

21    A.  I do not have teammate name of those that

22  contributed to this policy.

23    Q.  You can't remember one; is that your testimony?

24    A.  As indicated before, I believe Jeff Reib may have

25  contributed to this verbiage.  I was not in the room or on

00047

1  the conference call when this language was originally

2  drafted and subsequently made it to the policy after review

3  by our legal team.

4      Q.  How do you know it was reviewed by your legal team?

5      A.  It is our standard practice that all policies --

6      Q.  I'm sorry.  Start over because I hadn't finished my

7  question.  I did hesitate and I understand why you started

8  talking.  I'm sorry.  I stepped on the whole thing.  I'm

9  going to start over again.

10      How do you know whether it was reviewed by your

11  legal team?  Did you send it to them?

12      A.  No, I did not.

13      Q.  You said something about standard policy.  Is it

14  standard policy that any changes or additions or creation of

15  the Disaster Relief Policy will be reviewed by your legal

16  counsel?

17      A.  All teammate policies are reviewed by legal counsel

18  before publication.

19      Q.  How do you know that?

20      A.  That is the process that I have been advised of by a

21  teammate in people services.

22      Q.  Who advised you of that?

23      A.  Alejandro and I don't know his last name.

24      Q.  Alejandro?

25      A.  Um-hmm.

00048

1   Q.  And when were you advised that?

2   A.  During the course of my employment.

3   Q.  Six-and-a-half years.  Let's see if we can narrow it

4  down.  Were you advised that this year?

5   A.  In 2021, no.

6   Q.  How about in 2020?

7   A.  I don't specifically recall.

8   Q.  Did you have an orientation when you were hired

9  six-and-a-half years ago?

10   A.  Yes.  I did go through new hire orientation.

11   Q.  Were you informed then that all changes to the

12  policies would be reviewed by counsel?

13   A.  That was six-and-a-half years ago.  I don't

14  specifically recall.

15   Q.  Okay.  So how do you know it was reviewed by

16  counsel?  I mean you said, that's what the policy is.  But

17  you stated it as a fact.  Do you know that as a fact?

18   A.  I have not seen anything in writing indicating that

19  that is our policy, but I have taken the word of those that

20  support the policy as it is the fact.

21   Q.  Okay.  And that is -- give me the name again,

22  please?

23   A.  Alejandro.

24   Q.  And what is Alejandro's position?

25   A.  I don't know his particular title.

00049

1   Q.  How would it be that he would come to explain to you

2   that it is the policy that all personnel policies are

3   reviewed by counsel before they're published?

4      MS. PETERSEN:  Objection, misstates prior testimony.

5   Q.  That was your testimony, wasn't it, or did I

6   misunderstand.  Your understanding is that before these

7   policies were published, they're reviewed by counsel, right?

8   A.  Correct.

9   Q.  Okay.  Now, how is it that Alejandro came to tell

10  you that?

11  A.  DaVita goes through a process of review and updating

12  policies twice a year and Alejandro is the one that

13  facilitates that review for those responsible for each

14  policy.

15  Q.  It was -- okay.  I understand that.  You've

16  explained the review process, some of it, anyway.  We'll go

17  into that in a minute.  But my question was a little

18  different.  My question is how did Alejandro come to tell

19  you that; that, you know, all of these policies were

20  reviewed by counsel before they're published?

21  A.  That information would have been contained in an

22  email provided by Alejandro.

23  Q.  Say it one more about that.  Why would you have

24  received an email from Alejandro with that information?

25  A.  Alejandro would have been defining the process.  So

00050

1  once the policy owners and co-owners had an opportunity to

2  review and provide suggested changes to said policies, then

3  it would go to legal for review prior to publishing.

4      Q.  Well, okay.  I still -- I understand and thank you

5  for telling me that.  We're going to get into that a little

6  bit later.  Was Alejandro announcing a new DaVita policy to

7  you?  Was that why you got that email?

8      A.  The information would have been contained in our

9  an -- or in the regular review process of policies by policy

10  owners and co-owners.

11     Q.  What is a policy owner?

12     A.  A policy owner is the person who is responsible for

13  review and suggested edits to a policy.  Generally, it's the

14  teammate with the technical knowledge or the subject matter

15  expert to help enforce the policy.

16     Q.  Go over that again.  I want to write it down and I

17  want to use the same words when I ask these questions, okay.

18  If you don't mind, I realize I asked you this again.  But

19  I'm going to ask you to repeat it one more time.

20         So a policy owner, what's the significance of that

21  again?

22         MS. PETERSEN:  Objection, asked and answered.

23         Go ahead.

24     A.  Is a teammate who has the technical knowledge for

25  the subject matter expert over the policy area.

00051

1   Q.  Is it the co-owner?

2   A.  Co-owner would be a teammate who would assist in the

3  updating of the policy because they have working knowledge

4  and can contribute to the policy.

5   Q.  Okay.  Who is the owner of the Disaster Relief

6  Policy?

7   A.  I am the current owner of the Disaster Relief

8  Policy.

9   Q.  How long have you been the owner of the Disaster

10  Relief Policy?

11   A.  I don't know when I was deemed the owner of the

12  policy.

13   Q.  All right.  Well, were you deemed the owner of the

14  policy when it was adopted in 2017?

15   A.  I don't recall.

16   Q.  Well, if I wanted to know that, how would I find

17  out?

18   A.  You would need to inquire with the people services

19  team that tracks the owners of policies.

20   Q.  How does the people services track the owners of the

21  policies?

22   A.  I'm not aware of their process for tracking.

23   Q.  Well, being the owner of the Disaster Relief Policy,

24  do you provide support services in case someone has a

25  question about the Disaster Relief Policy?

00052

1   A.  Yes.  I do answer questions if a teammate inquires

2   about the policy.

3   Q.  How will a teammate know that you're the owner of

4   the policy to make the inquiry?

5   A.  They do not, so I have educated my teams on the

6   Disaster Relief Policy.  And if there's any questions

7   they're not able to answer, then they come to me.

8   Q.  Well, here's my question, the organizations that

9   hire 56,000 people roughly in the United States and they

10   find their way back to DaVita, how are those 56,000 people

11   supposed to know who to ask if they have a question about

12   the Disaster Relief Policy?

