# EXHIBIT F

00001

1       ROUGH DRAFT -- Since this deposition is in rough

draft form, please be aware that there may be a discrepancy

2   regarding page and line number when comparing the rough

draft, rough draft disc, and the final transcript.

3       Also, please be aware that the uncertified rough

draft transcript may contain untranslated steno, reporter's

4   note in brackets or misspelled proper names, incorrect or

missing Q/A symbols or punctuation, and/or nonsensical

5   English word combinations.  All such entries will be

corrected on the final, certified transcript.

6

            *   *   *   *   *   *

7

8   [Start at 9:32 a.m.] [Ex 16 marked]  [WITNESS: Bosl]

9   [BY MR. BORISON:]

10    Q.  Good morning.  I'm Scott Borison and I represent the

11   plaintiff in this case, and I am going to ask you a series

12   of questions.  Have you ever been deposed before?

13   A.  I have not.

14    Q.  Okay.  So it's pretty straightforward.  I'll just

15   ask you questions and then ask you to provide an answer to

16   them.  The first one, verbal responses are required just so

17   that the court reporter can take down what you're saying.

18   Second if there is some reason that I ask a question that

19   you don't understand, please tell me and I will try to

20   rephrase it.  Anytime you want a break, that's fine.  Just

21   let me know.  The only time is if there's a question

22   pending, usually we don't break because we're waiting on an

23   answer.  And then the fourth thing is if you've talked to

24   attorneys about any of these issues or if I ask you a

25   question that it turns out that the question goes to some

00002

1  conversation that you had with counsel, I'm not asking you

2  to tell me what you discussed with counsel.  Okay?

3    A.  That sounds good.

4    Q.  Beyond that, we'll just see if there is anything

5  else.  An during the course of the deposition your counsel

6  might object to some questions.  But unless she tells you

7  not to answer, basically we go forward and she's just noting

8  it for the record.  Okay?

9      THE WITNESS:  Scott, before we get started, I'm

10  going to switch to my phone audio because I can make it

11  louder and hear you a little better so if you can just give

12  me one moment.

13      MR. BORISON:  Sure.

14      (Pause in deposition.)

15  Q.  Who do you work for?

16    A.  I work for DaVita.

17  Q.  Okay.  And is that DaVita Inc. or do you know?

18    A.  I'm sorry.  Could you repeat the question?

19  Q.  Is that DaVita, Incorporated?  I-N-C period?

20    A.  Yes.

21  Q.  Okay.  And what is your position there?

22    A.  I'm a vice president.

23  Q.  And what is your -- vice president of what area?

24    A.  I'm a vice president in people services.

25  Q.  Can you tell me what people services is?

00003

1    A.  Yes.  People services is our name for our HR

2    function.

3    Q.  And let me just make sure.  Are you paid by DaVita

4    Inc. or are you paid by someone else, do you know?

5    A.  I'm not sure.

6    Q.  Can you describe just generally your job duties in

7    the position you're in?

8    A.  Yes.  I have three buckets of job duties in my

9    current role.  I am the interim vice president over PS

10   operations, which includes coordination of our HR business

11   partners, most of whom report up through their field

12   leadership, not through the central services org.  And I've

13   been performing that interim function since the beginning of

14   the year.

15        I'm also the interim vice president over our account

16   development org as of earlier this week.  And then when I

17   first joined the people services team, I -- I think my

18   official title is vice president of special projects.  And

19   in that role I oversee different types of projects,

20   communications and governance.

21   Q.  Okay.  And when did you start working for DaVita?

22   A.  June of 2015.

23   Q.  And so as vice president of special projects, have

24   you been in that position since January 1st of 2020?

25   A.  Yes, that is correct.

00004

1    Q.  Okay.  And the interim is just recent where you're

2    interim acting for accounts development, correct?

3    A.  I'm sorry.  Could you say that again?

4    Q.  Sure.  I'm sorry.  I thought you said accounts

5    development was something that you were just recently

6    appointed to.

7    A.  Are you saying accounts development?

8    Q.  I thought that's what you had said.  So if I got it

9    wrong, correct me.

10    A.  That's okay.  I just wanted to make sure I was

11    hearing you.  So I'm interim over our HR business partners

12    and I'm interim over our talent development.

13    Q.  Oh, okay.  I misheard you.  Those interim

14    appointments are recent appointments?

15    A.  Yes, recent appointments within 2021.

16    Q.  Okay.  And when you joined DaVita in 2015, what was

17    your position?

18    A.  I was a director of strategy and special projects.

19    Q.  Okay.  So basically the same job and you've just

20    been elevated over the time frame that you've been at

21    DaVita, correct?

22    A.  I started -- no.  I started in special projects.  I

23    moved to operations, and now I'm in a similar role again.

