# EXHIBIT G

00001

1       ROUGH DRAFT -- Since this deposition is in rough

draft form, please be aware that there may be a discrepancy

2  regarding page and line number when comparing the rough

draft, rough draft disc, and the final transcript.

3       Also, please be aware that the uncertified rough

draft transcript may contain untranslated steno, reporter's

4  note in brackets or misspelled proper names, incorrect or

missing Q/A symbols or punctuation, and/or nonsensical

5  English word combinations.  All such entries will be

corrected on the final, certified transcript.

6


7            *   *   *   *   *   *

8  [Start at 9:06 a.m.]

9  [BY MR. BORISON:]

10    Q.  Good morning, Mr. Zuckerman.  My name is Scott

11  Borison and I represent the plaintiff in this case.  Just

12  preliminary, have you ever had your deposition taken before?

13    A.  No.

14    Q.  Okay.  So I'm going to ask a series of questions.

15  So if for some reason you don't understand my question,

16  please tell me and I'll try to rephrase; it is the first

17  rule.  The second rule is that verbal responses are

18  necessary for the court reporter to take it down.  And third

19  is if you need a break, other than with a question pending,

20  just let me know and we're happy to accommodate you.  Okay?

21    A.  Okay.

22    Q.  And then the fourth is that if from time to time the

23   attorney might object to the questions, and unless she tells

24   you not to answer, we'll just go forward.  We'll deal with

25   that as it arises.  Okay?

00002

1    A.  Yes.

2    Q.  So can you tell me what your job title is?

3    A.  I am a director of shared services within DaVita.

4    Q.  When you say "within DaVita," is that do you work

5    particular entity or DaVita, Inc.?

6    A.  I personally I don't make a distinction.  I know my

7    paycheck comes from Total Renal Care.  But in my capacity

8    and in my job duties I treat DaVita as a whole entity.

9    Q.  Okay.  And as far as that goes, do you have a title

10   with DaVita, Inc. or is it just one title that you apply

11   across the board?

12   A.  One title, director.

13   Q.  All right.  And as part of being director, do you

14   deal with employees of entities other than Total Renal Care?

15   A.  I deal in my capacity, as director, I deal with all

16   DaVita employees.

17   Q.  All right.  If it's okay with you, rather than

18   saying "Total Renal Care, Inc." every time, if we can say

19   "TRC," and you'll understand I'm talking about that company.

20   Is that okay?

21   A.  Yes.

22   Q.  Thank you.  So my understanding is that one of your

23   job duties is communicating with the employees; is that

24   correct?

25   A.  Sorry.  You cut out just at the end.  Communicating

00003

1  with...

2    Q.  Employees.  Can you not hear me?  I'm sorry.

3    A.  I can.  Sorry.  I'm just thinking about the

4  question.  My day-to-day activities don't involve

5  communicating with employees.  I'm -- that's not part of my

6  regular job duties.

7    Q.  Okay.  Why don't we do it this way then what are

8  your job duties?

9    A.  So -- and I wear a few hats.  I'll talk about

10  policies.  With respect to policies, I would say my primary

11  function is to oversee the administration of the teammate

12  policy handbook.

13    Q.  Okay.  In addition to policies, what other hats do

14  you wear?

15    A.  I oversee our wage an hour team within people

16  services.  I oversee a team that handles internally

17  unemployment claims.  And then I also oversee our team that

18  oversees mergers and acquisitions from a people services

19  perspective.

20    Q.  Okay.  Thank you.  Now, probably focus -- let me ask

21  you because you said wage an hour.  Is that also commonly

22  referred to as non-exempt employees or is there a

23  difference?

24    A.  That would be one issue that we would deal with as

25  part of the wage an hour team.

00004

1    Q.  Okay.  Can you explain the difference between exempt

2    and non-exempt employees for DaVita.

3      A.  So we have exempt employees and would be exempt

4    under the FLSA.  And for most intents and purposes the

5    distinction, the importance of that is that they would not

6    be subject to overtime, whereas we have non-exempt teammates

7    who are -- the majority of our teammates are frontline

8    teammates who would be subject to overtime and required to

9    clock in and out for hours worked and be subject to all the

10   meal period rules and rest break rules.

11   Q.  Right.  And I assume you're exempt, correct?

12   A.  Correct.

13   Q.  And now you also mentioned that you oversee the

14   teammates handbook; is that correct?

15   A.  Yes.

16   Q.  And does that mean that you edit it or -- I mean

17   what's your involvement with the teammates handbook?

18     A.  So we would be involved in any deletion, revision,

19   amendment, publishing.  Anything that has to do basically

20   with that policy handbook in any capacity, would come

21   through my team.

22   Q.  You said "we," so you're referring to then you just

23   followed up with a "team."  Is "we" your team?

24   A.  Yes.

25   Q.  And who is on your -- how large is your team?

00005

1    A.  So my team is only myself and one other person.  So,

2   yeah, it's basically two of us.

3    Q.  And who is the other person?

4    A.  His name is Alejandro Bruner-Solos.

5    Q.  And what is his title?

6    A.  He's an analyst.

7    Q.  The teammate handbook, I know there was one issue in

8   January of 2020, correct?

9    A.  I'm not sure which issue you're talking about.

10    Q.  Well, there's one date of January 2020.  We could go

11   ahead -- actually, let me ask you as preliminary.  Did you

12   get -- I had sent some exhibits.  I don't know if you have

13   them handy or not.  And we talked about maybe sharing the

14   screen if we needed to.

15       MS. PETERSEN:  Counsel, the witness has not been

16   provided advance copies of the exhibits.  So if you can

17   share, that's the preference.

18       MR. BORISON:  Okay.

19       MS. PETERSEN:  If you can let me know in advance

20   which exhibit you will be using, I could potentially send

21   the witness a separate copy of it if that's easier to view.

22   But I think that it might make most sense for us to simply

23   use what you're referring to on the screen.

24       MR. BORISON:  That's fine.  I was just following up.

25   It's Exhibit Number 5.

00006

1    (Mr. Borison shares screen.) [**]

2    Q. Mr. Zuckerman, I know this is -- well a year into

3  it, I guess you're probably used to Zoom at this point.  I

4  put up and I just want to make sure you can see the document

5  that's being shared on the screen.  Can you see that?

6    A. Yes.  Yes, I can.

7    Q. All right.  And that's the document that I was

8  referring to which says it's effective January 1st, 2020.

9  Do you see that?

10    A. Yes.

11    Q. All right.  Is that -- and when did you begin work

12  at DaVita?

13    A. March 2017.

14    Q. And during your time there is there any -- was there

15  a teammate policy handbook prior to this one that we're

16  looking at?

17    A. Yes.

18    Q. Prior to this is it done annually or is it ad hoc

19  basis?

20    A. So we would publish a handbook or -- I have to be

21  careful how I answer.  We do a yearly publishing but there

22  may also be -- it's all electronic, right, the handbook is

23  all electronic.  So we do one kind of major publishing on a

24  yearly basis.  And then if there needs to be any changes to

25  the handbook, in theory it's republished but not to this

00007

1  degree.  So a major republishing every year on an annual

2  basis.

3    Q.  Okay.  So when you say "not a major republishing,"

4  there may be certain sections that are republished?

5    A.  Because of the electronic nature -- and I'm not a

6  technology guy -- but because of electronic format, even if

7  you change one word in a policy, you're essentially

8  republishing it.

9    Q.  Okay.  So you might dictate some changes to the

10  policy and someone else inputs it and so the document that

11  you see after that is different than the prior one?

