# EXHIBIT H

00001

1      ROUGH DRAFT -- Since this deposition is in rough

 draft form, please be aware that there may be a discrepancy

2  regarding page and line number when comparing the rough

 draft, rough draft disc, and the final transcript.

3      Also, please be aware that the uncertified rough

 draft transcript may contain untranslated steno, reporter's

4  note in brackets or misspelled proper names, incorrect or

 missing Q/A symbols or punctuation, and/or nonsensical

5  English word combinations.  All such entries will be

 corrected on the final, certified transcript.

6

                *  *  *  *  *  *

7

8  [Start at 9:01 a.m.] [Oliver McKinstry]

9  [BY MR. BORISON:]

10     Q.  Good morning.  My name is Scott Borison and I

11  represent the plaintiff in this case.  I'll be conducting

12  the deposition, which is just a series of questions I'll ask

13  you.

14      If for some reason I ask you something you don't

15  understand, just please tell me and I'll try to rephrase it.

16  Responses have to be verbal so the court reporter may take

17  it down.  And if you need a break for any reason, just

18  please let me know.  Other than if a question is pending,

19  you can have a break.

20      And last, that during the deposition your attorneys

21  here may interject objections.  Unless they tell you not to

22  answer, it's just really for the record.

23      And with all that, let me ask you have you ever been

24   deposed before?

25      A.  No, I have not.

00002

1    Q.  My understanding, though, is you actually do have a

2  legal background, correct?

3    A.  Yes.

4    Q.  And are you admitted to practice anywhere?

5    A.  I am.

6    Q.  And where are you admitted to practice?

7    A.  Colorado.

8    Q.  Okay.  And where do you actually live?

9    A.  In Denver, Colorado.

10   Q.  Okay.  And what is -- who do you work for?

11   A.  I work for DaVita.

12   Q.  Okay.  Is that DaVita, Inc.?

13   A.  Yes.  I call it DaVita but, yeah, I think that's

14  accurate.

15   Q.  Okay.  What do you do there?

16   A.  My title is senior director of teammate relations.

17   Q.  And what does that entail, job duty wise?

18   A.  I lead a few different teams; one of them is a team

19  of investigators of claims of discrimination and harassment;

20  and then a few other teams as well, including our policy

21  team, unemployment team, wage an hour team, and mergers and

22  acquisitions team.

23   Q.  And do you work with Shawn Zuckerman?

24   A.  I do, yes.

25   Q.  Okay.  And the reason you're here today is I

00003

1  identified you as a person with knowledge concerning the

2  policies and procedures for declaring an emergency time

3  frame under the Disaster Relief Policy.  Does that sound

4  accurate?

5      MS. PETERSEN:  Objection, Counsel, just to the

6  extent that you've identified him, I think you said as a

7  person with knowledge.  I just want to make sure we're clear

8  that we're here for his personal knowledge, yes, but not as

9  an PMK as it might be construed in other jurisdictions.  So

10  this is not a 30(b)(6) witness.

11      MR. BORISON:  I didn't say it was.  I was asking him

12  if that description of him was correct.

13  Q.  Is that correct?  Do you need me to repeat it?

14  A.  Yes, please.

15  Q.  Do you have knowledge regarding the policies and

16  procedures for declaring an emergency time frame under the

17  Disaster Relief Policy?

18  A.  Is the question, do I have knowledge?

19  Q.  Well, that's how someone described and said that you

20  had that knowledge.  Do you have that knowledge?

21      MS. PETERSEN:  Objection, assumes facts not in

22  evidence.

23      MR. BORISON:  That's what we're trying to establish.

24  Q.  Do you have knowledge regarding the policies and

25  procedures for declaring an emergency time frame under the

00004

1   Disaster Relief Policy?

2       A.  I do, yes.

3       Q.  Okay.  Are these policies and procedures, are they

4   written policies and procedures?

5       A.  We have a policy on the topic, yes.

6       Q.  And what is that policy called?

7       A.  It's called Disaster Relief Policy.

8       Q.  All right.  And is that the Disaster Relief Policy

9   that appears in the teammates handbook?

10      A.  Yes.

11      Q.  Is there any policies and procedures relating to

12  declaring an emergency time frame under the Disaster Relief

13  Policy?

14      A.  I'm not sure I understand that question.

15      Q.  Well, going back.  A description was written saying

16  you had knowledge regarding the policies and procedures for

17  declaring an emergency time frame under the Disaster Relief

18  Policy.

19      MS. PETERSEN:  Objection.  Again, assumes facts not

20  in evidence.  Is there a document that you're referring to,

21  Counsel, that you can help us understand what you're

22  referencing.

23      MR. BORISON:  It's your initial disclosure.

24      MS. PETERSEN:  Do you have the -- it's marked as an

25  exhibit.  Can we show the initial disclosures, just for

00005

1  clarity for the witness?

2      MR. BORISON:  Sure.

3      Q.  Do you need to see the document because you don't

4  understand what I'm saying when I read it to you, Mr.

5  McKinstry?

6      A.  Yeah, I apologize.  I don't understand.

7      Q.  Okay.

8      [Shares screen]

9      Q.  Can you see the document that's on the screen now?

10     A.  I can, yes.  [**] [4]

11     Q.  Have you seen this document before?

12     A.  I have not, no.

13     Q.  Okay.  Let me just scroll down.  And this is exactly

14  verbatim what I was reading.  Do you see the column that's

15  labeled [*] knowledge and your name is to the left?

16     A.  Yes, I see the column.

17     Q.  And can you read the column under knowledge that's

18  to the side of your name?

19     A.  Yes, I can read it.

20     Q.  That's what I was asking.  It says [*] policies and

21  procedures for declaring an emergency time frame.  My

22  question for you is, other than the Disaster Relief Policy

23  that appears in the teammates handbook, are there any

24  additional policies and procedures that you're aware of for

25  that topic?

00006

1    A.  For the topic of the Disaster Relief Policy?

2    Q.  No.  For declaring emergency time frame.

3    A.  No, I'm not aware of any other policies or

4  procedures.

5    Q.  Well, my question was written policies and

6  procedures.  Are there any written policies and procedures

7  relating to declaring emergency time frame other than what

8  appears in the teammates handbook?

9    A.  The policy for an emergency time frame is in the

10  Disaster Relief Policy in the handbook.

11    Q.  Okay.  And no other place, correct?

12    A.  That's correct, as far as I know.

13    Q.  What do you understand the policy and procedure for

14  declaring emergency time frame under the Disaster Relief

15  Policy to be?

16    A.  I'm happy to answer your question, but can we put

17  the exhibit down.  It's just a little distracting to have

18  up.

19    Q.  Yes.  Is that better?

20    A.  Yeah.

21    Q.  Okay.

22    A.  Can you repeat the question for me.

23    MR. BORISON:  Could you repeat the question for him,

24  please.

25    (Reporter read back as requested.)

00007

1    A.  I understand it to be at the discretion of local

2  leadership in conjunction with the Disaster Governance

3  Council.

4    Q.  Okay.  And the disaster, or the council that you

5  mention, who is on that council?

6    A.  Sure.  So that consists of some local leadership.

7  Typically, the people services director, the group vice

8  president, and then some executive leadership as well.  The

9  COO and the CPO.

10    Q.  Okay.  That's on the Disaster Governance Council?

11    A.  Right.

12    Q.  Okay.  So you said COO.  Who is that?

13    A.  The chief operating officer.

14    Q.  Right.  A name for the person.

15    A.  Oh.  Mike Staffieri.

16    Q.  And has he been there since January 30, 2020 to the

17  present?

18    A.  Yes, I believe so.

19    Q.  And then who else?  You said, I think, CPO?

20    A.  Right.

21    Q.  Who was that?

22    A.  Kenny Gardner.

23    Q.  And he's been there since January 1st, 2020 to the

24  present?

25    A.  Yes.

00008

1    Q.  And then I'm sorry.  Who else did you list as being

2  on this council?

3    A.  So it is including some local folks as well, the

4  people services director, and that would be for the local

5  area; and the group vice president for the local area.

6    Q.  And if this was -- when you said the for the local

7  area, in this context with the national pandemic, would that

8  include all of the local area group vice presidents and

9  people services director?

10    A.  I'm not sure what you mean by that.

11    Q.  Well, the pandemic didn't affect a particular local

12  area, did it?  It affected many areas, correct?

13    A.  As far as I understand, from my experience, yes, the

14  pandemic affected many different areas.

15    Q.  It affected the entire United States, correct?

16    A.  Yes.

17    Q.  So would these group vice presidents for every area

18  in the United States be included in the Disaster Governance

19  Council?

20    A.  Well, as far as I know, they did -- this did not

21  apply to the Covid pandemic.  So we did not follow this

22  process for the situation because it didn't apply.

23    Q.  Would you agree that this was an unprecedented

24  situation?

25    MS. PETERSEN:  Objection, vague.

00009

1    A.  Yeah.  I'm not sure I understand the question.  Are

2   you referring to the pandemic?

3    Q.  Yes.

4    A.  Well, I mean technically, no.  There have been other

5   pandemics in the past.

6    Q.  What pandemics are you referring to?

7    A.  I'm referring to the other pandemics that have

8   happened throughout history; so Spanish flu, the aids

9   pandemic -- I guess I'm not sure what you're asking me.  If

10  pandemics are unprecedented, the answer is no.

11   Q.  If someone described this as unprecedented, they

12  would be wrong, correct?

13      MS. PETERSEN:  Objection, argumentative.

14   Q.  I'm asking you.

15   A.  Well, yeah, technically.  I think that's right.

16  We've had pandemics before.

17   Q.  There is a motto of "One for all" at DaVita; is that

18  correct?

19   A.  Yeah.

20   Q.  And how did that apply to the pandemic that started

21  in 2020?