13   A.  They utilize their resources; one of which is the

14   payroll service center to have policy questions answered or

15   the teammate support center, which is part of people

16   services --

17   Q.  So there's teammate -- I'm sorry.  I stepped on you.

18   Finish the last part, please.

19   A.  I said to receive guidance.

20   Q.  Okay.  So the teammate support center, is there why

21   the teammates go to ask questions and they just send

22   somebody a an email or something like that?

23   A.  The teammate support center answers certain

24   questions that a teammate may have about policy regarding

25   entries in our HCM system; they answer a wide variety of

00053

1  teammate-related questions.

2    Q.  Well, if someone asks a question about the Disaster

3  Relief Policy, will the teammate support center then relay

4  that question to you?

5    A.  If they are not able to answer it on their own or

6  they may refer them to teammate relations or our wage an

7  hour team.

8    Q.  Who's the wage an hour team?

9    A.  Shawn Zuckerman is part of the wage an hour team.

10   Q.  Okay, part.  Who is the rest of it?

11   A.  The teammates on that team have changed over a

12  period of time.  Are you asking me who is on that team

13  presently or in the past?

14   Q.  Who is on it presently?

15   A.  I'm sorry.  I didn't hear your response.

16   Q.  Who is on it presently?

17   A.  Shawn Zuckerman and Liliana Pascal.

18   Q.  So you indicated that you have a service center for

19  questions under your directorship, right?

20   A.  Yes.

21   Q.  What is that service center for questions called?

22   A.  Can you repeat the question?

23   Q.  What is that service center for questions called?

24   A.  Am I hearing the question correctly?  What is the

25  service center questions called?

00054

1   Q.  I wrote down your answer right here and circled it

2  in red.  I asked you, one of the things that you said is

3  that you have a service center for questions; that's how you

4  described it.

5   A.  Yes.

6   Q.  You are very, very careful with your words, so I'm

7  trying to accommodate you and try to use the words that you

8  use to describe things.  So the way you described it is that

9  you have a service center for questions under your

10  directorship -- I used that word, directorship.  My question

11  to you is this, what is that service center for questions

12  called?

13   A.  Payroll service center.

14   Q.  Have you ever had questions about the Disaster

15  Relief Policy directed to you by teammates through the

16  payroll service center?

17   A.  I can't say for one hundred percent certainty that a

18  teammate question has come to me through the service center.

19  I would have to do look at our call log.

20   Q.  What do you think?

21    MS. PETERSEN:  Objection, calls for speculation.

22    MR. JONES:  I'm not asking her to speculate.  We're

23  think people here.

24   Q.  I just want to know what do you think.  Do you think

25  you received some of those calls or not?

00055

1    A. I do not personally receive a call, no.

2    Q. And see, that's where you're very careful with your

3   words.  I'm going to be very careful.  As the director of

4   payroll under whose directorship falls the payroll services

5   center, do you think you got questions from teammates about

6   the Disaster Relief Policy?  You being --

7    A. Probably.

8    Q. Probably, okay.  Why do you think that?

9    A. If one of the service center representatives was not

10  able to address the teammate's question, then it could have

11  been escalated to me for review.

12   Q. Do you remember any such escalation?

13   A. Not directly, no.

14   Q. What do you mean not directly?  We can only remember

15  things directly because we're dealing with our own memory so

16  that confuses me.  Would you mind saying more about that?

17   A. I don't recall.

18   Q. Now tell me about this call log.

19   A. All calls that come into the payroll service center

20  are logged utilizing a system called Service Now.

21   Q. Say again.  Service what?

22   A. Service Now, N-O-W.

23   Q. Okay.  And what happens to them when they log in?

24   A. A ticket is created on behalf of the teammate.  If

25  the service center representative is able to address the

00056

1  teammate's question or concern, it is then closed.  If

2  they're not able to resolve it, then the ticket is forwarded

3  to the appropriate team or teammate to address the question

4  or issue.

5     Q.  Okay.  So if you wanted to know how many -- or if

6  any teammates directed the questions towards the Disaster

7  Relief Policy in the year 2020, how would you go and find

8  that information?

9     A.  One I would have to determine if we have a category

10  within service now that captures that specific policy as a

11  category.  If not, then we would have to look through the

12  Service Now ticket headers, comments to determine if the

13  question is related to the Disaster Relief Policy.

14     Q.  Tell me about these tickets.  When you say tickets,

15  I think of speeding tickets, which is the bane of my

16  existence, and I get that on paper.  Are your tickets on

17  paper?

18     A.  Are tickets are stored electronically within the

19  service now application.

20     Q.  Are they searchable?

21     A.  Yes.

22     Q.  Who has authority to change the Disaster Relief

23  Policy?

24     A.  As policy owner, I have that ability along with

25  individuals in people services such as the chief people

00057

1  officer, wage an hour team, our legal team.

2     Q.  Okay.  Along with individuals in people services,

3  right; is that what you said?

4     A.  Yes.  I gave an example of a teammate within -- or

5  the chief people officer.  And I also gave an example of the

6  team such as the wage an hour team that make changes to the

7  policy.

8     Q.  Give me a name who.  Is the chief people officer?

9     A.  Our present chief people officer is Kenny Gardner.

10    Q.  Can Mr. Gardner change the Disaster Relief Policy

11  without consulting with you?

12       MS. PETERSEN:  Objection, misstates facts not in

13  evidence.  Actually, misstates prior testimony to the extent

14  that's what it is.

15       MR. JONES:  Hang on.  I'm older than that, all

16  right.  That is not an objection.  That's an instruction to

17  the witness.  I asked her a question.  I didn't misstate her

18  testimony.  We haven't heard her testimony, all right.  I

19  would appreciate it if you would please stop doing that.

20  All right?

21       Now, Madam Court reporter, would you read the

22  question back, please.

23       MS. PETERSEN:  One moment, please, before you do

24  that, Christina, my apologizes.  I misstated the objection

25  that I wanted to make with that last comment.  I apologize.

00058

1  What I was trying to get out was that it assumes facts not

2  in evidence.  I think I garbled my objection but that is my

3  objection.

4       MR. JONES:  How could a question to a witness assume

5  facts?

6       MS. PETERSEN:  My objection stands.

7       MR. JONES:  I didn't ask her if she stopped beating

8  your husband, okay.

9       Read the question back, please.

10      MS. PETERSEN:  Can we take a break, please, so we

11  can have a conversation off the record.