24    So there's another role in there.

25    Q.  All right.  Thank you.  And as vice president of

00005

1  special projects, can you just give a brief -- I assume it's

2  just an ad hoc that they assign just specific areas from

3  time to time; is that correct?

4      A.  It's more structured than ad hoc.  But the way I

5  would characterize it is working on strategic projects that

6  affect our people strategy at DaVita.  And then there is an

7  ad hoc component as well.

8      Q.  All right.  As part of your -- since January of

9  2020, were you assigned anything in regards to COVID-19

10  issues?

11      A.  I was involved in our COVID-19 response.  It's not a

12  formal assignment process.  The way we talk about it is, you

13  know, swarming a problem at DaVita.  So it wasn't a formal

14  assignment, but yes involved.

15      Q.  When you said the response, can you describe what

16  you mean by response?

17      A.  Yeah.  There are a number of different -- as you can

18  imagine, there were many moving parts.  And so I would help

19  coordinate the activities of the team across all the

20  different balls that were up in the air.  I helped with

21  coordinating some emergency staffing.  I helped with the

22  communications.  I helped with the help desk and questions

23  that people may ask.  So any number of different places that

24  required attention, I plugged into it.

25      Q.  Okay.  So when you said emergency staffing, can you

00006

1  give me an example of what you mean by that?

2     A.  We may have an area where we have teammates who are

3  sick and they needed help to staff those facilities.  It's

4  also something.  It's an assumption that I help with.  I'm

5  working on emergency staffing now, I will call it, that is

6  as a result of a competitive activity in my local market so

7  staffing for it.

8     Q.  And were you involved in any issues regarding

9  COVID-19 and the compensation to employees?

10    A.  I was involved with how we talked about things like

11  the Village Lives Award for the benefits that we offered

12  employees such as child care support or things of that

13  nature.

14    Q.  Okay.  How about were you involved in any decisions

15  to give any compensation to employees as a result of

16  COVID-19?

17    A.  No, not decision.

18    Q.  Did you participate in any discussions regarding

19  those issues?

20    A.  No, not that I can recall.

21    Q.  Do you recall being assigned any communication tasks

22  in connection with decisions made on compensation for

23  COVID-19?

24    A.  Yes.

25    Q.  And what was your involvement?

00007

1    A.  Once a decision would have been made, my team would

2   come together to ensure that we could communicate to

3   teammates.  And it's the same about compensation, but any of

4   the number of things that may have been going on.

5   Communicate to teammates about what was -- about the

6   communicate clearly to teammates about the information.  And

7   so that could come in a few different forms; maybe part of

8   it is making sure the Human Resources business partners

9   understand as a subject matter expert; maybe part of it is

10  an email communication, but ensuring that teammates are

11  fully understanding the people related issues.

12   Q.  Okay.  Let me pull up a document and ask you if

13  you've seen this document before.  Give me half a second.

14   [shares screen]  [**]

15   Q.  Do you see this document which has been labeled

16  Exhibit Number 6?

17   A.  Yes.

18      MS. PETERSEN:  Counsel, just noting -- perhaps it's

19  just my eyes but it's difficult to see.  I wonder is there's

20  a way to make it any larger?

21      MR. BORISON:  I will try.

22      MS. PETERSEN:  Thank you.

23      MR. BORISON:  Does that help?

24      MS. PETERSEN:  It does.  Thank you.

25   Q.  All right.  Have you seen this document before?

00008

1   A.  Yes.

2   Q.  And were you involved in the preparation of the

3   document?

4   A.  I may have been but I don't know.  We were producing

5   daily email communications all in a similar style and

6   format, and so I just don't recall.

7   Q.  And when you say producing daily emails, are you

8   referring to updates on COVID-19 emails?

9   A.  Yes.

10   Q.  And do you have an idea of a time frame that these

11   were being produced on a daily basis?

12   A.  I don't recall.  I don't recall.  I could guess.

13   Q.  Okay.  I'm not asking you to guess.  If you had a

14   basis for, you know, for an estimate, that would be helpful.

15   But if it's just a guess, I don't need a guess.

16   A.  Yeah, I would say probably around mid February, but

17   it might have been earlier in February that we started doing

18   that.  I man you can imagine the COVID world is very dynamic

19   and there are lots of people wanting to get information

20   through the field.  And so I remember being in a

21   conversation and a process being introduced where we said

22   we're going to stop individual emails and start these daily

23   COVID-19 updates.  And I think that time frame would have

24   been in the mid February area.