12    A.  Yes.  But what I'm trying -- for instance, this

13  teammate policy handbook where it says effective January

14  1st, we would have that.  So the idea is every year, at the

15  beginning of the year, we would publish a new handbook.  So,

16  you know, there was a similar publishing in the year prior

17  in the year previous to that.

18    Q.  Are the previous versions kept by DaVita?

19    A.  Yes.

20    Q.  All right.  Is there any way to tell what the

21  changes were from year to year?

22    A.  We keep track of that.

23    Q.  And how do you keep track?

24    A.  When I say "we," I mean my team internally.

25    Q.  And how do you keep track of that?

00008

1    A.  We use a -- we use SharePoint, which is basically a

2    software to keep track of that.

3    Q.  All right.  So you would have -- and you save the

4    information as the changes from time to time, correct?

5    A.  Yes.

6    Q.  And that would include what you sort of described as

7    maybe smaller updates as opposed to revamping the entire

8    policy manual, correct?

9    A.  Correct.

10    Q.  All right.  And does SharePoint create like an Excel

11    spreadsheet or do you have the document in redline versions?

12    A.  So we have the documents in redline versions.

13    Q.  Okay.  So if we started with this January 1st, 2020,

14    we would be able to see what changes were made from January

15    1st 2020 to the present day by looking at your SharePoint

16    information, correct?

17    A.  Correct.

18    Q.  And that should highlight every change that has been

19    made, correct?

20    A.  It should if it's been kept up appropriately.

21    Q.  Have you ever had a problem with keeping it up

22    appropriately?

23    A.  The only issue is I don't know how long that

24    SharePoint has been used.  Like I said, I took over this

25    team in 2018, so I can't speak to what happened prior to

00009

1  that.

2     Q.  Right.  And that's fine because we're sort of just

3  talking from January 1st 2020 forward.  And I guess so let

4  me rephrase my question.

5        Since you've taken over, have you had any problems

6  with SharePoint?

7     A.  No.

8     Q.  Okay.  And to access that, is that just a file in

9  some folder that you have?

10    A.  Yes.  So I don't actually -- again, Alejandro is the

11  one who does the day-to-day maintenance.  So he's the one

12  who has -- he and I have access to SharePoint and it's

13  pretty limited who has access to it.

14    Q.  And that's because you don't want anybody making

15  changes to it without your permission?

16    A.  Correct.

17    Q.  And how do you communicate -- like for instance,

18  what we're looking at, which is Exhibit Number 5, how is

19  this disseminated to the employees of DaVita?

20    A.  So when we publish the handbook, we put a -- we have

21  our intranet that we call VillageWeb and we put a banner at

22  the top.  And then we put -- there's a section on the

23  main -- this is all on the main page of the intranet.  And

24  then we put -- what we call, I believe, a DBN or DaVita -- I

25  can't remember what it's called exactly.  But it's on the

00010

1   main page again but lower down.  So there's two spots on the

2   main page; one being a very primary, you know, primary spot,

3   a banner, where it would be put up and communicated to

4   teammates that the teammate policies have been published.

5       Q.  So in essence you advertise on the VillageWeb?

6       A.  Correct, yes.

7       Q.  Okay.  And then how do you know whether employees

8   have downloaded it or not?  Is there a system to know if

9   employees have downloaded?

10      A.  There's no system in place to know that, but we then

11  do have the Star Learning Course to have teammates attest to

12  having received the policy.

13      Q.  And is there any sort of accounting done to see if

14  all the teammates have responded or not or how do you keep

15  track of whether a teammate has responded through the Star

16  Learning or not?

17      A.  Yes, there's a very robust system.  So every DaVita

18  teammate is enrolled in the course, in the Star Learning

19  Course.  And then starting, I believe -- so they were given

20  45 days to complete the course.  Starting with, I believe,

21  two weeks before the deadline, we start a robust series of

22  reminders to the teammate.  And at some point we also

23  include their manager.

24      Q.  All right.  And is there a list of people who have

25  not gone through Star Learning for the policies?

00011

1     A.  There is -- yes, this is a list.

2     Q.  And is that -- I mean so are there people who

3   actually go the whole year without doing the Star Learning?

4     A.  Potentially, although we severely narrow that down.

5   In most cases, the majority of those teammates have some

6   circumstances that maybe they were on a leave, or other

7   circumstances like, that they may have provided

8   justification.  But, yes, it's conceivable that some

9   teammates may have gone without completing the course.

10     Q.  But is it correct to say that you would know the

11   teammates who had not started the course?

12     A.  Yes.

13     Q.  All right.  And when we say -- I mean I think I saw

14   numbers that there's -- forgive me.  I might not have the

15   exact.  But 55 to 57,000 DaVita employees; is that correct?

16     A.  I believe that's correct.

17     Q.  And out of that are we talking, you know, 1 percent

18   of maybe 500 or less who haven't gone through Star Learning

19   or are we talking larger numbers?

20     A.  Yeah.  I think the most we get, you know, maybe 2

21   percent.  So we usually get to at least 98 percent

22   completion.

23     Q.  All right.  And are statics kept on that?

24     A.  Yes.

25     Q.  And who keeps the statistics?

00012

1    A.  Alejandro.

2    Q.  And if I had to ask him for those statistics, what

3  would I call that?

4    A.  I would say completion, course completion statics.

5  I don't know that there's a particular name.  It's just a

6  way of describing in the way that you would understand what

7  you're trying to get to.

8    Q.  Right.  And that's all I was looking for.  I

9  understand that there might not be a formal name to it.

10  Thank you.  And when the changes are made, even if it

11  doesn't call for a brand new complete version of the

12  teammates handbooks, how are the changes communicated to

13  employees?

14    A.  So if it's a change that's happening not within part

15  of that annual publishing, then we would -- in the table of

16  contents you would see -- I believe it says updated.  And so

17  that would be an indication that there's been a change to

18  the policy.  If you -- I believe if you keep scrolling down,

19  it would be in the individual for each chapter.  Right

20  there.  You see right there where it says update.

21    Q.  Right.  So you're referring to this page which is

22  labeled 507, correct?

23    A.  Correct.

24    Q.  And so the update just advises people that there's

25  been a change to it?

00013

1    A.  Correct.

2    Q.  And so you know we're here about the Disaster Relief

3   Policy, correct?

4    A.  Yes.

5    Q.  And on the issue of the Disaster Relief Policy,

6   there were changes made in 2020, correct?

7    A.  Correct.

8    Q.  And I think -- now, when I'm seeing this where it

9   says update, so whenever this was produced, I sort of have

10   to know what date this was produced, right, so I can figure

11   out what updates would be included?

12      MS. PETERSEN:  Objection.  Counsel, I'm just

13   clarifying produced in terms of the litigation?  Produced in

14   terms of --

15      MR. BORISON:  Right.  All I have access to is what

16   you produced in litigation.

17    Q.  So my only question is so when I look at this, so if

18   we look at page 41, Disaster Relief Policy, it says update.

19   But from your description if someone printed this out on --

20   let's just say June 1st of 2021 -- I would not see what it

21   was prior to that date; I would have the update already in

22   this policy, correct?

23    A.  Correct.

24    Q.  So to be able to see what it said on January 1st,

25   2020, we would have to go to your SharePoint files, correct?

00014

1    A.  Yes, or contact -- yes, or contact us.

2    Q.  Okay.  So you mentioned VillageWeb.  Can you

3  describe what VillageWeb is?

4    A.  That's basically just our intranet site, so internal

5  for DaVita teammates.

6    Q.  All right.  It's interactive in the sense that

7  employees could sign into the VillageWeb and send messages?

8    A.  As far as I'm aware, there's no messaging

9  capability.  It's just basically information, so a composite

10  of the information.