22   A.  I'm not sure I understand that question.

23   Q.  Sure.  Was there an effort to help -- I mean the

24  "one for all" motto that's expressed, was there a desire to

25  help the people who worked; the teammates who work at DaVita

00010

1  during this pandemic?

2      MS. PETERSEN:  Objection to the form of the

3  question.  It's vague.

4      You can answer if you understand.

5   A.  Yes.  I'm going to need it -- at least repeated.

6  That would be helpful.

7   Q.  Sure.

8      MR. BORISON:  Well, it might be helpful if you just,

9  Chelsea, if you just say object to form, rather than add the

10  commentary, maybe he'll remember the question.

11      But go ahead and repeat the question for him.

12      I think that's the proper thing to do, by the way,

13  Chelsea, is just object to the form.  We don't have to do a

14  speaking objection.

15      MS. PETERSEN:  I know my job.  Thank you.

16      MR. JONES:  Well, we're just reminding you of the

17  local rules.

18      (Reporter read back as requested.)

19   A.  Yes, there was a desire to help our teammates during

20  the pandemic.

21   Q.  And what was done for that effort?

22   A.  Multiple things were done to help the teammates

23  during the pandemic.  A lot of effort went into making sure

24  that we could continue providing patient care and therefore

25  continue to employ the teammates that we have.  But we also

00011

1  offered them multiple benefits during the course of the

2  pandemic and some additional payment to certain teammates.

3  So I think that demonstrates the desire to help the

4  teammates during the pandemic.

5      Q.  The additional payments that you mentioned, what

6  were they?

7      A.  I believe that they were payments paid a couple of

8  times throughout the year to help with the costs -- the

9  extra costs that teammates incurred during the pandemic.  I

10  can't exactly remember the title of the payments.

11      Q.  I think someone had mentioned Village Lives Award.

12  Does that refresh your recollection?

13      A.  Yeah, it does.  I believe we say Village Lives Award

14  but that, I believe, is the right title.

15      Q.  I'm sorry.

16      A.  That's okay.

17      Q.  And that additional payment was based on there were

18  different amounts depending on the hours worked by the

19  particular employee?

20      MS. PETERSEN:  Objection, assumes facts not in

21  evidence.

22      A.  Yeah, I don't recall exactly how the payments were

23  calculated.

24      Q.  Did you receive an award?

25      A.  I did not, no.

00012

1    Q.  And your position was senior director of teammate

2  relations; is that correct?

3    A.  Yes.

4    Q.  Has that been true since January 1st of 2020?

5    A.  Yes.

6    Q.  Do you know if this Disaster Governance Council met

7  to discuss the pandemic at any point?

8    A.  I don't know that.

9    Q.  Were you involved in any changes made to the

10  Disaster Relief Policy in 2020?

11    A.  I worked with our legal counsel on some changes,

12  yes.

13    Q.  Okay.  And when you say with your local counsel, who

14  did you work with?

15    A.  I worked with Colleen Ludwig and with Caitlin

16  Moughon.

17    Q.  Okay.  Was anybody else involved in those

18  discussions or just the three of you?

19    A.  There would have been others involved.

20    Q.  Who else?

21    A.  I believe my boss Jeremy Eaves was involved.

22    Q.  Okay.  What's his title?

23    A.  His title, I believe, is vice president of people

24  services.

25    Q.  Okay.  Anybody else?

00013

1   A. I believe Shawn Zuckerman was also involved.

2   Q. Anyone else?

3   A. Not that I can recall.

4   Q. And were there any meetings where it did not involve

5   Ms. Ludwig or Caitlin Moughon where you had meetings with

6   either Jeremy and Shawn or with Jeremy or with Shawn

7   individually?

8       MS. PETERSEN:  Object to the form.

9   A. I'm not sure if I understand the question.  If

10  you're asking if I've ever met with my boss or one of my

11  teammates without Colleen or Caitlin present.

12  Q. To discuss the changes to the Disaster Relief

13  Policy, yes.

14  A. No.

15  Q. So all of the discussions concerning the changes to

16  the Disaster Relief Policy were done with counsel?

17      MS. PETERSEN:  Object to the form.

18  A. Correct.

19  Q. Do you know why there was changes made to the

20  policy?

21  A. The only knowledge I have of that was the

22  discussions I had with legal counsel.

23  Q. Okay.  And, again, the only people you ever

24  discussed the changes with was with counsel present?

25  A. Correct.

00014

1    Q.  And this Disaster Governance Council, there's just

2  one Disaster Governance Council, correct?

3    A.  I'm not sure I understand.

4    Q.  Well, I'm asking, is there more than one Disaster

5  Governance Council at DaVita?

6    A.  Not that I know of, no.

7    Q.  Okay.  And you've told me everybody -- and everybody

8  you described earlier, they were there on the council from

9  January 2020 to the present?

10     MS. PETERSEN:  Objection, misstates prior testimony.

11    A.  Yeah.  I don't think.

12    Q.  You discussed there was a COO on it, correct?

13    A.  I did, yeah.

14    Q.  And you identified the COO.  And he was there from

15  January 1st 2020 to the present, correct?

16    A.  He was employed by DaVita, yeah.

17    Q.  Well, are there particular people selected for it or

18  is it the title who determines who is on the council?

19    A.  It's roles of people who are on the council.

20    Q.  Right.  So the COO would be on the council, correct?

21    A.  Right.

22    Q.  And the COO was the same person from January 1st

23  2020 to the present; is that correct?

24    A.  Yes.

25    Q.  And then you also said the CPO, which I think you

00015

1  said of Kenny Gardner, correct?

2     A.  Yes, I said that.

3     Q.  And he's been there as the CPO from January 2020 to

4  the present, correct?

5     A.  Yes.

6     Q.  Is that right?

7     A.  I think I lost you for a second.

8     Q.  I said and then you identified that there were local

9  people involved.  Can you hear me or not?

10    A.  Well, I can hear you now.  But I did lose you for a

11  little bit so I just want to make sure I understand the

12  question.

13    Q.  That's why I was asking it again whether you could

14  hear me.  Go ahead.

15    A.  Right.  So when there's a disaster, there's a local

16  team also involved on the Governance Council.

17    Q.  Right.  And was there a local team involved when the

18  pandemic was declared by the government?

19    A.  No.

20    Q.  Why not?

21    A.  Because the policy didn't apply.

22    Q.  Why did it not apply?

23    A.  Well, the policy is really designed in a couple of

24  ways.  One, it's geared towards disasters where teammates

25  are unable to perform their duties, and that wasn't the case

00016

1  with Covid.  So, you know, from the outset, it didn't apply.

2     Q.  Who made the decision that it did not apply?

3     A.  That's kind of like proving a negative.  It didn't

4  apply so, you know, it happens in the opposite direction.

5  People decide whether it applies when it applies.  They

6  don't decide that it doesn't apply.

7     Q.  Well, in March there was an addition made to the

8  policy to say that it did not apply to Covid 19.  Why would

9  you need that addition if it didn't apply, as you say?

10     MS. PETERSEN:  Objection.  It assumes facts not in

11  evidence; and to the extent that it's encroaching upon the

12  privileges discussions that the witness has already

13  identified as occurring with counsel.

14     A.  Yeah, I worked with my legal counsel on that topic.

15     Q.  I didn't ask you who you worked with on it.  I asked

16  you a specific question.

17     A.  Can you repeat the question you asked?

18     Q.  Sure.

19     (Reporter read back as requested.)

20     MS. PETERSEN:  My privilege objection still stands.

21     Oliver, if you can answer without divulging

22  privileged information, please do so.  If it would require

23  privileged, I'm instructing you not to answer.

24     A.  Yeah, then I'm not answering the question.  That was

25  part of a discussion with and advice from legal counsel.

00017

1    Q.  Okay.  Would you agree that the pandemic affected

2   employees of DaVita or teammates of DaVita because of

3   children were out of school, grocery stores were with low

4   supplies, spouses were out of work, and family members had

5   to care to other people, those were factors that affecting

6   DaVita employees during the pandemic?

7    A.  Yeah.

8    Q.  So did it affect the employees ability to work

9   during this pandemic?

10    A.  No.  Employees, teammates were able to come to work

11   and perform their duties very similarly to before the

12   pandemic.

13    Q.  And how do you work?  Do you work remotely or do you

14   go into an office?

15    A.  Right now I work remotely.  I previously did go into

16   the office.

17    Q.  When did you stop going to the office?

18    A.  My last day in the office was March 13, 2020.

19    Q.  And why did you stop going to the office?

20    A.  Due to the pandemic.

21    Q.  I just want to make sure.  I had asked you whether

22   there was any council meeting in regards to the pandemic.

23   And I thought your answer was there was no meeting ever held

24   of the Disaster Governance Council concerning the pandemic;

25   is that correct?

00018

1    A.  I believe that's right.

2    Q.  Okay.  Would there be any documents or other

3    materials that might refresh your recollection as to whether

4    that statement is accurate?

5    A.  I don't know the answer to that.

6    Q.  Do you know whether if the disaster relief

7    Governance Council meets, whether either minutes or notes

8    were taken of the meetings?

9    A.  No, I don't know.

10    Q.  If you had to find out if there were notes or

11    minutes, who would you ask?

12    A.  Can I get that question again?  I lost you for just

13    a brief second.

14    Q.  Sure.  I was just saying, if you had to find out the

15    answer to that question, who would you go to in your company

16    to ask that question?

17    A.  To ask if there were notes taken at a Disaster

18    Governance Council meeting?

19    Q.  Yes.

20    A.  I would go to the people that I thought were

21    involved in the discussion.

22    Q.  When you say the people involved in the discussion,

23    who do you mean?

24    A.  If I knew that a discussion had taken place, I would

25    go to the people who were involved in the discussion.

00019

1   Q.  That would be like, for instance, the CPO and the

2   COO?

3   A.  Right.  And also the PSD and the GVP.

4   Q.  Okay.  The PSD, tell me who that is -- I mean what

5   the acronym stands for first.