12      MR. JONES:  We can.  Why don't you call me on cell

13  phone?

14      MS. PETERSEN:  No, I'm not going to call you on your

15  cell phone.  We can just do this briefly right here.

16      (Discussion off the record.)

17      MS. PETERSEN:  I'm just wanting the record to

18  reflect that while we were off the record immediately

19  preceding my objection was reread and I now understand the

20  phrasing of the question so I withdraw my objection.

21      MR. JONES:  Thank you.

22      Madam Court Reporter, would you read the question

23  back, please.

24      (Reporter read back as requested.)

25      A.  Yes.

00059

1    Q.  Has anyone ever changed the Disaster Relief Policy

2  without consulting with you?

3    A.  No.

4    Q.  Were you consulted when the latest change to the

5  Disaster Relief Policy -- no.  Bad question.  I will

6  withdraw that.

7        Were you consulted when the paragraph found in the

8  current Disaster Relief Policy in that paragraph titled [*]

9  COVID-19 Crisis, were you consulted before that paragraph

10  was put into the Disaster Relief Policy?

11    A.  Yes.

12    Q.  Okay.  Whose idea was it to make that change, to add

13  the COVID-19 Crisis paragraph?

14    A.  I do not know the specific teammate who requested

15  the update.

16    Q.  All right.  Who consulted with you regarding that

17  update that you called it?

18    A.  I don't recall the teammate.

19    Q.  Male or female?

20    A.  I don't recall.  It would have been via email.

21    Q.  Do you still have that email?

22    A.  I may.

23    Q.  What's the retention policy for emails?

24    A.  It depends on the context of said email.

25    Q.  Say more about that.

00060

1    A.  Our village record retention policy, there is a

2  schedule for which we are to follow based on the contents of

3  the email.  We're not required to keep drafts of documents.

4    Q.  Of documents or emails?

5    A.  Emails which may contain documents.

6    Q.  You're not required to keep them?  Are you allowed

7  to keep drafts of documents?

8    A.  Yes, we are allowed.

9    Q.  Did you receive a draft of the COVID-19 Crisis

10  update to the Disaster Relief Policy?

11    A.  Yes, I believe so.

12    Q.  Okay.  Did you keep that draft?

13    A.  I don't know without looking in my email.

14    Q.  Well, how many drafts do you recall receiving of the

15  COVID-19 crisis paragraph that changed the Disaster Relief

16  Policy?

17    A.  I don't recall the number of drafts I may have been

18  emailed.

19    Q.  Do you recall whether it was more than one draft?

20    A.  No, I do not recall.

21    Q.  Do you recall whether it was a hundred drafts?

22    MS. PETERSEN:  Asked and answered.

23    Q.  I didn't ask about a hundred.  Do you recall whether

24  it was a hundred drafts?

25    A.  No, I do not recall it was a hundred drafts.

00061

1    Q.  Do you think that it was a hundred drafts?

2    A.  No, that would be excessive to me.

3    Q.  Do you think it was one draft?

4    A.  At least one.

5    Q.  It could have been more, true?

6    A.  It could have been more, yes.

7    Q.  Did you have any input into the language of the

8    update called COVID-19 Crisis?

9    A.  No.

10    Q.  Not your verbiage, not your feedback; is that true?

11    A.  Not my verbiage.  And if I provided feedback, I

12    didn't provide changes.

13    Q.  I'm sorry.  I'll just take a second.  So do you know

14    why the COVID-19 Crisis paragraph was added to the Disaster

15    Relief Policy?

16        MS. PETERSEN:  I'm going to insert a comment here

17    for the witness that I'm instructing you not to answer to

18    the extent that that would require you to disclose

19    attorney-client privileged communications.

20    Q.  Let me just make this real clear what I'm asking.

21    I'm asking you if you know why the paragraph known as

22    COVID-19 Crisis was added to the Disaster Relief Policy.

23    I'm not asking you the substance.  I'm asking you if you

24    know.

25    A.  My understanding was to provide clarity to

00062

1  teammates.

2     Q.  Where did you gain that understanding?

3     A.  Based on the communication that was distributed to

4  teammates.

5        MR. JONES:  Christina, may we put up Exhibit 7,

6  please.  [*]

7        [Shares screen]

8     Q.  Ms. Prockish, You'll see on the bottom right-hand

9  corner of what we're going to attach to your deposition as

10  Exhibit 7.  This is a 3-page document that has been

11  previously marked as TRC000152 through 154.  This was

12  produced to us by TRC, Total Renal Care.  Have you ever seen

13  this document before?

14    A.  Yes.

15    Q.  And help me understand how you came to see this

16  document.

17    A.  This is the document that was distributed to

18  teammates village wide providing clarity on the Disaster

19  Relief Policy.

20    Q.  Do you see this document before it was disseminated

21  village wide?

22    A.  No.

23        MR. JONES:  Go to 153, please, Christina.

24        MS. HENRY:  Okay.

25    Q.  This is TRC000153.  Have you seen this document

00063

1  before?

2     A.  That document appears to be the updated verbiage

3  added to the teammate policy 4.12.

4     Q.  Did you see this document before it was distributed

5  village wide?

6     A.  No.

7     Q.  Do you see any language in this document before it

8  was distributed village wide?

9     A.  The information -- no.

10    Q.  Next page, please.  Same questions as before.  Are

11  you familiar with this document?

12    A.  That appears to be the latter half of policy 4.12 .

13    Q.  Did you see any of the language in this latter half

14  of Policy 4.12 before it was disseminated village wide?

15    A.  In this communication, no.

16    Q.  Did you see it in any communication before it was

17  disseminated village wide?

18    A.  No.

19    Q.  Well, let's go back to this Kenny Gardner.  You told

20  me that Mr. Kenny Gardner has the authority to change the

21  Disaster Relief Policy without your input or without your

22  permission; is that true?

23    A.  To my knowledge, yes.

24    Q.  Why did you qualify that to your knowledge?  I'm

25  curious?

00064

1    A. No particular reason.

2    Q. Okay.  Now, who else besides Ken Gardner may change

3  the Disaster Relief Policy without your input?