25   Q.  Does it continue to this day?

00009

1    A.  We required daily -- I'm not sure when we required

2  daily.  I couldn't even guess there.  But we do send twice

3  weekly updates; some COVID-19, some other topics.

4    Q.  Okay.  And let me ask you because you also mentioned

5  besides emergency staffing communications, you mentioned

6  something about a help desk.  What is the help desk?

7    A.  You could see the reference here in the first

8  paragraph.  [*] Send questions to [COVID-19questions@

9  DaVita.com].  And so we encourage teammates to send their

10  questions in so they can get the information that they need,

11  so that was the help desk.

12    Q.  So you would get a copy of the questions that were

13  submitted?

14    A.  I got some.  I helped coordinate our responses for

15  people related questions.  So some of them I would get -- if

16  it was a unique question, I may get the question itself.

17  But otherwise, we would help the help desk with an essential

18  answer.  Everytime somebody writes in with a question

19  there's asked, there's a consistent way to respond.

20    Q.  And so who was in charge of -- I assume this would

21  go to someone's email directly and then that person would

22  distribute it to other people like yourself; is that

23  correct?

24    A.  I'm not sure if it went to a personal email or a

25  monitored inbox.

00010

1    Q.  Okay.  And has DaVita retained these emails that

2    they received to this email address?

3    A.  I don't know.

4    Q.  Do you know who would know?

5    A.  I would think that is a question for counsel but I

6    don't know.

7    Q.  Well, let me ask it for the ones that -- I assume

8    they were forwarded to you by someone at some point, the

9    ones that you saw?

10    A.  Some were forwarded directly and there were some

11    that maybe the question would have been copy pasted into an

12    email body.

13    Q.  So do you keep your emails?

14    A.  We have a record retention policy and so I would

15    assume there are copies of my emails somewhere.

16    Q.  Okay.  And the record retention policy, is that a

17    written policy somewhere?

18    A.  Yes.

19    Q.  Is that in the teammates handbook or somewhere else?

20    A.  I'm not sure if it's in the teammate handbook.

21    Q.  And I assume you're an exempt employee?

22    A.  Yes.

23    Q.  Where do you physically work?

24    A.  I work in Tampa, Florida in a home office.

25    Q.  Okay.  How long have you been in a home office?

00011

1   A.  Since I took on this role.

2   Q.  Okay.  So from January of 2020 forward, you would be

3   in your home office, correct?

4   A.  Correct, primarily.

5   Q.  And during that time did you receive any

6   compensation related to COVID-19 different than your regular

7   salary?  I'll just tell you, Mr. Zuckerman referred to that

8   there was something $100 or $200 payment, an extra payment

9   that he had gotten during this time frame.  Does that sound

10  familiar?

11  A.  I didn't -- yes, that would be the Village Lives

12  Award, which went to -- I believe it was managers and below.

13  I did not qualify for the award.

14  Q.  I'm sorry.  Could you tell me what -- the Village

15  Company Award?

16  A.  The Village Lives Award.  It was intended as a

17  relief payment given the shock rippling through our

18  community at large, you know, spouses losing jobs, service

19  workers being unable to work.  The intent was supporting our

20  teammates through a challenging time in our country.

21  Q.  Were you involved in the decision to make that --

22  A.  No, I was not.

23  Q.  Do you know who made the decision to make those

24  payments?

25  A.  I'm not sure who had the exact decision maker would

00012

1   have been.

2      Q.  Okay.  Was that paid to anybody -- I think you said

3   manager and below; is that right?

4      A.  Yes, I believe it should have been paid to every

5   teammate manager and below.

6      Q.  And did it matter whether they were working off-site

7   or on-site or did everybody get it?

8      A.  I believe -- I'm not a hundred percent certain.

9      Q.  And since I've made up the phrase on-site or

10   off-site, let me backtrack.

11      A.  You know what, it did go to everybody.  It would

12   have gone to everybody, manager and below.  Yeah, it went to

13   everybody, manager and below.

14      Q.  Okay.  Now, this particular document also refers

15   to -- it says on page 2 if you look at it's marked at the

16   bottom.  It's TRC 000150.  It's the document we're looking

17   at as part of Exhibit 6.  Up top the first paragraph ends

18   with [*] to learn more about this issue click here.  Are

19   these references or links to some web page somewhere?

20      A.  The emails linked to -- I'm going to speak broadly

21   -- the email is linked to a website in order to make sure

22   the information is fresh.  You can imagine if we were to

23   send hard copies of materials in a dynamic environment,

24   things could become out of date.  With regard to, you know

25   -- I can imagine it's no different here for this link, but I

00013

1  don't know in particular where that link links to.

2     Q.  Okay.  And I guess at the bottom of the page there's

3  a [*] for information visit the COVID-19 Village web page.