11    Q.  So if the employees had questions about corporate

12  policy, how would they communicate that to -- would they

13  communicate that to you?

14    A.  I should say there is contact information.  I mean

15  there is information about departments and there's contact

16  information.  But, yes, if people had specific questions

17  about policies, we have a separate policy email; or if they

18  could ask their leader or their -- you know, someone in

19  their local leadership -- and that either they can help

20  answer the question or they would know to direct it to my

21  team.

22    Q.  All right.  And are there any forms that are general

23  forms where employees can post questions or there's nothing

24  like that?

25    A.  I'm actually not sure if there's a kind of a post a

00015

1  question feature on the VillageWeb.  I'm not sure.

2    Q.  Okay.  Now let me switch documents.

3     (Mr. Borison shares screen.) [**]

4    Q.  This is what has been marked as Exhibit 3.  Let me

5  just ask if you recognize this document.  Just so you know,

6  it's your declaration you did in the case at one point?

7    A.  I do.

8    Q.  So in this document there's a couple of statements

9  that you made.  I just wanted to ask you about it.  In

10  paragraph 4 you reference in March 2020 that you issued a

11  statement regarding a Disaster Relief Policy.  Do you see

12  that?

13    A.  Yes.

14    Q.  And is this -- the statement that you reference, is

15  this different than a modification to the teammates

16  handbook?

17    A.  Yes.

18    Q.  And why was a statement issued as opposed to just

19  modifying the handbook?

20    A.  Well, I think this has to do with the pandemic.  In

21  particular with the pandemic, we have been since -- I mean

22  since it started in early 2020, have had constant

23  communications to our teammates about COVID-related issues.

24  And so I think this statement was just part of that series

25  of communications that we were sending to the Village, to

00016

1  our teammates, that had specific COVID-related messages.

2    Q.  Okay.  When you say it was "sent to your teammates,"

3  how were they sent?

4    A.  So we had -- my recollection is we do have a

5  dedicated COVID-19 page on our intranet, on the VillageWeb.

6  So I know that this was -- this statement was posted on that

7  page, on that COVID-19 page on our intranet.  So I'm not

8  sure what I -- sorry.  Go ahead.

9    Q.  No.  Go ahead.  I'm sorry.

10    A.  Well, I was going to say, what I'm not sure is I

11  also believe -- because we also had emails being sent on a

12  pretty consistent basis, and still do, to teammates, again,

13  about COVID-19 issues.  I seem to recall that there was a

14  email sent.  I just can't be certain anymore.

15    Q.  All right.  So when you said but if we went to the

16  intranet page that you referred to that was set up for

17  COVID-19 communications, that would tell us what

18  communications had been sent concerning COVID-19, correct?

19    A.  So I don't keep up with the page.  I know there was

20  something particular about the statement, so there was --

21  you could find the statement.  I'm not sure if they keep a

22  history of every communications that's been sent, but I know

23  the statement was there.

24    Q.  Who would be in charge of that page?

25    A.  I can't give you -- I'm not sure exactly.

00017

1    Q.  When you said you know they're there, is that

2  because you looked at the page yourself?

3    A.  I have.  I mean I remember it being there.  So,

4  again, I'm not sure of the history.  I'm not sure if they

5  have a history of everything that's been put on there.  But

6  I do recall that it was definitely up there at the point of

7  the statement being released.

8    Q.  Were you involved in releasing the statement?

9    A.  No.

10    Q.  Do you know who prepared the statement?

11    A.  I do not for certain.

12    Q.  But it did affect the handbook, correct?

13    A.  There was a component of it, yes.  In the statement

14  there's the section that it was put in the handbook.

15    Q.  Right.  And then in this -- but this wasn't -- in

16  paragraph 5 it talks about the employees annually

17  acknowledge.  There was no acknowledge as to the update

18  that's referred to in paragraph 4, is there?

19    A.  No.  That's correct.

20    Q.  And speaking of the acknowledgements is there a

21  record -- I know we discussed earlier there's a record of

22  people who have not responded.  Is there also a record kept

23  of people who have acknowledged?

24    A.  Yes.

25    Q.  And that would be the 98 percent.  So like, for

00018

1  instance, in this particular case in Exhibit 4 -- and I can

2  scroll down to it to help you, but I'm sure you're familiar

3  with it.  This is for my client, correct?

4    A.  Correct.

5    Q.  There would be similar one for everyone who

6  acknowledged this?

7    A.  Yes.

8      MS. PETERSEN:  Counsel, for the record, could you

9  please identify what page you're referring to.

10      MR. BORISON:  Sure.  It's page 14 of this

11  declaration.

12      MS. PETERSEN:  Thank you.

13      MR. BORISON:  Sure.

14    Q.  Now, in paragraph 3, this is the January 20 teammate

15  policy and also included is Disaster Relief attached as

16  Exhibit 2.  Now, we just -- we talked about and I'm looking

17  at Exhibit 2, which is page 49.  Do you know if what we're

18  seeing here was the actual original page included or does

19  this include updates?  [**]

20      MS. PETERSEN:  Objection, vague.

21    A.  This was --

22      MS. PETERSEN:  You can answer if you understand.

23    A.  I'm not sure if I understand.  But this policy, so

24  what we're seeing was the policy as of, I will say January

25  2020.

00019

1   Q.  And how do you know that?

2   A.  Well, I know it because it doesn't contain.  So what

3   it doesn't have is that policy, that section from the

4   statement.

5   Q.  Right, but there could have been changes between

6   January 2020 other than the statement, correct?

7   A.  Correct.

8   Q.  And so when you pulled this document -- I guess my

9   point is when had you pulled this document, you just went to

10  the current version of the handbook when you pulled it,

11  correct?

12  A.  Correct.  But I will say this because I'm in charge

13  of the policy team, I know that there was no changes to that

14  section.

15  Q.  Okay.  Did you check your SharePoint to determine --

16  to make that determination or you just remember that?

17  A.  I just remember that.

18  Q.  Have you at some time checked the SharePoint to see

19  if there were any changes?

20  A.  No.

21  Q.  So let's take a look at, which is Exhibit 3, and

22  it's page 10 of this exhibit.  Do you see that?

23  A.  Yes.

24  Q.  Now, just in the first sentence, "We understand some

25  teammates have raised questions."  Do you know how these

00020

1  questions were raised?

2     A.  I do not.

3     Q.  Who would know that?

4     A.  I guess -- I'm not even sure how to answer that.  I

5  don't know.

6     Q.  Okay.  Are you familiar that there were questions

7  raised about the application of the policy?

8     A.  So at the point where I became aware that was -- I

9  was looped into discussion with counsel.

10     Q.  Okay.  And so let me give a little short, I guess

11  number 4 rule.  I'm not asking for anything you discussed

12  with counsel.  You can tell me you have had discussions with

13  counsel, okay.

14     A.  Sure.

15     Q.  I just tell that you so you don't feel like you're

16  obligated to answer and give me details.  That is protected

17  by attorney-client privilege, so I'm not really seeking

18  that.  But I do need to know is there anybody, besides

19  counsel, that you spoke to about this?

20     A.  I don't believe so.  Like I said, I think by the

21  time there was discussion of this change or communicating

22  this part about the policy, at that point the first time I

23  got involved in those discussions counsel was already

24  involved.

25     Q.  Okay.  And so you were not party to preparing this

00021

1  document, correct?

2    A.  Sorry.  I want to be careful how I answer that.

3  This document -- I was not part of creating this document,

4  so the answer I guess is no.  Let me rephrase -- or maybe I

5  can ask you to rephrase your question.

6    Q.  Sure.  Did you participate in the drafting of this

7  document?