6   A.  It stands for people services director.

7   Q.  And that person is on the council as well?

8   A.  It's not a standing member, so it's a member when

9   the local PSD is impacted when the disaster is in that

10  person's local market.

11  Q.  Okay.  So it's a personal services director?  This

12  is the local people you were referring to earlier; is that

13  right?

14  A.  People services director.

15  Q.  I'm sorry.

16  A.  But otherwise, yeah, I agree with that.

17  Q.  And then there was another acronym you used,

18  something that, I think, started with G?

19  A.  Yeah.  GVP stands for group vice president.

20  Q.  And that group would also be based on a local group?

21  A.  Right, a local geography.

22  Q.  Right.  And anybody else?

23  A.  Anybody else?  I'm not sure I understand.

24  Q.  Well, you said people who would be involved.  I'm

25  just making sure.  I'm trying to make sure I understand.

00020

1  Based on your testimony -- and correct me if I'm wrong --

2  there's two people always on the Disaster Governance

3  Council, the COO and CPO, correct?

4     A.  Right.

5     Q.  Is there anybody else who is always on the council?

6     A.  No.

7     Q.  And then depending on what the topic is, local

8  people.  And the local people added would be the PSD and the

9  GVP for the local area; is that correct?

10    A.  That's my understanding.

11    Q.  Okay.  And would anybody else be involved in the

12  Disaster Governance Council other than the people we've just

13  described?

14    A.  I don't think so, no.

15    Q.  Okay.  And you said the Disaster Relief Policy did

16  not apply to COVID-19, correct?

17    A.  That's right.

18    Q.  And the reasons why you say that is that -- can you

19  please explain why it doesn't apply?

20    A.  Sure.  So I think I explained before that the goal

21  of the Disaster Relief Policy, one of the things it's meant

22  to address IS when teammates are not able to perform their

23  regular duties.  And that wasn't the case here.  Teammates

24  were able to perform their regular duties and so the policy

25  didn't apply.

00021

1    Q.  Any other reason?

2    A.  Well, yeah, part of the policy is that the local

3    leadership and Disaster Governance Council determine the

4    emergency time frame.  And they did not determine a

5    emergency time frame in this situation, so for that reason

6    it also didn't apply.

7    Q.  Okay.  So as to the first reason you gave, which was

8    it didn't apply because it didn't affect their ability to

9    perform their duties, that's your interpretation of the

10   policy, correct?

11   A.  Right.

12   Q.  Okay.  And then as to the Disaster Governance

13   Council not establishing a time frame, in this particular

14   instance, I think your testimony was they did not meet to

15   determine a time frame, correct?

16       MS. PETERSEN:  Objection, misstates prior testimony.

17   A.  They didn't determine an emergency time frame.

18   Q.  Well, did they meet to discuss one?

19   A.  Not that I know of.

20   Q.  Who would know?  I'll rephrase it.

21       Would you know if they had met?

22   A.  Yeah, I think I would.

23   Q.  Okay.  Let's just talk about your education

24   background.  I noted earlier, I think, you went to law

25   school, correct, at University of Pennsylvania, right?

00022

1   A. That's correct.

2   Q. Okay.  When did you graduate from there?

3   A. 2007.

4   Q. Did you go straight to law school after college or

5   was there work in between?

6   A. There was work in between.

7   Q. What did you do -- okay.  Let's start with your

8   undergrad, then.  When did you graduate from undergrad?

9   A. I want to make sure I get this correct.  2002.

10   Q. Where had you gone to school for undergrad?

11   A. I went to Macalester College in Saint Paul,

12   Minnesota.

13   Q. Okay.  And what was your degree in?

14   A. Communications studies and French.

15   Q. And then what did you do after you graduated from

16   college?

17   A. I taught English in rural Japan on the JET Program.

18   Q. How long did you do that?

19   A. Two years.

20   Q. And then after that?

21   A. I went to law school.

22   Q. Okay.  It looks like there's a five-year gap between

23   college.  I thought you said you graduated in 2002 and went

24   to law school in 2007.  Or did you graduate from law school

25   in 2007?

00023

1   A. I graduated in 2007.

2   Q. And then after law school, what did you do once you

3   graduated?

4   A. I joined the law firm of Dorsey & Whitney.

5   Q. Okay. And what location were you at with that firm?

6   A. Minneapolis, Minnesota.

7   Q. How long did you stay there?

8   A. Until 2010.

9   Q. And was there a particular area you worked at while

10  you were an associate there -- I assume you were an

11  associate there, right?

12   A. I was, yeah.

13   Q. Was there a particular area you were assigned to?

14   A. I was part of the -- what they called the trial

15  group. So practicing various kinds of litigation, from

16  employment litigation to financial services.

17   Q. Then after Dorsey & Whitney, where did you go?

18   A. Littler Mendelson.

19   Q. Okay. And you continued doing employment issues

20  there?

21   A. I did, yes.

22   Q. Anything else besides employment issues?

23   A. No.

24   Q. Okay. And how long were you there?

25   A. I believe I was there until 2012.

00024

1   Q.  Okay.  And then where did you go?

2   A.  I worked for Lockheed Martin.

3   Q.  Okay.  And what did you do there?

4   A.  I had several different roles while I was at

5   Lockheed Martin.

6   Q.  What were they?

7   A.  The first one was security investigator.

8   Q.  Okay.  Was that for security clearances?

9   A.  No.  That's actually a separate function that's

10  handled outside of the company.

11  Q.  Okay.  So what was the security that you're

12  describing?

13  A.  It's a workplace investigations function, so we

14  investigated allegations of misconduct in the workplace that

15  had some kind of security component.

16  Q.  Okay.  What other roles did you have?

17  A.  I was next what's called an ethics officer.

18  Q.  Okay.  And what function did that serve?

19  A.  Also a workplace investigator, just slightly

20  different content of the investigations; mainly upholding

21  the company's values.

22  Q.  And any other roles?

23  A.  Yes.  I was also an EEO investigator.

24  Q.  Okay.  Is that complete with the different roles

25  that you had at Lockheed Martin?

00025

1    A.  Yes.

2    Q.  Okay.  And then after Lockheed Martin where did we

3  go?

4    A.  DaVita.

5    Q.  Okay.  And when you started with DaVita, what year

6  would that be?

7    A.  2016.

8    Q.  And when you started at DaVita, what was your

9  position?

10    A.  Teammates relations manager.

11    Q.  Okay.  And how long did you stay in that position?

12    A.  About six months.

13    Q.  Then what happened?  A promotion?

14    A.  Kind of.  I became the acting senior manager of

15  teammate relations.

16    Q.  And that's your current role, right?

17    A.  No.

18    Q.  Okay.  I'm sorry.  So you were acting senior manager

19  and then what happened next?

20    A.  About five or six months later, I became director of

21  teammate relations leading the investigations team.

22    Q.  Okay.  Then did your job duties change again after

23  that or is that your current?

24    A.  No.  They changed again.

25    Q.  Okay.  What did you change to?

00026

1    A.  I actually left the company for a couple of months.

2    Q.  Okay.  Did you take time off or did you go somewhere

3  else?

4    A.  I went to another company called Twilio.

5    Q.  Okay.  And stay what did you do at Twilio?

6    A.  I was their global lead of employee relations.

7    Q.  So I'm tempted to say, did you get stock options

8  because they might be worth -- anyway.

9        So you went back to DaVita.  And then what did you

10  go back -- what was your position when you went back?

11    A.  Then I became the senior director of teammate

12  relations.

13    Q.  And that's what you are today, correct?

14    A.  Correct.

15    Q.  Okay.  Whose responsible at DaVita is it to

16  interpret the Disaster Relief Policy?

17    A.  I'm not sure anyone -- it's anyone's job.

18    Q.  Okay.  So prior to March 13, you were working in an

19  office.  Did you have administrative assistants working for

20  you in the office?

21    A.  I share an administrative assistant with my boss.

22    Q.  How did it work -- did that administrative assistant

23  continue to show up at the office or did that person also

24  start to work remotely?

25    A.  She also started to work remotely.

00027

1    Q.  Was anybody left in the office after March 13?

2    A.  Yes, some people were.

3    Q.  Okay.  And prior to March 13th, though, all of your

4    duties were done while you were at work at the office,

5    correct?

6    A.  Oh, no.

7    Q.  Okay.  Were you telecommuting prior to that?

8    A.  I have the -- let's just say I worked both at home

9    and in the office prior to that.

10    Q.  Just because of workload levels or because that's

11    just how you approached it?  In other words, did you have

12    homework, in essence?

13    A.  Yeah, I don't know how to answer that, except for I

14    did work both from home and in the office and that's kind of

15    always been my setup.  So that was really nothing new for

16    me.

17    Q.  And was it new for your administrative assistant

18    that you shared?

19    A.  I'm not positive.  I think she previously worked

20    from home a little bit as well.

21    Q.  Okay.  And prior to March 13, though, were you

22    expected to go to the office?

23    A.  Yes, on some rhythm.

24    Q.  And you said you didn't think it was anybody's duty

25    to interpret the Disaster Relief Policy.  What did you mean

00028

1  by that?

2      A.  Well, I think your question was, is it someone's job

3  to interpret the policy.  And there isn't one person who

4  just oversees that policy and charged with interpreting it.

5      Q.  Well, assuming that I didn't mean that it was just

6  one person whose job title was the interpreter of the

7  Disaster Relief Policy.  Is there someone at DaVita who is

8  responsible when the issues arise to interpret the policy?

9      A.  Again, I don't think that falls to one person.

10     Q.  Okay.  Who would that -- if it's more than one

11  person, who would be the people?  Would that be the Disaster

12  Governance Council or some other group?

13     A.  As far as interpreting the policy, I think it would

14  include myself, Shawn, my boss Jeremy, and we would consult

15  with legal counsel.