4    A. Our legal team.

5    Q. Who is that?

6    A. That is a group of attorneys that support DaVita.

7    Q. Do you got any names?

8    A. Colleen Ludwig, who is on this call; Dale Boland;

9  Caitlin Moughon; Ashley McAteer; [Brian Sarmey].

10    Q. Tell me how the process works.  Let's go back to the

11  original adoption of the Disaster Relief Policy.  Once in

12  2017, once that policy went through all the vetting, etc.,

13  who has the final word on whether the Disaster Relief Policy

14  would be adopted by DaVita?

15    A. I would have to say our legal team.  I don't know if

16  there are other teammates that sit on a potential committee

17  or not.  I don't know if it's one group of individuals or if

18  it's a collaborative effort.

19    Q. It wouldn't be you, right?

20    A. No, it would not have been me.

21    Q. So let's go back to again about you were consulted

22  about the changes to the Disaster Relief Policy that added

23  the section titled COVID-19 Crisis.  Was that your previous

24  testimony?  Am I remembering it correctly?

25    A. Yes.

00065

1    Q.  And did you make any suggested changes to the

2   COVID-19 Crisis paragraph?

3    A.  Not that I recall.

4    Q.  And, again, you don't recall who consulted you on

5   these changes; is that true?

6    A.  Correct.

7    Q.  And you don't know who drafted the COVID-19 Crisis

8   paragraph; is that true?

9    A.  True.

10    Q.  If I wanted to know -- or a better question is if

11   you wanted to know, where would you start to find out?

12    A.  I would have to --

13       MS. PETERSEN:  Sorry.  I didn't hear the first part

14   of that question.

15    Q.  I'll rephrase it.  I'll move a little closer to the

16   microphone.

17       If you wanted to know who was responsible for

18   drafting the paragraph known as COVID-19 Crisis that

19   ultimately was updated into the Disaster Relief Policy, if

20   you wanted to know who the author was, where would you go to

21   find out?  How would you do it?

22    A.  I would start with Alejandro.

23    Q.  Okay.  Why would he know?

24    A.  He is my contact for policies when they're updated.

25    Q.  What's his title again?

00066

1    A.  I don't know Alejandro's title.

2    Q.  Is he in the same building as you?

3    A.  No, sir.

4    Q.  Do you know where he's located?

5    A.  I presume he's located in Denver.

6    Q.  Does the pay versions of the Disaster Relief Policy,

7    have they ever been implemented to your knowledge?

8    A.  Would you please repeat the question?  I didn't hear

9    the first part clearly.

10    Q.  Can you hear me better now?

11    A.  Thank you.

12    Q.  To your knowledge, has the pay versions of the

13    Disaster Relief Policy ever been implemented?

14    A.  I don't understand the question.  I apologize.

15    Q.  That's okay.  That's what I want you to do.

16        MR. JONES:  Christina, could we put Exhibit 5 back

17    up, please.

18    [Shares screen]

19    Q.  Okay.  We see --

20        MR. JONES:  Let's go to page 50, please.

21    Q.  This is the Disaster Relief Policy and this is the

22    one -- not to confuse you -- this is the policy from January

23    before the paragraph titled COVID-19 Crisis was put into the

24    policy, okay.  Do you follow me?

25    A.  Following.

00067

1    Q.  All right.  And it says here, [*] pay practices for

2   non-exempt teammates.  Do you see that?

3    A.  Yes.

4    Q.  Has that changed since this policy was implemented

5   in 2017 other than the paragraph that's highlighted?

6    A.  Can I ask the question?

7    Q.  I'm not trying to trick you.  I realize that above

8   it now there's another paragraph and that's why I'm asking

9   you and made a point of making reference to the date of this

10  policy.  So I'm not trying to trick you, okay.  I realize

11  that it doesn't have the COVID-19 Crisis paragraph in it.

12  That's your concern, I think.

13      But my question --

14   A.  So --

15   Q.  Certainly you may ask a question.  I didn't mean to

16  avoid that?

17   A.  When you ask if there's a change, if there is a

18  punctuation change or a word change, I have not compared

19  this document against the previous documents to one hundred

20  percent say that a change has not been made.

21   Q.  Somebody might have tidied it up a little bit.  I

22  understand.  Thank you.  I tell you that I appreciate that

23  more than I can say.  I'll ask you a better question that I

24  think you'll be more comfortable with, okay.

25      When you look at pay practices for non-exempt

00068

1  teammates has there been any substantive change to this

2  policy, the portion of the policy since it was implemented

3  in 2017 other than the paragraph that is highlighted on

4  Exhibit 5?

5    A.  No.

6    Q.  Thank you.  Now, who is it that has the

7  responsibility of interpreting the Disaster Relief Policy?

8    A.  Again, it's a collaborative effort amongst teams;

9  payroll, wage an hour, and our legal team.

10    Q.  To interpret it?

11    A.  Yes.

12    Q.  Okay.  So if someone has a question about the

13  Disaster Relief Policy and they direct it to your

14  directorship, do you consult with legal on every question?

15    A.  Not on every question, no.

16    Q.  Can you ever remember having a question placed to

17  you about the interpretation of the Disaster Relief Policy

18  where you consulted with legal before answering that

19  question?

20    A.  In the four years I can't say whether I have or not.

21    Q.  Okay.  Why did you -- well, what happened four years

22  ago?  You've been there six-and-a-half years.  Did you gain

23  ownership of this policy four years ago?

24    A.  This policy was drafted and implemented in 2017.

25    Q.  Thank you.  Now the -- was there any type of

00069

1  Disaster Relief Policy before Section 4.12, the Disaster

2  Relief Policy, was implemented in 2017?

3     A.  There was not a formal policy in our teammates

4  policy referencing disaster relief.  As I previously

5  mentioned, there was a local pay practice.

6     Q.  Okay.  Do you know whether it was ever determined

7  whether the Disaster Relief Policy applied to the COVID-19

8  crisis -- and I'm talking about at any period before the

9  paragraph called COVID-19 Crisis was inserted into the

10  Disaster Relief Policy?

11     A.  Would you please ask that question again, so I'm

12  clear.

13     Q.  I'm talking about in the -- I'm talking about before

14  the paragraph titled COVID-19 Crisis was added to the

15  Disaster Relief Policy or, as you say, to clarify?  Do you

16  know if at any time prior to the insertion of that paragraph

17  into the Disaster Relief Policy, had anyone at DaVita made a

18  determination that the Disaster Relief Policy did not apply

19  to the COVID-19 emergency?