4  Do you see that, the second to the last sentence?

5     A.  Yes.

6     Q.  So there was a particular web page that was set up

7  to deal with that address COVID-19 issues?

8     A.  Yes.

9     Q.  And does that web page still exist?

10    A.  I don't know.

11    Q.  Do you know, were you involved in the preparation of

12  the web page for COVID-19 Village web page?

13    A.  We submitted materials to the -- where we uploaded

14  materials to the web page.  I didn't own the web page

15  itself.

16    Q.  Do you know who did own it?

17    A.  I don't know who did own it.

18    Q.  And the things that you would have submitted, would

19  you retain copies of what you submitted?

20    A.  I would imagine so.

21    Q.  And if you had retained copies, where would those

22  be?

23    A.  I would imagine in a file.  Yeah, in an electronic

24  file.

25    Q.  And is that something you would have access -- you

00014

1   personally would have access to?

2     A.  That's my pause.  I'm not sure that I personally

3   own -- have the final copies of what may have been posted.

4   So I'm not sure that I personally have access to, you know,

5   those files in a hard drive on my computer, for example.

6     Q.  Okay.  Well, you said you had submitted different

7   parts or different -- what would you describe them;

8   articles, or just text, copy?

9     A.  Yeah, I think that's fair.  When I said we or I, I

10  was speaking on behalf of me and my colleague Carley St.

11  Clair on the communications team.

12    Q.  So she participated with you and anything that you

13  would have submitted to the COVID-19 web page?

14    A.  I believe so, yes.

15    Q.  All right.  And if you make submissions, you would

16  do it via email, for instance?

17    A.  I'm not sure.

18    Q.  Okay.  Is there anything you remember that you did

19  submit to the COVID-19 web page?

20    A.  Sure, yeah, I can remember we had a -- a leave and

21  pay guide that we referenced for, you know, what should you

22  do if you have symptoms of COVID-19 but can't get tested,

23  for instance.  You know, what does a teammate do in that

24  situation?  What happens if a teammate is sick with

25  COVID-19, what resources are available, etc.  That was one

00015

1 document I know was on the web page.  Another document

2 object that was the web page was a frequently asked

3 questions document that included questions that teammates

4 may have about people related protocol during the pandemic.

5   Q. Okay.  Anything else that you recall?

6   A. Nothing else that I -- nothing else that I recall

7 for certain.

8   Q. Okay.  And I've put up a different document, which I

9 have labeled Exhibit 16.

10     MR. BORISON:  Chelsea, this is what you all

11 produced, I think, yesterday or the day before.  It's just

12 an email.  If I could just ask you if you have seen this

13 document before?

14     MS. PETERSEN:  Counsel, sorry to interrupt.  But

15 it's possible the witness sees something different than I do

16 but at the moment all I see is a header basically saying

17 that you've started screen sharing but there's no image

18 presented.

19     MR. BORISON:  Let me try again.  Do you see anything

20 now or no?

21     MS. PETERSEN:  No.

22     MR. BORISON:  Nothing, different, right?

23     MS. PETERSEN:  Nothing different.

24     MR. BORISON:  Let me try one more thing.  I don't

25 think I've changed anything I was doing.

00016

1    MR. JONES:  We could see what you were sharing

2  earlier, Scott.

3    MR. BORISON:  Yeah.  I don't know why.  Do you mind

4  if we take a quick break and let me see if I can figure out

5  why it's acting differently now?

6    MS. PETERSEN:  No problem.  Shall we take maybe five

7  minutes?

8    MR. BORISON:  Yes.  Thank you.

9    (Brief recess.)

10    [Shares screen.] [**] [16]

11  Q.  Have you seen this document before?

12  A.  I may have.

13  Q.  Okay.

14  A.  Probably.

15  Q.  Let's sort of cut to the chase.  I mean do you

16  recall any specific conversations that you had or were a

17  party to involving talking about compensation to DaVita

18  employees during COVID-19?

19  A.  Yes.

20  Q.  Okay.  You do.

21  A.  Yes, related to communication, not decisions.

22  Q.  Okay.  So related to the communications, what do you

23  recall?

24  A.  I recall getting teammate questions, a handful of

25  teammate questions.  I recall getting lots and lots of

00017

1   teammate questions.  But I remember getting a handful of

2   teammate questions about compensation.  Many of those were

3   about the Village Lives Award -- the logistics of how that

4   was paid, for instance; why was it this amount and not that

5   amount; or why wasn't it on my paycheck.  Those types of

6   logistic questions; a place that people could turn for

7   those.  I remember getting teammate questions about hazard

8   pay.  I remember getting teammate questions around the

9   Disaster Relief Policy.

10    Q.  Okay.

11    A.  And in my recollection it was -- go ahead.

12    Q.  No.  Go ahead.  I'm sorry to interrupt.

13    A.  I was going to say in my recollection it was small

14   in number.