8    A.  I would say no in the sense that I -- my

9  recollection is this had already been prepared and I had no

10  say in the wording of it.  So I guess the answer to your

11  question is no, I was not.  I did not participate in the

12  drafting of the document.

13    Q.  And do you know who prepared the document?

14    A.  I don't know for certain.

15    Q.  Well, when you say "not for certain," are you just

16  saying is that -- is there someone you believed was involved

17  in the preparation of this document?

18    A.  No.  I just know -- I know some of the parties that

19  were involved in those discussions I was having included

20  with counsel, but I don't know which of those parties

21  actually put pen to paper and drafted this document.

22    Q.  Okay.  When you say "parties," are you talking about

23  all lawyers or are you talking other people in the

24  non-lawyer position?

25    A.  There was lawyers, obviously, and then there were

00022

1   other -- yeah, I can't remember everybody on the call, but I

2   know definitely our lawyers and at least one other person

3   that I would call that was on.

4      Q.  Okay.  Who is the other person that you do recall?

5      A.  It would be our chief people officer.

6      Q.  Who is that?

7      A.  His name is Kenny Gardner.

8      Q.  Who does he work for?

9      A.  As far as I'm aware, he's the chief people officer

10  of DaVita.

11     Q.  Okay.  And I think you mentioned earlier you have

12  access to employee records regardless of which individual

13  activity the person works for as part of your job?

14        MS. PETERSEN:  Objection, assumes facts not in

15  evidence, misstates prior testimony.

16        MR. BORISON:  Well, let me ask you this, I thought

17  you said earlier that you had access -- that you dealt with

18  issues of anybody who was under the DaVita umbrella whether

19  they worked for TRC or someone else; is that correct?

20     A.  That's correct.  I just want to clarify.  In my

21  position, as part of overseeing the teams I mentioned, we

22  don't make a distinction as to -- I don't mean to be quite

23  transparent.  I'm not even sure I'm aware or have good

24  understanding of those distinctions; because for us, in my

25  capacity as director overseeing those teams, we treat

00023

1  everybody, all DaVita teammates are just DaVita teammates.

2    Q.  Right.  Here's maybe simpler, I guess we talked

3  about that there's 55 to 57,000 employees, correct?

4    A.  Correct.

5    Q.  Do you have access to the records, any records for

6  those 57,000 people?

7    A.  I do have -- I mean we have -- yes, I would have

8  access to some information regarding all those teammates.

9    Q.  Would that include their StarLearning attempts?

10   A.  No.

11   Q.  Okay.

12   A.  I mean -- so StarLearning is a separate system; I

13  just want to clarify that.

14   Q.  Tell me what StarLearning is.

15   A.  I'll tell you what I can.  And I don't even know

16  that -- I don't know what access I have to StarLearning

17  because I don't really access it very much.  But

18  StarLearning I would classify -- and I'm going by what my

19  understanding is, my personal understanding.  But I would

20  classify StarLearning as kind of our education platform, an

21  e-learning type of environment to educate our teammates on a

22  variety of topics.

23   Q.  Right.  But it's also used to obtain

24  acknowledgements from them, correct?

25   A.  Correct.  But, again, in my opinion, part of that is

00024

1   education, too, right.  So we're educating them about what

2   it we're asking them to acknowledge or attest to.

3     Q.  And that would include the different, the Disaster

4   Relief Policy, correct?

5     A.  Sorry.  We don't have anything that's particular to

6   Disaster Relief.  We have our StarLearning course that is

7   about our teammate policy handbook of which part of that

8   would be, you know, the Disaster Relief section.

9     Q.  Right.  But on this particular one, this

10  statement -- I guess, let me go back because I'm not sure.

11  We might have got sidetracked.  Were you aware of people

12  raising questions about the application of this policy

13  during COVID-19?

14      MS. PETERSEN:  Objection, asked and answered.

15    Q.  You can answer.

16    A.  I was trying to -- I seem to recall but I'm not even

17  aware of the timing of it.  But there may have been one

18  instance where -- and I don't even have a clear recollection

19  of it -- where there might have been an email about the

20  Disaster Relief Policy.  But other than that one incident,

21  which I still don't even have specific knowledge of when it

22  might have occurred before or after, I know -- you know,

23  again, when this statement came up, I was already looped in

24  when it had already been drafted.

25    Q.  Okay.  Well, putting aside when it happened, tell me

00025

1  what you recall.

2    A.  I don't even -- I don't recall specifics.  I seem to

3  recall that there may have been an email basically just

4  asking does the Disaster Relief Policy apply.  That would be

5  the extent of my recollection.

6    Q.  You don't recall who it would be from or anything

7  like that?

8    A.  I do not.  I'm just trying -- sorry.  I'm trying to

9  think about it.  No, I wouldn't.  I have no idea who

10  specifically it would have come from.

11    Q.  And that's the only communication which you recall,

12  is a single email, correct?

13    A.  Yeah.  Like I said, I'm just going by general

14  recollection, but yes.

15    Q.  Are there some documents that would refresh your

16  recollection?

17    A.  Not that I would keep track of.  You know, people

18  come to me, I was doing a lot of work on COVID so people

19  would come to me with some policy-related questions so it

20  could have been from a variety of sources.  But I don't know

21  and I don't think there's any way I could find out.

22    Q.  This document that we've been looking at on page 10

23  of this exhibit, do you know why it's not dated?  [**]

24    A.  I do not know.

25    Q.  Do you know when it was prepared?

00026

1   A.  The only thing -- my estimate is, because I'm aware

2   of kind of the timeline of how this all unfolded, I would

3   say it had to have been March 2020.

4     Q.  All right.  And when you say how this all unfolded,

5   what are you referring to?

6     A.  I'm just saying the timeline, because I know by the

7   end of March, I believe we had already communicated with

8   teammates.  And I know this all happened pretty early in the

9   pandemic, so that's why I say everything, by the time

10  this -- the policy, that provision was put in the policy,

11  that all happened by the end of March so it all happened

12  pretty quickly.

13    Q.  When you say communicated with teammates, is this

14  the communication that you're referring to or is there some

15  other communications?

16    A.  No.  This one.

17    Q.  Any other communications besides this one that was

18  provided to teammates?

19      MS. PETERSEN:  Objection, vague.

20    Q.  You can answer.

21    A.  I think I may have already said it.  But I'm not

22  certain of other -- you know, I referred to it being put on

23  the intranet.  I'm not sure.  I seem to recall there being

24  an email but I can't say for certain.

25    Q.  If you had to find that email, do you think you

00027

1  could find the email that communicated with the teammates?

2     A.  I don't know if I would have it just because our

3  system deletes emails after a certain amount of time and

4  we're talking, you know, more than a year ago, so I don't

5  know if I would find it within -- even if I searched within

6  my Outlook inbox.

7     Q.  When you were preparing the declaration, did you do

8  any search to see what communications had been sent to

9  teammates?

10        MS. PETERSEN:  Objection.

11     A.  No.

12        MS. PETERSEN:  To the extent that reaches into

13  attorney-client communication or work product.

14        MR. BORISON:  You're objecting my asking him if he

15  did a search.

16        MS. PETERSEN:  To the extent that that reflects

17  attorney-client communication, yes.  But he has answered the

18  question.

19     Q.  So during your time there in your position -- and

20  your position, as I understand it, and correct me if I'm

21  wrong -- you're in charge of the teammates handbook,

22  correct?

23     A.  Correct.  I would like to phrase that I'm in charge

24  of the administration of the teammate handbook.  I'm not

25  sure but that's how I would usually phrase it.

00028

1    Q.  You're not involved in drafting the teammates

2  handbook?

3    A.  I am not -- I'm not usually involved in creating

4  policies if that answers your question.