16     Q.  Anybody else besides the three of you and counsel?

17     A.  Potentially Toni Prockish in payroll.

18     Q.  What would -- my understanding is based on the

19  document we saw earlier, she is in charge of the payroll

20  department, I believe?  I don't have it right in front of

21  me.  I think her title is director of payroll?

22     A.  That sounds right to me.  I'm not positive off the

23  top of my head, but that's generally accurate.

24     Q.  What would be the consummation of her?

25     A.  Can you repeat that?

00029

1   Q.  Sure.  What would be her involvement?  I understand

2   your involvement during -- you know, you're the senior

3   director of teammate relations.  But she's in charge of

4   payroll.  Does she participate in policy decisions as well?

5   A.  Well, she technically is the owner of the policy.

6   Q.  Okay.  And can you explain what you mean by owner of

7   the policy?

8   A.  Yeah.  So in my role and in Shawn's role, we help

9   with some administrative functions around policies but we

10  don't draft all of the policies ourselves.  Most of the

11  policies have different authors and owners.  And for this

12  policy, I believe she's the owner of the policy.

13  Q.  So when you say owner of the policy, it affects her

14  job functions; is that accurate?

15  A.  I think that's accurate, though, the real way we

16  think about that is who drafts the policy and who has the

17  responsibility for working with internal or external counsel

18  for updates to the policy.

19  Q.  Okay.  So she would be the one responsible for the

20  Disaster Relief Policy as well?  She would be the owner in

21  your terms?

22  A.  Right.

23  Q.  And that is because she would participate in

24  drafting the policy, but also working with counsel for

25  making changes to the policy, correct?

00030

1    A.  Correct.

2    Q.  Do you know who had drafted the policy that was in

3  effect prior to the changes made to the Disaster Relief

4  Policy in March of 2020?

5    A.  I do not know the answer to that question.

6    Q.  Did you have any involvement in it prior to March of

7  2020?

8        MS. PETERSEN:  Objection, vague.

9    A.  Can you clarify which portion you're asking about my

10  involvement in?

11    Q.  Did you have any involvement in the Disaster Relief

12  Policy prior to March of 2020?

13    A.  I did, yeah.

14    Q.  All right.  What was your involvement prior to March

15  of 2020?

16    A.  Well, my team oversees the policy.  So I would have

17  reviewed the policy and then, you know, we have a process

18  for changes to the policy.  And so it would have gone

19  through what we call the annual review.  And I oversee that

20  process, so I was involved in that.

21    Q.  And the annual review, are there any minutes or

22  other notes taken during the annual review policies?

23    A.  There are.

24    Q.  And how are those stored?

25    A.  I believe they're stored on a SharePoint site as

00031

1  well as potentially a Smartsheet.

2     Q.  I'm sorry.  What was the second thing, a Smartsheet;

3  is that what you said?

4     A.  Yes.

5     Q.  Can you explain to me what that is?

6     A.  Yeah.  It's an online spreadsheet similar to an

7  Excel document that's kept online.  It's an online based

8  software.

9     Q.  And oes this Smartsheet show what the changes, the

10  actual changes are to the policy, correct?

11    A.  For the policies that are part of the process and

12  get changed, yes, it would show the proposed edits.

13    Q.  Right.  If the policy wasn't changed, there would be

14  nothing on the Smartsheet for that particular policy,

15  correct?  [scan]

16    A.  Right.

17    Q.  But if it did get changed, the edits would be there,

18  correct?

19    A.  I think so, yeah.

20    Q.  Would the reasons for the edits be there as well?

21    A.  Not necessarily.

22    Q.  Okay.  Who has access to the Smartsheets?

23    A.  Shawn Zuckerman, an analyst on Shawn's team named

24  Alejandro Bruner-Solas.  And the process involves legal

25  counsel, so actually Ashley McAteer is the lawyer that we

00032

1  work with on that process; she would also have access.

2     Q.  And do you know what Alejandro's title is?

3     A.  It is analyst.  I am not positive if there's a

4  modifier to that.

5     Q.  Is he a manager?

6     A.  He is not.

7     Q.  Anyone besides Alejandro and Shawn who would have --

8  and I assume yourself -- would have access to Smartsheets,

9  right?

10        MS. PETERSEN:  Objection, misstates prior testimony.

11    Q.  Do you have access to the Smartsheets?

12    A.  I do.

13    Q.  Okay.  Is there anybody besides you, Shawn, and

14  Alejandro who have access to the Smartsheets?

15        MS. PETERSEN:  Objection, asked and answered, and

16  misstates prior testimony.

17    A.  Legal counsel.

18    Q.  Anyone else?

19    A.  I don't think so.

20    Q.  And so you're not sure if the Smartsheets include

21  why the changes were made.  Is there a place where the

22  explanation of the need for the changes is written down?

23    A.  The answer is that the explanation wouldn't

24  necessarily appear in the Smartsheet and that's because

25  sometimes we just don't give an explanation of why we want

00033

1  the change made.  So some changes would have an explanation

2  and some likely wouldn't.

3      Q.  All right.  So is it fair to say that the Smartsheet

4  would contain an explanation if one was given for the

5  change?

6      A.  Well, if one was given in the Smartsheet, yes.

7      Q.  So is there any -- so you can make changes to a

8  policy without giving any explanation as to why the change

9  is necessary; is that correct?

10     A.  Yeah.

11     Q.  Okay.  And is there a Smartsheet relating to the

12  change in the Disaster Relief Policy in March of 2020?

13     A.  I don't believe there is.

14     Q.  Why not?

15     A.  Well, that change was not part of the annual review

16  process.

17     Q.  Okay.  For changes that are not a part of the annual

18  review process, is there any record keeping as to the

19  changes and the reasons for the changes?

20     A.  The changes would be documented, yes, and that would

21  likely exist in the SharePoint that Alejandro keeps.  And

22  the explanation for that change would be kept in the

23  documentation between legal counsel and me or my team.

24     Q.  And when you say my team, who is on your team?

25     A.  Both Shawn and Alejandro.

00034

1    Q.  Okay.  Is there anybody else on your team?  I mean

2   you mentioned you had a -- you shared an administrative

3   assistant.  Would that person have access to the SharePoint

4   documents?

5    A.  I don't think that she does.  I'm not positive.

6    Q.  Is there anybody else in that type of position that

7   might have access to the SharePoint documents?

8    A.  Do you mean in an administrative position?

9    Q.  Yes.

10    A.  Not that I know of, no.

11    Q.  Okay.  Sort of with our standard practice, it's been

12   an hour.  So if it's okay with you, we'll just take a short

13   break, like five, ten minutes and then we'll come back.  Is

14   that okay?

15      THE WITNESS:  It's okay with me.

16      MR. BORISON:  Thank you.

17      (Brief recess.)

18    Q.  Let me pull up a document and this has been labeled

19   as Exhibit Number 7.

20      [Shares screen]

21    Q.  I'll show you one page at a time.  Have you seen

22   this document before, Mr. McKinstry?

23    A.  I've seen it.  Yeah, I don't think I've seen it in

24   this format.  But, yeah, I'm familiar with this.

25    Q.  Did you participate in the drafting or preparation

00035

1  of this document?

2      MS. PETERSEN:  Object as to form.

3      A.  I participated in a recent update to it but not the

4  original drafting.

5      Q.  Okay.  So is this the first time -- when you said

6  it's not in the form that you have seen before, what's the

7  difference?

8      A.  This looks like a Word document to me.

9      Q.  Okay.  And what form would you have seen it in?

10     A.  In the teammate handbook.

11     Q.  Okay.  So this part you're saying that you think was

12  in the teammate handbook where it starts with [*] We

13  understand where I highlighted.  Can you see the highlights?

14  I assume you can.

15     A.  Sorry.  No, that part, I don't think, appeared in

16  the handbook.

17     Q.  Okay.  Were you involved in -- did you contribute in

18  any way to the preparation of what we're looking at, this

19  one page document?

20     A.  Can I just take a minute to review this document?

21     Q.  Sure.

22     A.  (Witness reviews document.)  Okay.  I've reviewed

23  this.

24     Q.  Okay.  Did you contribute in any way to this

25  document?

00036

1    A.  I believe I reviewed this, but I don't think that I

2  drafted this.

3    Q.  Okay.  And when you reviewed it, did you make any

4  changes to it?

5    A.  I don't recall.

6    Q.  Would any notes exist that would tell us whether you

7  made any changed?

8    A.  Not that I know of.

9    Q.  Okay.  And so just with the part I highlighted, [*]

10  I understand teammates have raised questions.  Do you know

11  what that's referring to?

12    A.  I have an idea of what that's referring to, yes.

13    Q.  Can you tell me what that idea is.

14    A.  Yes, teammates did inquire whether the Disaster

15  Relief Policy applied to the Covid pandemic.

16    Q.  Had you received any of the questions yourself?

17    A.  I may have, but I don't recall for sure.

18    Q.  Okay.  Did you ever provide responses to any

19  teammates concerning this issue?

20    A.  I may have drafted responses but I, again, don't

21  recall for sure.

22    Q.  Would there be anything you could consult to

23  determine if you had drafted responses or not?

24    A.  Not that I'm aware of.

25    Q.  Okay.  And did you review -- now you said that some

00037

1  of it -- or some of it maybe wasn't in the teammates

2  handbook -- like for instance, that first sentence.  Do you

3  know who this was distributed to?

4      MS. PETERSEN:  Object to the form.

5    A.  Yeah.  If I could just clarify, when you first put

6  this up, I misunderstood that this was the policy itself.

7  But now that I reviewed it, I understand that it is not.

8  And so my initial answer was based on a misunderstanding.

9  But now that I've reviewed it, I realize it's a

10  communication about the update to the policy.  And I don't

11  know for sure how this was distributed.