20     A.  Given that an emergency time frame was not

21  designated by local leadership or the governance council,

22  teammates were not paid under the Disaster Relief Policy as

23  they were --

24     Q.  You didn't answer my question.  I'm going to ask it

25  again.

00070

1     MR. JONES:  Madam Court Reporter, would you read it

2  back, please?

3     MS. PETERSEN:  The witness was still speaking.  She

4  had not finished her answer.

5   Q.  Did I cut you off?  Please finish.  I didn't mean to

6  do that.

7   A.  As teammates were able to perform their regular

8  duties.

9   Q.  Okay.  So who told you that?

10   A.  Who told me what?

11   Q.  That the policy didn't apply because teammates were

12  not prevented from doing their regular duties?

13   A.  The crux of this policy determined how teammates are

14  paid and so therefore when an emergency time frame is not

15  designated by local leadership or the governance committee,

16  the premium pay does not apply.

17   Q.  Okay.  That's your understanding, right?  Or is that

18  your interpretation of the words of the Disaster Relief

19  Policy or is that someone else's interpretation that you

20  just gave me?

21   A.  That is mine.  My interpretation and my

22  understanding of the policy that in order to be paid a

23  premium, an emergency time frame must be designated.

24   Q.  Designated?

25   A.  Yes.

00071

1    Q.  Okay.  Where do you get that out of the policy?  Let

2   me stop you right there.  Is there somebody in your office

3   with you?

4    A.  Somebody walked by.  I have windows and somebody

5   waved to me as they were leaving for the day.

6    Q.  All right.  Is it part of your responsibility for

7   you to interpret the emergency relief policy -- excuse me --

8   the Disaster Relief Policy; is that true?

9    A.  Interpret and apply, yes.

10    Q.  Now, the reading of this policy that you just told

11   me, you said that premium paid is not paid unless local

12   leadership or the Disaster Governance Council designates an

13   emergency time frame.  Do you remember testifying to that?

14    A.  Yes.

15    Q.  My question is, where did you find that in the

16   policy because I haven't found it anywhere.  And I'm

17   referring to the policy before, the insertion of the

18   paragraph COVID-19 Crisis?  Can you take me to it?

19     MS. HENRY: do you want me to put the other exhibit

20   up that has that verbiage?

21     MR. JONES:  No.  I asked her to take me to it.

22     MS. HENRY:  Okay.

23    Q.  Do you see it on the page that's in front of you,

24   TRC00050?  Do you see it there, the language that you rely

25   upon to reach that conclusion?

00072

1   A. Yes.

2   Q. Read it to me.

3   A. [*] The emergency time frame and affected facility

4   or business office will be identified on a case-by-case

5   basis by local leadership, DVD, GVP and PSD and the Disaster

6   Relief Governance Council, dependent on the severity of the

7   disaster and location.

8   Q. But that's not what you told me, was it?  You told

9   me that premium pay is not paid unless local leadership and

10  the Disaster Governance Council designates an emergency time

11  frame.  That's not what the policy says, is it?  It says [*]

12  identify an emergency time frame, true?

13  A. The verbiage does indicate identified.  I chose to

14  use the term designated as opposed to identify.

15  Q. Why did you chose to use the term designated as

16  opposed the word identify?

17  A. Designated comes more naturally to me than

18  identified in a sentence.

19  Q. Because it indicates that the local leadership and

20  the Disaster Governance Council has chosen a time frame, an

21  emergency time frame, right?

22  A. In order for the disaster relief, to apply an

23  emergency time frame must be identified.

24  Q. Okay.  Well, the reason I bring that up, you're

25  making me be very careful with my words.  It's okay.  I'm

00073

1  not picking on you.  This is an important area, all right.

2       So your understanding is that neither local

3  leadership nor the Disaster Governance Council identified a

4  emergency time frame thus no premium pay was due, correct?

5    A.  Correct.

6    Q.  Okay.  How is it that when local leadership and the

7  Disaster Governance Council identifies an emergency time

8  frame, how is that identification transmitted to you -- and

9  by you, I don't mean you personally; but I'm referring to

10  you in your directorship?

11    A.  We provide our people services director or manager

12  with a template to complete, which is in Excel.  It

13  identifies the applicable site and the emergency time frame

14  that has been designated for that premium pay.

15    Q.  Say that again.  You provide a template for who to

16  complete?

17    A.  For the local leaders to complete, it may be -- the

18  data may be combined into one spreadsheet by one particular

19  individual rather than having the GDP or DVP or PSD --

20    Q.  I don't know what those letters mean, ma'am.  I'm

21  sorry.

22       MS. PETERSEN:  Please let her finish.

23    A.  We receive an -- I'll start from the beginning --

24  Excel template completed and approved by the division vice

25  president or group vice president of the sites an emergency

00074

1   time frame designated for premium pay.

2      Q.  Sites and time frame, right?

3      A.  Begin and end date.

4      Q.  Begin and end date, okay.  Now who provides the

5   template to the local leaders?

6      A.  I provide the template to the people services

7   manager or director that is working in that area and then it

8   is provided to local leaders.

9      Q.  Okay.  Well, I mean do they have this available or

10  someone calls you up and says, hey, we have got an emergency

11  and we need the template?  How does it work?

12     A.  The people services directors and managers will

13  reach out and ask for the template.  Generally in a given

14  situation where there is a natural disaster, we are on calls

15  with the DaVita emergency management and people services on

16  that call as well.  And so that template is discussed.  If

17  an emergency time frame is to be designated, then they would

18  complete it.

19     Q.  What is the template?  What does it look like?

20     A.  The Excel template allowed the field to communicate

21  with payroll which sites are eligible for the disaster pay

22  and for what date range.

23     Q.  So how does the Disaster Governance Council fit into

24  this?

25     A.  Since I do not sit on the Disaster Governance

00075

1  Council, I presume that they're working closely with a local

2  leadership on reviewing and determining whether or not an

3  emergency time frame designation is appropriate.

4     Q.  Well, how do you know that the Disaster Governance

5  Council has, if you will, signed off on their identification

6  of the emergency time frame?

7     A.  I do not have documentation that they have signed

8  off on the emergency time frame.

9     Q.  Does the Disaster Governance Council exist?

10    A.  Yes.

11    Q.  Who is on it?

12    A.  I don't know the particular teammate.  However, I do

13  know that they recently met due to the Winter Storm Uri.