15    Q.  Okay.  Would you have kept copies of the questions

16   that you received?

17    A.  Probably.  I file my emails.  However, when my inbox

18   gets full, you know, the oldest stuff comes out.  And so I'm

19   not sure if I have everything.

20    Q.  Okay.  And along that lines, not only the questions

21   you received; you would also have copies of what the replies

22   were, correct?

23    A.  Under the same -- under the same thinking, right.  I

24   would have sent it from my email.  It would have stayed in

25   that folder.  When I get the alert that I'm out of space,

00018

1  you know, I remove my local copies of anything in order to

2  make sure I can continue to send and receive email.

3     Q.  But you do recall responding to some of these

4  questions in the categories we just --

5     A.  Yes.

6     Q.  And the first one you mentioned was the Village Life

7  Award?

8     A.  Lives Award.

9     Q.  Oh.  L-I-V-E?

10    A.  L-I-V-E-S, like the Village lives, even amid a

11  pandemic.

12    Q.  Can we just call it the Village Award and we'll all

13  understand what I mean?  Okay.  So on that award -- and we

14  already discussed, that was paid to everybody who was a

15  manager below.  And that was whether they were working at a

16  facility or if they were working from home or doing anything

17  else, correct?

18    A.  Correct.

19    Q.  And if people were not working, I mean --

20    A.  I just want to be -- I'm sorry to interrupt.  I just

21  want to be clear.  When you say doing anything else, it was

22  paid to teammates based on their employment status.  So

23  full-time teammates got a certain amount; part-time

24  teammates got a certain amount.  I don't recall the details

25  from teammates on LOA.  But when you say doing anything

00019

1   else, I just want to make sure I'm clear on that part.

2      Q.  So when you said that there was a division or, I

3   guess, a lesser pay for people who were part time, correct?

4      A.  Yes.

5      Q.  But as long as someone was either working full or

6   part time, they were paid that amount, some amount?

7      A.  Yes.

8      Q.  And then you also mentioned that you had questions

9   about hazard pay.  Can you tell me what you mean by hazard

10  pay?

11     A.  Yeah.  I don't remember the question -- I couldn't

12  tell you the specific question.  But a teammate might write

13  in and say, am I going to get paid extra for taking care

14  of -- for working during this pandemic?  Or am I going to

15  get paid extra for working in a cohort facility, which is

16  what we would call the facility where we would treat

17  patients who are either confirmed or suspected to have

18  COVID.  And many times, but not always, teammates would use

19  that -- sometimes teammates may use that designation of

20  hazard pay.  But the question was, am I going to get paid

21  more for doing that.

22     Q.  And what was your response?

23     A.  My response was no.  We care for patients with

24  highly infectious disease on a regular basis in our

25  facilities and that's what our caregivers are trained to do.

00020

1   We care for Hep B positive patients in isolation and nurses,

2   LPNs, technicians who are caring for those Hep B positive

3   patients make the same amount as others who are caring for

4   teammates without that.  We dialyze patients with HIV,

5   influenza.  And so there are all kinds of infectious

6   diseases that may be on our treatment floors and that's what

7   our clinical protocol is designed to -- is done for, is to

8   keep everyone safe.

9       Q.  Okay.  And you mentioned -- the last category was

10   the Disaster Relief Policy.  And can you tell me what you

11   recall about those type of questions.

12      A.  The flavor of the questions that may come through is

13   a state of emergency has been declared in my state.  Does

14   that Disaster Relief Policy apply?

15      Q.  All right.  And do you recall your response?

16      A.  My -- I don't recall the specifics on what I may

17   have said in a written response.  But generally the

18   thinking -- the thinking was in order to qualify for the

19   disaster relief -- in order to qualify under the Disaster

20   Relief Policy, there is a designated emergency time frame

21   and significant interruption to business operation and there

22   are a few other things.  There may have been other factors

23   that we may consider.  But I would think that would be what

24   I would have gone back to teammates with.

25      Q.  Would you refer them to the teammates handbook?

00021

1    A.  I don't recall.

2    Q.  And the teammates handbook, you follow the policies

3  that are set forth in the teammates handbook?

4    A.  Do I personally follow the policies?  I believe so,

5  yes.

6    Q.  And you sort of play dual roles here because you're

7  also a employee and also a manager.  As an employee, you

8  follow the handbook rules, correct?