5    Q.  Potentially.  So let me just explore it a little.

6  Where do the policies come from?

7    A.  So we will have various stakeholders that would come

8  forward with proposed, whatever it is, amendments,

9  revisions, deletions.  As you can imagine, there are certain

10  policies that may be related to certain departments.  And so

11  you -- and certain subject matter experts.  So it can come

12  from a variety of people, but I'm usually not the one to

13  say, you know, we need this policy and start actually

14  drafting the policy.  And that's where I think I go to the

15  administration, why I say that I'm there to administer the

16  handbook.

17    Q.  But are you included when people want to make

18  proposed amendments?

19    A.  Yes.

20    Q.  So you would have knowledge of proposed amendments

21  being circulated, whether you resolve them or not, you're

22  still in the chain for knowing that people are asking for

23  proposed amendments, correct?

24    A.  Correct.

25    Q.  And when you say they propose them, how is that

00029

1  normally done?

2     A.  That can be -- so it can be done in a variety of

3  ways.  I would say, the top of my head there's two main

4  ways; one is we talked about that annual publishing, so as

5  part of that process we reach out to all -- what we would

6  call, I guess, policy owners to see if they have any changes

7  to be made with respect to policies; and the other -- so

8  that's one way; the other way would be for anybody to

9  proactively come to us and say, hey, we want to add this,

10  change this, or do this.  So I think those are kind of the

11  two ways.

12     Q.  Is there any other way?

13     A.  I think those are the only two ways I can think of;

14  either we're reaching out or we're receiving reach-out, so I

15  can't really think of any other way it would come to us.

16     Q.  In this particular case as to the Disaster Relief

17  Policy, you didn't solicit any request, correct, or changes?

18     A.  So just to clarify, we would have -- you know, we

19  would have as part of our annual.  But with respect to that

20  section around COVID-19, no, we did not do the reach-out for

21  that.

22     Q.  And when you say people proposed changes or asked

23  for changes, it's usually a submission where they propose

24  something and someone acts upon that proposal?

25     A.  So there's no formal process.  It can happen in a

00030

1  variety of formats.  You know, they may reach out to me

2  directly; they may send an email to the inbox.  So there's

3  not -- I would just say that there's no formal way to

4  request a change.

5     Q.  When you get -- in this particular case, you didn't

6  get a proposal for a change; you were provided the statement

7  that was going to be issued, correct?

8     A.  Well, I would say -- so this was part of the -- the

9  one thing I want to say because this was part of a

10  discussion we had with counsel -- but there was prior to

11  this -- so the statement already includes the provision.

12  That provision I would say predates the statement, right.

13  So to include that provision in the statement, you

14  already -- that provision what I'm calling that COVID-19

15  paragraph, let's say -- that had already been drafted prior

16  to the statement.

17     Q.  Right.  But I'm talking about the -- let me just

18  refer you back to it.

19     A.  So the statement -- I just want to clarify -- the

20  statement itself is not in the policy handbook; only that

21  part where it says COVID-19 crisis; only that paragraph was

22  put into the handbook.

23     Q.  Right.  So was this statement that I'm looking at,

24  would that have been sent out to the employees or would they

25  just see that there was a change and this now appears in the

00031

1  handbook?

2      MS. PETERSEN:  Counsel, could you be a bit more

3  specific as to what you're referring to -- again, for the

4  record.

5      MR. BORISON:  Sure.  I started this with saying we

6  were looking at and he was just making a distinction between

7  the statement and what was actually included in the

8  handbook.

9    Q.  So my question to you is, do you see where I

10  highlighted, which is I think what you're referring to as

11  the part that was added to the handbook, correct?

12    A.  Correct.

13    Q.  Do you see the highlighted part that's labeled

14  COVID-19 crisis and it's one paragraph that starts with the

15  word "the" and ends with the word "patients."  Do you see

16  that?

17    A.  Yes.

18    Q.  That was what was added to the handbook, correct?

19    A.  Yes.

20    Q.  Do you know when it was added to the handbook?

21    A.  I don't know exactly but it was sometime in I

22  believe in March 2020.

23    Q.  And would there have been anything, an update or an

24  email sent out saying there's been an update to that

25  provision of the Disaster Relief Policy at that time?

00032

1    A.  There would have been just the statement.

2    Q.  Okay.  So that's what I'm asking you.  So the rest

3  of this statement would have been sent to everyone?

4    A.  Well, that's a -- so going, you know, to what I

5  said, I believe there was an email.  So you're using the

6  word "sent" so I want to be very careful in how I answer

7  because I can't say for certain that it was sent in terms of

8  a -- let's say like an email that's sent to all the

9  teammates.  I believe it was.  What I do know with a certain

10  degree of certainty is that this statement was put on the

11  VillageWeb for teammates to access, so that's why I'm just

12  trying to differentiate between the advertising, as you put

13  it in another context, as opposed to being sent.  I'm not a

14  hundred percent sure that it was sent.  I believe it was.

15    Q.  How would we find out it was sent?

16    A.  I believe you would have to talk to our

17  communications team.

18    Q.  Who is that?

19    A.  I would say the person -- the best person would be

20  Carley St. Clair.

21    Q.  Okay.  So besides what we just looked at, are you

22  aware of any other communications to teammates of the change

23  in the COVID-19 --or the change in the Disaster Relief

24  Policy that's reflected on this page 10?

25    A.  The only other thing is I would say there may have

00033

1  been oral communication.  We, again, as part of or constant

2  communication to teammates about Covid-19-related issues, we

3  would have ongoing calls with teammates, what we call Voice

4  of the Village Calls, and it may have been mentioned on one

5  of those calls.

6     Q.  And the Voice of the Village Calls, explain to me

7  what that is.

8     A.  That's just a forum to communicate issues, you know,

9  on a widespread basis to DaVita teammates and we had

10  specific Voice of Village Calls for COVID-19 issues.

11    Q.  And are they broken down into specific issues, for

12  instance, as to the Disaster Relief Policy; or is it just

13  general COVID-19 Voice of the Village Calls?

14    A.  I don't think it would be.  So, you know, the format

15  would be the leaders would have an agenda of things they

16  wanted to discuss so -- and I don't recall if the Disaster

17  Relief was one of those agenda items.  And the other part of

18  it, though, is there would be, you know, a town hall so

19  basically teammates could ask questions.

20    Q.  And are the records kept of these Voice of the

21  Village Calls?

22    A.  I can't say for certain.

23    Q.  Who would know?

24    A.  I'm not sure.  Carley may know.  I don't know.  But

25  I don't know if she knows that or not because that's -- you

00034

1  know, -- I will say Carley is or people services

2  communication and that may be, you know, DaVita has a

3  broader communications team.  So I don't know if it was that

4  team or if Carley would know.  I'm not sure.

5     Q.  Did you participate in any of these calls during

6  2020?

7     A.  When you say participate, participate as a speaker

8  or participate as a participant.

9     Q.  Any way.

10    A.  Yeah, I listened to probably a majority of those

11  calls.

12    Q.  Do you recall anybody raising the issue of the

13  Disaster Relief pay as it applied to COVID-19?

14    A.  I don't specifically recall.

15    Q.  Do you keep notes from those conversations that you

16  listen to?

17    A.  No.

18       MS. PETERSEN:  And, Counsel, we don't need to do it

19  right now but we've been going for about an hour so I would

20  like to ask for just a quick break.

21       MR. BORISON:  Why don't we do it right now and we'll

22  take five minutes, fair?

23       MS. PETERSEN:  Perfect.

24       (Brief recess.)

25    Q.  You had mentioned earlier that you had had a

00035

1  conference call with lawyers concerning this statement,

2  correct?