12    Q.  Do you know whether it was distributed to teammates?

13    A.  I believe it was, but I'm not positive.

14    Q.  And did you review it prior to it being distributed

15  if it was -- let's back up a sec.  It was prepared and would

16  have been distributed to someone.  The question, I think, is

17  to who it was distributed.  Would you agree that it was

18  distributed to someone?

19    A.  Yes.

20    Q.  And if it wasn't to the teammates, would this have

21  been something distributed amongst the people you

22  identified; for instance, Shawn, yourself, and possibly

23  Alejandro?

24    A.  Yes.  We're all teammates, so I suspect we received

25  it because of that; but also they likely reviewed it prior

00038

1  to distribution.

2    Q. Do you know who authored this document?

3    A. I don't know.

4    Q. Okay. And then I'm highlighting. I believe this is

5  the part that was added to the teammates handbook. Would

6  that be correct, the highlighted which just starts with [*]

7  COVID-19 crisis?

8    A. I think that's correct, yes.

9    Q. Actually, why don't we look at the next page because

10  I think this is what you were referring to, is this was the

11  provision of the Disaster Relief Policy that appeared in the

12  teammates handbook that included this addition under the

13  title [*] COVID-19 crisis; is that correct?

14    A. I want to be careful here because, again, this

15  doesn't look like the policy that I typically see. So if I

16  could just take a minute to review it.

17    Q. Absolutely.

18    A. (Witness reviews document.) I recognize this is the

19  policy with the COVID-19.

20    Q. Now, did you review this page of this document

21  before it was included in the handbook?

22    A. I believe I did, yes.

23    Q. Did you make any changes to it?

24    A. I don't recall but I don't think so.

25    Q. And who made the decision to insert the COVID-19

00039

1  crisis paragraph?

2      A.  A decision was made in conjunction with legal

3  counsel.

4      Q.  And the legal counsel -- I think you mentioned two

5  people, which was Colleen Ludwig and Caitlin Moughon; is

6  that correct?

7      A.  Caitlin Moughon, yep, that's correct.

8      Q.  I'm sorry.  I'm saying her name wrong.  Any other

9  legal counsel?

10     A.  Not that I know of.

11     Q.  And you mentioned Toni Prockish earlier; is that

12  correct?

13     A.  I mentioned her name, yes.

14     Q.  Right.  Well, you mentioned her as the owner of this

15  policy, correct?

16     A.  I did.

17     Q.  Did she participate in the discussions regarding

18  this policy?

19     A.  I don't know the answer to that question.

20     Q.  And let me just go back.  When you said that the

21  owner of the policy is someone who drafts the policy,

22  correct?

23     A.  Correct.

24     Q.  And then implements the policy; is that correct?

25     A.  Generally, yes.

00040

1    Q.  And to implement, the policy they would have to

2    interpret the policy, correct?

3    A.  Yes.

4    Q.  So as the owner, Ms. Prockish would be the one who

5    interpreted this policy, correct?

6    A.  I think she would be involved in reviewing and

7    interpreting the policy, yes.

8    Q.  Well, when you say involved, I thought she was the

9    owner, which meant she was sort of the person in charge of

10   it; is that correct?

11   A.  Well, she is the owner.  But when we previously

12   spoke about this, I believe I also mentioned that the

13   policies are updated and drafted in conjunction with legal

14   counsel based on any legal requirements or any legal updates

15   that happen.  And so Toni would generally work with legal

16   counsel for her organization on updates to this and then in

17   any interpretation and implementation.

18   Q.  Right.  Well, let's go through because I thought

19   when you testified earlier about the owner, that you said

20   they draft the policy, they implement the policy, and then

21   they're also involved in any changes to the policy, correct?

22   A.  They're involved, right.

23   Q.  Who makes the decision as to whether the policy is

24   changed, the owner or someone else?

25   A.  The owner in conjunction with the lawyers that they

00041

1   work on, work with on updates.

2      Q.  So the only changes that could be made have to be

3   approved by the legal department?

4      A.  Not necessarily.

5      Q.  Well, how do we know the difference when legal

6   counsel is required and when it's not?

7      A.  Well, there are a variety of types of updates that

8   are made to the policy; some are cancellations of programs;

9   some are changes to the language used in the policy; some

10   are substantive changes.  And so whether legal counsel is

11   involved, is really determined by the type of changes made

12   to the policy.

13      Q.  And the change made to the policy that's reflected

14   by the addition of the COVID-19 crisis, was one that

15   required legal counsel to be involved; is that correct?

16      A.  Correct.

17      Q.  And the Disaster Relief Policy itself, as the owner,

18   Ms. Prockish would have decided -- made the decision whether

19   it applied to COVID-19 or not?

20         MS. PETERSEN:  Objection, asked and answered.

21      A.  You know, it was -- it would not have been solely

22   for Toni to decide.  So she may have been involved, but she

23   wouldn't have decided that on her own.

24      Q.  Well, who made the decision that it didn't apply?

25      A.  I think we already talked about this.  And, you

00042

1  know, the policy on its face did not apply.  It has very

2  specific language that wasn't met in the COVID-19 situation,

3  so it didn't apply.

4      Q.  Who made the decision, is my question?

5      A.  I don't think a single person made that decision.

6      Q.  Okay.  What people were involved in the decision

7  that it did not apply?

8          MS. PETERSEN:  Objection, form of the question,

9  asked and answered.

10     Q.  You can answer.

11     A.  I'm not sure I can answer the question that you're

12  asking.  The policy has certain conditions that are required

13  to be met for it to apply and they were not met in this

14  situation.  And so the policy didn't apply and, you know, I

15  think, again, you're trying to ask me to prove the negative

16  here of who makes a decision when something doesn't apply

17  and that's just not really how it works.

18     Q.  Well, someone made the decision that this policy did

19  not apply to COVID-19, correct?

20     A.  I think of it in the reverse of that; that when this

21  policy applies.

22     Q.  I understand you want to think of it in reverse.

23  But my question is, who made the decision here.  Because

24  when you say it doesn't apply, someone had to review the

25  policy and make that determination.  Who made that

00043

1  determination?

2      MS. PETERSEN:  Objection, argumentative, and vague.

3      A.  I disagree with the basis of your question.

4      Q.  So nobody reviewed this policy before they

5  determined that it did not apply to COVID-19; is that your

6  testimony?

7      A.  No.

8      Q.  Well, who reviewed the policy to make a

9  determination whether or not it applied to COVID-19 or not?

10     MS. PETERSEN:  Objection, asked and answered.

11     MR. BORISON:  It's not been answered.

12     Q.  You can answer.

13     A.  Again, I just disagree with your perspective.

14     Q.  I understand.  You've said that several times that

15  you disagree.  Who made the decision that this Disaster

16  Relief Policy did not apply to COVID-19?

17     MS. PETERSEN:  Same objection.

18     A.  Yeah.  I don't have an answer for that.  You know,

19  just repeating the question doesn't change my perspective on

20  how this policy works.

21     MR. JONES:  Hold on, Mr. Borison.  Let's take a

22  break right now.  All right.

23     MS. PETERSEN:  I'm sorry.  Who was just speaking?

24     MR. BORISON:  We'll just take a short break, okay.

25     MS. PETERSEN:  Okay.

00044

1    (Brief recess.)

2    Q.  When we broke, I was asking you who made the

3    decision that this Disaster Relief Policy did not apply to

4    COVID-19.  Could you please tell me who made that decision?

5    A.  Yeah.  And I think I explained a couple of times

6    that I don't think that one single person made that

7    decision.  There were multiple people working very hard to

8    make sure our teammates were taken care of during this time.

9    Multiple people reviewed the policy.  And we all agreed it

10   was clear on its face that it didn't apply.

11   Q.  All right.  When you say there were multiple people

12   who agreed, who were the multiple people involved in those

13   discussions?

14   A.  So I said multiple people reviewed the policy and

15   agreed.  And I'm happy to talk -- there were a couple of

16   people that I think were likely involved; Shawn from my

17   team, myself, my boss, Jeremy, and our legal counsel Colleen

18   and Caitlin.

19   Q.  Anybody else?

20   A.  Not that I know of.  So, you know, I will just be

21   guessing if I listed other people.

22   Q.  What do you mean you would be guessing?  Why would

23   you be guessing?

24   A.  Well, I don't know.  I don't know if there were

25   others who reviewed the policy at that time.  But I believe

00045

1  that there were other leaders likely reviewing the policy

2  just to check and see if it applied.  And we all agreed it

3  did.

4      Q.  What other leaders are you referring to?

5      A.  I don't remember.

6      Q.  You don't remember what other leaders were at the

7  company that you worked at?

8      A.  Well, I remember a lot of leaders that work at the

9  company where I work.  I'm happy to just list them.  I

10  thought your question was a little different so maybe if you

11  could rephrase it.

12     Q.  I'm asking -- you stated -- and correct me if I'm

13  wrong --  that there were other leaders who looked at it,

14  who would have looked at it.  And I'm asking you, who are

15  you referring to; what other leaders were you referring to

16  in your answer?

17     A.  And my answer was I don't specifically remember.

18     Q.  Is Kenny Gardner someone who would have looked at

19  this policy?

20     A.  He may have.  But I don't know specifically know the

21  answer to that.

22     Q.  So you concluded that this policy didn't apply to

23  COVID-19, correct?

24     A.  I did.

25     Q.  And did Ms. Prockish make the same conclusion?

00046

1     MS. PETERSEN:  Objection, calls for speculation.

2   You can answer if you know.

3     A.  I don't know.

4     Q.  So this policy, she was the owner of the policy,

5   correct?

6     A.  Correct.

7     Q.  And she was responsible for implementing it,

8   correct?

9     A.  In conjunction with legal counsel, yes.

10    Q.  Right.  Did you consult with her concerning the

11   policy that she was the owner of?