14    Q.  How do you know that?

15    A.  I was advised that they met.

16    Q.  Who advised that?

17    A.  I don't recall the particular teammate.  I would

18  have to review my email.

19    Q.  Have you ever known anybody who sat on the Disaster

20  Governance Council?

21    A.  Yes.

22    Q.  Who?

23    A.  Caitlin Moughon.

24    Q.  Spell the last name.

25    A.  I'm going to butcher this.  M-O-U-G-H-O-N, I

00076

1  believe.

2     Q.  Who is she?

3     A.  Vice president and general counsel over labor

4  employment.

5     Q.  So you don't really have any authority to interpret

6  the Disaster Relief Policy, do you?

7     A.  Yes, I believe I do.

8     Q.  Okay.  Can you determine when the Disaster Relief

9  Policy will be implemented?

10    A.  I do not have a final say on when it is implemented.

11    Q.  Do you have any say in when it is implemented?

12    A.  It is up to local leadership and the council when

13  determining if teammates are eligible for disaster premium

14  pay under the policy.

15    Q.  Well, actually it doesn't say that, does it?  The

16  policy says that [*] local leadership and the Disaster

17  Governance Council will identify the emergency time frame,

18  right?  Right?

19    A.  Yes, they're responsible for determining the time

20  frame, emergency time frame.

21    Q.  Determining or identifying?

22    A.  Identify.

23    Q.  And then if we go, for instance, to the next

24  designation [*] pay practices and non-exempt teammates, it

25  says that, for example, [*] if a facility or business office

00077

1  opens late or closes early due to a declared emergency or

2  natural disaster as defined above, the teammates will be

3  notified promptly of the approved opening and closing times.

4  Non-exempt teammates to arrive or leave at the approved

5  opening and close time, will be paid their hourly rate of

6  pay for their regularly scheduled hours unless state law

7  provides otherwise.  It's not permissible.  It says "will";

8  isn't that right?

9     A.  Yes, the policy does indicate will be paid their

10  hourly rate of pay per their regularly scheduled hours

11  unless state law provides otherwise.

12     Q.  And the policy also states, if we look on the right

13  hand column, the first full paragraph, [*] if a designated

14  facility or business office is open during the emergency

15  time frame, teammates who report to their location and work

16  their scheduled hours will be paid premium paid for all

17  hours worked, true?

18     A.  True.

19     Q.  Okay.

20     MR. JONES:  Let's take a short break, please.

21     (Brief recess.)

22     Q.  Ms. Prockish, I've been listening very carefully to

23  your testimony and correct me if I have a misunderstanding.

24  It is my understanding of your testimony that you said that

25  the Disaster Relief Policy did not apply to the COVID-19

00078

1  crisis for two basic reasons; number one, it did not prevent

2  teammates from performing their regular duties; number two,

3  there was no emergency time frame identified by local

4  leadership and the Disaster Governance Council.  Did I say

5  that correctly?

6     A.  Yes, you did represent that correctly.

7     Q.  Now, I would like to go to the first leg of that

8  because I see it as two things.  The first thing is this, it

9  said that the Disaster Relief Policy only applies if during

10  an emergency time frame when an emergency or natural

11  disaster prevents teammates from performing their regular

12  duties.  Let's talk about that, okay.

13        Is it your testimony -- I'm not trying to put words

14  in your mouth; I'm asking you a question.  Is it your

15  testimony that the Disaster Relief Policy provides pay

16  continuance during an emergency time frame when a declared

17  emergency or natural disaster prevents all teammates from

18  performing their regular duties; and by all teammates, I

19  mean all teammates within the declared emergency area?

20     A.  Would you please repeat that?

21     Q.  Sure.  I'm just drilling down a little on what you

22  said earlier.  You said that the COVID-19 emergency didn't

23  prevent teammates from performing their regular duties,

24  okay.  Does that mean in order for the Disaster Relief

25  Policy to kick in, does the emergency have to stop all

00079

1  teammates from doing their regular duties within the

2  emergency or disaster area or just some of it?

3    A.  It does not have to be all teammates.  It can be

4  some teammates within that area.  As the policy alludes to,

5  it is based on a case-by-case basis.  Local leadership will

6  determine when it applies and to which locations and which

7  teammates.

8    Q.  But the policy doesn't say that, does it?  It

9  doesn't say that local leadership will determine which

10  locations it will apply, does it?  It says that the local

11  leadership and the Disaster Governance Council will identify

12  the emergency time frame.  That's what it says, doesn't it?

13    A.  If you wouldn't mine pulling up the policy, I can

14  testify to it.

15      MR. JONES:  Christina, would you do that?  I'm

16  looking at page TRC 00050.

17    [Shares screen] [**]

18  A.  (Witness reviews document.)

19  Q.  So the policy doesn't say what you just said, does

20  it?

21  A.  Not word for word, no, it does not.

22  Q.  Okay.

23  A.  But it does indicate that local leadership will

24  determine the time frame in which the disaster pay applies

25  depending on the severity of the disaster and the location.

00080

1   Q.  Do you see, there you go again.  You used the term

2   instead of identify.  Why is that?

3   A.  That is my normal course of vocabulary.  As

4   indicated before, identify doesn't come naturally to me to

5   use.

6   Q.  Well, that's why I'd asked you earlier who wrote

7   this.  And I can't seem to figure out -- or somebody won't

8   tell me anyway.  I've asked -- either me and my colleagues

9   asked everyone who we've deposed who wrote this, so we can

10  go in an ask them whey they use these words.  But you will

11  agree with me, will you not, that words mean things, right?

12  A.  Yes.

13  Q.  And you will agree with me that determine and

14  identify are different words, true?

15  A.  Yes, they are two different words with similar

16  meaning.

17  Q.  No.  They have different meanings.

18  A.  I believe that they have similar meanings and so

19  I've been utilizing designated or determined.

20  Q.  Have you ever picked up your dictionary and looked

21  at them when you attempted to interpret this policy?

22      THE WITNESS:  Chelsea, you're on mute.

23      MS. PETERSEN:  I was inserting an objection,

24  argumentative.

25      But you can answer.

00081

1      MR. JONES:  I'm not arguing.

2      A.  No, I did not pick up a dictionary.

3      Q.  Have you ever utilized a dictionary when

4  interpreting this policy to look at the words to try to --

5      A.  No, I did not.

6      Q.  Okay.  Now, if we look at the policy, the policy

7  provides that [*] if a facility is closed due to a declared

8  emergency or natural disaster as defined above, that

9  non-exempt teammates will be paid for regularly scheduled

10  hours at their base rate due to a designated emergency time

11  frame; is that right?