9    A.  I believe so, yes.

10    Q.  Okay.  I just want to clarify.  As a manager, do you

11  follow the handbook in how you treat employees at DaVita?

12    A.  I believe so, yes.

13    Q.  And do you follow the handbook as a manager?

14    A.  Yes, and the handbook is lengthy.  In it is -- it's

15  updated annually and so annually or perhaps more often.  And

16  so there are things that do change in the handbook.  And so

17  there's a certain way that I conduct myself as an employee

18  and as a manager that's consistent with how I conduct myself

19  in life.  And so that's how I think about how I show up

20  rather than, you know, a 40-page policy manual and --

21  however long it is; I'm not sure -- but that's why I say I

22  believe so, yes.

23    Q.  Just so you know, I'm not trying to trick you.  I

24  don't have a gotcha question that on March 10th you did

25  this.  I was just, in general, asking, you know, what the

00022

1  approach to the handbook is, both in terms of you as an

2  employee and in terms of you being a manager.  And I

3  recognize you're a vice president but I'm using the term

4  manager generically for anybody manager and above, okay.

5    A.  Yeah.

6    Q.  That's all I was asking, so I'm not sure -- I don't

7  have anything to trick you that I have, you know.

8       Were you involved in any discussions as to whether

9  or not the Disaster Relief Policy would be implemented or

10  whether there would be an emergency time frame designated?

11    A.  Not that I recall.

12    Q.  Are you in any of the people involved in making that

13  decision?

14    A.  You broke up in the first part of your question.

15  Would you repeat that question, please?

16    Q.  Are you one of the people involved -- for instance,

17  let me just ask you.  Are you a DVP?

18    A.  Not currently, no.

19    Q.  And how about a GVP?

20    A.  No.

21    Q.  SVP?

22    A.  SVP, no.

23    Q.  Are you familiar with the Disaster Governance

24  Council?

25    A.  Yes.

00023

1    Q.  And who is on that council?

2    A.  I believe -- I know at least two names that are on

3  it, which is Kenny Gardner and Caitlin Moughon.

4    Q.  And what is -- is it Caitlin?

5    A.  Yes.

6    Q.  What is her title?

7    A.  VP.

8    Q.  Any particular area?

9    A.  Legal.

10    Q.  During your time frame at DaVita, have you ever seen

11  the Disaster Relief Policy applied?

12    A.  Yes.

13    Q.  When was that?

14    A.  During Winter Storm Uri earlier this year.  Also as

15  an operator -- I'm not sure at what point the Disaster

16  Relief Policy went into effect, but we did offer premium pay

17  related to Hurricane Irma.

18    Q.  When you say premium pay, what does that mean?

19    A.  It would have been some premium to teammates'

20  regular pay -- I don't recall if it was one and a half or

21  two times pay -- for a certain number of days before, during

22  or after the storm.

23    Q.  And that would be pay to non-exempt personnel?

24    A.  To non-exempt teammates.

25    Q.  Right.  I'm sorry.

00024

1   A.  Yeah, to non-exempt teammates.  I can't say -- it

2   wouldn't be -- it would paid to non-exempt payments who were

3   working.

4   Q.  Who would show up to work the regular hours?

5   A.  It may not be their regular hours, but who would

6   show up to work.

7   Q.  So if they showed up to work, they would get it

8   during the time frame established, correct?

9   A.  During the emergency time frame if it is an affected

10  facility, of course.

11  Q.  So what you're saying is besides an emergency time

12  frame, it would also be a geographic location or multiple

13  locations?

14  A.  Yes.

15  Q.  When that policy would go into effect, how was it

16  communicated?  Were you involved in communicating it being

17  in effect?

18  A.  In which instance?

19  Q.  Well, I think you mentioned Hurricane Irma; is that

20  right?

21  A.  Yes.  Hurricane Irma -- yeah, as I mentioned, I was

22  an operator during Hurricane Irma.  I remember getting the

23  information that we would be offering; premium pay, you

24  know, for these days before and for some facilities, I

25  think, there were some days after.  I would have shared that

00025

1  information probably verbally with my facility

2  administrators but that was a long time ago.  I don't

3  remember all the details.

4      Q.  And forgive me.  You said there was one other

5  occasion you recall it being made effective.  What was the

6  other occasion?

7      A.  Winter Storm Uri, the ice storms in Houston -- or

8  Texas earlier this year.

9      Q.  And you were involved in communicating information

10  about that?

11      A.  Yes.

12      Q.  And how did you do, that just emails to teammates or

13  did you post -- or was there a separate web page like for

14  COVID-19?

15      A.  I believe it was emailed to teammates only plus

16  education for their certain members of their leadership

17  team.