3    A. So I know there was email communications.  I don't

4  know -- I don't particularly recall there being calls, but

5  there may have been a call.  What I remember distinctly were

6  email communications.

7    Q. Okay.  And none of these were addressed to you in

8  particular but you were included amongst other people

9  correct?

10   A. Correct.

11   Q. And I thought -- and the reason I said that was I

12  thought you had identified someone else who had been on the

13  call with you and I'm -- I did not write down his name but

14  there was another person who is not an attorney who you

15  recall participating.  Do you remember --

16   A. Yeah, I did.  Again, just to clarify, because I

17  don't think if I did -- I don't believe, you know, I was

18  saying it was a call.  I think it was attorney

19  communications because -- yeah, so I just want to make clear

20  that I remember emails.  But, yes, his name was Kenny

21  Gardner and he's our chief people officer.

22   Q. Right.  And I'm sorry.  It might have just been my

23  -- phrased it as a call, so I'm not trying to put words in

24  your mouth.

25      Let me ask you a question.  During your time frame

00036

1   with DaVita, have you seen the Disaster Relief Policy ever

2   applied?

3      A.  So I don't have direct knowledge of it being

4   applied.  I'm not part that have process where it's applied

5   -- again, focusing on I administer the teammate policy

6   handbook.  I'm not part of this application process.

7      Q.  Okay.  But you are in charge of the wage an hour

8   people who would be affected by the Disaster Relief Policy,

9   correct?

10     A.  Sorry.  I need you to clarify.  When you say the

11   wage an hour people, which people are we talking about.

12     Q.  I thought one of your topics or one of your areas

13   was wage an hour employees.

14     A.  So let me clarify.  Wage an hour issues, not

15   necessarily employees.  My team oversees wage an hour

16   issues.  So, you know, you mentioned one of the issues we

17   deal with is exemption/non-exemption.  So when issues come

18   up around that, when there's questions around it, you know,

19   my teammate may, with help from counsel, provide guidance on

20   that.  But it's not -- yeah, I think -- you asked me the

21   question.  We're not constantly communicating with teammates

22   about wage an hour issues.

23     Q.  Okay.  Let me ask you a question.  We looked at the

24   teammate handbook.  Are there any other policies issued by

25   DaVita to TRC, or anybody else that you're aware of, besides

00037

1  the teammates handbook?

2     A.  I can't -- I'm sorry.  Could you repeat that

3  question?  I just want to make sure I understand it first.

4     Q.  Are there any other policies that you're aware of

5  besides what would be reflected in the teammates handbook?

6     A.  So there are other policies.  These I, you know I

7  want to -- we're talking about -- and for clarification, I

8  keep referring to teammates, which is what we call our

9  employees.  I'm part of our human people services, which is

10  human resources.  So these policies are human resource

11  policies.

12        There are other policies like clinical policies that

13  I have no -- you know, we have compliance policies.  I'm not

14  part of those teams, so I can't speak to how those are

15  communicated, you know, when they're communicated.  I can

16  only speak to people services policies.

17     Q.  Okay.  I understand.  So limiting it to your area,

18  which is people policies, are there any other policies other

19  than what's reflected in the teammates handbook?

20     A.  I want to say there may be.  But, you know, it also

21  comes to what the definition of a policy is.  We may have

22  guidance.  I'm just trying to -- I'm just trying to think

23  about this to make sure I can give you the best answer on

24  this.

25     Q.  I would take a mediocre answer.

00038

1    A.  Well, listen, my -- I think my goal, my intent is to

2   have any policy that would apply on a widespread basis to

3   DaVita teammates, my goal would try and ensure it's in the

4   policy handbook.  So I would try to limit, if there were

5   policies that were sent to teammates, I would try to limit

6   that because my goal is to try and make sure that it's in --

7   I want our handbook to kind of be that go-to document for

8   DaVita teammates.

9        So there may be policies out there.  But my goal is

10   to always -- if there is in fact a policy, I would think it

11   should be -- you know, we would want to try and get it in

12   the handbook if it has a general widespread application.

13    Q.  Well, Are you aware of any other policies, though,

14   that's my question?  I understand your goal would be to

15   include it in the handbook.  Are you aware of any other

16   policies?

17    A.  So honestly I'm not trying to be evasive.  I just

18   want to ask because I don't know what you define as a

19   policy.  We have -- so, for instance, let me give you an

20   example.  We have one of our policies in this handbook is

21   about attendance, so we have our attendance policy.

22        There are divisions out there that have these

23   supplemental, but it all depends on what you call it.  Some

24   people might call it a supplemental attendance policy.  It

25   kind of builds on our policy.  So if you call that a policy,

00039

1  are there other policies, absolutely.  But I would call that

2  kind of a -- that, first of all, very specific to a

3  particular region.  And I don't know if I would call it a

4  policy as opposed to a supplement or, you know, addition.

5  So that's why it's very hard for me to answer that question

6  because I don't know what you consider a policy.  I'm also

7  not aware of everything out there.

8         But to answer, again, are there supplemental

9  attendance -- what some people call attendance policies --

10  yes, there are those out there.  So maybe there are other

11  things I don't know about.

12    Q.  Right.  And I'm only asking what you know about.  I

13  think maybe you're taking these questions much broader on

14  behalf of the entire company as opposed to I'm just asking

15  for your knowledge, okay.

16        And so here's my question, are you aware of any

17  policies that have been in effect that affected either

18  exempt or non-exempt employees' compensation during

19  COVID-19?

20    A.  Any policy -- can you repeat that question for me?

21    Q.  Sure.  Any policy affecting compensation of exempt

22  or non-exempt employees during COVID-19.  And we'll start

23  for the COVID 19 era, we'll say from January 1st, 2020 to

24  the present.

25    A.  I'm going to say, no, I'm not aware of any policies

00040

1  related to COVID that were issued outside of the handbook.

2     Q.  Are you aware of any compensation being paid to any

3  exempt or non-exempt employees that has increased during the

4  COVID-19 era, which I defined as January 1st, 2020 to the

5  present?

6     A.  Yes, I am aware, yes.

7     Q.  What -- tell me what you're aware of.

8     A.  So at some point there was -- and I want to be very

9  clear because I don't know how to phrase it.  I'm not a

10  payroll person.  But at some point in recognition of COVID,

11  there was an amount of I believe -- I can't remember what it

12  was; it may have been $100, $200 per paycheck or whatever it

13  was -- for a period of time that was paid out to teammates.

14    Q.  And was that paid out to particular teammates or all

15  teammates?

16    A.  I don't recall for certain.  I know I received it,

17  so I'm going to say it may have been all teammates; but I

18  don't know for certain.  But, again -- so that's not within

19  any of the fields that I deal with.  I'm only telling you as

20  a DaVita teammate what my experience was in that regard.

21    Q.  I appreciate that.  You know, earlier your attorney

22  said "if you understand" or "if you know."  Of course I

23  can't ask you anything you don't know, correct?

24    A.  Correct.  But that's why I just want to clarify.

25  I'm speaking to you not as someone who had been on one side

00041

1  of the fence.  I'm speaking to you as just like any other

2  teammate could tell you, oh, yeah, I remember we received

3  this $200 or whatever it was.

4      Q.  Right.  Do you know why you received it?

5      A.  Again, I don't know how -- I don't recall how it was

6  phrased or how it was worded.  I just remember it had to do

7  with recognizing, you know, the pandemic.  And this was

8  earlier on, too, when everything was new.

9      Q.  And did you get any written explanation with why

10  you're getting it?

11      A.  So, you know, I spoke about the Voice of the Village

12  Calls so I know it was mentioned on at least a couple of

13  those calls.  And there may have, again, been email

14  communications as part of those robust communications that

15  were being sent out.  I'm pretty certain that there was an

16  email about it, too.