12    A.  I don't recall for certain.

13    Q.  Do you think you consulted with her?

14    A.  It's possible.

15    Q.  Are you in the same office as she is?

16    A.  No.

17    Q.  Where is she located?

18    A.  I believe she lives in Washington State and works

19   out of an office in Washington.

20    Q.  And if you had consulted with her, would it be by

21   email?

22    A.  Potentially email or phone.

23    Q.  Do you recall which?

24    A.  I don't.

25    Q.  Do you keep your emails?

00047

1    A.  I do.

2    Q.  And would you have them from January 30th, 2020 to

3  the present?

4    A.  Some of them, yes.

5    Q.  When you say some of them, why would you have some

6  and not others?

7    A.  Well, I don't keep every email that I receive.

8    Q.  Well, my question wasn't limited to emails you

9  receive.  Do you keep emails that you sent?

10   A.  I do keep most of them.  I'm not sure if I keep all

11  of them.

12   Q.  What would be the distinction between the ones that

13  you keep and the ones that you do not keep?

14   A.  Well, I don't have a formal rule on that.  But I do

15  receive and send a lot of email and some of it is not

16  necessary to keep.  It's not a formal company record, and so

17  I don't keep every single piece of email that I receive or

18  send.

19   Q.  Now, you said if it's not a company record.  Are

20  your emails that you send to other employees not company

21  records?

22   A.  Not all of them are technically defined as company

23  records.  So that's my perspective.

24   Q.  Does DaVita have a retention policy for the records?

25   A.  It does.

00048

1    Q.  What is that policy?

2    A.  I can't recite the policy off the top of my head.

3    Q.  What do you understand it to be?

4    A.  That certain documents fall into categories that

5    require keeping for certain periods of time.

6    Q.  What type of categories of documents are required to

7    be kept?

8    A.  I do -- well, there are various types of documents

9    that are required to be kept, and I follow the rules to the

10   best of my understanding and ability.

11   Q.  My question was, what are those categories?

12   A.  Well, I don't know all of them.  There are a lot of

13   them.

14   Q.  Well, tell me what you do know.

15   A.  Okay.  There is a category for investigations that I

16   use because I lead a team of investigators.  There is a

17   category for what we consider non-record documents that we

18   want to maintain for reference purposes.  I use that

19   category.  And there are some categories for various HR type

20   documents and I use some of those categories as well.

21   Q.  Anything else?

22   A.  Yeah, there are a lot of other categories, like I

23   said.  But there's no way I'm going to remember all of the

24   categories.

25   Q.  Right.  I'm just asking what you remember?

00049

1    A.  Okay.  I don't remember any other categories.

2    Q.  But would emails concerning the Disaster Relief

3  Policy be within a category that would be retained?

4    A.  I think so, yeah.

5    Q.  So if you did have emails to Ms. Prockish or anybody

6  else concerning the Disaster Relief Policy, you would still

7  have those emails, correct?

8    A.  I think so.

9    Q.  Okay.  Have you checked to see what emails you have

10  between yourself and others concerning the Disaster Relief

11  Policy?

12    A.  No.

13    Q.  Okay.  Do you know when -- now, you said that you

14  had reviewed the policy and you thought Shawn Zuckerman had

15  reviewed the policy as well as Jeremy and concluded that it

16  did not apply to COVID-19, correct?

17    A.  Yes.

18    Q.  When did you make that decision?

19    A.  I don't remember the date off the top of my head.

20    Q.  Is there any documents that would refresh your

21  recollection as to when that was made?

22    A.  Not that I know of.

23    Q.  Do you remember when it was first discussed whether

24  the COVID-19 policy -- whether the Disaster Relief Policy

25  would apply to COVID-19?

00050

1    A.  Again, I don't remember the date off the top of my

2   head.

3    Q.  Do you agree that there was a declaration of

4   emergency declared in regards to COVID-19 on January 30th,

5   2020?

6    A.  I believe there was, yes.

7    Q.  Do you have any reason to doubt that?

8    A.  No.

9    Q.  Other than the people that you've identified, which

10   are the two lawyers and the three of you, is there anybody

11   else that you know who reviewed the COVID-19 or the Disaster

12   Relief Policy and determined that it did not apply to

13   COVID-19?

14    A.  Not that I know of.

15    Q.  When you were -- did you do any investigation as to

16   the cost of if the Disaster Relief Policy applied to

17   COVID-19?

18    A.  I did not, no.

19    Q.  Do you know if anybody else did any analysis as to

20   the cost if the Disaster Relief Policy applied to COVID-19?

21    A.  I don't know, but not that I was aware of.

22    Q.  Okay.  And in making your determination that this

23   Disaster Relief Policy would not apply to COVID-19, did you

24   consider anything other than the text that existed in the

25   handbook at the time of the Disaster Relief Policy?

00051

1   A.  Well, I would say, yes, we considered the context.

2   Q.  Okay.  Explain what you mean by that.

3   A.  Well, we reviewed the policy in context of the

4   pandemic and what was going on and applied the policy to see

5   if it fit the situation.

6   Q.  When you say you applied the policy to the

7   situation, can you explain what --

8       MS. PETERSEN:  Counsel -- sorry.  Finish your

9   question.  I apologize.

10       MR. BORISON:  Okay.

11   Q.  -- what you were applying -- I mean explain what you

12   mean when you applied the policy?

13       MS. PETERSEN:  Objection, with regard to the extent

14   that this could be going into the attorney-client privileged

15   portion of the discussion.  The witness has testified that

16   these discussions took place with counsel involved.

17   A.  Yeah.  I reviewed the policy and considered what was

18   going on with the pandemic and consulted our legal counsel

19   to talk through the differences between the policy and what

20   was going on.  And based on that analysis, decided it didn't

21   apply.

22   Q.  Right.  So that was based on your consultation with

23   the lawyers that the policy didn't apply; is that correct?

24   A.  Right.

25   Q.  And that was a conclusion that you shared with all

00052

1  of the teammates at DaVita, correct?

2     A.  The company shared that.  I didn't personally share

3  it, but yes.

4     Q.  So the result of your conversations were shared with

5  anybody at the company at any level?

6     A.  Right.

7     Q.  Is that right?

8        MS. PETERSEN:  Object that it Misstates prior

9  testimony to the extent that that's what that is intended to

10  reiterate.

11     A.  Can you repeat the question?  I'm not sure I

12  understand it.

13        MR. BORISON:  Do you want to repeat it, please.

14     (Reporter read back as requested.)

15     A.  So just to clarify, I would say the conversation --

16  the results of it weren't all shared with all teammates, but

17  we provided teammates an update on the policy.

18     Q.  Well the conclusion that was reached was shared with

19  everyone, correct?

20     A.  I'm not sure what you mean by conclusion.

21     Q.  Okay.

22     [Shares screen] [**]

23     Q.  Do you see part of Exhibit 7 it's Bates stamped

24  00153?  Do you see that?

25     A.  I do.

00053

1    Q.  And that is something that was added to the

2   teammates handbook, correct?

3    A.  It was, yes.

4    Q.  And so that was the conclusion reached by you after

5   consulting the attorneys as to whether this policy applied

6   to COVID-19, correct?

7    A.  Yes.

8    Q.  And this was open to any teammate, right?  The

9   teammate handbook goes out to all 57,000 employees?

10    A.  Well, kind of.  It's delivered electronically, so

11   it's available on the Village web, the intranet that we have

12   for our teammates.  A physical copy isn't delivered.  But,

13   yes, this was included in the electronic version.

14    Q.  And when interpreting this policy, when you reviewed

15   this policy, you felt the need to consult with the attorneys

16   as to whether or not it applied to COVID-19, correct?

17       MS. PETERSEN:  Object as to form.

18    A.  I consulted the lawyers, yes.

19    Q.  You thought that was a necessary thing to do to

20   interpret the policy, correct?

21    A.  I thought it was the prudent thing to do.

22    Q.  How often do you consult with the lawyers on

23   policies that are contained in the teammates handbook?

24    A.  All the time.

25    Q.  Why did you think it was the prudent thing to do in

00054

1  this instance?

2    A.  To get another opinion.  I think I'm the type of

3  leader who likes to have a consensus decision and I respect

4  the lawyers that I work with and so I tend to consult them.

5    Q.  Did Mr. Zuckerman agree with your conclusion as to

6  the interpretation?

7    MS. PETERSEN:  Objection, to the extend that it

8  calls for part of conversations, including counsel.

9    A.  I believe he did.  I believe he was likely part of a

10  discussion with myself, Jeremy, and our legal counsel.

11    Q.  Did you have any discussions prior to consulting

12  legal counsel between you and Mr. Zuckerman or Jeremy?

13    A.  I'm not positive.

14    Q.  Do you think you had discussions before consulting

15  legal counsel with either Jeremy or Mr. Zuckerman concerning

16  whether or not -- making the decision whether or not the

17  Disaster Relief Policy applied to COVID-19?

18    A.  I don't recall.  It's possible but I don't know for

19  sure.

20    Q.  Is there any documents that would refresh your

21  recollection as to whether or not you had any communications

22  -- and when I say communications I'm going beyond just

23  conversations; if there were emails between you and Jeremy

24  or Mr. Zuckerman or jointly concerning the interpretation,

25  the determination that the Disaster Relief Policy did not

00055

1   apply to COVID-19?

2      A.  Not that I know of.

3      Q.  If you had sent an email to either Mr. Zuckerman or

4   Jeremy regarding this issue, would you have retained that

5   email as part of the DaVita retention policy?

6      A.  I think so.

7      Q.  And same question but broadening it to, do you

8   recall any conversation with Ms. Prockish prior to your

9   consultations with the attorneys concerning whether or not

10   the Disaster Relief Policy applied to the COVID-19 crisis?

11     A.  No, I don't.

12     Q.  I'll make it even broader.  Anybody else that you

13   would have consulted with concerning this issue of whether

14   or not the Disaster Relief Policy applied to COVID-19?