12      A.  Yes, that's what the verbiage reads.

13      Q.  Okay.  But that's the only situation where a

14  teammate will be paid under the emergency, the Disaster

15  Relief Policy?  Did they have to -- can I start over.

16          That's the only occasion in which a teammate will be

17  paid for not showing up at work under the Disaster Relief

18  Policy; that is if the facility which that teammate works is

19  closed because of the disaster, right?

20      A.  Can you repeat the question?

21      Q.  Sure.  Let me go at it a different way.

22          The pay practices for non-exempt teammates says that

23  [*] if your facility where the teammate works is open during

24  the emergency time frame and the teammate shows up for their

25  scheduled hours, they'll be paid premium time, right?

00082

1    A.  They will be paid premium hours while working during

2    the designated emergency time frame.

3    Q.  So that's a "yes"?

4    A.  Yes.

5    Q.  The pay practices for non-exempt teammates also

6    provide that [*] if the facility is open late or open early

7    and the teammates show up for their scheduled work hours,

8    they will be paid premium time, right?

9    A.  Can you say that one more time?

10   Q.  Sure.  The pay practices for non-exempt teammates

11   says, [*] if a facility or business office opens late or

12   closes early due to a declared emergency or natural

13   disaster, the teammates are going to be notified of the

14   approved opening and closing times.  Do you see that?

15   A.  Yes.

16   MS. PETERSEN:  The document speaks to itself.  And

17   to the extent that you were reading that, it was not

18   complete.  I'm not sure if you want to rephrase.

19   Q.  Okay.  Now, it says [*] also non-exempt teammates

20   who arrive or leave at that approved opening and closing

21   time will be paid their hourly rate of pay for their

22   regularly scheduled hours unless state law provides

23   otherwise.  Do you see that?

24   A.  Yes.

25   Q.  [*] Any non-exempt teammate who arrives at work

00083

1  after the approved opening and closing and leaves work

2  before the approved opening and closing time will be paid

3  only for the time actually worked, in which case the

4  teammate should utilize PTO in accordance with the regular

5  PTO policy.  Did I read that correctly?

6      A.  I think you skipped over a portion of it.  But if

7  it's --

8      Q.  I'll read it again, okay.  That's why I was trying

9  to paraphrase it but it draws an objection, so let me read

10  it.

11      It says, basically -- it says [*] If a facility or

12  business office opens late or closes early due to a declared

13  emergency or natural disaster as defined above, teammates

14  will be notified promptly of the approved opening and

15  closing time.  So this anticipates there may be situations

16  where a facility will have to change its regular hours for

17  teammates.  Is that how you read it?

18      A.  Yes.

19      Q.  Then it says that [*] non-exempt teammates who

20  arrive or leave at the approved opening or closing time will

21  be paid their regularly hourly rate of pay for their

22  regularly scheduled hours unless state law provides

23  otherwise.  They don't get premium pay even if they change

24  their hours, right?

25      A.  Correct.

00084

1   Q.  And [*] any non-exempt teammate who arrives at work

2  after the approved opening time or leaves work before the

3  approved closing time, will be paid only for the time

4  actually worked in which case the teammate could utilize PTO

5  in accordance with the regular PTO policy.  Did I read

6  correctly?

7   A.  Yes.

8   Q.  So if they changed open late, open early, open late,

9  changed the hours, the teammate works those hours, they

10  don't get premium time, correct?  Am I reading that right?

11   A.  They will not get premium pay under the policy;

12  that's correct.

13   Q.  Even if their hours changed because they opened late

14  or they closed early, if they don't show up for those

15  scheduled irregular hours, they're not going to get paid at

16  all.  They've got to use their personal time off, right?

17   A.  Correct.  They're paid only for the hours worked.

18   Q.  But if a designated facility or business office is

19  open during the emergency time frame, the teammates who

20  report to their location and work their scheduled hours will

21  be paid premium time for all hours worked; is that the

22  policy?

23   A.  That is what the policy states, yes.

24   Q.  So it is only those facilities that are open during

25  an emergency time frame and when the employees show up at

00085

1  those open facilities and work their regularly scheduled

2  hours, they get premium time.  Am I reading the policy

3  correctly?

4    A.  When they work their scheduled hours, yes, they will

5  be paid premium time.

6    Q.  So this policy does contemplate that there will be

7  facilities within an area of declared emergency within an

8  emergency time frame that will be operating the scheduled

9  hours and will be open.  And those employees who show up and

10  work their scheduled hours, will be paid premium time, true?

11    A.  May I ask a clarifying question?

12    Q.  Certainly.

13    A.  In your question you stated declared emergency.

14    Q.  Right.  If you look back, let's go to 000049 -- the

15  previous page.  Do you see right here under Disaster Relief

16  Policy?

17    A.  Yes.

18    Q.  It says, [*] The Disaster Relief Policy provides for

19  pay continuance during an emergency time frame when a

20  declared emergency or a natural disaster prevents teammates

21  from performing their regular duties.  Did I read that

22  correctly?

23    A.  Yes.

24    Q.  Do you understand what I mean by declared emergency?

25    A.  By reading the remaining part of the policy, which

00086

1  defines a declared emergency or natural disaster, it helped

2  clarify.

3     Q.  But if it was a declared emergency or natural

4  disaster, according to the policy, shall be proclaimed

5  either by the President of the United States, a state

6  governor, or other elected official, or of local leadership,

7  DVP/Palmer deems it appropriate.  Those are three situations

8  where a declared emergency or natural disaster can be

9  proclaimed, right?

10   A.  Yes.

11   Q.  [*] So if in an area where there's been declared

12  emergency during a time frame that is the emergency time

13  frame, even if a facility is not closed, even if the

14  employees work their scheduled hours, their regularly

15  scheduled hours, they'll still receive premium pay, true?

16   A.  Please repeat the question.

17     MR. JONES:  Read it back, please.

18     (Reporter read back as requested.)