18      Q.  I'm sorry.  Say that again.  Education for...

19      A.  Education for certain members of their leadership

20  team.  So say a teammate has a question about their pay,

21  they need to raise their hand and ask, say their people

22  services manager or the person that helps them with policies

23  and that kind of stuff out in the field.  We of course

24  wanted to make sure those people understood as well.  So I'm

25  explaining that simply to say there was supportive

00026

1  conversation happening to others who needed to know in

2  addition to just simply a teammate.

3     Q. So actually that ties into Exhibit 16.

4        MR. BORISON:  Christina, could you scroll down to

5  page 318 of the exhibit.  [**]

6     Q. Is this an example of what you had for educating

7  your manages?

8     A. It could be.  So oftentimes -- and this goes for all

9  different types of things.  So I'm thinking about a payroll

10  change we recently made.  We gave one communication to

11  teammates and then we gave a little bit more information to

12  their managers.  When I'm talking about Winter Storm Uri, we

13  did send an email to teammates that included a lot of

14  different resources and things.  We also sent an email to

15  facility administrators that may have -- I don't remember

16  all of the information.  I remember there was a piece in

17  there about what they needed to do to enter their teammates

18  time to get the clock closed on time so teammates could get

19  paid timely.  I remember that was a big crunch in Winter

20  Storm Uri.  And I also got on a phone call with the VP in

21  our above team.  I answered questions about any number of

22  people related issues; payroll, closure, pay disaster

23  relief, etc.

24     Q. Okay.  And if you look at the page we have up, 318

25  of Exhibit 16, there's a reference in the middle of the page

00027

1  under the heading [*] all leaders.  It says, [*] please

2  refer to our managers guide.

3     A.  What is the managers guide, is that what you said?

4     Q.  Yes.  What is that?

5     A.  I believe it is an SAQ geared more towards managers

6  than to the teammates themselves.  So -- yeah, a question

7  that I can think of being in the -- this was a long time

8  ago -- a question that I can think of being in the managers

9  guide is, I have a teammate who doesn't want to wear a mask

10  to work.  You know, what do I do?  Like a social worker who

11  may not usually wear a mask in an office, but our policy now

12  is they have to wear a mask in an office.  What do they do.

13  And so how to help managers answer some of these trickier

14  team related questions that they need to.

15     Q.  Well, let me ask you this, were there additions made

16  to the managers guide relating to COVID-19 issues?

17     A.  I believe this managers guide is only COVID-19.

18     Q.  Okay.

19     A.  I believe that managers guide is only COVID-19.

20  But, again, it was a long time ago.

21     Q.  Okay.  And who has access to the managers guides?

22     A.  I'm not sure.

23     Q.  Do you have access to it?

24     A.  I might.  I don't know, for instance, is it posted.

25  It's a document that I made -- I wouldn't have been a part

00028

1  of making for others and not something that I personally am

2  referencing on an ongoing basis and so that's why I say I

3  don't know if I have access to it.

4    Q.  So you might be the author provisions of it but you

5  just don't consult with it as part of your job?

6    A.  That's correct.

7    Q.  All right.  So do you recall anything in the

8  managers guide that specifically addresses either any of the

9  three issues that we just talked about in regards to

10  compensation during COVID-19; and that would be a Village

11  Award, hazard pay, or Disaster Relief Policy?

12    A.  I can't say for sure.  I would think it is very

13  reasonable that we would have information about the Village

14  Lives Award in a managers guide, yes.  But the other items I

15  can't say for sure.

16    Q.  If you had to find that out, who would you contact

17  to ask that information?

18    A.  I would think Carley would have the latest version

19  of that managers guide.

20    Q.  And that's Carley St. Clair?

21    A.  Carley St. Clair, yes.

22    MR. BORISON:  We've been going a little bit over an

23  hour with the break because I had technical difficulties.

24  Do you want to take a quick break just to keep it

25  reasonable?  Five minutes?

00029

1      THE WITNESS:  That sounds good.  Thank you.

2      (Brief recess.)

3      Q.  When we were talking earlier, you mentioned a record

4   retention policy.  Is that a written policy somewhere?  If

5   you answered that, I apologize if I'm asking again.  But I

6   was just curious, was it a written policy?

7      A.  Was that a question for me, Scott?  I'm sorry.  All

8   I heard was the last few words.  Could you ask it again,

9   please?

10      Q.  Sure.  I was just asking, you had mentioned that I

11   thought a record retention policy.  And I was asking whether

12   that was a written policy?

13      A.  I believe so.

14      Q.  And where would that policy be located?  Is it part

15   of the teammates handbook or somewhere else?