17      Q.  And who do you think sent out that email; who would

18  have done that?

19      A.  I think it would have come in the name of perhaps

20  Kenny Gardner but I can't be for certain.  But, again, our

21  communications team would know.

22      Q.  And that's Ms. St. Clair, I think?

23      A.  I think Ms. St. Clair would be a good starting

24  point, at the very least.

25      Q.  Okay.  Anything other than that pay that you just

00042

1  described?  Anything else that changed because of COVID-19

2  as far as compensation?

3    A.  Not that I can recall off the top of my head.  I

4  remember that.  I remember that payment that was made, those

5  payments but...

6    Q.  And let me just ask you about your background.  You

7  said -- did you start to work there in 2017; is that what

8  you said?

9    A.  Correct, March, yes.

10    Q.  And prior to that -- you're actually an attorney in

11  Canada?

12    A.  In Canada.  I'm not licensed in any of the states.

13    Q.  When did you graduate from law school?

14    A.  2000.

15    Q.  And did you proceed -- and this might show my

16  ignorance of the system.  Did you go from college to law

17  school; is that how it works there in Canada as well?

18    A.  So at the time -- and to be hones, I don't even know

19  how it works anymore -- at the time you had to have at least

20  completed, I believe, it was two years of an undergraduate

21  degree before you could go to law school.  I actually

22  completed my full undergraduate degree before going to law

23  school.

24    Q.  Was there any gap between going from undergrad to

25  law school for you?

00043

1   A.  No.

2   Q.  Okay.  So you graduated in 2000.  And once you

3  graduated, what did you do?

4   A.  At the time in Canada you had to do what we call

5  articling, so you basically you had to go article with a

6  firm for -- I think it was around 11 months.  So you article

7  and then you write your bar exam.  So I articled and then

8  you go to -- you take the courses, the bar courses through

9  the law society, and then you write all the several bar

10  exams.

11   Q.  Okay.  And so let's say that took a year.  And then

12  what was your first non-articling job?

13   A.  So my first non-articling job was working at a very

14  small -- it was basically a three-person firm, full service

15  kind of firm, law firm, that -- I would say they primarily

16  dealt with civil litigation.  I started focusing on real

17  estate.

18   Q.  How long did you stay there?

19   A.  I wasn't there very long.  I think my recollection

20  is about -- I want to say six to eight months.

21   Q.  Okay.  And I'm just -- I don't want to -- it's not a

22  memory test.  But is there any significant, you know, did

23  you go to a different private practice or did you do

24  something different?

25   A.  So I moved around.  After that I went actually to --

00044

1  I went to work for a company, just a business, a technology

2  business.  And I acted -- I kind of did some in-house type

3  work for them, but the majority I was actually doing

4  production management, essentially.  It was a very -- it was

5  startup firm.  There was three of us and we basically wore a

6  lot of hats.

7    Q.  And when you say production manager, are you talking

8  they actually produced, for lack of a word, widgets?

9    A.  They actually produced motors for elevators.

10   Q.  Okay.  Then after that?

11   A.  After that I believe I went to the -- what we

12  call -- it's called LawPro -- no.  I'm sorry.  Let me back

13  up.  I am trying to go back to my memory.  I believe after

14  that I went to -- I started my own firm, primarily in real

15  estate.

16   Q.  Okay.  And then stayed in private practice for a

17  period of time?

18   A.  Yeah.  So I think I had my own firm for about two

19  years.

20   Q.  Okay.  Did you like it?

21   A.  It was fun.  It was stressful being, you know,

22  solely responsible for yourself and basically having all

23  functions under your umbrella.  It was very interesting,

24  very educational.  But that's also why I left; it was just

25  very stressful.

00045

1    Q. I know how you feel.  Okay.  So you left private

2    practice and then what came next?

3    A. So then I went to the Law Society of Ontario

4    basically has a bar-related title insurer and I went to work

5    for them as a -- I can't remember what my title was, but I

6    think it was a title analyst of some sort.

7    Q. Okay.  Did you stay with -- did that change at any

8    time while you worked for them or did your duties change?

9    A. I think I was with them for about two years.  And

10   over the course of those two years I started getting a

11   little bit more responsibility but my job duties didn't

12   change fundamentally.

13   Q. Okay.  And did that -- was that right before DaVita

14   or was there something else?

15   A. No.  So that ended in 2008.  So I think we're up

16   around 2008 now.  In 2008, I want to say August, I went to

17   work for the Law Society of Ontario.

18   Q. Okay.  And I thought you had said that you had

19   worked for the Law Society of Ontario for the title

20   insurance.  Is this a different entity?

21   A. So it's a separate entity.  It's an affiliate.  It's

22   a bar-related title insurer and they have an affiliation but

23   they are distinction.  So I moved from LawPro, which was the

24   title insurer to the actual Law Society of Ontario.

25   Q. Okay.  What did you do there?

00046

1    A.  I investigated complaints against lawyers and

2  paralegals for alleged violations of the rules of

3  professional conduct.

4    Q.  And anything after that before DaVita or was that --

5    A.  So there's kind of a gap there because we moved from

6  Canada.  So after that, we moved from Canada to Texas where

7  I was actually a stay-at-home dad for a few years.  And then

8  in 2016 I went back to Canada to resume, on a contract

9  basis, the same role I had, complaints resolution counsel.

10  So from 2016 to early 2017, I was actually working back in

11  Canada; and then in 2017 came back here for the DaVita

12  position.

13    Q.  Okay.  And then when you first got hired by DaVita,

14  you moved up to director.  You didn't start out as director,

15  right?

16    A.  Correct.

17    Q.  And what was your role prior to becoming director?

18    A.  So I have had two roles prior to becoming director.

19  I was initially hired in 2017 as a manager.  And then I

20  believe it was 2018, I became a senior manager.  And then

21  recently, beginning of March 2021, I became director.

22    Q.  All right.  And when you were a manager in the same

23  department or different?

24    A.  No.  So there's been changes, initially in 2017 when

25  I was hired as a manager, I conducted investigations for

00047

1   what teammate relations group.  And for the specific

2   geography so I'm in Texas, so I was doing investigations for

3   -- primarily our Texas market.

4       Q.  And then when you were senior manager, did that

5   change?

6       A.  Yes.  So senior manager is when I kind of left

7   behind doing the investigations I still -- at that point I

8   started overseeing a team that conducted -- well, I guess

9   all facets of investigations, more on the west coast.  And

10  then I also, at that point, took over -- that's when I took

11  over the policy team.

12      Q.  And when you became director, it was the same area,

13  just broader or not?

14      A.  So director, I haven't -- so I'll try and put

15  this -- so in 2018 I became senior manager.  I started

16  overseeing kind of that western investigations group.  I

17  started overseeing the policy team in October of -- I want

18  to say 2019 is when I took over the wage an hour team.  I

19  was still senior manager.  I still had my other duties.  I

20  started overseeing the wage an hour team.

21          At some subsequent point I kind of stopped

22  overseeing the investigations group.  So I was focused

23  exclusively on wage an hour and the policies group and then

24  I also, at some point, started overseeing the unemployment

25  sphere.  And then more recently -- I want to say the

00048

1  beginning of 2021 -- is when I took on the mergers and

2  acquisitions piece.  So I already had all that stuff going.

3  And then in early March, early March, I was promoted to

4  director but nothing really changed.  I already was given

5  any new teams to oversee.

6      Q.  Okay.  Now, and this -- let me ask you, did you read

7  the complaint or the amended complaint filed in this case at

8  any time?