15     A.  Are you asking me if I remember those conversations?

16     Q.  Well, my prior question was limited to Mr. Zuckerman

17   and Jeremy or Ms. Prockish.  Now I'm opening it to other

18   than the conversations you referenced with counsel, is there

19   anybody else that you recall that you communicated with?

20     A.  No, not that I recall.

21     Q.  And now you referenced that you consulted with the

22   attorneys because you wanted to arrive at a consensus

23   opinion; is that correct -- and correct me if I'm wrong?

24     A.  Yeah, I consult with them regularly on policy

25   questions.  And I think it's helpful to have their

00056

1  perspective.  And in that spirit, I consulted with them on

2  this.

3     Q.  Who had the authority to change the Disaster Relief

4  Policy in March of 2020?

5     A.  Well, I'm not exactly sure what you're asking.

6     Q.  Who had the authority to make changes to the

7  Disaster Relief Policy in March of 2020?

8     A.  Well, a few people can make changes to our policy,

9  so it's not as simple as just asking for one person.  But

10  Shawn and I can make changes to the policies anytime if

11  there needs to be an update, so can the policy owner.  And

12  if there are legal updates or we receive advise from legal

13  counsel, we make up dates based on that as well.

14    Q.  All right.  And I'm talking about specifically the

15  Disaster Relief Policy.  Can you tell me who would have the

16  authority to make any changes to the Disaster Relief Policy

17  in March of 2020?

18    A.  So Toni is the owner of the policy.  She would have

19  authority over that and that process is worked through my

20  team.  So when an update happens for a variety of reasons,

21  like I mentioned, including advice from legal counsel, we

22  would work as a team to get the policy updated.

23    Q.  Anyone else besides Toni?

24       MS. PETERSEN:  Object to the form.

25    A.  Well, yes.  Like I said myself, Shawn, and legal

00057

1  counsel.  You know the updates don't typically come from

2  just one person or one place.  So, you know, any of us would

3  be able to propose the update and then we would decide on

4  how to move forward as a group.

5      Q.  And you're talking in general, but I'm talking

6  specifically about the Disaster Relief Policy.  Anyone

7  besides Toni who can make the decision?

8      MS. PETERSEN:  Asked and answered.

9      A.  That's just not the way it works.  And Toni doesn't

10  make the decision on her own and then we update it without

11  any involvement at all.  And so I just disagree with the

12  premise that there's one person who has all the authority on

13  this topic.

14      Q.  Well, I understand that you have shared authority to

15  make changes.  I'm asking who would participate or who would

16  have shared authority to make changes?  You identified Toni

17  Prockish as the owner of the policy.  You also said that she

18  would consult with you and Shawn and legal counsel at some

19  point.  Anyone else besides those people who would be

20  involved in making a decision to change the Disaster Relief

21  Policy at DaVita?

22      A.  I think my boss was also involved Jeremy Eaves and

23  that's all I can remember.

24      Q.  How do you spell Jeremy's last name?

25      A.  His last name is Eaves, E-A-V-E-S.

00058

1    Q.  And in your scenario where you said she would

2    consult with you all, who has the ultimate authority as to

3    whether the change is made or not?

4        MS. PETERSEN:  Objection, asked and answered.

5    A.  Again, I just disagree with the premise of the

6    question.  The process doesn't work by one person having

7    complete authority or not.  You know, so I don't know to

8    answer it.

9    Q.  What happens if you disagree with the owner of the

10   policy, the Disaster Relief Policy?  What would happen?  How

11   does that get resolved?

12   A.  Well, like I said, I believe in a consensus.  I'm a

13   consensus driven leader.  And my goal is to talk any type of

14   disagreement through with the policy owner and come to a

15   consensus around the right path forward.  And, you know, in

16   most cases that happens with legal counsel.  And in this

17   case that happened in consultation with legal counsel.

18   Q.  All right.  So the ultimate decision here was a

19   consensus between the various parties you've identified?

20   A.  Yes, I would agree with that except for there wasn't

21   a lot of disagreement, so I don't want to make it sound like

22   there was a lot of disagreement that needed consensus.  The

23   parties agreed here that it was clear on its face that the

24   conditions the policy required were not met by COVID-19.

25   Q.  All right.  And that was based on your analysis of

00059

1  the text of the Disaster Relief Policy, correct?

2      MS. PETERSEN:  Objection, to the extent that you're

3  encroaching into the attorney-client privilege discussion as

4  to the --

5      MR. JONES:  Counsel, could you help me?  What is

6  your objection?

7      MS. PETERSEN:  I just stated it

8      MR. JONES:  I didn't understand.  If you don't mind

9  helping me.  Would you mind restating it.

10      MS. PETERSEN:  I object that the question is

11  inquiring into attorney-client privileged information.

12      MR. JONES:  That's not your privilege to object to;

13  that's the witness's.  If the witness wants to tell us what

14  he talked to his lawyer about, you can't stop him.  You can

15  only advise him.  Just for purposes, so we don't clutter

16  this up, if you want to advise the witness not to disclose

17  that information, I understand that.  But you can't object

18  to us asking him that.  It's the witness's privilege, right.

19      MS. PETERSEN:  Counsel, I will state it this way, my

20  objection is intended to offer the counsel the opportunity

21  to rephrase the question in case he's not actually inquiring

22  into the content of that conversation.  If that is what

23  counsel is inquiring into, then the privilege applies and

24  I'm instructing the witness not to answer.

25      MR. JONES:  I understand that.  Just so the record

00060

1  is clear, all right, look not all objections are preserved.

2  So when you make an objection, I want to understand it.  So

3  what you're doing is instructing the witness, correct, and

4  Mr. Borison

5      MS. PETERSEN:  Counsel, how many counsel for --

6  plaintiff's counsel are going to --

7      MR. BORISON:  Well, let me ask you, when you object,

8  I mean are you instructing him not to answer?  We talked

9  about this earlier in the deposition.  Are you instructing

10  him not to answer based on privilege?

11      MS. PETERSEN:  The way I just responded still

12  stands.  My objection was to give the opportunity to provide

13  some clarity around your question.  If the purpose of the

14  question is to inquire into conversations with counsel,

15  then, yes, I am instructing the witness not to answer on the

16  basis of attorney-client privilege.

17      MR. JONES:  Thank you.

18      Q.  Now, Mr. McKinstry, when I asked you that the

19  decision that was made that the Disaster Relief Policy did

20  not apply to COVID-19 was a consensus, I think you said yes,

21  but then you added but there was no disagreement.  But the

22  answer to the question itself and on a yes or no basis, is

23  the decision that you referred to that the Disaster Relief

24  Policy did not apply to COVID-19 was a consensus decision,

25  correct?

00061

1    MS. PETERSEN:  Object to the form.

2    You can answer if you understand.

3    A.  I don't understand.  Sorry.  Too long of a question

4  for me.

5    Q.  Okay.  Was the decision that was reached that the

6  Disaster Relief Policy did not apply to COVID-19, a

7  consensus decision?

8    A.  Well, it involved legal counsel, so I'm not going to

9  go into the detail of that discussion.

10    Q.  I'm not asking what the contents was.  The question

11  was -- and you've already answered it but you added

12  something to the answer -- I'm asking you to clarify, to

13  make it clear and precise.  I am asking you whether or not

14  the decision that the Disaster Relief Policy did not apply

15  to COVID-19 was a consensus decision?

16    A.  And I'm going to stick with the answer I already

17  gave.

18    Q.  Which was what?

19    A.  You described it so and I...

20    Q.  I need you to answer to make it clear.  We're going

21  to do it again.

22    MS. PETERSEN:  Counsel.

23    MR. BORISON:  Listen because he needs to answer the

24  question.

25    Q.  Was the decision that the Disaster Relief Policy did

00062

1  not apply to COVID-19 a consensus decision?

2      MS. PETERSEN:  Objection, asked and answered.  You

3  can answer again.

4    A.  I've already answered this question.

5    Q.  That's not an answer.  Please answer the question.

6    A.  I believe I've already answered the question.

7    Q.  I understand what your belief is, but we're going to

8  keep doing this until you answer the question.

9      MS. PETERSEN:  My objection still holds.

10      But, Oliver, you can answer the question again.

11      MR. BORISON:  Well, let's make it clean, though.

12  Let's repeat the question and then him provide an answer so

13  that the transcript is clear what's being asked and what his

14  answer is.

15      Court Reporter, would you mind reading back the

16  question and then he can provide his answer.

17      (Reporter read back as requested.)

18      MS. PETERSEN:  Objection, asked and answered.

19      You may answer again.

20    A.  The decision was made as a consensus because I

21  believe in consulting people when making a decision and I

22  also believe that there was no disagreement on the

23  interpretation of this policy and the application to

24  COVID-19.

25    Q.  All right we're going to do it once more, and the

00063

1  question asks for yes or no question.  You will have an

2  opportunity to explain.  I will give you that opportunity.

3  But I want a yes or no answer without adding to it or trying

4  to change the question so let's do it one more time.

5      (Reporter read back as requested.)

6      MS. PETERSEN:  Objection, asked and answered.

7      You can answer again.

8    A.  I believe that it was a consensus decision but there

9  is no disagreement on the decision.

10    Q.  Can you answer that question yes or no?

11    A.  I'm answering the question to the best of my ability

12  consistent with the facts.

13    Q.  My question is, can you answer the question yes or

14  no?

15    A.  No, I don't believe I can.

16    Q.  You're not capable of just saying yes or no as to

17  whether or not the decision that the Disaster Relief Policy

18  did not apply to COVID-19 was a consensus decision?

19      MS. PETERSEN:  Objection, argumentative.  The

20  witness has provided the answer as many times as he can.

21      MR. BORISON:  Well, I disagree.  It's a yes or no

22  question.  He has not provided yes or no answers?