19   A.  Would you please go to the next page of the policy?

20  [*] Even if there has been a declared emergency or a natural

21  disaster, an emergency time frame must be identified by

22  local leadership and the governance council in order to

23  provide premium pay to those teammates working at an open

24  facility during their scheduled hours.  The determination is

25  dependent upon the severity of the disaster and the

00087

1  location.

2    Q.  I already read that.

3      MR. JONES:  Read my question again, please.

4      (Reporter read back as requested.)

5    A.  Yes, those factors must be present in order for

6  teammates to get the premium pay.

7    Q.  Thank you.

8      MR. JONES:  Just one second.  I'm going to check

9  my...

10    Q.  So during a declared emergency with an emergency

11  time frame, it is only those employees who are working for

12  open facilities, not closed facilities, or facilities who

13  have had to modify their hours, there's only those employees

14  that are going to be entitled to premium pay; is that

15  correct?

16    A.  Please restate the question.

17      MR. JONES:  Read it back, Christina, please.

18      (Reporter read back as requested.)

19    A.  Teammates at open facilities during the emergency

20  time frame will receive premium pay.

21    Q.  My question was whether my statement was correct.

22  Do you want to hear the statement again?

23    A.  Sure.

24      (Reporter read back as requested.)

25    A.  Yes.

00088

1    Q.  Thank you.

2       MR. JONES:  All right.  I'm going to check my notes.

3       (Pause in deposition.)

4    Q.  Ms. Prockish, was anyone under the DaVita umbrella

5   paid premium paid under the disaster policy during the

6   period of March 1 through March 31, 2020?

7    A.  No.

8    Q.  Now, not counting this winter storm that came

9   through this year, when was the last time before that Winter

10   Storm Uri that you recall that anyone was paid under the pay

11   practices for non-exempt teammates under the Disaster Relief

12   Policy?

13    A.  Outside of Winter Storm Uri there have been times

14   related to hurricanes.  Hurricane Michael back in 2018 comes

15   to mind.  I would have to double-check my record, but I do

16   think it was applied in other hurricanes as well,

17   potentially in 2019 and 2020.

18    Q.  There was a payment by the entities under the DaVita

19   umbrella to employees because of the COVID-19 crisis, wasn't

20   there?

21    A.  Could you repeat the question?

22       MR. JONES:  Why don't you read it back, Christina.

23       (Reporter read back as requested.)

24    A.  Could you be more specific on --

25    Q.  I'd be happy to.

00089

1   A.  -- you see a payment or is there something specific

2   that you're referring to?

3   Q.  Well, I'm asking.  No.  I'm making it a broad

4   question because you have the information.

5   A.  Yes.  Teammates did receive payments throughout the

6   pandemic, one of which was called Village Lives Awards which

7   was a relief payment to teammates to help with expenses

8   incurred due to the pandemic.

9   Q.  Do you know if any of the entities under the DaVita

10  umbrella applied for PPP loans?

11  A.  I do not know.

12  Q.  Were there any other payments besides the Village

13  Lives payments during the COVID-19 crisis?

14  A.  There have been payments for double time for

15  overtime based on local leadership decision to implement

16  that pay practice.  And effectively it's to provide that

17  extra compensation of 50 percent.  Instead of earning

18  overtime, the teammates are paid double time effectively for

19  those hours.

20  Q.  Okay.

21  A.  There was a payment for business reimbursement to

22  teammates under the atlas umbrella.  And when I reference

23  Atlas, those are our business office teammates that were

24  required to perform their regular duties in a remote work

25  environment.

00090

1    Q.  Tell me about Atlas again.

2    A.  Atlas is the group of individuals that support the

3    clinical teammates under DaVita, so we are generally your

4    business office teammates that are in a support role.

5    Q.  Were you a business office teammate?

6    A.  Yes, I am.

7    Q.  But you don't work for Atlas?

8    A.  Atlas is not an entity; it's a group name of

9    teammates that we use to designate them.

10    Q.  Yeah, okay.  So DaVita did something for you?

11    A.  No.  I was not eligible for those payments.

12    Q.  What kind of payments were they?

13    A.  As previously indicated, Village Lives Awards and

14    the business expense reimbursement.

15    Q.  Did you review any documents in preparation for your

16    testimony today?

17    A.  I was provided a copy of the claims against DaVita.

18    I recently read that over as well as Carol Strong's -- sorry

19    -- it's not a testimony.  I'm blanking on the appropriate

20    word.

21    Q.  Can I ask you a --

22        MS. PETERSEN:  Briefly if I could -- and obviously

23    the witness has already disclosed two documents.

24        But I'm going to instruct the witness that for

25    further discussion regarding documents provided in

00091

1  preparation for the deposition today, that that's considered

2  to be attorney-client, the compilation of those exhibits.

3  And I would instruct the witness to not answer further.

4     THE WITNESS:  My apology.

5     Q.  So did someone give you a copy of Ms. Strong's

6  deposition?

7     A.  Deposition, no.  I do not have a copy of her

8  deposition.

9     Q.  How about her declaration -- the document I showed

10  you earlier, did you ever see that document?

11     A.  Yes.

12     Q.  Had you ever seen that document before I showed it

13  to you today?

14     A.  Briefly.  It would -- pardon me?

15     Q.  Had you ever seen that document before I showed it

16  to you today?

17     A.  Briefly.

18     Q.  What other documents did you review in preparation

19  for your testimony today?

20     MS. PETERSEN:  I'm instructing the witness not to

21  answer.

22     Q.  On what basis?

23     MS. PETERSEN:  Attorney-client privilege.  As I

24  indicated earlier, the selection of documents for

25  preparation for this deposition is work product and part of

00092

1  attorney-client privileged conversations.

2       MR. JONES:  We'll mark this part of the deposition,

3  please, and we'll suspend the deposition at this time.

4       Thank you, Ms. Prokish.

5       I intend to seek the guidance of the court on that.

6       MS. PETERSEN:  And I do not -- not that it was asked

7  -- but on the record I do not have any further questions.

8  And my expectation is that the deposition is closed but for

9  this open issue.  And I understand that counsel --

10       MR. JONES:  Your expectation may be misplaced, but

11  I'll put you on fair notice.

12       MS. PETERSEN:  Okay.  Counsel, it's easier if I

13  could get just get my full thought before you speak over but

14  your point is taken.  We agree to disagree.

15       (Adjourned at 5:38 p.m.)

16       (Signature reserved.)

17  [sig/cert/corr]

18

19

20

21

22

23

24

25