16      A.  I'm not sure.

17      Q.  Do you know who would know the answer to that?

18      A.  I'm not sure.

19      Q.  Okay.  We talked about the Disaster Governance

20   Council.  And you said you know two of the people.  Do you

21   know how many people are on the council?

22      A.  There are three.

23      Q.  And we also talked about this Village Award.  And I

24   was curious, you said there were different amounts.  Were

25   the amounts tied to the number of hours that the person

00030

1  worked?

2    A.  I recall the amounts being tied to status which

3  would be driven by hours worked, not a sliding linear scale.

4  But I believe full time would get X, part time would get Y.

5    Q.  Okay.  You mean the hours worked would determine

6  whether they were part time or full time?

7    A.  Yes.

8    Q.  There was a scale set up if you worked from 10 to 19

9  hours, you would get X; you worked 20 to 30, you would get X

10  plus, for instance?

11    A.  I'm nearly certain it was full time for part time.

12    Q.  But not the same --

13    A.  It wasn't -- I believe there were only two groups.

14  There may have been something else for people in LOA, but I

15  believe it was a full-time amount or a part-time amount.

16    Q.  Okay.  Were you involved with the -- you did not

17  have any involvement in deciding to implement that program,

18  correct?

19    A.  Correct, I did not have involvement.

20    Q.  I just want to make sure.  So we discussed what you

21  recall as far as responding or receiving emails that related

22  to as to the compensation for COVID-19.  We talked about the

23  three categories.  Are there any other categories that you

24  thought about that you can share with us now?

25    A.  The only additional thing I could think of would be

00031

1  certain volunteer incentives for somebody who may go work in

2  another area to assist with staffing.  That's not COVID-19

3  specific, although it was a program that we drew upon here.

4      Q.  Could you describe the program that you're referring

5  to?

6      A.  So if we had a market where cases were high and

7  teammates were out, we may need people to come help dialyze

8  patients -- in this particular example.  There are other

9  examples how we have used this program at other times.  But

10  we may offer flights or a small daily stipend to -- to pay

11  people for their -- to reward people for going to assist in

12  other areas.  And that would be me describing it in

13  laypeople's terms, but yeah.

14      Q.  Okay.  But like you said, that wasn't specific to

15  COVID-19.  You know it occurred during this COVID-19 era?

16      A.  Yeah.  I think that's the only other compensation

17  related program for non-exempt teammates.

18      Q.  And this managers guide that we talked about, that

19  would be something that you had input into.  Would that

20  include like, you know, when you responded to a request with

21  reference to hazard pay, that you would upload it add it to

22  the manager side as to what your response was or were your

23  emails --

24      MS. PETERSEN:  Objection, compound, form of the

25  question.

00032

1   Q. Let me rephrase. Did your manages guide include

2  your specific responses to emails?

3   A. The core of the answers probably were quite similar.

4  The point of having a central response team was to make sure

5  we were giving, on any topic, consistently reliable

6  information. And so, you know, of course we -- when we

7  would respond to a teammate email, we would say, you know,

8  hi Scott -- you know, personalize it. But the core

9  information should be the same from one document to the

10  next.

11   Q. Okay. So if I saw your managers guide, I could form

12  an opinion as to what the general responses to questions

13  would be; is that accurate?

14   A. I don't know that I can answer for what you might be

15  able to do with it. But I could say the managers guide is

16  consistent with -- should be consistent with all other forms

17  of communication that we had.

18   Q. And let me -- and the Village Award -- I just want

19  to make sure. It's people who showed up for work that would

20  get the Village Awards?

21   A. I don't recall the LOA piece. The specifics on the

22  calculations, I don't recall the specifics of the

23  calculations. And the reason I'm saying that is I don't

24  know if it was maintaining full-time status over six weeks

25  or a different time period. And so showed up to work, is

00033

1  maybe looser than how I would characterize it.  Does that

2  make sense?

3     Q.  Let me ask you a question first because I think you

4  referenced LOA.  What did you mean by that?

5     A.  Teammates who are on leave of absence may or may not

6  have been treated differently.  I just don't remember those

7  details.

8     Q.  Okay.  I'm sorry.  I just didn't know what LOA meant

9  so...

10    A.  Got it.  Thank you.  Shorthand.

11    Q.  All right.  Was your ability to work affected by

12  COVID-19 at all?

13    A.  No.

14       MR. BORISON:  Okay.  That's all the questions I

15  have.  Chelsea, do you have anything, obviously?

16       MS. PETERSEN:  Nothing for me.  Thank you.

17       MR. BORISON:  Thank you.

18       (Concluded at 10:57 a.m.)

19       (Signature reserved.)

20  [sig/cert/corr]

21

22

23

24

25