9      A.  I don't believe I've actually seen the complaint.

10     Q.  Okay.  Can you tell me what you understand the

11  purpose of providing the teammates handbook to DaVita's

12  employees is?

13     A.  Sorry.  Just repeat, providing the handbook?

14     Q.  Right.

15     A.  Yeah.  So I would say, in my opinion, the purpose of

16  providing the handbook is to make teammates aware basically

17  of what we expect of them -- so it's two-fold; I think the

18  expectations of them and we also alert them to things that

19  are available to them.  And I say that because we have, you

20  know, descriptions of certain programs that they can

21  utilize, benefit-type programs.

22     Q.  And any other -- when you say expect of them, it's

23  basically to provide them -- can you give me an example of

24  expectation?

25     A.  Yeah.  I mean performance and behavior expectations.

00049

1  So, you know, one example, conduct or, you know, appearance

2  or, you know -- I mentioned attendance.  So those are all

3  expectations we have of teammates, that they're going to

4  dress in a professional manner; that they're going to attend

5  promptly and those types of expectations, things we expect

6  of them.

7      Q.  And does it create any expectations of how they're

8  going to be treated by DaVita?

9      A.  I would say yes.  I mean, for instance, we have our

10  harassment policy which goes both ways, right.  We're down

11  to leaders and, myself included, are bound by these policies

12  just as much as any other teammate.  And so I, as a leader

13  of DaVita, to answer your question, yes, I'm under the same

14  expectations and obligations.  So a teammate reading this

15  should know that I, as a leader or their leader or whoever

16  it is, has to treat them fairly and appropriately and

17  professionally as well.

18      Q.  Now, as far as the complaint, you said you don't

19  think you've seen it.  If I showed you the document, would

20  that maybe help refresh your -- I mean are you familiar with

21  what a complaint is?

22      A.  Yes.  It's funny.  I think at some long previous

23  point I had asked.  It's been a while since I don't do any

24  court documents.  But, yes, I think I'm familiar.

25      Q.  Would it help you to show you the complaint

00050

1  potentially or -- let me pull it up and see.

2      MS. PETERSEN:  Counsel, are you going to refer to

3  the document?

4      MR. BORISON:  Yeah.  I'm just looking for the

5  number.  It will be Exhibit Number 1.  And let me just pull

6  it up, okay.

7    A.  And the only reason I say that is because in Canada

8  I think we probably have different terminology.

9    Q.  Yeah.  Here it could vary state by state.

10     (Mr. Borison shares screen.) [**]

11     MR. BORISON:  This is marked as Exhibit Number 1.

12  And just for the record, we had created a master list and we

13  were going to use the same numbers for all the depositions

14  rather than mark them separately.  But this is Number 1 of

15  the master list.  I'm happy to scroll through it.  I don't

16  know if the first page triggers your memory or not.

17    A.  Yeah.  I definitely have not seen this recently.  I

18  don't think I've seen it.  But I'm also -- I mean I don't

19  know -- I think I would remember if I did.

20    Q.  That's fine.  I just want to know.  I don't want to

21  ask you questions about it if you haven't seen it.

22    A.  No.  And I don't think I've seen it.  It just

23  doesn't -- yeah.

24    Q.  Okay.  So let me ask you a couple of questions.  Do

25  you know whether DaVita, Inc. itself actually has its own

00051

1  employees?

2    A.  I don't know.  Like I said, for all the functions I

3  am in charge of, we don't make any distinction between

4  DaVita; everybody, to us, is a DaVita teammate, so I don't

5  know.

6    Q.  I mean is part of that -- so if you get involved in

7  a wage an hour issue, for instance, that might apply to

8  particular employees at Total Renal Care, TRC, or some other

9  entity that's under the DaVita umbrella; is that correct?

10    A.  Yeah.  That has never been an issue or even

11  identified as to when we get an wage an hour question, this

12  is a Total Renal Care teammate; it never comes that way.  I

13  don't recall any instance where that's even been identified.

14    Q.  Have you ever seen like an organizational chart for

15  DaVita, Inc. and listing all the subsidiaries?

16    A.  No.

17    Q.  Do you know if one exists?

18    A.  I'm sorry.  If what exists?

19    Q.  An organizational chart.

20    A.  Oh, an organizational chart.  I don't know -- I

21  can't speak -- I haven't seen one, so I'm not sure if it

22  exists or not.

23    Q.  I'm sorry.  Forgive me.  I think we just touched on

24  it and I might have asked you this so forgive me if I have.

25  During your time there, have you seen any time that the

00052

1  Disaster Relief Policy was applied to a situation?

2       MS. PETERSEN:  Objection, asked and answered.

3       MR. BORISON:  I'm sorry.  I really just don't

4  remember.

5    Q.  Are you answering or you're thinking or not?

6    A.  I'm sorry.  I was just -- I thought counsel had said

7  it was already asked and answered.

8    Q.  Yeah, but that's just for the record.  If you could

9  indulge me.

10    A.  Okay.  Yeah, I think what I said before is I'm not

11  part of that process.  I know now you just used the word

12  "have you ever seen."  So I'm not even sure what necessarily

13  what that means, "seen."  I'm not part of that decision as

14  to whether it's utilized or not, so I can't say.

15    Q.  Okay.  That's fine.  I'm just -- I couldn't

16  remember.  And your answer explains why I probably couldn't

17  remember.

18       Do you know what the Disaster Governance Council is?

19    A.  Again, I'm not part of that.  I know what it says in

20  the policy, but that's the extent of my knowledge with

21  respect to that.

22    Q.  Do you know anybody who's on it, how it's composed?

23    A.  No.

24    Q.  If you had to find out, what would you do to find

25  out who is on that council?

00053

1    A. I don't know.  Probably reach out to the council.

2    Q.  And in the section there's a reference; there's some

3  acronyms.  They're probably self-explanatory, but let me

4  just ask you.  There's a DVP is that district vice

5  president?

6    A.  Yes -- or sorry.  Not district, division -- division

7  vice president.

8    Q.  Thank you.  GVP?

9    A.  Group vice president.

10    Q.  And then PSD?

11    A.  People services director.

12    Q.  That's you, right, or not?

13    A.  Well, so that would -- so, yes, I am the director of

14  people services.  But what that's really referring to is a

15  local -- so we have kind of these local human resources

16  groups.  And it there would be a people services manager for

17  that geographic region and then there would be a people

18  services director.

19    Q.  Do they --

20    A.  But, again, I'm not sure.  Maybe I could be included

21  in that.  I don't know.  But when I think of, what we call

22  PSDs and we use that acronym, when I use that, it's usually

23  in reference to those geographical directors.

24    Q.  Do they report to you or do they report to someone

25  else?

00054

1    A.  They do not report to me.

2    Q.  Who do they report to if you know?

3    A.  Sorry.  Now I'm blanking.  They would report up to

4   the people services group, which is separate, though, from

5   me.  So there's a separate kind of field group.  But this is

6   where I'm going to go into honestly I usually isolate myself

7   from my own world, so I don't want to give you wrong

8   answers.

9    Q.  That's fine.  I appreciate that.  I'm just asking if

10  you knew.

11       MR. BORISON:  Unless you have an objection, Chelsea,

12  could we take five minutes and let me see what else.

13       It might be over soon, Mr. Zuckerman.

14       MS. PETERSEN:  That's fine.

15       (Brief recess.)

16       MR. BORISON:  Thank you for your time, and that's

17  the end of my questions.

18       If you have any questions and if you want to tell

19  him about read and sign.

20       MS. PETERSEN:  No questions for me.

21       (Concluded at 10:52 a.m.)

22       (Signature reserved.)

23  [sig/cert/corr]

24

25