23      MS. PETERSEN:  Counsel, I appreciate that you want a

24  yes or no answer to this.  But if the witness's answer

25  requires more than that, then that's what it is.

00064

1     MR. BORISON:  Well, it doesn't require more than

2  that.  It's a yes or no question.  He can answer it yes or

3  no.  I will give him the opportunity to explain his answer

4  later if he would like it.  But I would like a yes or no

5  answer.  If he's not capable, as an attorney trained, went

6  to the University of Pennsylvania.

7     Q.  If you're not capable of giving a yes or no answer,

8  just tell me.

9     MS. PETERSEN:  Counsel, again, the fact that this

10  witness has gone to law school is of no moment in a

11  situation where he's testifying purely as a fact witness.

12  He's not acting in a capacity as an attorney.  I'm going to

13  suggest that we take one more round at this and see if we

14  can move through this.  But after that, we'll need to take a

15  pause if needed.

16     So my suggestion is, Counsel, if you want to ask

17  your question one more time, the witness can respond if he's

18  able to response and then we will move forward.

19     MR. BORISON:  If you would.

20     (Reporter read back as requested.)

21     MS. PETERSEN:  Objection, asked and answered.

22     You can answer.

23     A.  Same answer as before; it was a decision that was by

24  consensus with no disagreement.

25     Q.  All right.

00065

1       MR. BORISON:  If we could just make that

2   conversation so we can present it to the court if necessary

3   to get it answered.

4       THE COURT REPORTER:  Okay.  [MARK/INDEX]

5    Q.  If you could look at the language that appears on

6   the COVID-19 crisis that I've highlighted, do you see the

7   document in front of you?

8    A.  I do.

9    Q.  Did you contribute in any way to that paragraph?

10   A.  I consulted with legal counsel on this paragraph.

11   Q.  My question is, did you contribute?

12   A.  Only in discussions with legal counsel.

13   Q.  Let me ask you, the preceding page that I went back

14  to -- it's Bates 000152.  Do you see that?

15   A.  I do.

16   Q.  It says, [*] we recognize that the pandemic has made

17  our teammates' work more difficult and complex.  What is

18  meant by that?

19   A.  My understanding is that that references some of the

20   protocol that we put in place in the clinics to protect our

21   teammates and it refers to circumstances outside of work

22   that may have presented challenges, like child care

23   responsibilities as well.

24   Q.  Anything else?

25   A.  Not off the top of my head, no.

00066

1    Q.  Can you tell me, going back to the COVID-19 crisis

2   paragraph, can you tell me what you contributed to this

3   paragraph?

4        MS. PETERSEN:  Objection to the extent that that

5   inquires into attorney-client privileged communications or

6   work product.  Again, I'm seeking some clarity on the

7   question as to for what you're asking for.

8        MR. BORISON:  This paragraph that is sent out to

9   everybody at the company is public record.  This paragraph

10   is not covered by attorney-client privilege.  I'm asking

11   what he contributed to this product that was produced and

12   distributed widely to every employee in the company.

13    Q.  So can you tell me what you contributed?

14    A.  I believe I contributed my perspective in

15   conversations with legal counsel.

16    Q.  Did you contribute to the wording of this paragraph?

17    A.  Not that I know of.

18    Q.  Do you know who did contribute to the wording of

19   this paragraph?

20    A.  I don't know.

21    Q.  Who would know?

22    A.  I think legal counsel would likely know.

23    Q.  Anyone else?

24    A.  Not that I know of.

25        MR. BORISON:  Let's take a five minute break if that

00067

1   would work for everybody.

2       MS. PETERSEN:  Sure.

3       MR. BORISON:  Thank you.

4       (Brief recess.)

5       Q.  Before we move on from this document, you had

6   mentioned that you gave your perspective on this paragraph.

7   Can you tell me what your perspective was?

8       A.  Yeah.  My perspective in general is that the

9   Disaster Relief Policy didn't apply to COVID-19 because

10  teammates continued to be able to perform their regular

11  duties, and so that was my perspective on the policy and

12  this paragraph as well.

13      Q.  Okay.  Thank you.  The Disaster Governance Council

14  we talked about, did they meet on a regular basis?

15      A.  No.

16      Q.  When would they meet?

17      A.  Only when there's a disaster that causes some

18  teammates to be unable to perform their regular duties, and

19  so there's a need to discuss the implementation of the

20  policy.

21      Q.  It would be triggered by an emergency declaration?

22      A.  Not necessarily, no.

23      Q.  When you give that perspective on that, is that

24  based on just your understanding of the policy or is there

25  some written policy somewhere that addresses when the

00068

1  Disaster Governance Council would meet?

2     MS. PETERSEN:  Objection, vague.

3     A.  I think this policy actually specifies that.  So the

4  answer is, yes, it's based on my understanding of this

5  policy.

6     Q.  Anything other than this policy that we're looking

7  at?

8     A.  No.

9     Q.  Do you know how many -- since you've been there,

10  excluding the two months that you left for a short period of

11  time, how many changes have been made to the Disaster Relief

12  Policy?

13     A.  I don't know that.  I don't know that off the top of

14  my head.

15     Q.  If you had to determine that, where would you look

16  or what would you do to find that out?

17     A.  I would work with Alejandro and look at the

18  SharePoint site to see if other changes had been made.

19     Q.  Okay.  And we've been talking about this, you know,

20  where you review the policy and other people review the

21  policy and you convene various discussions about it.  What

22  caused you all to look at this in the first instance?

23     MS. PETERSEN:  Objection, instructing the witness

24  not to attorney, attorney-client privilege.

25     MR. BORISON:  As to why he would look at the policy?

00069

1      MS. PETERSEN:  My understanding of your question

2   was, the conversation with regard to it.

3      MR. BORISON:  No.

4   Q.  I'm asking what caused you all to even look at the

5   Disaster Relief Policy in connection with COVID-19?

6      MS. PETERSEN:  Objection, vague.  I'm sorry.  Asking

7   for the witness or for you all?  I don't understand.

8      MR. BORISON:  Yeah, for the witness.

9   Q.  You're the only one here, right?

10     A.  Can I just get the question again?  Sorry about

11   that.

12        (Reporter read back as requested.)

13     A.  Just to clarify, you're asking what caused me to

14   look at the policy?

15   Q.  Yes.

16     A.  I believe that there had been some questions raised

17   by teammates about whether the policy applied.

18   Q.  Okay.  And I guess just to clarify, when you say

19   teammates, would that include managers or would that just be

20   -- I guess does teammates apply to everyone; managers, vice

21   presidents, everything?

22     A.  Yes.

23   Q.  Was Toni Prockish one of the people who inquired?

24     A.  No.

25   Q.  Okay.  Now, after you knew it was an issue and you

00070

1  start to look at it, then you also consulted the attorneys,

2  were you looking for legal opinions from the attorneys?

3      MS. PETERSEN:  Objection.

4      I'm instructing the witness not to answer.  That is

5  attorney-client privilege.

6      MR. JONES:  Wait a minute.  You're instructing him

7  not to answer?

8      MR. BORISON:  Hold on.  You're instructing him not

9  to answer as to why he was consulting the attorneys?

10     MS. PETERSEN:  Correct.

11     MR. JONES:  No.  You're asking whether he consulted

12  the attorney for a legal opinion.

13     MS. PETERSEN:  I'm sorry.  I can't hear.  There's

14  two counsel talking and I can't hear.

15     MR. JONES:  I'm sorry.  That's my problem.  I'll

16  just make this clear.  I have a difficult connection right

17  here, so I can't always hear.  I didn't mean to interrupt.

18     MR. BORISON:  Sure.

19     Q. So my question is, why did you contact legal

20  counsel?

21     MS. PETERSEN:  Objection.  I'm inserting my

22  objection in case you want to rephrase the question.  But if

23  the question is precisely, why did he make the decision to

24  reach out to legal counsel, then I'm instructing the witness

25  not to answer.  That is attorney-client privilege.

00071

1    Q.  Before you consulted the attorneys, you made a

2  decision to consult with them, correct?

3    A.  Yes.

4    Q.  Right.  And why did you make that decision?

5        MS. PETERSEN:  Objection.  If what you're asking for

6  is the reason why he contacted legal counsel, I'm

7  instructing the witness not to answer.  That's privileged by

8  the company.

9    Q.  I assume you're going to take her instruction?

10   A.  I am.

11   Q.  Okay.  Let's just clarify.  Did you consult legal

12  counsel to obtain a legal opinion?

13       MS. PETERSEN:  If you can answer that question

14  without revealing attorney-client information, you can.

15       MR. BORISON:  We don't have to do a talking

16  objection, okay.

17   A.  Well, you know, I'm not going to answer.  I

18  consulted our legal counsel and I believe that to be

19  privileged conversation and the reason that I contacted them

20  also to be privileged.

21   Q.  Your decision as to why you consulted them, you're

22  claiming is subject to attorney-client privilege?

23       MS. PETERSEN:  Counsel, that is the reason I have

24  instructed the witness not to answer, so yes.

25       MR. BORISON:  Are you instructing him not to answer?

00072

1  I'm not asking what the opinion was.  I'm asking whether he

2  was consulting them for the purposes of obtaining an

3  opinion.

4      MS. PETERSEN:  And I am instructing the witness not

5  to answer.

6    Q.  And you're following that instruction?

7    A.  I am.

8    Q.  Okay.

9      MR. BORISON:  At this point I think -- we're not

10  going to conclude the deposition because there are various

11  issues that have been left open at this point.  But as they

12  point I don't have any further questions based on the last

13  two responses and the previous issues that we've talked

14  about that I think we might have to revisit these issues

15  after consultation with the court.

16      Mr. McKinstry, thank you for your time.

17      And, Chelsea, do you have any questions?

18    MS. PETERSEN:  I do not.

19    (Adjourned at 11:43 a.m.)

20    (Signature reserved.)

21

22  [sig/cert/corr]

23

24

25