# EXHIBT A

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

---------------------------------------------------------

JOSEPH J. HESKETH III, on     )
his behalf and on behalf      )
of other similarly            )
situated persons,             )
                              )
            Plaintiff,        )
                              )
        vs.                   )    No. 2:20-cv-01733-JLR
                              )
TOTAL RENAL CARE, INC., on    )
its own behalf and on         )
behalf of other similarly     )
situated persons,             )
                              )
            Defendants.       )

---------------------------------------------------------

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF

JEREMY MICHAEL EAVES

Conducted via Zoom

---------------------------------------------------------

ATTENDANCE OF ALL PARTICIPANTS VIA ZOOM VIDEO CONFERENCE

---------------------------------------------------------

DATE:  May 10, 2021

REPORTED BY:  Olivia Pennella

## Page 2

A P P E A R A N C E S:

FOR PLAINTIFF:

J. CRAIG JONES
Jones & Hill, LLC
131 Highway 165 South
Oakdale, Louisiana 71463
318-335-1333
craig@joneshilllaw.com
CHRISTINA L. HENRY
Henry & DeGraaff, PS
119 First Avenue South, Suite 500
Seattle, Washington 98104
206-330-0595
chenry@hdm-legal.com

SCOTT C. BORISON
Borison Firm, LLC
1900 South Norfolk Street, Suite 350
San Mateo, California 94403
301-620-1016
scott@borisonfirm.com

FOR DEFENDANT:

CHELSEA D. PETERSEN
MARGO S. JASUKAITIS
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
206-359-3993
cdpetersen@perkinscoie.com
mjasukaitis@perkinscoie.com

ALSO PRESENT:

COLLEEN LUDWIG (DAVITA)

## Page 3

E X A M I N A T I O N

| WITNESS | | |
|---|---|---|
| JEREMY MICHAEL EAVES | MR. JONES | 7 |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Amended Class Action Complaint (Jury Demand) | 18 |
| 2 | Defendant Total Renal Care, Inc.'s Answer to Plaintiff's Amended Complaint | 18 |
| 3 | Declaration of Shawn Zuckerman in Support of Total Renal Care, Inc.'s Answer to Complaint | 18 |
| 4 | Defendant Total Renal Care, Inc.'s Initial Disclosures | 18 |
| 5 | Teammate Policies, Effective January 1, 2020 (TRC 000001 - TRC 000148) | 55 |
| 6 | Email re Daily All Teammate COVID-19 Update, dated March 27, 2020 (TRC 000149 - TRC 000151) | 18 |
| 7 | Teammate Policies Section 4.12 (Disaster Relief Policy) (TRC 000152 - TRC 000154) | 18 |
| 8 | Teammate Policies, Effective August 19, 2020 (TRC 000155 - TRC 000302) | 18 |
| 9 | DaVita-ese, A Guide to Our Terminology and Acronyms (TRC 000303 - TRC 000312) | 18 |

## Page 4

E X H I B I T S (Continued)

| No. | Description | Page |
|---|---|---|
| 10 | Star Learning Certificate for JJ Hesketh (TRC 000313) | 18 |
| 11 | Defendant Total Renal Care, Inc.'s Responses to Plaintiff's First Set of Requests for Production | 18 |
| 12 | Defendant Total Renal Care, Inc.'s Responses to Plaintiff's First Set of Interrogatories | 18 |
| 13 | Declaration of Carol Strong in Support of Total Renal Care, Inc.'s Notice of Removal | 18 |
| 14 | Defendant Total Renal Care, Inc.'s Supplemental Responses to Plaintiff's First Set of Interrogatories | 18 |
| 15 | Defendant Total Renal Care, Inc.'s Supplemental Responses to Plaintiff's First Set of Requests for Production | 18 |
| 16 | Email re Daily Phoenix Group COVID-19 Update, dated March 27, 2020 (TRC 000317 - TRC 000319) | 18 |
| 17 | Notice of 30(b)(6) Deposition of DaVita's Corporate Representative | 18 |
| 18 | Subpoena; Third Amended Schedule A to the Subpoena to Rule 30(b)(6) Corporate Representative to DaVita, Inc. | 18 |
| 19 | Amended Notice of Deposition of Jeremy Eaves | 18 |
| 20 | Email string re Disaster Relief policy; top email dated March 19, 2020 (DAVITA_003368 - DAVITA_003373) | 135 |
| 21 | Email string re Compensation; top email dated March 19, 2020 (DAVITA_003375 - DAVITA_003376) | 136 |

## Page 5

E X H I B I T S (Continued)

| No. | Description | Page |
|---|---|---|
| 22 | Email string re Interview Process Recommendations Updated; top email dated March 17, 2020 (DAVITA_003477 - DAVITA_003486) | 137 |
| 23 | Email re Disaster policy pay questions dated March 17, 2020; Email re Interview Process Recommendations Updated, top email dated March 17, 2020 (DAVITA_003131 - DAVITA_003137) | 143 |

2 (Pages 2 to 5)

1    Monday, May 10, 2021
2    12:10 p.m. PDT
3    -----------------------------------
4        THE COURT REPORTER:  We are on the record.
5        MS. PETERSEN:  Thank you.  This is Chelsea
6    Petersen for defendant, Total Renal Care.
7        MS. HENRY:  If you'll wait for a moment,
8    Chelsea.  As I mentioned, we are about to come on to the
9    thing.  So just give us one minute, please.
10       MS. PETERSEN:  Okay.  I'm simply introducing
11   myself --
12       MS. HENRY:  Thank you.
13       MS. PETERSEN:  -- and indicating that we are
14   here and ready to begin the deposition.
15       MS. HENRY:  And I understood that.  As I said,
16   I'm trying -- I will be on in a minute.  I'm almost off
17   the phone.  Just a minute.
18       MS. PETERSEN:  Thank you.  We can go off the
19   record.
20       (Recess taken from 12:10 p.m. to 12:48 p.m.)
21   JEREMY MICHAEL EAVES,   witness herein, having been duly
22              sworn by the Certified Court
23              Reporter, testified as follows:
24   \\\
25   \\\

1          E X A M I N A T I O N
2    BY MR. JONES:
3        Q.   Mr. Eaves, I'm Craig Jones.  And I appreciate
4    your patience.  Quite often in corporate depositions,
5    things drag early on.  And we'll try not to take up any
6    more of your time than is necessary.
7           Now, I'm going to start with the first
8    question.  It's the one that you always hear in your
9    lawyer programs.  I'm going to ask you to state your
10   full name, please.
11       A.   Sure.  Jeremy Michael Eaves.
12       Q.   Mr. Eaves, where do you live?
13       A.   I live in Broomfield, Colorado.
14       Q.   How far is that from Denver?
15       A.   I would say about 18 miles from door to
16   office.
17       Q.   Where are you right now located, physically?
18       A.   I'm in my home office in Broomfield, Colorado.
19       Q.   Okay.  I'd like you to -- well, first of all,
20   let me tell you how I'm going to take the deposition.
21   This is a corporate deposition of DaVita.  Are you aware
22   of that?
23       A.   I am.
24       Q.   Have you ever given a deposition before?
25       A.   I have.

1        Q.   On how many occasions have you given a
2    deposition?
3        A.   One time.
4        Q.   And what was the occasion for that one
5    deposition?
6        A.   It involved an investigation that was
7    conducted internally, DaVita.
8        Q.   Would you say a little bit more about that?
9    I'm -- I don't --
10          It doesn't sound like it involves what we're
11   here today about, but I've got to ask little questions.
12   Was it an internal investigation with DaVita, or tell me
13   something about it?
14       A.   Yes, it was an internal investigation that
15   involved DaVita.
16       Q.   How long have you worked for DaVita?
17       A.   Ten years, six months.
18       Q.   Let me give you the ground rules.  Hang on.
19          I want you to answer out loud, please.  You're
20   doing a good job of that.  If you continue to do so,
21   I'll appreciate it.  Will you do that for me?
22       A.   Yes.
23       Q.   This lady is a court reporter right here, and
24   she's going to be taking down everything that we say
25   today and put it in booklet form.  But if we both speak

1    at the same time, the way that she's trained, she'll
2    indicate in the deposition that we are both speaking at
3    the same time; or she would put one-half of the question
4    on one line, your answer on the second line, and the
5    other half of the question on the third line.
6           And that makes for awkward reading when this
7    comes out in booklet form.  So even though you may
8    understand and probably will understand my question
9    before I finish it, if you would hesitate just a second
10   before you begin your answer and let me finish my
11   question, and I'll hesitate just a second after you
12   finish your answer to begin my next question.
13          Does that make sense, what I'm saying?
14       A.   It does.
15       Q.   Okay.  Now, I'd like to ask you to do this for
16   me.  If I should ask you a question and you don't
17   understand it, I really don't want you to answer the
18   question.
19          What I want you to do is tell me that you
20   don't understand it, and I will rephrase the question as
21   many times as I need to until we understand the
22   question.  Will you do that for me?
23       A.   Yes, I will.
24       Q.   Conversely, if I ask you a question and you
25   answer that question, I'm going to assume that you

1  understood my question and that your answer was fairly
2  directed directed the question I asked; is that fair?
3      A.  Yes, I believe so.
4      Q.  You realize that today you're under oath as if
5  you were in a court of law?
6      A.  Yes, I do.
7      Q.  And that means that you have certain
8  obligations.  One of those obligations is to tell the
9  truth.  You understand that?
10     A.  Yes, I do.
11     Q.  And are you prepared to tell the truth today?
12     A.  Yes, of course.
13     Q.  The other obligation you have is to answer
14 questions frankly because, you see, this may be the only
15 opportunity we have to speak to you as representative of
16 DaVita before the trial of this matter.
17         And me and my co-counsel here, as have all the
18 lawyers in this deposition, have taken an oath to
19 represent our clients to the best of our ability.  And
20 so we want to make sure that we get a good, frank
21 answer.  Now, are you prepared to give frank answers
22 today?
23     A.  Mr. Jones, can you tell me what the
24 expectation will be around frank?
25     Q.  Certainly.  Now, let's say that you came home

1  one evening and your wife or your spouse said, "Jeremy,
2  where have you been?"  That would be an easy question.
3  But if your wife or your spouse said, "Jeremy, have you
4  been down at this saloon across from the courthouse?"
5         And in fact you had been down at the saloon
6  across from the railroad tracks; and you looked at your
7  spouse or your wife, and you said, "No, I haven't been
8  down that saloon across from the courthouse."  That
9  would be an honest answer, but it wouldn't be frank.
10        Do you understand my example?
11     A.  I -- I do understand your answer.  I -- I
12 understand what you're trying to get to, yes.
13     Q.  Okay.  Are you prepared, sir, to answer all my
14 questions frankly today?
15     A.  Yes, I am.
16     Q.  All right.  Thank you.  Now, we're here to
17 take a corporate deposition of DaVita.  Do you know what
18 a corporate deposition is?
19     A.  I do have a general understanding, yes.
20     Q.  Before we get started with that, I'd like you
21 to tell me a little something about yourself.  And I'm
22 not going to pry, but we're asked to -- allowed to ask
23 something about the person who's answering the
24 questions.
25        Why don't you give me a thumbnail sketch of

1  your educational background, starting with high school
2  and just bring me forward?
3      A.  Sure.  I graduated from high school in 1989.
4  I attended undergraduate and graduate school.  Both of
5  those degrees were obtained at Colorado State
6  University.  My undergraduate degree is in technical
7  journalism.
8         I went immediately after graduation that fall.
9  And my advanced degree, which is a master of science, is
10 officially called student affairs in higher education,
11 also known as higher education administration.
12     Q.  Why don't you give me a thumbnail sketch of
13 your work history, just starting with when you finished
14 college and bring me forward?
15     A.  Sure.  I'm happy to do so.  After I obtained
16 my master's degree, I worked for a couple of years at
17 the University of Colorado at Boulder.  My
18 responsibilities there were as a full-time hall
19 director, where I was responsible for doing judicial
20 hearings for students who received infractions and also
21 was responsible for the living environments that the
22 students that were in the residence hall facilities I
23 oversaw.
24         I decided that the compensation was not enough
25 to keep me afloat, and quickly decided to see if it

1  would be possible for me to go to the corporate world.
2  In short, my next job was at Oppenheimer Funds, where I
3  was a learning and development instructor.  I was there
4  for a couple of years.  I then went on to a company by
5  the acronym of ING -- N for Nancy, G for Group.  It was
6  an international company that came into the United
7  States.
8         And I was what we called at the time a human
9  resources generalist, which eventually landed with me
10 being a lead human resources consultant.  I was there
11 for about five years.  And then I did a very similar
12 job, where I was doing generalist HR responsibilities
13 for a subsidiary of KeyBank called Key Equipment
14 Finance.  I was also there for five years, at which time
15 I applied and received a job at DaVita.  I've worked at
16 DaVita, as I mentioned earlier, for ten years and
17 six months.
18     Q.  What is your current position with DaVita?
19     A.  My title is vice president, people services
20 operations.
21     Q.  Who's your immediate supervisor?
22     A.  My immediate supervisor is the chief people
23 officer.
24     Q.  See, I don't -- I don't know if I know who the
25 chief people officer is.  Does that person have a name?

Page 14

1      A.   Sure.  I'm sorry about that.  Yes.  His name
2  is Kenny Gardner.
3      Q.   Okay.  Sometimes I may have to ask you
4  questions, the answers are obvious and, you know, I
5  already know the answer.  But I'm just making a record.
6  Okay?
7      A.   Yeah.  And, Mr. Jones, you'll have to keep me
8  honest.  We have a lot of different acronyms and names
9  at DaVita that might be unusual in the corporate world.
10  I will do my very best to -- to make that something that
11  I'm trying to be clear on, but feel free to remind me.
12  I'm happy to break down those acronyms or give you more
13  explanations if needed.
14      Q.   I know.  I appreciate that.
15           What does Palmer stand for?
16      A.   Palmer can mean a couple of different things.
17  Palmer can mean a geographic region.  And so we've got
18  Palmers throughout the United States, which basically
19  kind of describes the regional operations we may have in
20  the domestic United States.
21           We also use the title to refer to the leaders
22  of those groups.  Those are also called group -- group
23  vice presidents or GVPs and -- and they will lead those
24  Palmer groups.
25      Q.   I'm going to ask you to just get me through

Page 15

1  that again because -- I think I understand what you
2  mean.  But, I mean, is -- one more time, if you don't
3  mind.
4      A.   Sure.
5      Q.   Can you just answer that question again?  I'm
6  struggling with it.  Can you help me understand a little
7  better?
8           MS. PETERSEN:  Objection.  Asked and answered.
9           Go ahead.
10      A.   Yes, I can.  So again we would -- we would use
11  the term "Palmer" to describe two separate things.  We
12  have geographic operational regions throughout the
13  country.  And off the top of my head, I think we have
14  nine or ten of those.  And those would be distinct
15  geographic operational regions.
16           Just to put that in context, there are three
17  groups that are Palmers -- like Galaxy, Titan, Endeavor.
18  We would also refer to the leader of those groups as a
19  Palmer.  So we might say, "What Palmer will be attending
20  that meeting today?"  And that could also reference the
21  specific leader who is the operational lead for that
22  regional group.
23      Q.   (By Mr. Jones)  Okay.  Thank you.  That
24  probably eliminated about 15 questions I had for you
25  right there.  I appreciate it.

Page 16

1           MR. JONES:  Well, I want to attach some
2  documents to the deposition now.  And we'll start with
3  attaching -- give me a second.
4           And Madam Court Reporter, we're going to
5  attach to -- to reference it.
6           If that's okay with you, Ms. Petersen, rather
7  than drag the deposition down and turn it into something
8  that's unwieldy.
9           MS. PETERSEN:  What do you mean by "attach" --
10  by -- what was the phrase you just used?
11           MR. JONES:  Reference.
12           MS. PETERSEN:  Reference.  How do you --
13           MR. JONES:  We have -- yeah.  Well, we had
14  previously identified 15 documents as Exhibits 1
15  through 15 that were used in the last depositions.  And
16  they were provided to you again today.
17           MS. HENRY:  And, Craig, it was -- there were
18  16.  I checked.
19           MR. JONES:  16.  Okay.  And -- hang on one
20  second.  And I want to start out by attaching those
21  documents.  I can have -- and, look, I'll send them to
22  the court reporter, if you want them attached to this
23  deposition.
24           But I generally -- we know what they are.
25  And, you know, I don't know that whoever has to read

Page 17

1  these depositions appreciates them all being attached to
2  every one of them.  But it's your pleasure, however you
3  want to handle it, Ms. Petersen.  I mean --
4           MS. PETERSEN:  I don't mind if they're
5  attached.  I'm just wanting to make the point, which we
6  did prior to this deposition starting, that the witness
7  doesn't have access.  So in terms of sharing a
8  particular document --
9           MR. JONES:  You didn't send them to him?
10           MS. PETERSEN:  No.  I made that clear --
11           MR. JONES:  You did not send them to him?
12           MS. PETERSEN:  I made --
13           MR. JONES:  You're not going to?
14           MS. PETERSEN:  May I finish, please?  I made
15  clear in advance of the deposition that in the past six
16  depositions that we've had so far in the case, we have
17  not provided the exhibits in advance to the witness.
18           So, no, this witness has not received the
19  Exhibits 1 through 16.  The practice so far in the
20  depositions has been to simply introduce them and share
21  on the screen.
22           MS. HENRY:  And the court reporter has all 16
23  of them.
24           MR. JONES:  Thank you.
25           Madam Court Reporter, let us attach those --

5 (Pages 14 to 17)

Page 18

1  hang on -- as Exhibits 1 through 16, please.  We would
2  also attach as Exhibit 17 the DaVita Notice of Corporate
3  Deposition, with the Third Amended Topics, Attachment A.
4       Our subpoena will be Exhibit 18.  And 19,
5  we'll have Amended Notice of Deposition of Jeremy Eaves
6  for the 30(b)(1) deposition that may follow this one if
7  necessary.  Hopefully it won't be, Mr. Eaves.
8       (Exhibits-1 through 19 marked for
9       identification.)
10      MR. JONES:  All right.  Ms. Petersen, you
11  follow our exhibits?
12      MS. PETERSEN:  Looking for a little
13  clarification on 17.  That's just going to be the --
14  well, help me understand, if you would, what 17 is going
15  to be?
16      MR. JONES:  I think Ms. Henry sent you a copy
17  of it today.
18      MS. HENRY:  I did not, so I will send those to
19  her now.  I sent it to the court reporter.
20      All right.  Confirm when you get them, so I
21  know that they've gotten to you.
22      MS. PETERSEN:  Will do.  And, Christina, do
23  you mind confirming -- since the subpoena was just, I
24  think, revised and amended, even after kind of we were
25  set to start today, are we looking at that most recent

Page 19

1  version or a prior version?
2       MS. HENRY:  That most recent version.
3       MS. PETERSEN:  Okay.  Okay.  The email just
4  came through.  I'm opening the documents now.  So to be
5  clear, the Exhibit 17 is the notice that was setting the
6  dep back when it was a notice and when the date was
7  April 5?  I just want to --
8       MS. HENRY:  Yes, that's my understanding, yes.
9       MS. PETERSEN:  Okay.
10      MR. JONES:  Yeah, I mean, we agreed to move it
11  to this date, didn't we?  I didn't see any reason to
12  paper up on that.
13      MS. PETERSEN:  The concern is that that is
14  presented as a notice; whereas, you know, ultimately
15  the -- it needed to be a subpoena for a non-party, but I
16  believe that is what Exhibit 18 is.
17      MR. JONES:  Yeah, I mean, we also agreed that
18  the subpoena we served -- that you accepted -- that we
19  would end up moving it till today.  I don't want the
20  record to sound like we surprised you in any way.  We've
21  agreed to all of this, haven't we?
22      MS. PETERSEN:  We have agreed that there is a
23  subpoena that compels testimony today, yes, definitely.
24  17 -- the -- my questions related to 17 are simply just
25  that I think this is both out of date and not in a form

Page 20

1  that is still relevant.  But it's fine for it to be an
2  exhibit.  I'm opening 19 here quickly as well.
3       To confirm, is 19 what was provided today?
4       MS. HENRY:  No.  19 was the 30(b)(1) of --
5       MS. PETERSEN:  I see.
6       MS. HENRY:  -- Jeremy Eaves.  And that was
7  provided whatever date that was.  April 24th is when the
8  updated date was.
9       MS. PETERSEN:  Okay.  I --
10      MS. HENRY:  After, I think, the Court's
11  ruling.
12      MS. PETERSEN:  Got it.  Thank you.  I see that
13  it's there --
14      MS. HENRY:  Yeah.
15      MS. PETERSEN:  -- the 30(b)(1).  Thank you.
16      MR. JONES:  Hang on.  Now, does Mr. Eaves have
17  access to Exhibit No. 17?
18      MS. PETERSEN:  No.
19      MR. JONES:  Are you going to provide him
20  access to that, Counsel?
21      MS. PETERSEN:  No.  Counsel, as I've explained
22  in advance of the deposition, the way that we've handled
23  this so far in each -- and so the expectation that we
24  had for this was that we would share exhibits via Zoom,
25  that it's not something where I was providing the

Page 21

1  exhibits in advance to the deponent.
2       MR. JONES:  I specifically asked you today to
3  provide that to him.  I don't want to have to sit
4  here and put -- let me finish and explain why.  I
5  have -- we have a 13-page document here and limited time
6  to take this witness's deposition.  I don't want to have
7  to put one page at a time, have him look and zoom, and
8  he can't -- and then I ask him the first question, "Have
9  you seen this document before?"
10      "Well, hold on.  Let me look at 13 pages on
11  Zoom," you know.  I mean, that's one of the first
12  questions that's always asked in a 30(b)(6) deposition.
13  I -- you know, the -- I'm going to ask you to provide
14  him a copy of what it is, so that we can get it --
15  identify that we're talking about the same thing.  It's
16  not -- that's not hard to do.  I don't think that's an
17  unreasonable request.
18      MS. PETERSEN:  Counsel, as I've explained, the
19  witness is very familiar with the documents in this case
20  and has had an opportunity to read the documents in this
21  case.  I don't think you're going to have any issue with
22  unfamiliarity or with situations where it's going to
23  require any undue time to review documents.
24      And as I explained in advance, the plan is
25  just to show the exhibit that you would like the witness

6 (Pages 18 to 21)

1    to address.  And that's all we need to do.
2         MR. JONES:  Okay.  We are very close to
3    shutting this thing down right now and go to the judge
4    right now.  I'm asking a reasonable accommodation.  If
5    he doesn't have a copy of this document, I would
6    appreciate you emailing it to him.  He's your witness.
7    He's your corporate rep.  I can't contact him.
8         MS. PETERSEN:  Counsel, these are your
9    exhibits.  All right.  Tell me which exhibit you would
10   like to email to the witness and --
11        MR. JONES:  17.
12        MS. PETERSEN:  -- I will.  But I'm very
13   careful with depositions, that we make sure that the
14   witness has the opportunity to just focus on exactly
15   what's being asked; and that to the extent that the
16   witness is trying to go through email or to open
17   documents, things like that, that can add unnecessary
18   complications for everybody involved.
19        So the idea was to attempt to be streamlined
20   about this -- have the witness be fully prepared to
21   testify here and for the witness to be able to view the
22   exhibits that are shown, not every possible exhibit that
23   there could be.
24        So if there's a particular exhibit that would
25   be helpful for me to provide to the witness right now, I

1    will provide it -- an individual exhibit to the witness
2    right now.  But I don't think that saves us any time
3    over simply just sharing the document and we're all
4    looking at it together.
5         MR. JONES:  Exhibit 17, please.
6         MS. PETERSEN:  I have transmitted a copy of
7    Exhibit 17 to the witness.
8         Q.  (By Mr. Jones)  Mr. Eaves, tell me when you
9    get that document, please.
10        A.  I -- to be clear, I have not opened my email.
11   I did not have that open, or we would be hearing dings
12   all day.  So if the expectation is that I go on there, I
13   will do that.  Give me a quick second.
14        Q.  Are you looking at Exhibit 17, sir?
15        A.  I have just opened the document.  Yes.  Mine
16   says, "In The United States District Courts."  I just
17   want to make sure it's the correct one.  Can I get
18   clarification?  Am I just supposed to have this document
19   open, or would you like me to read it?  I'm not sure
20   what I'm supposed to do --
21        Q.  Oh, no, you don't have to read it.  I'm just
22   going to ask you -- I'll tell you why I want you to look
23   at it, because my next question is going to be:  Have
24   you ever seen this document before?
25        A.  I did see this document, yes.

1         Q.  Okay.  What is the first occasion you had to
2    see this document?
3         MS. PETERSEN:  Object to form.
4         MR. JONES:  What's the objection to the form?
5         MS. PETERSEN:  Vague, in terms of the
6    occasion.  Are you asking when he first saw?  Again,
7    trying to get clarity here.
8         Q.  (By Mr. Jones)  Do you understand the
9    question, Mr. Eaves?
10        A.  I do understand the question.  I saw it this
11   morning.
12        Q.  Have you seen this document before this
13   morning?
14        A.  I have not.
15        Q.  Okay.  Have you seen some -- what appears to
16   be some version of this document before this morning?
17        A.  I have not.
18        Q.  Do you realize that you're being produced as a
19   corporate representative to give corporate knowledge on
20   behalf of DaVita?
21        A.  I am aware of that, yes.
22        Q.  What does that mean to you?
23        A.  That means that I'm speaking on behalf of the
24   company, as a company representative.
25        Q.  Okay.  Now, do you know which of the

1    designation of topics to the testimony you're being
2    produced to give corporate knowledge about today?
3         A.  Can you rephrase your question?
4         Q.  Sure, I'd be happy to.  And I appreciate that,
5    Mr. Eaves.  That's what I want you to do.  If you don't
6    understand it, tell me; and I'll rephrase.  Thank you.
7         When we look at the document, you'll see that
8    there are 37 topics on the document, I believe.  Follow
9    me?
10        Now, some of them you'll see that the topic
11   just says "Withdrawn."  Okay?  So when I speak of all
12   the topics, it's not a trick question.  I mean, I'm just
13   trying to get an in globo understanding of what you know
14   and what you understand is your role here today.  It's
15   not -- I'm not trying to hide anything from you or trick
16   you.
17        Now, are you being produced today to speak to
18   all 37 of those topics, save and except the ones that,
19   you know, have been withdrawn?
20        MS. PETERSEN:  Counsel, if I can interject for
21   a moment.  Exhibit 17 is not the current version of the
22   topics.  Exhibit 17 reflects what was from back in --
23   this is dated March 8.  The list has subsequently
24   changed since then.  So to your referencing --
25        MR. JONES:  Well, let's take a short break.

Page 26

1   Hang on. Let's take a short break.
2        MS. PETERSEN: If I may finish.
3        -- to the topics that were referenced to
4   having been withdrawn, this is not the notice that
5   includes those -- any withdrawn topics.
6        MS. HENRY: Exhibit 18 is a subpoena with the
7   documents attached.
8        MR. JONES: Oh, okay. My mistake.
9        MS. HENRY: The topics attached.
10       MR. JONES: So these --
11       MS. HENRY: Exhibit 17 is just the --
12       MR. JONES: All right. Well, let's go to
13  that. Thank you.
14       MS. PETERSEN: Again, the witness does not a
15  have a copy of Exhibit 18. If you want to share that
16  document.
17       MR. JONES: Let's just share with him,
18  Christina, because I don't feel like squabbling over
19  this anymore. All right?
20       MS. HENRY: Okay. Just a second. All right.
21       Can everyone see that?
22       MR. JONES: I can see the top half of it.
23   Q.  (By Mr. Jones) Can you see it, Mr. Eaves?
24       THE WITNESS: I'm able to see the screen
25  projection, Ms. Henry.

Page 27

1    A.  Yes.
2    Q.  (By Mr. Jones) Can you tell whether you've
3   seen this document before?
4    A.  I cannot say for sure.
5    Q.  Would you mind sending him a copy,
6   Ms. Petersen, so he can look at it and see if he's seen
7   it before?
8        MS. PETERSEN: Sure.
9        MS. HENRY: I'll note that this is updated to
10  today's date, and was served this morning.
11       MS. PETERSEN: I have transmitted to the
12  witness Exhibit 18, served today.
13   Q.  (By Mr. Jones) Tell me when you can see it,
14  Mr. Eaves.
15   A.  I just received it in my inbox. I am just
16  opening it now, Mr. Jones. I'll let you know when I get
17  a chance to look at it.
18   Q.  Sorry about that. I had the wrong doc.
19   A.  Nope, no problem. So Mr. Jones, I'm not sure
20  if I saw this exact document. It looks similar to
21  Exhibit 17 that we used before.
22   Q.  Well, you help me out, Mr. Eaves. I want to
23  kind of just motor through this, if we can. Normally
24  what happens is we provide, you know, notices and
25  topics. That gets to the corporate representative. I'm

Page 28

1   able to just, without much ado, be able to identify the
2   document that we've sent through the attorney to the
3   witness and be able to establish that we're both talking
4   about the documents that that corporate representative
5   has reviewed and is there to address.
6        The reason that we do that is because
7   sometimes people show up, they don't know why they're
8   there. They're just an empty suit that's been thrown
9   out there. And I don't think that's why you're here.
10  But let's see if we can work through this. All right?
11       I mean, take your time. I mean, how are we
12  going to get through this? I want to -- without me
13  asking you what your lawyer told you. All right? I
14  want to make sure that you're here to address these
15  topics. You take a look at the subpoena, and tell me if
16  you are -- if you're being produced to respond to these
17  topics.
18   A.  Mr. Jones, I'm doing a quick scroll. I'm
19  paying attention, in the quick scroll, to the bolded
20  topics and some of the stuff which is just right after
21  it. And I believe that, in my role as corporate
22  witness, I should be able to talk to you about all of
23  the topics that I'm seeing here today.
24   Q.  Thank you. Thank you, Mr. Eaves.
25       Now, there is also, Mr. Eaves, if you will go

Page 29

1   through this -- if you will go through and look at
2   section, I believe it's designated, four -- I just have
3   a cheat sheet. I don't have a copy of the exact
4   subpoena. I just have all that's been put down kind of
5   in block form for me.
6        But do you see where it says, "Documents
7   Request -- or Requested"?
8    A.  Yeah. And --
9        THE WITNESS: And, Ms. Henry, maybe you can
10  help me -- just so I can look at this a little larger on
11  the document I've received -- would the footer on
12  this be "3rd Amended Schedule A to Subpoena - 10"?
13       MS. HENRY: Yes. And I have it on the screen
14  for you, also.
15       THE WITNESS: It's a little small, but I'm
16  happy to navigate.
17       MS. HENRY: I can make it a little bigger, if
18  you'd like. But it's page 10 of the Schedule A attached
19  to the subpoena.
20   A.  Yes, Mr. Jones, I see "Documents Requested."
21   Q.  (By Mr. Jones) Are you here today to produce
22  these documents on behalf of DaVita?
23   A.  Can you help me understand what you mean by
24  "produce"?
25   Q.  Well, those -- we've been provided -- in the

1  age of COVID-19, we do things remotely.  And in the old
2  days, we used to stroll up into a conference room.  And
3  the corporate representative would drag out boxes of
4  documents that probably have been produced ahead of
5  time.
6        And we would go through each item and say,
7  "Okay.  Which item are you producing in response to
8  this?"  But Counsel has provided us a link, where we
9  were able to download in excess of 7,000 documents
10  today.
11        And my question to you, sir, is that:  Are you
12  here prepared to produce these 7,617 documents that's
13  numbered by, I suppose, Counsel?  Or is there someone
14  else who's going to show up and say, "Hey, I'm going to
15  produce the documents today"?
16     A.  I think what I would say is, I'm -- I'm
17  prepared -- again, a quick glance -- to speak to all of
18  these.  So I don't want to get hung up on the word
19  "produce," but I think I'm prepared to --
20     Q.  Yeah.
21     A.  -- speak to all of these, yes.
22     Q.  Yeah, I know that's a -- it's a technical
23  jargon because, you know, it's been produced
24  electronically -- or remotely, I should say; right?
25        Okay.  I think that was a clear answer.  Thank

1  you, Mr. Eaves.
2     A.  You're welcome.
3     Q.  Now, Mr. Eaves, tell me what your -- again
4  what your position is right now?  You're vice president
5  of people services; is that correct?
6     A.  That's correct.  Vice president of people
7  services/operations.
8     Q.  How long have you held that position with
9  DaVita?
10     A.  You're going to be comfortable with --
11  hopefully, with me ballparking.  I think I was promoted
12  into that position in December of 2019.
13     Q.  I don't have a problem in the world with you
14  estimating, Mr. Eaves, if you would just please tell us
15  that you're estimating.  Because in fairness to you, I
16  don't want this deposition to come out and make it sound
17  like you're speaking to something as a fact, when in
18  fact you're estimating.
19        Can you do that for me, please?
20     A.  Yes, of course.
21     Q.  Thank you.  Well, let's talk about this.  I
22  mean, do you have an office assigned to you by DaVita?
23     A.  I do not.
24     Q.  Okay.  Have you ever had an office assigned to
25  you by DaVita, in an office building?

1     A.  Generally, or just at DaVita?
2     Q.  Well, let's talk about the last time, you
3  know, that you were in an office for DaVita.  That's a
4  ter- -- that's going to read terribly, so I'm going to
5  ask a better question.  Okay?
6        The last physical office that you were
7  assigned to for DaVita, where was it located?
8     A.  It was in a building that we called Casa del
9  Mundo.  It's at 2000 - 16th Street, Denver, Colorado
10  80202.  And I did have a physical office in that
11  building.
12     Q.  You still have an office in that building?
13     A.  I do not.  I now have a subspace.  We have
14  moved to the very open, progressive structure.  And I
15  have a cubicle in a building that we call Casa Vida.
16  And that's at 2001 - 16th Street, Denver, Colorado
17  80202.
18     Q.  So when did you ascend from an office to a
19  cubicle?
20     A.  When we made the -- moved over to the new
21  building.  I could not tell you off the top of my head
22  the exact month or year.  I'm sorry.
23     Q.  Okay.  Was it in 2000 -- before 2000?
24     A.  It would have been in the last three years
25  probably, three to four years.

1     Q.  But you are still assigned to a workspace in
2  Casa DaVita, right?
3     A.  In Casa Vida, I do have an assigned workspace,
4  that is correct.
5     Q.  Okay.  And do you keep regular hours at that
6  assigned workspace at Casa DaVita?
7     A.  No.
8     Q.  Have you ever kept regular hours at that
9  workspace in Casa DaVita?
10     A.  No, I would not say there would be regular or
11  consistent hours.
12     Q.  All right.  Can you say more about that?
13     A.  I can.  My job is one where it's not always
14  necessary for me to be in the building, and I also
15  travel.  It might not be unusual for me to have a call
16  that might go until 8:00 p.m. or 9:00 p.m.
17        I might be inclined to start my day a little
18  later.  I could start my day at 6:00 a.m. and leave.  So
19  there's huge degrees of discretion that I'm allowed to
20  interact with, to conduct my job.
21     Q.  What was the position you held before this
22  position as vice president?
23     A.  Senior director of people services.
24     Q.  I'm going to ask you the same series of
25  questions.  Did you have an assigned workspace, when you

Page 34

1    were a senior director?
2        A.  Yes, I did have an assigned workspace.
3        Q.  Did you keep regular hours at that assigned
4    workspace?
5        A.  I did not.
6        Q.  Have you ever kept regular hours with DaVita,
7    in your ten years?
8        A.  No, sir.  Mr. Jones, I have not.
9        Q.  Are you a non-exempt employee with DaVita?
10       A.  Mr. Jones, I'm an exempt teammate at DaVita,
11   yes.  Not --
12       Q.  Okay.  You're an --
13       A.  -- (unintelligible) --
14       Q.  I'm sorry.  You broke up a little bit.  I'm --
15   would you mind saying that again, please?
16       A.  My classification has always been exempt,
17   during the course of my employment at DaVita.
18       Q.  Okay.  Thank you.  Now, let me ask you a
19   little bit about DaVita.  Okay?  I want to ask you about
20   DaVita's corporate structure.
21          Now, DaVita itself is structured as a
22   corporation.  Is that your understanding?
23       A.  Can you repeat that?  You broke up a little
24   bit.
25       Q.  Sure.  There's a storm going on here, and I

Page 35

1    live in the country.  So, you know, it's sort of like
2    living in Mayberry, you know, when the train line goes
3    down.  So the -- when --
4           I want to ask you about the business vessel
5    known as DaVita.  Is that a corporation?
6        A.  It is.
7        Q.  And explain to me, if you can, the structure
8    of that corporation.  Does DaVita, for instance, run all
9    of its renal care facilities from the corporate
10   structure known as DaVita, or do they have some other
11   way to do it?
12       A.  Yeah.  Yeah, Mr. Jones, I don't want to be
13   difficult.  I also want to be helpful in answering this.
14   So let me see if I can do this, and you tell me.  DaVita
15   is the parent company, and all of their dialysis work
16   falls under that DaVita Inc. umbrella.
17       Q.  Thank you.  I was throwing it out there very
18   broadly, so you could -- I already know the answer to
19   all these questions.  Okay?
20          Now, I understand that there are 30-something
21   companies under the DaVita Inc. umbrella.  Am I about
22   right?
23       A.  Yes, I believe there to be 34ish subsidiaries
24   under DaVita Inc.
25       Q.  Tell me a little bit more about DaVita Inc.

Page 36

1    Does DaVita Inc. have any payroll employees?
2        A.  Yes.
3        Q.  Okay.  Are any of those payroll employees
4    non-exempt employees?
5        A.  Yes.
6        Q.  Okay.  Explain that.  Are any of them actually
7    hands-on in the renal care business, I mean, actually
8    treating patients?
9        A.  Can you rephrase your question?  That seems a
10   little vague.  I just want to make sure I'm answering --
11       Q.  Sure.
12       A.  -- your question.
13       Q.  Well, let me just tell you my understanding.
14   My understanding is DaVita Inc. is the parent
15   corporation.  But the actual, you know, renal care
16   facilities, you know, when -- are actually run under
17   various wholly-owned subsidiaries in different
18   corporations that are owned by the parent corporation,
19   DaVita.
20          That DaVita -- there's -- even though they
21   have these facilities -- it may say DaVita Inc.  If you
22   look underneath them, the paperwork is actually in the
23   name of one of the wholly-owned subsidiaries.  Am I
24   right, or am I wrong?
25       A.  That's correct.  We have 34 subsidiaries that

Page 37

1    sit under the DaVita Inc. parent company umbrella.
2        Q.  Okay.  Now, who is your payroll employer?
3        A.  I'm sorry.  You broke up again.
4        Q.  Who is your payroll employer?
5        A.  I work for DaVita Inc.
6        Q.  Okay.  Do you know why we're here today?
7           MS. PETERSEN:  Object to the form.
8        A.  Yes.
9           MR. JONES:  What's wrong with the form?
10   What's wrong with the form?
11          MS. PETERSEN:  Ambiguous.
12          Go ahead.
13       Q.  (By Mr. Jones)  I don't want to be ambiguous.
14   I'm just -- I'm just straight up asking you.  Do you
15   know why we're here today?
16       A.  Yes, I have an understanding of why I'm here
17   today as a witness.
18       Q.  Okay.  Would you give me your understanding,
19   please?
20       A.  I -- I think the discussion is about whether
21   or not non-exempt teammates would be eligible for
22   premium pay under our Disaster Relief Policy due to the
23   COVID-19 pandemic.
24       Q.  Okay.  Okay.  And do you know who it is that I
25   represent?

10  (Pages 34 to 37)

1    A.  I -- I know you represent a DaVita teammate,
2  yes.
3    Q.  Do you know that teammate's name?
4    A.  I -- I believe his name is JJ Hesketh.  I'm
5  not sure what the J and the J would stand for.  And I --
6  I only know that through the documentation.  I do not
7  know JJ personally.
8    Q.  Thank you.  So let's go down and take a peek
9  at the topics, and we'll start on topic 1 on the
10  subpoena.  Are you looking at it?
11    A.  On Exhibit 18, sir?
12    Q.  Yes, sir.
13    A.  Yes, I do have that in front of me.
14    Q.  And it says, "State the facts as to whether
15  DaVita requires its Logo to appear on or be placed on
16  paychecks issued to employees of TRC or any other
17  Subsidiaries."
18       Do you know what we mean by TRC and other
19  subsidiaries?
20    A.  Yeah, I'm just -- let me get to that.  It's
21  much easier for me to look at the emailed copy.
22    Q.  Sure.
23    A.  Please state your question, again?
24    Q.  Sure.  I'm just looking at topic number 1.  I
25  kind of want to get the easy ones out of the way, you

1  know.
2       Does DaVita require its logo to appear on the
3  paychecks issued to the employees of Total Renal Care or
4  any of DaVita's subsidiaries?
5    A.  Yeah, I -- it's not required.  We -- we do
6  that.
7    Q.  And that's what I want to ask you about.  I
8  heard that before, and I find that curious.  But the
9  logo is on all of the employees' paychecks, is it not?
10    A.  Yes, it is, sir.
11    Q.  Well, what makes you think it's not required?
12    A.  I'm not aware of there being any specific
13  requirement that's actually included on the
14  paychecks; nor the stubs.  I do know that as an
15  organization we do that.
16    Q.  Well, you have centralized payroll; right?
17    A.  That is correct.
18    Q.  And who controls that centralized payroll?
19  DaVita?
20    A.  What do you mean by "control"?
21    Q.  Well, control.  You know, I mean, control the
22  day-to-day operations of the centralized payroll.
23    A.  I -- I don't know how I can be any more
24  specific about it.  It's a centralized department that's
25  under DaVita Inc.  They administer that for the

1  organization.  Are you looking for a name?  I just don't
2  understand what additional I can provide you.
3    Q.  Well, does DaVita's parent corporation -- how
4  is the -- how are the lines of authority structured in
5  DaVita Inc.?
6    A.  Again, there's no line of structure.  DaVita
7  Inc. administers -- pay for all -- for all of the
8  subsidiaries that sit under the parent company.
9    Q.  Is there -- Total Renal Care -- someone in
10  there can decide, "I don't want to put the DaVita logo
11  on my paycheck anymore.  I want to use something
12  different," and that would be that?
13    A.  That would not be an accurate statement.
14    Q.  Okay.  You tell me, then.  I mean, someone has
15  to make decisions; right?
16    A.  Yes, I'm -- I'm sure somebody makes the
17  decision about that.  I -- it would not be up to an
18  individual subsidiary to say whether they do or do not
19  want to put a logo on the paycheck.  Again, it's
20  administered from an overarching parent company, which
21  we call DaVita Inc.
22    Q.  And then whose decision would it be to put the
23  logo on the paychecks?  The overarching parent company's
24  decision?
25    A.  I'm -- I'm not aware of who would make a

1  specific decision around that.  But what I can tell you
2  is, that's our practice.
3    Q.  I understand that, but you're not answering my
4  question.  It's a really simple question.  All right?
5  I'm going to go down and ask you about the lines of
6  control that an overarching parent corporation by the
7  name of DaVita asserts over the 30-something
8  subsidiaries that it wholly owns.  All right?
9       And if you don't know, then fine.  Then,
10  you're not -- you've been produced to answer something
11  you don't know.  Then, I'd ask that you tell me that.
12  But I'd like a direct answer.
13       Who makes the decision, then, to put the logo
14  on the payroll checks?  DaVita?
15    A.  Sir, DaVita Inc. has made a decision to put
16  the logo on the checks that are produced to the
17  organization.
18    Q.  And who did they require to put the logo on
19  the checks?  Would that fall under Ms. Prockish's
20  directorship?
21    MS. PETERSEN:  Object to the form.  Compound.
22    A.  Can you restate your question, please?
23    Q.  (By Mr. Jones)  Who would DaVita have required
24  to have done that?  Would that have been Ms. Prockish?
25    A.  Mr. Jones, I -- I believe the practice was in

Page 42

1  place before Ms. Prockish was employed with the
2  organization.
3      Q.  I'll ask a better question.  Who would have
4  been required to put the logo on the paychecks?  Would
5  that have been Ms. Prockish or someone in -- that
6  preceded her, that's in her same position of authority?
7      A.  I -- I could -- I could not speak to a
8  specific individual or position that would make the
9  decision.  Again, it is a practice that I believe has
10 been long-standing, with regards to a logo being placed
11 on the paycheck stubs.
12     Q.  Mr. Eaves, when you were in grade school and
13 you took a true/false test, did you scribble in the
14 lines or did you check out true or false?
15         MS. PETERSEN:  Objection.  Argumentative.
16     Q.  (By Mr. Jones)  It's a legitimate question.
17 I'd like an answer.
18         MS. PETERSEN:  Same objection.
19         A.  Would you please restate the question?
20     Q.  (By Mr. Jones)  No.
21         MR. JONES:  I'm going to ask you, though,
22 Madam Court Reporter, to read the question over again,
23 please.
24         (Record as shown on page 42, lines 12 through
25         14, read back.)

Page 43

1         MS. PETERSEN:  Objection still stands, and
2  outside the bounds of the topics for which the witness
3  has been designated to testify.
4      Q.  (By Mr. Jones)  I'd like an answer, Mr. Eaves.
5      A.  Sir, if the exercise was true or false, and I
6  reflect back on my behavior in grade school, I believe I
7  would have checked true or false.
8      Q.  This is a true or false question.  DaVita Inc.
9  requires that its logo be placed on the paycheck of all
10 of the employees of TRC or its subsidiaries, true or
11 false?
12     A.  It is false.  It is not a requirement we do
13 it.
14     Q.  Okay.  Now, Mr. Eaves, what is the person of
15 highest executive authority in Total Renal Care?
16     A.  Within the legal entity, Total Renal Care, it
17 would still roll up to our chief executive officer,
18 Javier Rodriguez.
19     Q.  Say it again, please?
20     A.  Javier Rodriguez.
21     Q.  And who is the most -- who is the top
22 executive officer in DaVita Inc.?
23     A.  My answer remains the same.  That would be
24 Javier Rodriguez.
25     Q.  And if I were to ask you to go down and name

Page 44

1  for me the highest executive in each of the 30-something
2  subsidiaries of Davita Inc., would the answer still be
3  the same, Javier Rodriguez?
4      A.  That is correct.
5      Q.  So the only way that the logo for Total Renal
6  Care could change is if, ultimately, Mr. Rodriguez
7  obtained the permission of Mr. Rodriguez to do it?  Is
8  that a true or false statement?
9      A.  I think the statement would be false, because
10 again it's not required.  So I -- I believe that there
11 could probably be a decision that's potentially made by
12 another party.  I just don't -- I'm not sure what the
13 logo would have to do with it in that situation.
14     I just don't think there's a formality
15 associated with it, to the extent this line of questions
16 is -- is -- is going down.  This -- this is our logo
17 that appears in the upper left-hand corner of our pay
18 stubs.  That's the extent of it.
19         MR. JONES:  Christina, I want you to take
20 these topics down, or tell me how to make this thing
21 bigger on my screen, if you know -- oh, thank you.
22     Q.  (By Mr. Jones)  And if you need them back up,
23 Mr. Eaves, we're not hiding anything from you.  But you
24 just tell me.  All right.  On my screen, when we do
25 this, I can see you better; I communicate better.

Page 45

1      Now --
2          MS. HENRY:  Craig, would you like to introduce
3  that exhibit into the record?
4          MR. JONES:  I thought we had.  Hadn't we done
5  18?  Isn't that 18?
6          Olivia, have you introduced 18 and 17 into the
7  record?
8          THE COURT REPORTER:  Yes.
9          MS. HENRY:  Thank you.
10     Q.  (By Mr. Jones)  Now, which of the subsidiaries
11 of DaVita -- I'm talking about from the period of
12 January 1, 2017, to the present -- have their non-exempt
13 employees acknowledge that they're expected to read,
14 understand, and adhere to the DaVita Teammate Policies,
15 Code of Conduct, and Compliance Program?
16     A.  Mr. Jones, can you repeat it?  And I'm most
17 specifically interested in the dates you covered.
18     Q.  Okay.  If you'd look at number 3 on the
19 notice.  Do you see this -- I'm not a hide-the-ball
20 lawyer.  I sent you the questions in writing, Mr. Eaves.
21 Okay?
22     A.  Okay.
23     Q.  All right.  Let's look at number 3.
24     A.  Okay.
25     Q.  There are two questions there.  I'm going to

1  break it down into two.
2      First of all, true or false, all of the
3  subsidiaries of DaVita -- from January 1, 2017, to the
4  present -- have their non-exempt employees acknowledge
5  that they are expected to read, understand, and adhere
6  to the DaVita's Teammate Policies, Code of Conduct,
7  and/or Compliance Program?
8      Is that true or false?
9      A.  That is true.
10     Q.  Why is this done?
11     A.  The reason we ask for all of our teammates,
12  not just the non-exempt, to read and acknowledge that is
13  to make sure that they understand general guidelines to
14  be successful in their roles.  And I also -- the company
15  also thinks it's important for them to understand
16  resources that are available to them.
17     And so we ask that they read that, that they
18  acknowledge that they understand that, that they know
19  where to go if they've got questions.  And the signature
20  would indicate that they have acknowledged all of those
21  to be the case.
22     Q.  Well, I'm going to ask the same question about
23  the Teammate Policies updates.  Do all the subsidiaries
24  require their employees to read and be familiar with and
25  understand Teammate Policies updates?

1      A.  On an annual basis, we ask all of our
2  teammates to go in and review those and sign, just as I
3  had previously explained.
4      Q.  So you were scribbling in the lines again,
5  Mr. Eaves.  I'm going to ask the court reporter to read
6  that back over.  Could we get a yes or no answer,
7  please?
8      MR. JONES:  Madam Court Reporter, would you
9  read that question back, please?
10     (Record as shown on page 46, lines 22 through
11     25, read back.)
12     A.  Okay.  So your nuance there is the updates.
13  We would not have them sign for every update that occurs
14  in our Teammate Policy handbook.  Does that answer your
15  question more specifically, Mr. Jones, without
16  scribbling between the lines?
17     Q.  (By Mr. Jones)  So the answer to the question
18  is that the employee -- well, you see, the question is
19  more general than that.  The question asks you -- well,
20  let me just ask you straight up.
21     Are all the employees of the subsidiaries
22  required to annually acknowledge that they have read the
23  Teammate Policies updates?
24     A.  Yes, that is correct.
25     Q.  Now, are there consequences to an employee of

1  DaVita or DaVita subsidiaries -- for the period
2  January 1, 2017, to the present -- for failure to adhere
3  to DaVita's Teammate Policies, Code of Conduct, or
4  Compliance Program?
5      A.  Yes, there could be consequences for failure
6  to comply.  That is correct.
7      Q.  Why?
8      A.  I'm sorry?
9      Q.  Why are there consequences, if the teammate
10  failed to comply?
11     A.  Yeah.  Quite -- quite simply, the policies
12  handbook provides guidelines and expectations that we
13  would have of our teammates.  And if they -- they veer
14  from those and it causes problems or breaks a policy,
15  there could potentially even be a violation of law.
16     We would want to address those to make sure
17  that we're course-correcting the teammate, making sure
18  that they're clear on our expectations, and also putting
19  something in place potentially to ensure the same thing
20  does not happen again.
21     Q.  So are you familiar with the definition of the
22  term "required," Mr. Eaves?
23     A.  I'm familiar with the term "required."
24     Q.  You know, there's a West Coast term that I'm
25  very fond of.  And it is to refer to the word "ask" in a

1  non-transitive way, such as -- the ask here is, blank.
2      Do we understand each other?  Have you heard
3  the phrase used in that -- the term used in that way?
4      A.  I'm unclear of what you're saying, Mr. Jones.
5      Q.  Well, you know, if I were to say, "Look, the
6  ask here is, I want you to talk to me about whether
7  DaVita is a corporation or not."  Would you understand
8  my question?
9      A.  Yes, of course.
10     Q.  You would understand how I'm using the verb
11  "ask," correct?
12     A.  Yes.
13     Q.  Now, Merriam-Webster's defines "require" as to
14  claim or ask for by right and authority.
15     Does DaVita have the right and authority to
16  ask that its logo be placed on all of the paychecks
17  issued to its employees or the employees of the
18  subsidiaries?
19     A.  Sir, I don't know that there is a regulation
20  or a -- a definition somewhere in the corporate world
21  that would make that a requirement, that we could
22  formally ask of that.
23     What I can tell you, though -- and I -- I'm
24  sorry if I'm getting this unclear -- it is a practice
25  that we do from a DaVita Inc. standpoint on down.  And

Page 50

1  it is the same, regardless of the subsidiary that
2  someone happens to sit into, from a legal entity
3  purpose.
4      Q.  Now, do all of DaVita's subsidiaries have
5  access and make use of the DaVita intranet, VillageWeb?
6      A.  Yes.  All -- all DaVita teammates that sit
7  under the DaVita Inc. umbrella, which would be all the
8  subsidiaries we discussed, would have access to our
9  VillageWeb or the intranet.  Yes.
10     Q.  And why is that?
11     A.  It's a central repository of information that
12 allows people to have information necessary to conduct
13 their job, understand resources or benefits that are
14 available to them.
15     Q.  Okay.  And it is a method of command and
16 control, is it not?
17     A.  It's a method of -- I'm sorry?
18     Q.  Sure.  The -- let's go to the -- I want to
19 talk about three documents that are rather -- let's
20 refer to just documents.  I want to talk about Teammates
21 Policies, Teammate Code of Conduct, and Teammate
22 Compliance Program.  I'm going to speak to them -- all
23 three.
24     Those programs are a method of command and
25 control, are they not?

Page 51

1      MS. PETERSEN:  Object to form.  Vague as to
2  command and control.
3      A.  Mr. Jones, I would say that that's information
4  available, as I mentioned before, that kind of gives
5  general guidelines and outlines resources available to
6  our teammates.  I -- I do not agree with the words
7  "command and control."  These are not documents intended
8  to be authoritarian, with no flexibility.  These are --
9      These are guidelines, programs, resources that
10 are available as needed.  And I would need to understand
11 specific situations to -- to better talk about that.
12 But I do not -- I disagree that their documents are
13 command and control.
14     Q.  (By Mr. Jones)  Well, your employees are told
15 not to sexually harass their co-employees, are they not?
16     A.  Which is an expectation of law.  So we have
17 captured that in there appropriately.
18     Q.  Yeah, but -- so you want to talk about the
19 law.  I want to talk about what the policies and
20 procedures say.  Now, I would like a clean answer to
21 that, if you don't mind.
22     A.  Please restate your --
23     Q.  Your -- DaVita's policies say that it's --
24 that DaVita employees and the employees of its
25 subsidiaries shall not sexually harass another employee;

Page 52

1  isn't that true?
2      A.  I -- I don't know that those are the exact
3  words, but we do have a policy that addresses harassment
4  in the workplace.
5      Q.  You didn't answer my question.  I would like a
6  direct answer to it.
7      MR. JONES:  Madam Court Reporter, would you
8  read it back, please?
9      (Record as shown on page 51, lines 23 through
10     25, and page 52, line 1, read back.)
11     A.  Yes, I believe our policies would ask or have
12 the expectation that our teammates not harass others,
13 but -- but the problem with -- with the question of
14 wanting me to give you a yes or no answer is that a
15 teammate might not know that.  And so an example might
16 be a teammate who asks another team out -- teammate out.
17     The teammate says no on the first occasion.
18 They're told, "Stop.  That made me uncomfortable."  And
19 two weeks later they say, "You know what, you sure?
20 We -- we talked a couple more times.  Would you like to
21 do that again?"  They might not understand that that
22 could fall under the definition of harassment.
23     And so back to my point, on a case-by-case
24 basis, we would refer to that document to explain what
25 the infraction was.  And then we would provide guidance

Page 53

1  about our expectations.  And it may or may not,
2  depending upon the situation, require some type of
3  disciplinary action.  I just -- I want to make sure the
4  full context is there.
5      Q.  (By Mr. Jones)  Mr. Eaves, it is DaVita's
6  position that its rules and regulations -- let's change
7  that.  Start over.
8      It's DaVita's position that its sexual
9  harassment policy will be followed by its employees and
10 the employees of its subsidiaries.  Is that true or
11 false?
12     A.  True.
13     Q.  That is not a suggestion, is it?
14     A.  It is not a suggestion.  It would be an
15 expectation.
16     Q.  It is a -- it is a directive that is issued
17 from a position of authority by DaVita; am I correct?
18     A.  I'm sorry.  Can you just --
19     Q.  It's a -- I'll restate.
20     It is a directive issued to the employees by
21 DaVita from a position of authority, true?
22     A.  It is a directive around the expectation, yes.
23     Q.  That's what I mean by command and control.
24     Now, tell me about this.  What do you know
25 about pay -- or do you know about pay practices of the

14 (Pages 50 to 53)

1  subsidiaries of DaVita?
2      A.  Yes, Mr. Jones, I can speak to this.
3      Q.  Do you know what I mean by pay practices?
4      A.  Generally.  And I promise, if you get too
5  specific, I'll let you know.  But I feel like I can
6  speak to it.
7      Q.  I suspect you will, Mr. Eaves.
8          By pay practices, I'm not just talking about
9  payroll practices.  I mean, pay practices involve what
10  you pay employees.  That's how I use the term.  Payroll
11  refers to how you physically get the money to them.  Can
12  we understand each other?
13      A.  Yes, I follow you.
14      Q.  Now, does DaVita have a uniform pay practices
15  that it applies to its subsidiaries?
16      A.  Can you just help me understand what you mean
17  by "uniform"?
18      Q.  Yeah.  I mean, does DaVita have -- treat any
19  of the nonqualified employees of one subsidiary, in
20  terms of pay practices, different than they do from
21  another subsidiary, if those two people are doing the
22  same work?
23      A.  No, there's -- there's no difference in pay
24  practice, depending on which subsidiary you sit in.
25      Q.  I know people are paid different amounts.

1  That's not what I'm talking about.  I get that.  I mean,
2  if you're on the West Coast, the cost of living is so
3  much higher than if you're in the South or even in the
4  Upper Midwest.  Right?  So I get that.
5          But in terms of pay practices -- and let's
6  talk about overtime practice -- no, let's talk about --
7  strike -- we'll come to that in a minute.
8          Is DaVita's Code of Conduct applied uniformly
9  across its affiliates?
10      A.  Yes, it is.
11      Q.  Are the Teammate Policies applied uniformly
12  across DaVita's affiliates?
13      A.  Yes.
14      Q.  And are the -- is DaVita's Compliance Program
15  applied uniformly across its affiliates?
16      A.  Yes.
17      Q.  Now, I would like to --
18          MR. JONES:  If we could, Christina, put up on
19  the board TRC 000145, please.
20          MS. HENRY:  Okay.
21          MR. JONES:  145.  That's Exhibit 5, Christina.
22          MS. HENRY:  So it's not the new stuff.  Okay.
23  Exhibit 5.  Sorry.
24          MR. JONES:  Let's start with 144, Christina.
25  All right.

1      Q.  (By Mr. Jones)  Have you seen this document
2  before?
3          And you see on the bottom right-hand corner,
4  Mr. Eaves -- you will see TRC 000144.  Let me tell you
5  what that is.  That is referred to, you know,
6  euphemistically, frankly, as a Bates stamp because in
7  the -- you know, old-timers like me, we used to have
8  these machines.  You'd have to Bates stamp each
9  individual document?
10          We'd have somebody stamp -- sound like a young
11  war going off in your office.  You'd have people
12  stamping all the time.  And you would get there, and you
13  would Bates -- used to have the stamp.  And when you
14  push it down, it would say 501.  And we pulled it up, it
15  would switch -- it had a rotor -- and it switched to 2.
16  Okay?
17          So we refer to that as a Bates stamp.  Can we
18  understand each other, when I say that?
19      A.  Yeah.  Mr. Jones, I follow you, yes.
20      Q.  Thank you so much.  Now, we look down here.
21  And the Bates stamp says TRC 000144.  That means Total
22  Renal Care.  And that was produced by TRC, who's the
23  named defendant in this case.  Okay?
24          So I don't want to get hung up.  When I ask
25  you if you've seen this document before, you go down and

1  you go, "Oh, I haven't seen that little thing in the
2  bottom right there."  All these documents are going to
3  have a Bates stamp, and that's not original to the
4  document.  Okay?
5          Are you familiar with the document that we put
6  on the Zoom board as TRC 000144?
7      A.  I am.
8      Q.  Okay.  There is a -- in the Teammates hand- --
9      A.  Mr. Jones, just a quick clarification.  Is --
10  is the entirety of this document Bates stamped 000144,
11  or is it just this specific --
12      Q.  No, no, no.
13      A.  -- page?
14      Q.  Right.  No, it starts at 0001.
15      A.  Okay.
16      Q.  And let's stop right here, so we can give you
17  a reference.  You look right here, you see "Teammate
18  Policies"?
19      A.  Yes.
20      Q.  This is the one effective January 1, 2020,
21  'cause we -- we now have looked at these documents.  We
22  know they've changed.
23      A.  Sure.
24      Q.  I don't want you to think I'm trying to fool
25  you here.  So we're talking about the Teammate Policies

Page 58

1    effective January 1, 2020. The Teammate Policies --
2    what do you call this?
3        Do people refer to it as a handbook or manual,
4    or just Teammate Policies? How is it referred to, so
5    that you and I -- I don't have to every time say
6    Teammate Policies effective January 1, 2020?
7        A.  Let's just call it a handbook.
8        Q.  Perfect. Okay. We're going to -- I may slip
9    back and -- old habit -- call it Teammate Policies. If
10   I do that, we understand we're talking about the same
11   thing. Okay?
12       A.  I'm following you.
13       MR. JONES:  All right. Let's go to 144,
14   Christina, please.
15       Q.  (By Mr. Jones)  Now, there are sections in the
16   handbook that -- one of the sections, though -- I think
17   the last section is "Teammate Acknowledgment." Are you
18   familiar with the organization of the handbook?
19       A.  I am familiar with the organization.
20       Q.  Okay. Give me just a second here, Mr. Eaves.
21       MR. JONES:  Now let's go, Christina, to the
22   next page, 145 -- 144 -- 145. You went too far. Okay.
23   I see.
24       Q.  (By Mr. Jones)  So there are basically three
25   parts to the Teammate Acknowledgment of this handbook --

Page 59

1    Teammate Acknowledgment, Teammate Compliance Statement,
2    Teammate Property Responsibility Statement. Are you
3    familiar with those three sections?
4        A.  I am.
5        MR. JONES:  Next page, please, Christina.
6        Q.  (By Mr. Jones)  This is 000146, and it -- my
7    understanding is that this Teammate Acknowledgment is
8    from -- the subsidiary's employees are required to sign
9    this acknowledgment or some pretty close form of this
10   acknowledgment; am I correct?
11       A.  We do ask that they electronically acknowledge
12   these, yes, that is correct.
13       Q.  How often must the teammates electronically
14   acknowledge that they're familiar with the Teammate
15   Policies?
16       A.  Annually. Once a year.
17       Q.  One more time?
18       A.  Annually. Once a year.
19       Q.  Now, let's go through this because you are
20   familiar with this acknowledgment; correct?
21       A.  I am. But I -- if I could just ask
22   Ms. Henry -- because I -- I think there were three
23   sections on 145. Okay. So the next document, 146, that
24   I'm looking at shows the Acknowledgment; the Compliance
25   Statement. Can I just see the Property Statement? I

Page 60

1    just want to make sure I'm fully familiar with this.
2        THE WITNESS:  Thank you, Ms. Henry. You can
3    go back.
4        Q.  (By Mr. Jones)  All right. Now, this is what
5    the acknowledgment says. It says, "As a DaVita
6    teammate, I understand I am expected to read, understand
7    and adhere to our Company's policies."
8        What does DaVita mean by "adhere to company
9    policies"?
10       A.  That you would follow the policies and
11   expectations that have been outlined in the document.
12       Q.  Merriam-Webster defines "adhere" to mean to
13   bind oneself to observance.
14       Would that be a fair definition of the word
15   "adhere," as it is used in the Teammate Acknowledgment
16   as found at TRC 000146?
17       A.  So Mr. Jones, when you said the last part of
18   that definition, you're leaning back in your seat. And
19   I'm having trouble hearing you through the microphone.
20   I'm sorry.
21       Q.  No problem. I'll start over.
22       Merriam-Webster defines the word "adhere" to
23   mean to bind oneself to observance. Would that be a
24   fair definition of the word "adhere," as it is used by
25   DaVita in the Teammate Acknowledgment that is found on

Page 61

1    TRC 000146?
2        A.  I think that's fair. I'm not going to
3    disagree with Merriam-Webster.
4        Q.  The next sentence says, "I will familiarize
5    myself with the materials in the Teammate Policies, the
6    Code of Conduct and the DaVita Compliance Program, as
7    well as any changes to them." That commitment is -- let
8    me start over.
9        Each teammate is required to acknowledge that
10   commitment annually; is that true?
11       A.  That's true.
12       Q.  I'm going to -- the next sentence says that,
13   "I understand that these policies and programs can be
14   found on DaVita's VillageWeb and People Services Page."
15       Not only can the policies be found on
16   VillageWeb and People Services Page, any changes to the
17   policies can be found there; is that true?
18       A.  On the VillageWeb and People Services Page,
19   yes, that is true.
20       Q.  Now, I want to skip the next sentence, and I
21   want to go to the one right after that. Here's how it
22   reads, "I understand that I am governed by the contents
23   of the Teammate Policies, the Code of Conduct and the
24   DaVita Compliance Program, and I recognize that DaVita
25   reserves the right to interpret, amend, modify,

Page 62

1    supersede or eliminate policies, practices, or benefits
2    (except employment-at-will policies) described in these
3    policies from time-to-time in its sole and absolute
4    discretion."
5        Now, let's unpack that. That's a lot. All
6    right? The teammate has to acknowledge that the
7    teammate is governed by the contents of the Teammate
8    Policies and Code of Conduct and the DaVita Compliance
9    Program. That is what each teammate is required to
10   acknowledge; is that true?
11       A. That is correct.
12       Q. What does DaVita mean by the teammate
13   acknowledging that the teammate understands that he or
14   she is governed by the contents of the Teammate Policies
15   and Code of Conduct and the DaVita Compliance Program?
16       A. I'm not sure I understand your question.
17       Q. What does DaVita -- did DaVita mean, when it
18   used the word "govern" in that sentence that I just read
19   to you?
20       A. Guided.
21       Q. Does it mean anything else?
22       A. My answer remains guided. I -- I can't think
23   of another word off the top of my head that comes to
24   mind.
25       Q. Okay. See, the word "guided" -- again, going

Page 63

1    to Merriam-Webster -- is different than "governed." The
2    word "guided" means to lead or direct. The word
3    "governed" means to lead or direct from a position of
4    authority.
5        Now, did DaVita mean, by the word "governed,"
6    that they wanted to guide or direct their employees from
7    a position of authority?
8        A. I think that this would be a position of --
9    I -- I have problems with the word "authority," because
10   I think governed and government can mean a couple of
11   things. It's -- you're provided with leadership or
12   guidance.
13       Q. Well, here's the thing, Mr. Eaves. We're all
14   thinking people here. Okay? The last bastion of pure
15   authoritative power is the American corporation. And
16   let me illustrate what I'm talking about. Everywhere I
17   turn in these policies, I see references to at-will
18   employment.
19       What does DaVita mean by at-will employment?
20       MS. PETERSEN: Objection, to the extent that
21   calls for a legal conclusion.
22       You can go ahead.
23       Q. (By Mr. Jones) Let me make this very clear.
24   You're not a lawyer, are you?
25       A. I am not a lawyer.

Page 64

1    Q. Okay. And the -- and these are words that are
2    in DaVita's Teammate Policies, their handbook; right?
3        A. That is correct.
4        Q. The Teammate Policies and handbook is not a
5    law book, is it?
6        A. It is not.
7        Q. And so, sir -- but that word "at-will
8    employment" is used in this document, right?
9        A. It is.
10       Q. I want to know what DaVita means, when it
11   says -- when it tells its employees, "You're an at-will
12   employee"?
13       MS. PETERSEN: Objection. That's outside the
14   scope of the topics for which this witness has been
15   designated.
16       You can answer in your personal capacity.
17       MR. JONES: No, no indeed. It is right in the
18   middle -- right exactly in the middle of the topic.
19       MS. PETERSEN: To which topic --
20       MR. JONES: You can go look at any one of
21   them. You can go to 17.
22       MS. PETERSEN: Which --
23       MR. JONES: I specifically -- I specifically
24   mentioned these documents in -- hang on -- in topic --
25       MS. HENRY: I think he means 18.

Page 65

1        MR. JONES: Thank you.
2        MS. PETERSEN: Topic 18, which relates to
3    emergency time frame?
4        MR. JONES: No. 17, 1-7.
5        MS. PETERSEN: 17(i) relates to the creation
6    of the Disaster Relief Policy?
7        MR. JONES: Let me take you to 4, then, which
8    asks, "... regarding which Subsidiaries require their
9    non-exempt employees during the January 1, 2017, through
10   the present to make, sign, adopt or somehow confirm the
11   'Teammate Acknowledgment' found at TRC 000145-000147 or
12   an acknowledgment similar to that 'Teammate
13   Acknowledgment' and why."
14       MS. PETERSEN: I'm reading that. I see
15   nothing related to an assessment of what did DaVita mean
16   by at-will employment in the teammate handbook.
17       MR. JONES: Well, I'm going to understand --
18   the question is going to stand. You can tell him not to
19   answer, if you'd like. But either way, I'd like him
20   to answer.
21       MS. PETERSEN: Oh, I'm not going to instruct
22   him not to answer. I'm just saying that's not a topic
23   for which he's been designated.
24       So Mr. Eaves, you can answer in your -- based
25   on your personal knowledge.

Page 66

1      Q.  (By Mr. Jones)  Well, Mr. Eaves, do you
2  know -- let me ask you a different question.  All right?
3      Do you know what DaVita means as -- when it
4  uses the term "at-will employment" in its handbook?  I'm
5  asking you what -- your corporate knowledge here.
6      MS. PETERSEN:  And same objection.
7      MR. JONES:  It's noted.
8      A.  My personal understanding of at-will
9  employment --
10     Q.  (By Mr. Jones)  I'm not asking you, personal
11 understanding.  I'm asking for DaVita's understanding of
12 what at-will employment means?
13     A.  I --
14     MS. PETERSEN:  Again, Counsel, my objection
15 does still stand.  This is a topic which is outside the
16 areas of designated testimony.  He is absolutely welcome
17 to testify as to his personal knowledge.
18     MR. JONES:  Listen, you're directing the
19 witness not -- to avoid my question.  And I'm making a
20 note of that, Ms. Petersen.  And I'm reaching the end of
21 my patience.  I want to know -- if I ask him a very
22 simple question, I would like a very simple answer.
23     Q.  (By Mr. Jones)  Mr. Eaves, you know why --
24 what DaVita means when it says at-will employment in its
25 acknowledgment, don't you?

Page 67

1      MS. PETERSEN:  Same objection.
2      A.  I understand at-will employment, yes,
3  Mr. Jones.
4      Q.  (By Mr. Jones)  All right.  Tell me, what did
5  DaVita mean by at-will employment when it put it in the
6  acknowledgment?
7      MS. PETERSEN:  Excuse me.  In the
8  acknowledgment?
9      MR. JONES:  Yeah.
10     MS. PETERSEN:  Did I mishear?
11     MR. JONES:  No, you didn't miss it.  In the
12 acknowledgment.  It's in the acknowledgment.
13     MS. PETERSEN:  I'm sorry.  I think you broke
14 up, at least on my end.  Do you mind repeating?
15     MR. JONES:  I'll ask it again.
16     Well, Christina, let's keep it right there.
17 Okay.  Making me dizzy.
18     Madam Court Reporter, did you hear the
19 question?
20     THE COURT REPORTER:  Yes.
21     MR. JONES:  Would you read it back, please?
22     (Record as shown on page 67, lines 4 through
23     6, read back.)
24     MS. PETERSEN:  Same objection.  It's outside
25 the scope of the topics.  The witness may answer in his

Page 68

1  personal capacity.
2      MR. JONES:  You're instructing him not to
3  answer as a corporate representative, yes or no?
4      MS. PETERSEN:  Counsel, if you can point me to
5  the topic that addresses this, I --
6      MR. JONES:  I'm not arguing with you.  I just
7  need a straight answer.  Are you instructing him not to
8  answer that question as a corporate representative, yes
9  or no?
10     MS. PETERSEN:  Yes.
11     Q.  (By Mr. Jones)  Mr. Eaves, are you refusing to
12 answer my question as a corporate representative of
13 DaVita --
14     A.  I will take --
15     Q.  -- yes or no?
16     A.  Yes, I will take guidance from my counsel.
17     Q.  All right.  That was my next question.  You're
18 doing so because of instruction of Counsel, correct?
19     A.  That is correct.
20     Q.  Now --
21     MS. PETERSEN:  Mr. Jones, again, I'm -- if we
22 can talk about --
23     MR. JONES:  I don't care to -- I don't care to
24 have this -- no, Ms. Petersen, I really don't.  I'm
25 trying to ask another question.  Okay?  We've moved on.

Page 69

1      THE WITNESS:  Mr. Jones, may I ask you a
2  question?  I'm about ready for a bio break.  And so if
3  we can --
4      MR. JONES:  You can get a comfort break any
5  time, Mr. Eaves.
6      THE WITNESS:  I -- could I have one, please?
7  That would be great.  I think --
8      MR. JONES:  Sure, absolutely.
9      THE WITNESS:  -- I could use the restroom.  Do
10 I just come back when I'm ready, or do we break?
11     MR. JONES:  Yeah.
12     THE WITNESS:  Come back at --
13     MR. JONES:  We -- you'll come back.  We trust
14 you, Mr. Eaves.
15     THE WITNESS:  I'll be right back.  Thank you
16 so much.
17     (Recess taken from 2:26 p.m. to 2:34 p.m.)
18     Q.  (By Mr. Jones)  All right.  Let's go to --
19     MR. JONES:  Are we back on?  Madam Court
20 Reporter, I don't mean to -- we're back on?
21     THE COURT REPORTER:  We're back on.
22     MR. JONES:  All right.
23     Q.  (By Mr. Jones)  We'll go back to TRC 000146.
24 Now, I want to skip down a little bit.  And the last --
25 in the first column on the left at the bottom, there's a

18 (Pages 66 to 69)

Page 70

1   sentence that starts with, "I understand that ..."
2      Do you see the line I'm talking about?
3     A.  At present there's nothing projected.  I'll
4   let you know when I see something.
5     Q.  There we go.  Okay.  Do you see the last
6   sentence on the column on the left?  It starts with, "I
7   understand ..."
8     A.  Yes, I see that.
9     Q.  Would you read it out loud for us, please?
10    A.  "I understand that the Teammate Policies, the
11  Code of Conduct and the DaVita Compliance Program and
12  their contents are not intended to create any
13  contractual or legal obligations, express or implied,
14  between DaVita and its teammates; however, these
15  policies do set forth the entire employment arrangement
16  between me and DaVita with respect to the at-will nature
17  of my employment relationship with DaVita."
18    Q.  Why does DaVita have its subsidiaries have
19  their employees sign an acknowledgment with that
20  sentence in it?
21    A.  The entirety of the sentence, or is there a
22  specific area you want me to comment on?
23    Q.  Well, yeah, I mean, if you want to break it
24  down -- it's a broad question.
25      Why does DaVita have its affiliates have their

Page 71

1   employees sign an acknowledgment that has that sentence
2   in it?
3      MS. PETERSEN:  Object, to the extent that it
4   calls for a legal conclusion.
5    A.  And, Mr. Jones, I'm not delaying.  I want to
6   re-read it again.  If you can just give me a second.
7    Q.  (By Mr. Jones)  Sure.  I think I -- I
8   understand the difficulty.  There are actually two
9   sentences there.
10    A.  You want me to comment on the first part of
11  the semicolon, or the break after?
12    Q.  There you go.  There you go.  I think I
13  understand the struggle, and I want to be fair about
14  this.  So I'm going to break the sentence in half.
15  Okay?  Why don't you read the first half of it, and then
16  let's end with the semicolon.
17    A.  This is not an employment contract.
18    Q.  Why does DaVita have its affiliates' employees
19  sign an acknowledgment with that statement in it?
20    A.  Because we don't want to have employment
21  contracts.  And we -- and we don't use this in standard
22  practice at all.
23    Q.  Right.  But you make the teammate sign off on
24  that.  Are you trying to tell the teammate this is not
25  an employment contract?

Page 72

1      MS. PETERSEN:  Objection.  Outside the scope
2   of the topics for which this witness is here to testify.
3    Q.  (By Mr. Jones)  You can answer my question.
4      MS. PETERSEN:  Counsel, my objection still
5   stands.  If the question -- well, if you want to read
6   back the question, we can all be clear on it.  I'm happy
7   to -- happy to consider it.
8      MR. JONES:  Sure.
9      Madam Court Reporter, would you read it back,
10  please?
11      (Record as shown on page 71, lines 23 through
12    25, read back.)
13      MR. JONES:  I'll clean that up.
14    Q.  (By Mr. Jones)  Does DaVita have its employees
15  sign off on the acknowledgment that indicates that the
16  Teammate Policies and Code of Conduct and the DaVita
17  Compliance Program and their contents are not intended
18  to create any contract or legal obligations, express or
19  implied, between Davita and its teammates because it
20  wants the teammates to understand this is not an
21  employment contract?
22    A.  Or legal document.
23    Q.  That's a yes?
24    A.  I would say that it's not a legal -- it's not
25  a legal contract or obligation.

Page 73

1      MR. JONES:  Okay.  Why don't you read the
2   question again, Ms. Court Reporter?
3      (Record as shown on page 72, lines 14 through
4    21, read back.)
5    A.  That's included in their -- yes, for that
6   purpose.
7    Q.  (By Mr. Jones)  Okay.  Well, what does DaVita
8   mean by employment contract?
9    A.  That there would be defined term associated
10  with someone's employment with the organization.
11    Q.  Tell me more about that, please.
12      MS. PETERSEN:  Counsel, I have to object
13  again.  I want the witness to be able to provide
14  testimony here, and yet at the same time each of these
15  questions is outside the bounds of the topic list.  If
16  you can help point me to a specific topic, again we'll
17  reconsider.  But --
18      MR. JONES:  Let me just say, Ms. Petersen --
19  you know this, too, and -- that's the last time I'm
20  going to have this repartee on the record with you.  You
21  know as well as I do, I'm fairly allowed to drill down
22  and -- you know, on these topics.  And my topic was --
23  we want -- is that -- is this -- is that we're asking
24  why they have them sign off on those acknowledgments.
25      That was a clear question.  He said, "We don't

Page 74

1    want employment contracts." Now, I can follow up on
2    that and find out why DaVita doesn't want employment
3    contracts, what they consider to be an employment
4    contract, what they consider not to be an employment
5    contract, what they consider to be employment at will.
6         I can do that, and you know I can do that.
7    And if -- you know, let me just tell you. This judge is
8    very user-friendly. If you don't think I can do it,
9    let's get him on the line. But I wish you would stop
10   interrupting me, because it's stopping the flow and it's
11   making this longer than it needs to be.
12        MS. PETERSEN: Counsel, I am certainly
13   permitted to make objections. And my objections --
14        MR. JONES: (Unintelligible) objections.
15        MS. PETERSEN: May I finish my statement,
16   please? We can go off the record, if need be. The
17   concern is this is going to legal conclusions and
18   outside the bounds of the topics. Yes, I do agree there
19   can be some exploration in this area.
20        That's what I meant by saying -- you know, I
21   want to be -- the witness to be able to testify here,
22   and yet trying to keep to the bounds of corporate
23   testimony and what has been noticed as the topics.
24        Mr. Eaves, you can respond if you are able to
25   do so.

Page 75

1         Q. (By Mr. Jones) Do you need to hear the
2    question again, sir?
3         A. Yes, Mr. Jones, I would, please.
4         MR. JONES: Ms. Court Reporter, would you read
5    the question back, please?
6         (Record as shown on page 73, lines 7, 8, and
7         11, read back.)
8         A. So, Mr. Jones, I -- I think -- what I'm trying
9    to explain here is that this in and of itself should not
10   be seen as an agreement that both DaVita and an employee
11   enters to as a contract around expectations and the
12   absolutes that you tend to want to describe these at.
13        I think that these are general guidelines and
14   outside of employment at will. These -- these are the
15   guidelines that we would expect for them to -- to follow
16   and adhere to.
17        Q. (By Mr. Jones) Right. So -- and I want to
18   follow up on that answer, you know. And it goes back to
19   where we started. What do you mean by employment at
20   will?
21        MS. PETERSEN: Objection. Outside the topics
22   for which this witness has been designated to testify.
23   He is the VP of people services, and can answer that
24   question in his personal capacity.
25        MR. JONES: I want an answer by DaVita. He

Page 76

1    just used the word "employment at will" in an answer, as
2    a corporate representative of DaVita. And I am allowed
3    to ask him what he meant by using those words. And the
4    last answer, I did not -- those words were not in my
5    question; they were in his answer. And I get to explore
6    that.
7         Now, are you instructing him not to answer my
8    last question?
9         MS. PETERSEN: I am. Consistent with the
10   prior instruction, I am.
11        Q. (By Mr. Jones) Mr. Eaves, will you refuse to
12   answer my question?
13        A. Mr. Jones, I'll follow the advice of my
14   counsel. I won't answer the question on behalf of
15   DaVita.
16        Q. Thank you very much. Now, let's go to the
17   second half of this -- or of this sentence that we had
18   read. And it is after the semicolon, in the right-hand
19   column of TRC 000146. Please read those words,
20   beginning with "however."
21        THE WITNESS: Ms. Henry, can you just put that
22   down? I just want to make sure I'm looking at the --
23        A. So you just want me to read the second half of
24   the semicolon sentence, sir?
25        Q. (By Mr. Jones) Yes, sir.

Page 77

1         A. "... however, these policies do set forth the
2    entire employment arrangement between me and DaVita with
3    respect to the at-will nature of my employment
4    relationship with DaVita."
5         Q. Why does DaVita have the subsidiaries have
6    their employees sign an acknowledgment with that
7    sentence in it?
8         A. Because these are general guidelines that we
9    would like for a teammate to follow. And so absent us
10   asking them to go outside of the legal structure of
11   things, these would be our general expectations.
12        Q. Yeah. But that's not the words that are used
13   in that sentence. It says that the "policies set forth
14   the entire employment arrangement between me" -- being
15   the employee -- "and DaVita." Okay?
16        I mean, what is it about that clause that
17   DaVita is trying to get the employee to acknowledge?
18        A. So as I had mentioned, there are general
19   expectations that we have as an employer. And there
20   should be general expectations that teammates have with
21   regards to understanding their rights and resources that
22   are under this guidebook.
23        So we are saying, with respect to that, we --
24   we are outlining that these would be the general
25   arrangement that we would have, absent us crossing any

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

Page 78

1    guidelines about breaking the law or anything.
2    Q.  Yeah.  Okay.  So -- but they acknowledge this
3    is the "entire employment arrangement between me and
4    DaVita."  I mean, what do they mean by that?
5    MS. PETERSEN:  Objection.  We're in the same
6    territory again here.  Calls for a legal conclusion --
7    MR. JONES:  Yeah.
8    MS. PETERSEN:  -- eventually, and also outside
9    the scope of the topic for which this witness has been
10   designated to testify.
11   MR. JONES:  We will -- we will find out about
12   that, because I've never in 35 years have someone
13   instruct a witness not to answer questions about what
14   the corporation meant when they made their employees
15   acknowledge specific words and I ask them, "Well, what
16   did you mean by those words?"  You know, never.  In 35
17   years, I -- you know, for the life of me.
18   These are fair questions, and they're fairly
19   within the scope of this 30(b)(6).  And I'm going to
20   make as many -- I'm going to document the record as well
21   as I can, because we're coming back.  So if you're going
22   to instruct him not to answer, then instruct him not to
23   answer.  I'm tired of all this jabbering back and forth.
24   MS. PETERSEN:  The witness may testify as a
25   30(b)(1) witness, in his capacity.  He is instructed not

Page 79

1    to answer as the 30(b)(6) witness, as this is outside
2    the scope of the topics for which he's been designated
3    to testify.
4    Q.  (By Mr. Jones)  Do you refuse to answer as a
5    corporate representative of DaVita, Mr. Eaves?
6    A.  Mr. Jones, I'll take direction from my legal
7    counsel.
8    Q.  I understand that, but that's a yes or no
9    question.  I'm not trying to pick on you.  I'm not
10   trying to get you in any trouble.  I'm just trying to
11   establish that you understand the question and that you
12   refuse to answer it as a corporate representative of
13   DaVita, based upon advice of Counsel.
14   Is my --
15   A.  Correct.
16   Q.  -- statement true?
17   A.  I will not answer the question as a corporate
18   witness, based on the advice of my counsel.
19   Q.  Thank you.
20   MS. PETERSEN:  Counsel, can we go off the
21   record for just one second -- side bar?
22   MR. JONES:  Sure.
23   (Discussion held off the record.)
24   MR. JONES:  All right.  Back on the record.
25   Q.  (By Mr. Jones)  Mr. Eaves, you ever had a

Page 80

1    speeding ticket?
2    A.  Yes, I think so.
3    Q.  What'd you get the ticket for?
4    A.  Speeding.
5    Q.  Okay.  Is that a legal conclusion?
6    A.  (No response.)
7    Q.  No.  It's -- you're using the term "speeding,"
8    even though legal -- speeding is a legal term, right?  I
9    asked you that as a layperson, right?  And so this is
10   what I want to establish.  Okay?
11   First of all, again, remember I asked you
12   earlier about your education.  There was a reason for
13   that.  And I didn't hear anywhere in there where you
14   went to law school.  I am correct, you didn't go to law
15   school; is that right?
16   A.  That's correct.  I have not gone to law
17   school.
18   Q.  And you're not a legal counsel for DaVita,
19   correct?
20   A.  I'm not.
21   Q.  And you never had any formal legal training;
22   is that correct?
23   A.  That is correct.  I have not had legal
24   training.
25   Q.  Okay.  So, you know, when I ask you these

Page 81

1    questions about what you mean by -- you as a corporate
2    representative of DaVita -- by employment at will, I'm
3    not asking you as a lawyer.  I'm not asking you for a
4    legal opinion.  So I want to go back to your answer that
5    you gave.
6    And do you remember when you gave that answer,
7    and you used that term "employment at will"?  Do you
8    remember that?
9    A.  I'll have to be refreshed.  It sounds like
10   Ms. Pennella will refresh me on my answer.
11   MR. JONES:  Would you read the answer back,
12   please?
13   A.  And -- and may I ask that Ms. Henry project
14   the policy acknowledgment again?
15   Q.  (By Mr. Jones)  Sure.
16   A.  And Mr. Jones, I'd ask that before the
17   question be read back to me, I just have a chance to
18   read it again.  I would appreciate that very much.
19   Q.  Okay.  Do you want me to give you reference,
20   also?
21   A.  I -- I do not --
22   Q.  We're talking -- okay.
23   THE WITNESS:  I'm sorry, Ms. Henry.  Can you
24   blow that up?  Okay.  So, Ms. Henry, it's in two
25   columns.  So I'd appreciate the opportunity to review

21 (Pages 78 to 81)

Page 82

1    the lower left-hand corner, and then I'll move up to the
2    rest of the sentence.  That's fine.  Thank you.
3         THE COURT REPORTER:  Okay.  I'm going to
4    search for that answer now.
5         (Record as shown on page 75, lines 8 through
6         16, read back.)
7    Q.  (By Mr. Jones)  Mr. Eaves, what did you mean
8    by the term "employment at will"?
9    A.  Employment at will means that outside of legal
10   requirements that we would have as an organization, we
11   would reserve the right to edit, revise, add, or amend
12   something.  And, similarly, an employee has the right or
13   advantage to terminate at any given point in time
14   without notice.
15   Q.  Thank you.  And if I could, I want to explore
16   your answer a little bit, to make sure that I understand
17   it.  And DaVita --
18        By at-will employment, as you used it, DaVita
19   wants to make it clear, I suppose, by signing this
20   acknowledgment, that its teammates -- that they don't
21   have a contract with DaVita that -- for a term of
22   employment, right?
23   A.  That is correct.
24   Q.  And that -- but, conversely, DaVita doesn't
25   have a hold -- a contractual obligation over the

Page 83

1    employee to show up for work tomorrow.  Would that be
2    fair?
3    A.  A contractual obligation -- help -- I'm not
4    sure I'm following you.  Can you rephrase or restate?
5    Q.  Okay.  Yeah, I'm --
6         DaVita wants the employee to understand that
7    there is no employment contract out there for a term of
8    employment with the at-will employee.  That's part of
9    why they have them sign this acknowledgment, right?
10   A.  Yes.
11   Q.  Okay.  Conversely, as you were saying on the
12   employee side of it, the employee doesn't have any
13   contractual obligation to show up for work the next day.
14        I mean, they can terminate the relationship
15   with DaVita, just like DaVita can terminate the
16   relationship with the employee; right?
17   A.  They do not have a contractual obligation.  I
18   agree with that statement.
19   Q.  Okay.  But certainly DaVita wants its
20   employees to show up for work tomorrow, right?
21   A.  Yes, absolutely.  We -- we perform very
22   critical patient care.  It would be disastrous if they
23   did not.
24   Q.  And would it be fair to say that DaVita's
25   policy -- that DaVita has in place policies and

Page 84

1    procedures that intend to retain their at-will employees
2    as employees?
3    A.  Tell me what you mean by "retain"?
4    Q.  Well, I mean, you know, DaVita -- does DaVita
5    consider that their at-will employees add value to their
6    business?
7    A.  Yes.
8    Q.  And I would suppose that DaVita then is
9    aware -- or let me use a different word.  It would be
10   disastrous, as you say, if DaVita's at-will employees
11   just didn't show up tomorrow.
12        So I suppose DaVita has in place policies
13   and procedures so that, number one, it could be aware of
14   whether their employees are unhappy; is that true?
15   A.  I cannot think of a policy we have in place
16   that would allow us to see if our teammates are happy.
17   I don't think that's in the guidebook or the policy
18   handbook.
19   Q.  Well, you certainly have procedures where
20   people in management -- you know, you have a -- what is
21   called a communications feedback loop.  Are you familiar
22   with what I'm talking about?
23        You know who Charles Koch is, of Koch
24   Industries?  He wrote a book on it about 25 years ago,
25   how he grew Koch Industries from being a

Page 85

1    $100-million-a-year business to being a
2    $125-billion-a-year business.  And one of his primary
3    tools is that he had a feedback loop from one of his
4    employees, where they would give him feedback.
5         And he could get a sense of how happy they
6    were in their employment, and they would also be --
7    figured if they're happy in their employment, they would
8    give him feedback as to how he could run his business
9    better.  All right?
10   A.  Mr. Jones --
11   Q.  I --
12   A.  -- there's questions on the table.  You're
13   asking me about -- the first, if I'm familiar with the
14   feedback loop; the second is, am I familiar with
15   Mr. Koch.  Which would you like me to answer?  I'm
16   sorry.
17   Q.  I was just giving you a reference to what I'm
18   talking about.
19        Does DaVita have a feedback loop, where they
20   sort of take the pulse of their employees?
21   A.  Mr. Jones, I -- I would guess you might be
22   referencing something similar to like an engagement
23   survey.  I would not conflate that with the teammate
24   handbook.  I think that's a separate process that we
25   have in place to monitor engagement of our teammates.

22 (Pages 82 to 85)

Page 86

1     Q.  No, Mr. Eaves.  I'm just trying to talk about
2  what we both already know, without going through and
3  defining every word in my question.  Can we do that,
4  please?
5     A.  We absolutely can.  I'm just confused with
6  your question, sir.
7     Q.  Let me go to the question, then.  I have read
8  in the policies and procedures and -- in DaVita -- where
9  they have emails set up, where if employees have a
10 question about some -- one of the policies and
11 procedures, they can write and they will not -- and
12 they're going to write there, they're going to ask that
13 question, and there is someone who is charged with the
14 responsibility of answering that employee's questions;
15 isn't that right?
16    A.  Yes.  Okay.  I will agree with you on that.
17 We definitely have those options in our handbook, yes.
18    Q.  Do you know what that is?  It's a feedback
19 loop.  The employee's feeding you back questions to you,
20 because they have -- you know, they're letting DaVita
21 know, "Here's a question I have about this policy and
22 procedure."
23         And those employees are supposed to get an
24 answer 100 percent of the time; isn't that correct?
25    A.  The employees responding from those email

Page 87

1  lines?
2     Q.  Well, yeah.  The employees are supposed to get
3  an answer to their question 100 percent of the time,
4  true?
5     A.  Sure.  The -- the expectation would be that
6  teammates who operate those inboxes are responding to
7  teammate questions, yes.
8     Q.  And if those questions coming from teammates
9  are directed like to a particular policy or procedure,
10 that may raise a red flag for leadership; isn't that
11 right?
12    A.  I do think that's possible, Mr. Jones.
13    Q.  Not only possible.  It happened with the
14 Disaster Relief Policy in March of 2020, didn't it?
15    A.  What was the question?
16    MR. JONES:  Read it back, please.
17    (Record as shown on page 87, lines 8 through
18     11, read back.)
19    A.  I believe I answered that question.
20    MR. JONES:  Read my next question, please.
21    (Record as shown on page 87, lines 13 and 14,
22     read back.)
23    A.  There were questions about the Disaster Relief
24 Policy, yes.  We had many questions about COVID in
25 general during that time frame, yes.

Page 88

1     Q.  (By Mr. Jones)  Now, what is it that DaVita
2  means when it makes its employees acknowledge that the
3  policies do set forth the entire employment arrangement
4  between them and DaVita?  What do you mean by employment
5  arrangement?
6     A.  Yeah, I think there's -- there's two answers
7  to that.  The first is that there are guidelines and
8  expectations we have about behaviors and conduct as a
9  teammate.  And that, similarly, there are benefits and
10 resources that are available to teammates that are also
11 defined in that handbook.  So the -- the entirety of the
12 two of those, as they come together, are the
13 arrangement.
14    Q.  So let me see if I can give you my
15 understanding -- you tell me if I understand
16 correctly -- that these policies and procedures set
17 forth DaVita's expectation of its employees, is a broad
18 brush approach.  Is that a fair description of the
19 policies and procedures?
20    A.  I think that captures the -- the one of my two
21 answers to your response, yes.
22    Q.  But it also sets forth what the employees can
23 expect from DaVita, too; is that true?
24    A.  It does outline resources and -- and perhaps
25 benefits that would be available to them as employees of

Page 89

1  our organization.
2     Q.  Now, let's go to topic number 17.  All right.
3         Now, are you familiar with the definition of
4  "state the facts," as it was found in this subpoena?
5     A.  I'm familiar with it, yes.
6     Q.  Well, "State the facts regarding the
7  following.  The creation of the Disaster Relief
8  Policy" -- we see a typo right off the bat.  Let me
9  start over.
10        "State the facts regarding the following.  The
11 creation of the Disaster Relief Policy contained in the
12 DaVita Teammate Handbook, including when it was created,
13 why it was created, who had input into its creation, the
14 Identity of any and all documents that evidence, or have
15 to do with its creation."  Okay.
16        First of all, why was the Disaster Relief
17 Policy created by DaVita?
18    A.  Sure.  The Disaster Relief Policy was intended
19 to put some guidance around what to do in the event
20 teammates were not able to perform their duties in the
21 event of a natural disaster.
22    Q.  All right.  I want to drill down on that.
23 The -- I want to reference you to what has been produced
24 previously by DaVita.
25    MR. JONES:  And let's go to TRC triple -- or

1  000049, Christina.
2      MS. PETERSEN:  Is that a prior exhibit?
3      MR. JONES:  Yeah, that's exhibit -- we're
4  still on Exhibit --
5      MS. PETERSEN:  5, maybe.
6      MR. JONES:  -- 5.  Yeah.
7      MS. PETERSEN:  Okay.
8      MS. HENRY:  What was the number, page number?
9      MR. JONES:  49.  49.
10     Q.  (By Mr. Jones)  Now, first of all, when I read
11  the Disaster Relief Policy -- and this is the Disaster
12  Relief Policy that existed on January 1, 2020.  Okay?
13  I see that the first sentence says that, "The
14  Disaster Relief Policy provides for pay continuance
15  during an emergency time frame when a declared emergency
16  or natural disaster prevents teammates from performing
17  their regular duties."  Okay.
18     Do you see that, sir?
19     A.  I do see that.
20     Q.  Does the Disaster Relief Policy apply only to
21  teammates who have prevented -- who have been prevented
22  from performing their regular duties by an emergency or
23  natural disaster?
24     A.  I'm not -- I'm not sure I understand the
25  question.  Only to teammates?

1      Q.  Let me -- I'll re-ask it.
2      Does the Disaster Relief Policy -- is it
3  intended to apply only to those teammates who have been
4  prevented from performing the regular duties by an
5  emergency or a natural disaster?
6      A.  It can be for -- if teammates are prevented
7  from doing their regular duties.  So not just limited to
8  a natural disaster or a declared emergency, it's -- it's
9  for performing their regular duties.
10     Q.  Yeah.  But it's a true/false question.  I want
11  to ask it again, if you don't mind.  I'm going to give
12  you all the time to explain your answer.  But I would
13  like a yes or no first, please, so I can know I
14  understand your answer.  So let me ask it again.
15     Does the Disaster Relief Policy, as we see
16  here beginning on TRC 000049, is it intended to apply
17  only to teammates who were prevented from performing
18  their regular duties by an emergency or natural
19  disaster, yes or no?
20     A.  Yes.
21     Q.  Okay.  So it is only those teammates who were
22  prevented from performing their regular duties that
23  could expect to receive any benefits from the Disaster
24  Relief Policy.  Is that your testimony today, sir?
25     A.  Well, not -- not entirely, because it would

1  only speak to our non-exempt team population.
2      Q.  Okay.  That's all I'm going to talk about.
3  And that's the teammates, so --
4      A.  Okay.  Just make sure you and I are on the
5  same page about that.  Thank you.
6      Q.  Yeah.  Let me just kind of like give an in
7  globo right here, so that -- that's all we're talking
8  about, are non-exempts.  Unless I ask you questions
9  about exempt, which you remember earlier I asked you
10  about yourself -- and so unless I say --
11     When I say "teammates," I'm talking about
12  non-exempt teammates.  Okay?
13     A.  Sure.
14     Q.  So your testimony today is, only those
15  teammates that were prevented from doing their regular
16  duties could expect -- by an emergency or a natural
17  disaster could expect any benefits from the Disaster
18  Relief Policy.  Is my statement true or false?
19     A.  True, in the event -- in the event that this
20  policy was triggered, true.
21     Q.  Okay.  Then let's look at the policy, then.
22  And let's jump down here to "Pay Practices."
23     MR. JONES:  That's on page 000050, Christina,
24  the next page.  And, yeah, get rid of that.  Thank you.
25     Q.  (By Mr. Jones)  If we look at -- under "Pay

1  Practice for Non-Exempt Employees."  Do you see that?
2      A.  I do see that.
3      Q.  All right.  And this is what it says.  The
4  first paragraph says, "If a facility or business office
5  is closed due to a declared emergency or natural
6  disaster as defined above, non-exempt teammates will be
7  paid for their regularly scheduled hours at their base
8  rate of pay during the designated emergency time frame."
9  Okay.  When I --
10     Am I correct that the first paragraph provides
11  Disaster Relief Policy benefits to those teammates who
12  can't get to work because the facility or business
13  office is closed because of a declared emergency or
14  natural disaster; right?
15     A.  Yes.  If the facility or business office is
16  closed due to one of those and they're not able to
17  perform their regular duties, yes, I agree with you.
18     Q.  And they will be paid at their regular --
19  they'll be paid their regularly scheduled hours at their
20  base rate of pay, no premium there; right?
21     A.  That's correct.
22     Q.  The second paragraph says, "If a facility or
23  business office opens late or closes early due to a
24  declared emergency or natural disaster as defined
25  above," the teammates -- and I'm paraphrasing -- will be

Page 94

1    told about their new hours.  And if they show up and
2    work those hours, they will be paid at their base rate
3    of pay; is that correct?
4         A.  Give me just a second to read through that,
5    Mr. Jones.  Please repeat your question.
6         Q.  The second paragraph says -- and I'm, you
7    know, paraphrasing it.  But when I read it, what I saw
8    it to say is that if an emergency or natural disaster
9    causes the facility to open -- or change its opening and
10   closing times -- or opening or closing times, then the
11   teammates' hours are going to be rescheduled.  They may
12   have to come in earlier or leave later.
13        And if they worked those rescheduled hours,
14   they're going to be paid at the regular rate of pay;
15   correct?
16        A.  And just to be clear, we're just talking about
17   the first sentence of that paragraph?
18        Q.  Yeah, yeah.  Yeah, I mean, I'm not going to
19   read the whole paragraph every time I ask you a
20   question.  It's not a trick question.
21        A.  I understand.
22        Q.  I realize it says some other things in there,
23   too.  We're going to get to it.  But I would like a
24   clean question and a clean answer, because this is going
25   to be put down in booklet form.  All right?

Page 95

1         And so the second paragraph of the "Pay
2    Practice for Non-Exempt Teammates" provides that if a
3    facility or business office opens late or closes early
4    due to a declared emergency or natural disaster, that
5    those teammates who show up and work their hours that
6    have changed because they're going to open late or close
7    early, they're going to be paid at their regular rate of
8    pay; right?
9         A.  Unless state law provides otherwise, yes.
10        Q.  Yeah, yeah.  Now, we go to the third
11   paragraph.  And it says, "If a designated facility or
12   business office is open during the emergency time frame,
13   teammates who report to their location and work their
14   scheduled hours will be paid premium pay for all hours
15   worked"; right?
16        A.  That's correct.
17        Q.  But we go down to the next to last paragraph.
18   And it says, "If a facility or business office is open
19   during the emergency time frame and teammates are unable
20   to work, teammates should utilize PTO in accordance with
21   the PTO policy."  Do you see that?
22        A.  I do see that.
23        Q.  Is that correct, that was the pay practices
24   for non-exempt teammates on January 1, 2020?
25        A.  I agree.

Page 96

1         Q.  So the only situation, under the "Pay Practice
2    for Non-Exempt Teammates," where a -- where premium pay
3    benefits would be paid to a teammate is when the
4    facility or business office is open and the teammate
5    shows up to work their regular -- or, rather, their
6    scheduled hours; true?
7         A.  I'm sorry.  Tell me that again?
8         Q.  Yeah.  So the only situation, under the "Pay
9    Practice for Non-Exempt Teammates," where premium pay is
10   paid is if -- is when the teammates who are working at a
11   facility or business office that is open during the
12   emergency time frame, and they report to their location
13   and work their scheduled hours; they'll get premium pay,
14   right?
15        A.  Please give me a second.  Yes.
16        Q.  Now, lets go back to page 49.  And you
17   remember when I was asking you questions about the first
18   sentence.  It says, "The Disaster Relief Policy provides
19   for pay continuance during an emergency tame frame when
20   a declared emergency or natural disaster prevents
21   teammates from performing their regular duties."
22        The disaster -- the pay practices certainly
23   provides continuation of pay when teammates aren't able
24   to work because the facility's closed, right?
25        A.  Yes.

Page 97

1         Q.  But the pay practices of the Disaster Relief
2    Policy also provide that people who show up at a
3    facility that's open and work their scheduled hours are
4    going to get premium pay, right?
5         A.  When an actual disaster prevents them from
6    doing their normal duties, yes.
7         Q.  But it doesn't say that, does it?
8         MR. JONES:  Let's go back to page --
9    Christina, page 50.
10        Q.  (By Mr. Jones)  And let me read it to you.
11   And I'm looking on the right-hand corner of the column,
12   the first full paragraph.  "If a designated facility or
13   business office is open during the emergency time frame,
14   teammates who report to their location and work their
15   scheduled hours will be paid premium pay for all hours
16   worked.  Unless state law requires otherwise, premium
17   pay will be one-and-one-half times the teammate's base
18   rate of pay."
19        It doesn't say anything about their regular
20   duties being disrupted.  To the contrary, it says if you
21   show up at a facility that's open and you work your
22   scheduled hours, you get premium pay; isn't that true?
23        A.  Yeah, I -- I think where I disagree with you,
24   though, is -- it does say that.  It's just on page 49.
25   So I feel like your question is kind of entering midway

Page 98

1  into written documentation.  It does say that at the
2  beginning of the policy, Mr. Jones.
3       Q.  All right.  Let's go up here, and let's look
4  at it.  All right?  Okay.  Let's go to page 49.  Now,
5  the Disaster Relief Policy provides for pay continuance
6  during an emergency time -- when a declared emergency or
7  natural disaster prevents teammates from performing
8  their regular duties.  All right?
9       So we've got a situation where the facility or
10 the business office is closed, and teammates can't get
11 to work.  That prevents them from working their
12 regular -- from performing their regular duties, right?
13      A.  If -- if the facility is closed, yes.
14      Q.  Then you have a situation where -- if the
15 facility opens early or closes late, then the teammate
16 shows up and works their scheduled hours, they're going
17 to get paid regular pay.
18      That certainly, by definition, is going to
19 show that these teammates -- the emergency or natural
20 disaster prevented them from performing their regular
21 duties, 'cause they had to work different hours; right?
22      A.  (No response.)
23      Q.  Right?
24      A.  If the schedule had been adjusted when they
25 come into the office, yeah, they -- they would be --

Page 99

1  they would be paid in accordance with that, yeah.
2       Q.  Then, they -- I have a situation where -- if
3  you can't come to work and the facility is open, but the
4  emergency or natural disaster prevents the teammate from
5  coming to work, they get regular pay.
6       And certainly under that scenario, the
7  emergency or natural disaster prevented those teammates
8  from performing their regular duties; right?
9       A.  Can you rephrase the question?  I feel like
10 there's a lot of narratives, and then there's a "right"
11 at the end.  What's the question?
12      Q.  Well, then we have a situation where the
13 facility or business office is open and -- but the
14 teammate, for whatever reason, cannot appear at that
15 facility or home office because of the natural disaster
16 or emergency.  And in those -- that situation, the
17 teammate gets to claim PTO, right?
18      A.  Well, if they're -- if they're able to perform
19 their job duties at work, we would pay them for the time
20 they're able to come in to work, when the facility is
21 open.
22      Q.  But you'd pay premium time for that, right?
23      A.  (No response.)
24      Q.  Right?  That's what it says.
25      THE WITNESS:  Ms. Henry, can you please go to

Page 100

1  the second page of this document -- page 50 -- please?
2  Okay.
3       A.  Mr. Jones, can you direct me where you're
4  referring?
5       Q.  (By Mr. Jones)  Sure.  On page 50, right-hand
6  column, first full paragraph.  "If a designated facility
7  or business office is open during the emergency time
8  frame, teammates who report to their location and work
9  their scheduled hours will be paid premium pay for all
10 hours worked.  Unless state law requires otherwise,
11 premium pay will be one-and-one-half times the
12 teammate's base rate of pay."
13      Those are teammates whose ability to perform
14 their work has not been interfered with by an emergency
15 or a natural disaster.  Because their facility is open,
16 they could show up and work their scheduled hours, they
17 get premium pay; isn't that true?
18      A.  It is.  And I think the important language in
19 there is during the emergency time frame, which would
20 naturally --
21      Q.  Hold on.  Wait, wait, wait, wait.  You're
22 trying to step all over my question and answer a
23 question I didn't ask.  All right?  We're going to get
24 into that in a minute, but I would like a clean answer
25 to this question.  All right?  So let's go back.  Let's

Page 101

1  look at this paragraph.
2       First full paragraph in the right column,
3  which says, "If a designated facility or business office
4  is open during the emergency time frame, teammates who
5  report to their location and work their scheduled hours
6  will be paid premium pay for all hours worked.  Unless
7  state law requires otherwise, premium pay will be
8  one-and-one-half times the teammate's base rate of pay."
9       What that paragraphs means is that if a DaVita
10 teammate is able to go to work, because the natural
11 disaster or emergency has not closed the facility --
12 they're able to go to work, 'cause the natural disaster
13 or the emergency has not interfered with their ability
14 to work their scheduled hours.
15      If those employees show up and work the
16 scheduled hours, they're going to be paid premium time.
17 That's what that paragraph means, doesn't it?
18      A.  If an emergency time frame has been declared,
19 yes.
20      Q.  Correct.  Now -- so there is a situation
21 within the Disaster Relief Policy where premium time is
22 paid to DaVita teammates, but yet they have -- their
23 ability to work has not been affected; isn't that true?
24      A.  What's the last part of that?  You -- you --
25 I'm sorry.  You keep leaning back on the chair.  I'm not

Page 102

1  catching the microphone.
2      Q.  So there is a situation, under the emergency
3  disaster policy, where DaVita employees are -- show up
4  at their regular duties, at their -- at the regular
5  facility or business office -- it has not been closed --
6  and perform their scheduled hours, because the emergency
7  or natural disaster has not interfered with their
8  ability to do so.
9          Those employees receive premium time -- time
10 and a half -- unless state law requires otherwise, true?
11     A.  False.
12     Q.  How is it false?
13     A.  Because an emergency time frame is going to
14 imply that there was actually a natural disaster that
15 was occurring, that prevented them from coming in and
16 doing their normal job duties.
17     Q.  But how can you say -- what are you saying?
18         They have to be able -- they can show up and
19 work their scheduled hours in a facility or business
20 office that's open, but somehow the natural disaster or
21 the emergency had to have interfered with their ability
22 to perform their natural -- their normal duties?
23         In what way?
24     A.  No, what -- what I'm saying is that a natural
25 disaster in and of itself does not necessarily imply

Page 103

1  that this is triggered.  I can reference fires that took
2  place, that were declared emergencies.  It did not
3  disrupt somebody's ability to perform their normal job
4  duties.  And as such, if they came in to work, we would
5  pay them their normal pay.
6          And if they didn't make it in to that work --
7  if they didn't make it in to work, they have the option
8  to use PTO.  There was nothing that prevented them from
9  coming into the building or the facility and performing
10 their normal job functions.
11     Q.  All right.  Well, let me ask you this.
12         If the facility or business office was in an
13 emergency time frame and was one of the affected
14 facilities or business offices within that time frame
15 and the DaVita employee showed up, worked their regular
16 hours, did their regular duties, would they be entitled
17 to premium pay?
18     A.  No, because you're -- you're implying in that
19 question that they were able to perform their normal job
20 duties.
21     Q.  Well, what is --
22     A.  And that's the --
23     Q.  When does it ever apply --
24     A.  That's the inherent mishear that I -- that I'm
25 hearing in your question, is that they're coming in and

Page 104

1  they're performing their job duties, when the -- the
2  opening statement of this entire policy is saying that
3  this is in place, in the event they're not able to do
4  so.
5          And we have this in place so that we
6  incentivize people outside of those distractions and to
7  come in, because we're incentivizing them to do so.  But
8  an emergency declaration by the President or by, you
9  know, an elected official in and of itself is not going
10 to necessarily infer that a teammate is not able to
11 perform their natural job functions.  That -- that --
12         That's just not the way that this policy is
13 laid out.  That first sentence is critical.  You can't
14 just jump into the policy and -- and say, in and of
15 itself, that a declared emergency is going to be
16 indicative -- or dictate, in and of itself, how we would
17 apply a pay practice.
18     Q.  Why do you think so many teammates called in
19 and asked if they were going to get premium pay?  Do you
20 think they misread this policy?
21     A.  I think there were a lot of questions at this
22 period of time, COVID-19.
23     Q.  I think there were, too.  And I'm asking you
24 why you think there were that many questions; not
25 whether there were questions.

Page 105

1      A.  I -- I think there were questions about
2  whether or not people were going to receive additional
3  considerations or concessions during COVID-19.
4      Q.  I think so, too.  Why do you think they did --
5  they thought that?  Do you think they read this policy,
6  and they thought they were entitled to premium pay?
7      A.  No, sir.  I -- I think that there were a
8  number of questions about other things that we might do,
9  which DaVita did.
10     Q.  Do you think that this policy could be
11 interpreted as that all facilities, during COVID-19,
12 should get a 50 percent premium pay for those teammates
13 that came in and worked their scheduled hours for a
14 facility that was open?
15     A.  I'm sorry.  I missed the first part of your
16 question.  Would you please repeat it, or have the court
17 reporter do so?
18         MR. JONES:  Read it back for him, please.
19         (Record as shown on page 105, lines 10 through
20           14, read back.)
21         MR. JONES:  Did you say 15 percent, Madam
22 Court Reporter?
23         THE COURT REPORTER:  50 percent.
24         MR. JONES:  Thank you.
25     Q.  (By Mr. Jones)  Do you understand the question

Page 106

1    Mr. Eaves?
2         A.  I do.  And I -- I think that where you would
3    want to focus in the pay practice -- there might be some
4    question, which there was, about how the policy would be
5    interpreted.
6         But, again, I go back and stand firm in my --
7    my proclamation that this is intended to be addressed in
8    the event people are not able to perform their
9    natural -- or their -- perform their normal job
10   functions.
11        Q.  Mr. Eaves, you misunderstand me completely.
12   You want to argue your point, that I'm not trying to
13   make here.  And I would appreciate it if you would stop
14   doing that and answer my questions.  Now, I know you
15   want to make that point.  And I'm going to get to that
16   to, too, in a minute.
17        But I also know that over -- that hundreds,
18   perhaps even thousands, of DaVita employees read the
19   same paragraph that I read.  And they -- they had
20   thought, or at least asked, whether they were going to
21   get premium pay.
22        Because when they read that paragraph on
23   page 50, that full paragraph that is on the right-hand
24   column that I just read to you -- "If a designated
25   facility or business office is open during the emergency

Page 107

1    time frame, teammates who report to their location and
2    work their scheduled hours will be paid premium pay for
3    all hours worked" -- they read that to mean if they
4    showed up for work, that they got premium pay.
5         Now, that happened.  A lot of employees read
6    that paragraph like I did, didn't they, Mr. Eaves?
7         MS. PETERSEN:  Objection.  Object to the form,
8    and ask that Counsel please lower his voice when
9    speaking to the witness.
10        MR. JONES:  The witness has said five times in
11   the last 20 minutes that he could not hear me.  I am not
12   yelling at him.  I am raising my voice at his request,
13   Ms. Petersen.  Now, I don't appreciate that at all.
14   That is bush league lawyering.  I am not yelling at this
15   witness, and I do not want you putting it on the record
16   or implying that I am.
17        MS. PETERSEN:  No need for insults, Counsel.
18   I'm simply --
19        MR. JONES:  No.  And that's right.  And you
20   insult me by suggest- -- by saying that I'm yelling at
21   the witness.
22        A.  Mr. Jones, I -- you're making me a bit
23   uncomfortable.  Please -- please let me just explain my
24   point here.  And I -- okay.  Listen.  Under the
25   emergency --

Page 108

1         Q.  (By Mr. Jones)  Hold on, hold on.  Hold on,
2    Mr. Eaves.  There's no question on the table.  There's
3    no question on the table right now.  All right?  It was
4    stepped all over with -- by that repartee between
5    counsel.
6         Now, Mr. Eaves, if I'm making you
7    uncomfortable with the volume or my tone, you tell me.
8    If the questions are making you uncomfortable, then
9    that's okay; you can say that, too.  But the questions
10   are going to remain on the table.  Because sometimes we
11   find ourselves in a very uncomfortable position because
12   we don't want to admit that the shortest distance
13   between two points is a straight line.
14        Now, Mr. Eaves, I read that paragraph right
15   there.  And I'm not talking about the emergency time
16   frame.  When I read that paragraph on page 50 -- it
17   says, "If a designated facility or business office is
18   open during the emergency time frame, teammates who
19   report to their location and work their scheduled hours
20   will be paid premium pay for all hours worked."
21        I read that as meaning that in an emergency
22   situation, where there's a declared emergency time
23   frame, when some employees are interfered with from
24   showing up to work -- and I make it my business to show
25   up for work, to work my scheduled hours, I'm going to

Page 109

1    get premium pay.  That's how I read it.
2         Now, do you think that is an unreasonable
3    reading of the paragraph, that I pointed out?
4         A.  I do not believe that to be unreasonable, as
5    you're looking at that document.
6         Q.  Okay.
7         A.  I -- I --
8         Q.  You agree with that interpretation, true?
9         A.  Mr. Jones, policy from beginning to end for me
10   is quite clear.  I think if you were to go in and look
11   at those subheadings, I could see how there might be
12   some questions around that.
13        It would not be unusual for us to get
14   questions around policies, that my team would interpret
15   for teammates.  Okay?  There were questions about that.
16   There were questions about exposure.  There were
17   questions about PPE.  There were questions about the
18   effectiveness of the PPE.
19        And for us to go into any of those, whether
20   that -- those be policies or procedures that were done
21   from an infection control standpoint, it doesn't
22   necessarily mean that in page 1, page 2, or page 3 --
23   that you can selectively jump in and try to make that
24   run to your benefit.
25        We have people -- we have teams, just as you

Page 110

1  had inferred earlier in these handbooks, where if
2  there's questions, we have the ability to jump in and
3  provide guidance around that.
4       Q.  I appreciate that.  But let me just say this,
5  Mr. Eaves.  The fact is, you don't agree with that
6  interpretation of the policy under the "Pay Practice for
7  Non-Exempt Teammates"; isn't that true?
8       A.  It is true that I don't agree with that.  And
9  I think you are in receipt of documents/emails that
10 would also suggest that there are a number of people
11 that also agree with me in that assessment.
12      This is not Jeremy, this is not one person
13 that's overseeing this, or a group of people that's
14 trying to cheat each other -- cheat anyone out of
15 something in any way.  We care very deeply for our
16 teammates.  And, quite honestly, I think we've done a
17 number of things to be responsive to this COVID-19
18 crisis.
19      Q.  You don't have to be defensive, Mr. Eaves.
20 Now, the fact is -- my question is this.
21      You do understand, though, how someone could
22 read this policy like I did and think that my
23 interpretation of it was a reasonable interpretation;
24 correct?
25      A.  I do not agree that it would be a reasonable

Page 111

1  interpretation, when you read the full context of the
2  policy.
3       Q.  You think it would be an unreasonable
4  interpretation?
5       A.  I'm sorry.  Are those your words, or mine?
6       Q.  No, I'm asking you.
7       Do you think it would be an unreasonable
8  interpretation for someone to read this section that I
9  just read to you and think that, when they show up to go
10 to work in the middle of a health crisis, they would be
11 entitled to premium pay?
12      A.  Are you asking me this as a fact witness in my
13 individual opinion, or do you want me to speak to that
14 from a corporate perspective?
15      Q.  From a corporate perspective.
16      A.  I think it's unreasonable, because you have to
17 consider the entirety of the policy from beginning to
18 end.
19      Q.  I see.  So you don't -- you think there's only
20 one reading of this policy, and that is the way that
21 DaVita chose to interpret it; true?
22      A.  I think that it's -- it's the way the policy
23 was written, right.  And that is the correct
24 interpretation of the policy.
25      Q.  You see, Mr. Eaves, you changed my question.

Page 112

1  And I can't allow you to do that.  So please don't do
2  that anymore.  All right?  And we'll get through this.
3  We'll motor -- I'm not making these questions up as we
4  go, Mr. Eaves.  I've read the policy.  I've got them
5  all -- all the questions are written down right here.
6  Okay?
7       And, you know, I understand -- I've been
8  listening very carefully to you.  DaVita's position is,
9  there's only one reasonable interpretation of its -- of
10 the pay practices for non-exempt teammates; and that is
11 the way that they interpreted it.  Is that a true
12 statement?
13      A.  "They" being?
14      Q.  DaVita.
15      A.  Correct.
16      Q.  Why was it necessary -- why did DaVita think
17 it was necessary, then, to clarify the Disaster Relief
18 Policy?
19      A.  Yes, I'm happy to speak to that.  And,
20 Mr. Jones, I -- I'd be remiss if I didn't tell you this.
21 I do not want to come across as uncooperative with you.
22 I'm trying to do the best that I can.  I feel like the
23 way you phrase questions, sometimes you're asking for a
24 simple yes or no.
25      And the context for me is important, and I

Page 113

1  want to make sure that I get that on the record.  So I
2  just want to be clear.  That's all I'm trying to do.  I
3  really want to be cooperative, and I really want to make
4  sure I'm helping out with this.
5       Q.  Now, Mr. Eaves, let me make a point here.  All
6  right?  Okay?
7       First of all, most lawyers wouldn't allow you
8  to get away at all with doing that.  I want you to make
9  your point.  Okay?  Now -- and let me make this point.
10 Okay?  The questions I asked are yes and no questions.
11 You will -- I will always afford you the courtesy to
12 explain your answers.  It is considered, however, to be
13 evasive for a witness to start explaining an answer
14 before they answer it.
15      If I ask you a yes or no question, I would
16 appreciate you giving me a yes or no answer and then
17 explain it.  Because that way, I will not treat you as
18 an evasive witness.  Is that a fair rule, Mr. Eaves?
19      A.  It's a fair rule, Mr. Jones.  I --
20 procedurally --
21      Q.  Thank you very much.
22      A.  I understand there's a question on the table.
23 Once I've answered that question, may I request a break?
24      Q.  You can take a break right now, Mr. Eaves.
25      A.  I -- I prefer to answer the question, and then

29 (Pages 110 to 113)

## Page 114

1    I'm -- I'm happy to do so.
2        Q.  Yeah, I've forgotten what it is.  What is the
3    question?
4        A.  I think your question was why we had made
5    efforts to clarify the policy.
6        Q.  Well, let me ask you this.  We'll start over
7    on it.  Okay?
8            Do you think that this policy was clear on
9    January 1, 2020?
10       A.  Yes.
11       Q.  You didn't think that it needed any
12   clarification on January 1, 2020?
13       A.  No.
14       Q.  Did you feel that the policy needed
15   clarification after March -- some time after March 15,
16   2020?
17       A.  We -- we did make a decision to put specific
18   language in the policy, yes.  To answer your question, I
19   did feel it necessary, speaking on behalf of DaVita.
20       Q.  Now, what changed DaVita's mind then from --
21   going on January 1, 2020, believing that their policy
22   was clear and then something happened on March 15, which
23   is barely 45 days later, that DaVita felt they had to
24   amend their policy and clarify it?
25           What happened?

## Page 115

1        A.  Sure.  When the COVID crisis hit, we started
2    to get one or two off questions, which originally came
3    into our people services structure.  Because of the
4    number of questions, we actually set up help desks and
5    help lines to field the number of questions that came
6    in, to COVID.
7            As I mentioned earlier, there were questions
8    about PPE, exposure, benefits, personal issues people
9    might be having with how to address child care.  And
10   Mr. Jones, one of those was also around whether or not
11   there would be additional considerations for pay,
12   particularly as it related to the Disaster Relief
13   Policy.  The Disaster Relief Policy was never
14   considered, because teammates were able to perform their
15   normal job functions.
16           We continued to get those questions.  Our next
17   step was to make sure we were being clear about that, by
18   putting out communications that started in terms of
19   blurbs in our Village communications that were attached
20   to the intranet; that were spoken about on our Voice of
21   the Village calls, which are our large-scale town halls.
22           And there were still questions about it, just
23   as there were about many of the other things that we had
24   spoken to.  And as we continued to get questions around
25   those, there were different venues and alternatives for

## Page 116

1    us to clarify some of those high volume/repetitive
2    questions.
3            The one about the Disaster Relief Policy
4    naturally made sense to address within our teammate
5    handbook.  And the reason for that was because that's
6    where teammates were going and pulling out the selective
7    language that was in there.
8        Q.  All right.  So did anyone within management
9    feel that the Disaster Relief Policy could be
10   interpreted so that people who showed up and worked
11   their scheduled hours were entitled to premium pay?
12       A.  Can you define "management" for me?
13       Q.  You know, I don't know what to call it.  The
14   management/leadership, you know.  That's people who
15   supervise over people.  Management is defined as getting
16   things done through other people, isn't it?
17           So I would think that it would be somebody who
18   has some type of supervisory or reporting
19   responsibility.
20       A.  Okay.  There -- there -- there are documents
21   that were forwarded from questions from teammates that
22   would ask about and -- and make us aware of the fact
23   that there were questions around that.
24           When those did come into people services
25   channels, through the help desk, through my team, there

## Page 117

1    was -- there was no question about that.
2        Q.  No question about what?  That the people were
3    asking these questions?
4        A.  No, that it did not apply.
5        Q.  Okay.
6        A.  So to your question, were there leaders?  Yes,
7    I think there were some supervisors who were forwarding
8    questions from their PCTs and their nurses, to say,
9    "Hey, can you give us some interpretation of that?"
10   That's why we -- we exist.  And we did -- we did
11   interpret that.
12           Now, levels of leadership that would look at
13   that, my -- my team, any -- anybody that was looking at
14   that, that was familiar with the policy, were able to
15   say that this did not apply because, fundamentally and
16   foundationally, no one was dis- --- distracted from
17   performing their normal job duties.
18       Q.  Do you know Kevin Spring?
19       A.  I'm sorry.  Who?
20       Q.  Kevin Spring.
21       A.  The name is not ringing a bell, no.  Can you
22   tell me his title?
23       Q.  No.  I'm looking at --
24           MR. JONES:  Christina, would you put up
25   DaVita_003371?

Page 118

1        MS. HENRY:  The new stuff, 3371?
2        MS. PETERSEN:  And, Counsel, I -- there's not
3   quite a question pending here.  But just recognizing
4   that the witness had asked for a break a while back, so
5   not sure --
6        MR. JONES:  Sure.
7        MS. PETERSEN:  -- if now is a time -- or in a
8   moment.
9        MR. JONES:  Sure.  Now's a perfect time.
10       (Recess taken from 3:59 p.m. to 4:10 p.m.)
11   Q.  (By Mr. Jones)  Mr. Eaves, whose
12   responsibility was it in DaVita to interpret the
13   Disaster Relief Policy on March 1, 2020?
14   A.  There would not be a particular person.  My
15   policy team would interpret and create answers, if there
16   were questions about it, usually.
17   Q.  Well, I don't know how that works.  Why don't
18   you explain it to me?
19   A.  Yeah, if somebody has a question?  I just want
20   to be clear.
21   Q.  Go ahead.
22   A.  I'm -- I'm sorry.  I was asking for
23   clarification.
24   Q.  Sure.  What do you mean by "team"?  Who -- I
25   mean, you said your policy team.  Was there a team of

Page 119

1   people who were assigned to interpret the Disaster
2   Relief Policy?
3   A.  Yeah, that -- so my team -- which would be
4   myself, Shawn Zuckerman, Oliver McKinstry -- we have an
5   analyst on the team, Alejandro Bruner-Solas -- those
6   would be the primary folks, if there were questions and
7   people didn't immediately know the answer, where we
8   would be able to respond and interpret the policy.
9   Q.  Okay.  Was there any confusion in your mind on
10   January 1, 2020, when this policy came out that we were
11   looking at that was on -- that was found -- started on
12   TRC 000049 through 50 -- was there any confusion or
13   vagueness in your mind about what or how the policy
14   worked?
15   A.  Can someone point the policy?
16   Q.  Say again?
17   A.  I don't see a policy.  I just see everybody's
18   faces.
19   Q.  No.  You know what policy we're talking about.
20   We're talking about the Disaster Relief Policy.  And I'm
21   asking -- I'm taking you back to a point in time,
22   Mr. Eaves.  And that point in time is January 1, 2020.
23       The reason is because that is the point in
24   time that the Disaster Relief Policy, that we've put on
25   the board here for you earlier -- that's the time that,

Page 120

1   according to its own terms, it came into effect.  I'm
2   giving you a point of reference in the policy.
3        Who was the head of the team that was
4   responsible for interpreting the Disaster Relief Policy
5   on January 1, 2020?
6   A.  That rolls up to Oliver McKinstry.
7   Q.  All right.  And so it was up to Mr. McKinstry
8   to run the team to interpret the policy?
9   A.  Yes.
10   Q.  Yes?
11   A.  Mm-hmm, yes.
12   Q.  Who did Mr. McKinstry report to?  Who was his
13   supervisor?
14   A.  He reported to me.
15   Q.  Do you have any role in interpreting the
16   Disaster Relief Policy?
17   A.  There -- yes, I did get a couple of questions
18   about it, and I responded about.
19   Q.  No, that's -- that's what you did.  I'm
20   talking about your role.  I'm not saying -- I didn't ask
21   you whether -- did you respond to a couple of inquiries
22   during all of this, sir.  I asked you, what is your role
23   as vice president?  Do you have a role in interpreting
24   the policy on January 1, 2020?
25        And I specifically picked January 1, 2020,

Page 121

1   Mr. Eaves, because I wanted to avoid you launching off
2   into people that you talked to during the COVID-19
3   crisis.  January 1, 2020, there may have been a crisis;
4   but certainly we weren't really -- it wasn't on our
5   plate in the United States, if you will.  Let me go back
6   to my question.
7        On January 1, 2020, what was your role in
8   interpreting the Disaster Relief Policy?
9   A.  I would not have had a role.
10   Q.  Okay.  Other than perhaps the people who
11   interpreted the policy reported to you?
12   A.  Correct.
13   Q.  All right.  Did you understand how the
14   Disaster Relief Policy worked on January 1, 2020?
15   A.  No.
16   Q.  I'm sorry.  I didn't hear your answer.
17   A.  No.  I would not have been able to recite that
18   verbatim, no.
19   Q.  Okay.  When did you learn how the Disaster
20   Relief Policy works?
21   A.  I looked at it during -- when we got our
22   initial questions from the COVID-19 crisis.
23        MR. JONES:  Now, Christina, 3376.
24   Q.  (By Mr. Jones)  This is a -- this is --
25        MS. HENRY:  Sorry.  I realize it's small, but

## Page 122

1    I'm doing it so you can see the Bates number.  And then
2    I'd like to make it bigger, if you're all right with it.
3         Q.  (By Mr. Jones)  Can you read it?
4              THE WITNESS:  Thank you, Christina.  I'm
5    prepared for you to make it bigger now.  Thank you.
6         Q.  (By Mr. Jones)  All right.  This is
7    DaVita_003376.  It's one of about 7,600 documents that
8    were produced to us today, most for the first time.
9              MS. PETERSEN:  Is it 75 or 76?  'Cause on the
10   tab it says 003375.
11             MR. JONES:  I know I said 70- -- let me start
12   over.
13        Q.  (By Mr. Jones)  This is found at DaVita
14   003376, part of around 7,800 documents that were
15   provided to us today, some for the first time.
16             MR. JONES:  Scroll back down, Christina.
17        Q.  (By Mr. Jones)  Now, this is Abegail
18   Fontanilla, March 16, 2020.  And have you seen this
19   email before, sir?
20        A.  I -- I would have reviewed them.  I can't say
21   I specifically recall this one, though, sir.
22        Q.  Let me read it to you.  "I was scrolling
23   through our Teammate Handbook and came up with a
24   question.  Governor of Virginia, Mr. Ralph Northam and
25   our president Mr. Donald Trump have declared, quote,

## Page 123

1    unquote, a state of emergency last week.
2         "In Section 4 of Pay Practices, it states that
3    'if a designated facility is open during the emergency
4    time frame, teammates who report to their location and
5    work their scheduled hours will be paid premium pay for
6    all hours worked.
7         Unless otherwise stated, premium
8    pay will be one and one half times the teammates base
9    rate of pay,' close quotes.  Does it not apply to our
10   situation right now?  Specially with all other kinds of
11   clinics and businesses are closed due to COVID 19."
12             Did I read that correctly?
13        A.  You did.
14        Q.  Now, here's a question from Mr. Abegail
15   Fontanilla.  And if you read it as a thinking person, it
16   appears that Abegail, clinical administrative assistant/
17   patient care technician for DaVita, has read the pay
18   practices for non-exempt teammates -- that paragraph
19   that we went over before we took the break.
20             Apparently, she read it the same way I did.
21   Is that how you read this email?
22             MS. PETERSEN:  Objection.  Calls for
23   speculation.
24        A.  Mr. Jones, I read this as a question that we
25   would typically get for clarification.

## Page 124

1         Q.  (By Mr. Jones)  Okay.  But she says, "Does it
2    not apply to our situation right now?"
3              As a thinking person, does that lead you to
4    believe that perhaps she thinks that it does apply to
5    our situation right now?
6         A.  I -- I think she's got a question about it,
7    yes.
8         Q.  Yeah.  And so -- and she's obviously read the
9    same section of the pay practices for non-exempt
10   teammates of the DaVita Disaster Relief Policy that I
11   read, right?
12        A.  Yes, I -- based on the language she's using
13   here, it looks like she looked at that policy, yes.
14             MR. JONES:  Christina, let's go to 003375 and
15   scroll all the way to the bottom.  There you go.  At the
16   bottom, we have now Ms. Lindsay Burns on March 18, 2020,
17   to Jeremy Eaves -- that's you, Mr. Eaves -- "Subject:
18   FW" -- I guess that's forward -- "Compensation."
19             "Hey Jeremy, this is an example where TMs are
20   referencing an emergency situation.  We explained that
21   we are not paying hazard pay but this may be where
22   confusion is coming from."  Do you remember receiving
23   this email, Mr. Eaves?
24        A.  I -- I do -- I do remember I -- I saw this
25   email.

## Page 125

1         Q.  Did you see this email when it came in?
2         A.  From Lindsay, yes, I did.  And I --
3         Q.  Who is Lindsay Burns?
4         A.  Lindsay is a director on our operations
5    innovation team.  And she was set up to run the help
6    desk for the influx of questions we have related to the
7    COVID-19 pandemic.
8         Q.  Okay.  She sent this to you as an example,
9    where TMs -- that stands for teammates -- are
10   referencing an emergency situation and may be where the
11   confusion is coming from.
12             Is that what you thought, when you saw her
13   email?
14        A.  That's what I read, yes.  That's what I
15   thought at the time.
16        Q.  So then you write back to her about 29 minutes
17   later.  You say, "Ah, I see.  Okay.  Quote, the Disaster
18   Relief Policy provides for pay continuance during an
19   emergency time frame when a declared emergency or
20   natural disaster prevents teammates from performing
21   their regular duties, close quotes.
22             "Pay practice for non-exempt TMs as defined in
23   the pay practices policy."  And these are all caps.
24   "Facility closed.  Facility opens late or closes early.
25   Facility remains open but teammates not able to come

Page 126

1    into work (e.g." -- meaning, for example -- "roads
2    blocked, gas shortages).  Teammates not able to work --
3    use PTO, and approved by supervisor.  Teammates able to
4    make it in and get to the facility are paid at 1.5 or as
5    defined by state law.
6            "With this pandemic, teammates are not
7    disrupted in their abilities to perform their regular
8    duties.  All facilities remain open (you may get
9    pushback that we closed the CBOs -- but that is not the
10   case -- those offices remain open and we are encouraging
11   TMs to work from home).  I hope that helps.  J."
12           Did you write those words, sir?
13      A.  Yes.
14      Q.  Now, I want to take you to the pay practices
15   for non-exempt TMs as defined in the pay practices
16   policy.  And the two bullet points that are indented,
17   the first says, "Teammates not able to work -- use PTO,
18   and approved by supervisor."
19           Was that the policy, when you wrote this?
20      A.  Yes.
21      Q.  "Teammates able to make it in and get to the
22   facility are paid 1.5 or as defined by state law."  Was
23   that the policy, when you wrote this?
24      A.  Yes.
25      Q.  Now, in this she writes, "Okay.  Thank you.  I

Page 127

1    am going to work with Mandy to use some of the talking
2    points she had on the VOV call on Tuesday to remind
3    people that they are essential.  Thanks."
4            What does "VOV" stand for?
5       A.  Voice of the Village.
6       Q.  All right.  Now, you write at the bottom,
7    "With this pandemic, teammates are not disrupted in
8    their ability to perform their regular duties."  Okay?
9    But I want to know what you mean -- I want to ask you
10   what you mean by that.  But here's my question.  It's
11   more focused, on this specific.
12           The fact is, if a teammate is working at a
13   facility or a business office that is within an
14   emergency time frame -- so it is a facility or a
15   business office within a designated emergency time
16   frame -- and that teammate is not able to work, they use
17   their PTO.  That's what the pay practices say?
18      A.  Mm-hmm.
19      Q.  They can't make it in to work, right?
20      A.  Yep.
21      Q.  But if they can make it in to work, they get
22   paid time and a half; true?
23      A.  Not nec- -- not in that situation, sir.  The
24   Disaster Relief Policy was never enacted.
25      Q.  Okay.  But, see, you want to answer a question

Page 128

1    I didn't ask.  All right.  And I think you know that,
2    Mr. Eaves.  So we're going to back up.  I'm going to ask
3    you again.
4            If you were then in an emergency time frame --
5    and so designated facility -- one of the teammates are
6    not able to make it in to work, they get to claim PTO;
7    right?
8       A.  During an emergency time frame, correct.
9       Q.  But if a teammate's able to make it in and
10   gets to the facility, they're paid time and a half;
11   right?
12      A.  During an emergency time frame, yes.
13      Q.  All right.  So that's the policy of DaVita.
14           In order to know whether a specific
15   employee -- whether DaVita would agree to pay a specific
16   employee, we've got to go and look at the emergency time
17   frame; right?
18      A.  Correct.  If one exists.
19      Q.  If one exists.  But if one exists and a
20   teammate's able to make it in and get to their facility
21   and works their scheduled hours, they're entitled to
22   receive time and a half; right?
23      A.  Correct.
24      Q.  Now, does DaVita reserve the right to renege
25   on that employee?

Page 129

1            That if the employee -- again, during the
2    emergency time frame, that employee is able to make it
3    in and gets to the facility, works their scheduled
4    hours, they look around -- they say, "DaVita, pay me
5    time and a half."
6            Does DaVita reserve the right to renege on
7    that right to pay time and a half?
8            MS. PETERSEN:  Object, to the extent that
9    calls for a legal conclusion.
10           You can answer.
11      A.  If the Disaster Relief Policy is in effect and
12   there's an emergency declaration on that, DaVita would
13   reserve the right to be able to move those dates, if
14   it's no longer in existence.  I can give you an example.
15      Q.  (By Mr. Jones)  No, I don't want that example,
16   Mr. Eaves.  I want to use my example.  See, you're --
17   there you go again, and I'm older than that.  We've been
18   here for hours, and you know I'm not going to let you
19   get away with that.  I want you to answer my question,
20   not your question.  Okay?
21           Now, let's go back over it again.  During an
22   emergency time frame, the teammate that's able to make
23   it in and get to the facility, they work their scheduled
24   hours, they're entitled to receive time and a half,
25   aren't they?

Page 130

1      A.  Yes, during an emergency time frame.
2      Q.  Yeah.  And DaVita did not reserve to itself
3   the right to say, "Well, you know, my policy says I'm
4   going to pay you time and a half; but I just decided I'm
5   not going to."
6      Did DaVita reserve that right to itself?
7      MS. PETERSEN:  Objection, to the extent that
8   calls for a legal conclusion.
9      Go ahead.
10     A.  Mr. Jones, are you asking about it as it
11  relates to COVID-19?
12     Q.  (By Mr. Jones)  No.  I'm noticing you -- that
13  you listen to your -- the lawyer's objections very
14  carefully.  We're going to go through this, and we will
15  be here until we call a judge or until I get this
16  question answered.  All right?
17     It is a simple question, sir.  And I'm going
18  to -- I'm going the ask the court reporter to read it
19  back, because I'm tired of asking it over again.  The
20  fact -- well, then I'll ask it a different way.
21     Does DaVita consider itself to be bound to the
22  promises that it makes to its employees?
23     MS. PETERSEN:  And object, to the extent that
24  calls for a legal conclusion.
25     Q.  (By Mr. Jones)  I'm not asking you for a legal

Page 131

1   conclusion, Mr. Eaves.  I just want to know what the
2   corporate culture of DaVita is.  If they say they're
3   going to pay under these circumstances and that employee
4   shows up for work and they work under the exact
5   circumstances that DaVita's policies and procedures say,
6   they're going to get paid time and a half.
7      Does DaVita believe that it's reserved to its
8   right to renege and not pay that employee what they
9   promised to pay him?
10     A.  No.  They would pay the time.
11     Q.  Thank you.
12     Now, you think Mr. Kenny Gardner knew what the
13  Disaster Relief Policy was in the middle of March 2020?
14     MS. PETERSEN:  Objection.  Calls for
15  speculation.
16     MR. JONES:  No, it doesn't.  I'm asking him
17  what he thinks.
18     Q.  (By Mr. Jones)  How long have you known Kenny
19  Gardner?
20     A.  I -- I've known Kenny for well -- years, but
21  I -- I mean, very, very, very far removed.  He -- he
22  was --
23     Q.  I'm sorry.  The last part again, very what?
24     A.  He was very far removed.  So I know of Kenny.
25  He used to be a Palmer.  So I've known of Kenny since

Page 132

1   he's been in the Village.  He's had ten years of tenure.
2   He and I have had very limited interactions, until I
3   started reporting in to him on or around January of
4   2020.
5      Q.  All right.  And do you know whether
6   Mr. Gardner knew what the disaster pay policy was on
7   March 17, 2020?
8      MS. PETERSEN:  Objection.  Outside the scope
9   of the topic for which this witness has been designated
10  to testify.  I'm uncertain if you're asking in his
11  corporate capacity or as a (b)(1) witness.
12     MR. JONES:  I don't really care.  I just want
13  an answer.  The judge --
14     A.  I do not --
15     MR. JONES:  -- will decide that.
16     MS. PETERSEN:  So my objection is that it's
17  outside the scope.
18     But, Mr. Eaves, you can --
19     MR. JONES:  I heard it.
20     MS. PETERSEN:  -- respond in your personal
21  capacity.
22     A.  I do not know.
23     Q.  (By Mr. Jones)  In March -- around March 17,
24  2020, did DaVita close clinics because of the COVID-19
25  disaster?

Page 133

1      A.  I'm sorry.  Did you say a statement, or did
2   you ask a question?
3      Q.  I'm going to ask the question.  I'll ask it --
4      Around the middle of March 2020 -- say, around
5   the 17th -- you know, had Davita closed any clinics
6   because of the COVID-19 crisis?
7      A.  No.
8      Q.  Do you know what "de novo" means?
9      A.  I do.
10     Q.  What does it mean?
11     A.  It's a -- it's a new facility.  So we --
12  we've -- we built it from the ground up.  It's mortar
13  that -- it actually makes the facility.
14     THE COURT REPORTER:  I'm sorry.  Can you
15  repeat that?
16     THE WITNESS:  Which part, ma'am?
17     THE COURT REPORTER:  The answer.  I didn't
18  get -- the answer.  I didn't get your answer.
19     A.  A de novo facility is a new facility that
20  we've built.  So it's a ground up facility that we've
21  constructed.
22     Q.  (By Mr. Jones)  All right.  Do you know who
23  Erica Edwards is?
24     A.  I do know Erica Edwards.
25     Q.  Who is she?

Page 134

1    A.  She's a vice president of people services.
2    Q.  I thought you were the VP of people services?
3    A.  There's multiple.  She's functionally over the
4  recruiting.  At the time, she would have been recruiting
5  talents and diversity and inclusion.
6         MR. JONES:  Christina, 3482, please.
7         MS. HENRY:  Can I have the court reporter --
8  that last exhibit, that started 3375 to 3376, can that
9  be marked as Exhibit -- where are we -- 19?
10        THE COURT REPORTER:  20, I believe.
11        MR. JONES:  20.
12        MS. HENRY:  Okay.  So this will be the next
13  exhibit.
14        And I'm sorry, Craig.  What was the exact
15  number again?
16        MR. JONES:  3483.
17        MS. HENRY:  I think that last one should be
18  all together.  It was just that one email that was all
19  together, right?
20        MR. JONES:  Hang on, Christina.  This is found
21  in a document that is -- was produced in globo as DaVita
22  003368 through 003373, I believe.  Let me check that.
23        MS. HENRY:  And I'm on 3383; is that right?
24        MR. JONES:  Oh, Christina, you're going to
25  mess me up here now.

Page 135

1         MS. HENRY:  Okay.  I'll stop.  It's -- mess me
2  up, too.
3         MR. JONES:  3368 through 3373.  It was a
4  single -- it's a single document, Madam Court Reporter.
5         THE COURT REPORTER:  So will that be marked as
6  Exhibit 20?
7         MR. JONES:  Yes, please.
8         MS. HENRY:  Yes.
9         (Exhibit-20 marked for identification.)
10        MS. PETERSEN:  For clarification, for
11  Exhibit 19, do you mind telling me the numbers -- the
12  Bates number for Exhibit 19?  Is that 3375 and 76?
13        MS. HENRY:  The 19 is the ones that were
14  already sent to you.  That was the -- wasn't that the
15  amended 30(b)(1)?
16        MS. PETERSEN:  Okay.  Have any other emails
17  been admitted into evidence?
18        MS. HENRY:  I don't think we've seen any other
19  ones, but the one we just did; right?
20        MR. JONES:  Right.
21        MS. PETERSEN:  So perhaps a -- more of a
22  clarifying question is:  Bates number 3375 and 3376,
23  which were just testified to, is that an exhibit?
24        MR. JONES:  Yeah.  And I put them in there.
25  Hang on.

Page 136

1         MS. HENRY:  All right.  So that will be --
2  that will be 21.
3         MR. JONES:  Then, I'm going to 3375-3376.
4  That will be as -- as Exhibit 21, right?
5         MS. HENRY:  Mm-hmm.
6         (Exhibit-21 marked for identification.)
7         MS. HENRY:  And I'll send these to the court
8  reporter.
9         MR. JONES:  I'm saving them right here,
10  Christina.
11        MS. PETERSEN:  And I'm not going to lie.
12  I'm -- I turned around as to which documents are which
13  exhibits, so it'll get sorted when we see them.  But if
14  we can refer to Bates numbers as we're moving forward,
15  that will be helpful.
16        MR. JONES:  Yeah.
17        Where are we, Christina?
18        MS. HENRY:  So the one you're trying to get me
19  to pull up right now is 3383; is that correct?
20        MR. JONES:  No, that one -- I think you'll
21  find it as 003477.
22        MS. HENRY:  Now you want me to go to 3477?
23  Okay.
24        MR. JONES:  I think that 3477 is a single
25  document, multiple pages.

Page 137

1         MS. HENRY:  Okay.  That's where I'm going now.
2         MR. JONES:  Hold on.  And it starts at 3477,
3  Christina, and it goes to 3486.
4         MS. HENRY:  All right.  I have that up.
5         MR. JONES:  Okay.
6         THE COURT REPORTER:  What exhibit is this
7  going to be?
8         MS. HENRY:  This will be number 22.
9         (Exhibit-22 marked for identification.)
10        MR. JONES:  Let's -- yeah, let's introduce it
11  before we -- as Exhibit 22.
12        MR. JONES:  All right.  Christina, go to
13  3484 -- excuse me -- 3482.
14        Q.  (By Mr. Jones)  All right.  Do you see here --
15  I want you to look at the email that starts from Erica
16  Edwards, Monday, March 16, 2020, 9:57, to Kenny Gardner,
17  Debbie Wolfe, Carley St. Clair; Interview Process,
18  Recommendations, Update.
19        Do you see that?
20        A.  I do.
21        Q.  All right.  Now, Ms. Edwards is VP.  She's in
22  charge of recruiting, right?
23        A.  Yes.
24        Q.  And I want to go to the next page, because
25  what she's doing here is -- this is a a -- she's sending

## Page 138

1 Mr. Gardner and some other folks this report, and it
2 goes on to the next page.
3      Do you see where it says, "Open questions to
4 task force"?  Do you see that?
5      A.  I do not.
6      MR. JONES:  I think you changed it, Christina.
7      MS. HENRY:  Did I skip a page?
8      A.  I see it now, the sentence there, yeah.
9      MR. JONES:  You want to go -- you really want
10 to actually go forward to 84 -- to 83.  That's 82.  You
11 want to go to 83, Christina.
12      MS. HENRY:  Oh, okay.
13      MS. PETERSEN:  Where -- we seem to be in the
14 middle of this document.
15      MR. JONES:  We are.  That's where the email is
16 found.
17      MS. PETERSEN:  Okay.  Just --
18      MS. HENRY:  I went -- I went the wrong way.
19 So if I back up, it's 82.  And now it goes down to 83.
20      MR. JONES:  Got you.
21      Q.  (By Mr. Jones)  So you see, though -- I want
22 to call your attention -- it says, "Updated Guidance."
23 And then she has these two paragraphs.  If we go down to
24 paragraph 2, subsection (a), subsection (i) -- excuse
25 me -- subsection (ii), sub subsection (1).  Do you

## Page 139

1 follow me?
2      The (ii) says, "Off-hours live interview in
3 clinic (revisit with taskforce).  (1) DeNovos and closed
4 clinics prioritized for cohort hiring."
5      Do you know what that means?
6      A.  Give me a second to review this, just so I can
7 understand the context.
8      Q.  Absolutely.
9      THE WITNESS:  Ms. Henry, I'm wondering if it
10 would be possible for me to just understand the context
11 of where this is coming from.  The recruiting guidance
12 seems a little out of place, so I'm just trying to
13 understand.  I -- I do --
14      MS. HENRY:  Do you want me to go to 82 again?
15      THE WITNESS:  Well, if I could just see from
16 the inception of when the email started, that might be
17 able to help me answer Mr. Jones' question.
18      MS. PETERSEN:  And the page -- unless I'm
19 looking at the wrong thing, I think there's also an
20 earlier portion of the chain.
21      A.  So am I reading from the documents now or --
22      MS. HENRY:  If you want -- I'm --
23      Q.  (By Mr. Jones)  I don't know what you want,
24 Mr. Eaves.  You want to read the whole thing, we'll
25 email it to you; take a break.

## Page 140

1      A.  Why don't we do that?
2      Q.  Hang on.  Because it's about nine pages long,
3 but it's got all --
4      MS. PETERSEN:  I'll send the full exhibit to
5 the witness now.
6      MR. JONES:  Yeah, let's take a break right
7 here.
8      (Recess taken from 4:50 p.m. to 5:04 p.m.)
9      MR. JONES:  All right.  Christina, let's go to
10 our document.
11      MS. HENRY:  Okay.  Just a second.  Okay.
12      MR. JONES:  All right.  That's 3482, "Open
13 questions to task force."  Go to the next, 83,
14 Christina.
15      Q.  (By Mr. Jones)  You had a chance to review
16 this part of the email, sir?
17      A.  I did.  Super helpful.  Thanks for the time.
18      Q.  You're quite welcome.  All right.
19      MR. JONES:  Let's go to 84, Christina.  All
20 right.  Let's go back to 83.
21      Q.  (By Mr. Jones)  My question is this,
22 Mr. Eaves.  You see under -- it says, under "Hiring
23 Manager Interview Options" -- you see that?
24      A.  I do.
25      Q.  Do you know what -- do you know what Ms. Wolfe

## Page 141

1 is talking about right there?
2      A.  I -- I believe this is actually written by
3 Erica Edwards, correct?
4      Q.  I'm sorry.  That's correct.
5      A.  I -- I do understand the context of this.
6      Q.  Okay.  What was meant by "DeNovos and closed
7 clinics prioritized for cohort hiring"?
8      A.  Yeah, so -- and please let me give some
9 context, because it will be helpful to understand this.
10 We were trying to do an infection protocol, so we
11 weren't infecting patients or teammates.  So one of the
12 concerns became -- people who were typically going to
13 the clinics, who might not adhere to some of the PPE
14 standards that were required -- so that we weren't
15 transmitting the disease.
16      And so there was a discussion about -- saying
17 we know we have live interviews that take place in our
18 clinics all the time.  And there was a lot of discussion
19 around whether or not we allowed those to happen.
20 Ultimately, we made the decision that we wouldn't allow
21 that to happen.  So they were talking about, how do we
22 interview teammates.
23      We still need to hire folks.  It's the normal
24 course of business, and we need to make sure they're
25 getting interviewed here.  So specific to that one,

Page 142

1  Mr. Jones, you -- you can see it's -- I'm sorry -- so
2  in -- in (a), they're saying if -- if there still is a
3  preference for live interviews, one, off-site interviews
4  are preferred.
5        Another option would be to do off-hours live
6  interviews, so when nobody was there conducting
7  business.  And specific to line item number 1, it would
8  be that de novos or closed clinics that were prioritized
9  for cohort hiring could actually be used.
10       What it means by closed clinics is, we might
11 have a clinic that would only operate on given days --
12 so Monday, Wednesday, or Friday.  We might prioritize
13 those so that we could do cohort hiring, and we could
14 bring in groups of patients who were with COVID.  But
15 the -- that's the purpose of the closed clinics.
16 Q.  All right.  Thank you.
17       MR. JONES:  Pull up, Christina, 003131.
18       MS. HENRY:  Okay.
19       MR. JONES:  We'll attach this as --
20       Where are we, Madam Court Reporter?
21       MS. HENRY:  3131?
22       MR. JONES:  Yep.
23       THE COURT REPORTER:  Next exhibit is 23.
24       MS. HENRY:  And that'll be 23.
25       MR. JONES:  Just a second.  I've got to clear

Page 143

1  my screen here.  All right.
2        Christina, start on -- in that document, start
3  on 3136.
4        MS. HENRY:  Okay.  Okay.
5  Q.  (By Mr. Jones)  Do you see at the bottom of
6  the page, this is -- that's Erica -- that's Erica
7  Edward's email that you just familiarized yourself with.
8  All right?
9        MR. JONES:  Go to the next page, if you want
10 to identify, Christina.
11       MS. HENRY:  Oh, okay.
12       MR. JONES:  Back to 3136.  All right.  That's
13 fine, Christina.  Let's take that down -- let's attach
14 that document as Exhibit 23.  Is that right?
15       MS. HENRY:  So do you want the whole exhibit
16 from --
17       MR. JONES:  Yeah.  Yeah, let's do the whole
18 exhibit.
19       MS. HENRY:  From 3131 to 3137?
20       MR. JONES:  I do.
21       MS. HENRY:  And that's Exhibit 23.
22       (Exhibit-23 marked for identification.)
23       MR. JONES:  Yep.  All right.  Pull it down,
24 Christina.  Thank you.
25 Q.  (By Mr. Jones)  Mr. Eaves, who decided that

Page 144

1  the Disaster Relief Policy did not apply to the COVID-19
2  crisis?
3  A.  There is no one that decided that.  It just --
4  it wasn't a discussion, with regard to how the policy
5  was implemented.
6        MR. JONES:  Put it back up on the screen,
7  Christina.  Go to 3131, please.
8  Q.  (By Mr. Jones)  You see on the bottom here it
9  says March 17, Tuesday, 2020, Debbie Wolfe to Kenny
10 Gardner, Carley St. Clair, Erica Edwards; Subject:
11 Interview Process Recommendations.
12       "Essentially, TMs are beginning to ask if the
13 disaster relief policy would be in effect given the fact
14 that the President has declared an emergency.  Below is
15 an excerpt from the policy outlining conditions for 50
16 percent premium pay.
17       "Some feel it could be interpreted that all
18 facilities should get 50 percent premium pay given the
19 national disaster declaration.  Questions have surfaced
20 from Titan and now Endeavor."
21       Do you see where I read that?
22 A.  I do.
23 Q.  Now, that was at -- on 9:53 a.m. on
24 March 17th.  Kenny Gardner replies at 10:55 a.m.
25       Can you read his answer, please?

Page 145

1        MS. PETERSEN:  Objection, to the extent that
2  this contains information which we previously disclosed
3  was inadvertently privileged information that was
4  provided in this version of the document.
5        MR. JONES:  I don't think copying a lawyer
6  makes it privileged.  But, I mean, you can reserve that.
7  I'm going to ask these questions.  All right?
8  Q.  (By Mr. Jones)  Now, why don't you read his --
9  Kenny Gardner's answer?
10 A.  I'm sorry.  You want me to do that?
11 Q.  I do.
12 A.  Okay.  "The answer is no.  But I'm copying
13 Colleen so that it is on her radar.  I don't want to
14 make sure the President's declaration does not conflict
15 with our own policy."
16 Q.  "Kenny."
17       Now, do you know what happened between
18 9:53 a.m. on March 17th and 10:55 a.m. on March 17th
19 that made Mr. Gardner say that the answer was no, that
20 the COVID-19 -- excuse me -- that the emergency disaster
21 policy does not apply to the COVID-19 situation?
22 A.  No, I don't.
23 Q.  Do you still maintain that no one made the
24 decision that -- that the Disaster Relief Policy does
25 not apply to the COVID-19 crisis?

37 (Pages 142 to 145)

Page 146

1    A.  That's correct.
2    Q.  It does appear that Mr. Gardner made that
3  decision.  Wouldn't you read it that way?
4    A.  I think I looked at previous documentation,
5  where I answered similarly.
6    Q.  I don't know what your answer means.  Why
7  don't you try again?
8    A.  Can you please ask the question again?
9    Q.  Sure.  It looks like Mr. Gardner said, "The
10  answer is no," when Debbie Wolfe asked him that -- from
11  the policy outlining -- it said, "Below is an excerpt
12  from the policy outlining conditions for 50 percent
13  premium pay.
14    "Some feel it could be interpreted that all
15  facilities should get 50 percent premium pay given the
16  natural disaster declaration.  Questions have surfaced
17  from Titan and Endeavor."  He responds, "The answer is
18  no."
19    That sure sounds to me like Mr. Gardner made
20  the decision right then, some time between 9:53 a.m. and
21  10:55 a.m.  Does it look like that to you, Mr. Eaves?
22    MS. PETERSEN:  Objection.  It mischaracterizes
23  the document.
24    MR. JONES:  Well, hang on.  I can characterize
25  or mischaracterize all I want to, Ms. Petersen.  That

Page 147

1  was a direct instruction to the witness.  I'm going to
2  ask you to stop doing that.  I'm not going to put up
3  with that again.
4    MS. PETERSEN:  Counsel, to the extent that
5  you're trying to assert in your question, though, that
6  you are reading --
7    MR. JONES:  You're doing it again,
8  Ms. Petersen.  You're doing it again.
9    Q.  (By Mr. Jones)  Did you read that email
10  differently than I did?
11    MS. PETERSEN:  Is that to the witness, sir?
12    MR. JONES:  Yes.  You're not sworn in,
13  Ms. Petersen.
14    MS. PETERSEN:  I'm aware.  I'm clarifying for
15  the witness.
16    A.  Mr. Jones --
17    MR. JONES:  You are clarifying for the
18  witness.
19    Q.  (By Mr. Jones)  Did you read that email
20  differently than me?
21    A.  I'm unclear on your question.  I was the one
22  who read the email.
23    Q.  The question is -- I read Mr. Gardner as
24  telling Ms. Wolfe that the Disaster Relief Policy does
25  not apply to the COVID-19 crisis.  Do you read that

Page 148

1  email differently than I do?
2    A.  I -- I think you're asking me to speculate
3  about that, but Kenny --
4    Q.  No, I'm not.  Hold on, hold on, hold on.  Wait
5  a minute.  Hold on.  You're listening to the lawyer and
6  then asking me to restate the question, because you're
7  chewing off of what she is saying.  That is not
8  appropriate.  We're in -- you are the equivalent of --
9  in a United States District Court, Mr. Eaves.  And I
10  would appreciate it --
11    Mr. Eaves, when asked what is man's greatest
12  mistake, the Buddha said, "He thinks he has time."  I'm
13  going to respect your time.  Please respect mine, and
14  don't do that again.  I'm asking you a simple question.
15  I'm allowed to ask you if you read this email the same
16  way I did.
17    I read it that Mr. Gardner, between
18  9:53 a.m. when he received this email on March 17, 2020,
19  and 10:55 a.m. when he replied back, that he was
20  responding to Ms. Wolfe saying, "Some feel it could be
21  interpreted that all facilities should get 50 percent
22  premium pay given the natural disaster declaration" --
23  Kenny's response, "The answer is no."
24    It sure seems to me like he made a decision as
25  to what the Disaster Relief Policy did or didn't apply

Page 149

1  to.  Do you read it that way?
2    MS. PETERSEN:  Object to the form.
3    A.  I do not.
4    MR. JONES:  Go to the -- let's see.  Go to the
5  previous page.  Keep going.  Keep going.  Here it is.
6    Q.  (By Mr. Jones)  Debbie Wolfe, at 9:22 a.m.
7  And she writes to Kenny Gard- -- to Carley St. Clair,
8  Kenny Gardner, and Erica Edwards, "Subject: Interview
9  Process Recommendations Update."
10    She asked, "Do we have disaster pay policy on
11  the list?"  Mr. Gardner responded, "What is disaster pay
12  policy?"  Do you see that?
13    A.  I do.
14    MR. JONES:  Now, keep going, Christina.  Go
15  back to -- go back to -- there you go.
16    Q.  (By Mr. Jones)  Now, it's a curious thing
17  about this email chain.
18    MR. JONES:  All right.  You can take it down,
19  Christina.
20    MS. PETERSEN:  Was there a question?
21    MR. JONES:  No, there isn't.
22    Q.  (By Mr. Jones)  Sir, did --
23    MR. JONES:  Let's put the -- Christina, let's
24  put the Disaster Relief Policy back up on the board,
25  please.  That would be Exhibit 5.  50, Christina.  Okay

1  keep that out. Okay. Now, let's go to page 49. That's
2  my mistake.
3          Now, page 49, I want to look at the -- at
4  4.12. All right. I want to go to the second sentence
5  under Disaster Relief Policy. "A declared emergency or
6  natural disaster shall be proclaimed either by the
7  President of the United States, a state Governor or
8  other elected official, or if local leadership
9  (DVP/Palmer) deems it appropriate."
10         Do you see that?
11     A. I do.
12     Q. So the policy of DaVita on January 1, 2020,
13 was there were three situations where a declared
14 emergency, for purposes of the Disaster Relief Policy,
15 could occur.
16         It was either a declared emergency or natural
17 disaster by the President of the United States, by a
18 state governor or other elected official, or if local
19 leadership of DaVita -- DVP/Palmer -- deemed it
20 appropriate. Do you see that?
21     A. Yeah.
22     Q. Okay. Now, what does DVP stand for?
23     A. Division vice president.
24     Q. Palmer is the leader of the geographical
25 region?

1      A. Correct.
2      Q. Are those the same thing? Divisional vice
3  president and Palmer, are they refer- -- they refer to
4  the same level of executive within DaVita?
5      A. They do not. They're different levels.
6      Q. Okay. All right. Palmer under DVP?
7      A. DVP under Palmer.
8      Q. Then it says, "In the event of a state or
9  federally declared natural disaster, this policy
10 provides information relative to pay practices, work
11 schedules, and facility or business office coverage."
12         Do you see that?
13     A. I do.
14     Q. "This policy supersedes and replaces any past
15 practice or policy relating to pay practices, work
16 schedules, and facility coverage" --
17         MR. JONES: Next page, Christina, please.
18     Q. (By Mr. Jones) -- "in the event of a declared
19 emergency or natural disaster."
20         Now, let's go to "Emergency Time Frame." It
21 says, "The emergency time frame (and affected facility
22 or business office) will be identified on a case-by-case
23 basis by local leadership (DVP, GVP and PSD) and the
24 Disaster Governance Council, dependent on the severity
25 of the disaster and location."

1          Do you see that?
2      A. I do.
3      Q. What does -- DVP, divisional vice president;
4  right?
5      A. Correct.
6      Q. GVP stands for what?
7      A. It's the same as -- it's the equivalent to a
8  Palmer.
9      Q. Say again?
10     A. It's equivalent to the title of Palmer.
11     Q. What does it stopped for?
12     A. Group vice president.
13     Q. And PSD?
14     A. People services director.
15     Q. And the Disaster Governance Council. Now,
16 tell me this. The -- it doesn't say there that an
17 emergency time frame is declared. It says emergency
18 time frame is identified; isn't that right?
19     A. Correct.
20     Q. Here's my question. Did the Disaster
21 Governance Council ever meet regarding COVID-19?
22     A. No, they did not.
23     Q. Have you ever known the Disaster Governance
24 Council to meet?
25     A. I do.

1      Q. When's the last time they met?
2      A. February 2021.
3      Q. Who was on the Disaster Governance Council in
4  March of 2020?
5      A. Kenny Gardner, Caitlin Moughon, and Mike
6  Stafferi.
7      Q. And what is the criteria for the Disaster
8  Governance Council to meet?
9      A. A severe disaster that would prevent people
10 from performing their normal duties at work.
11     Q. Is that criteria written down anywhere?
12     A. No, not that I'm aware of.
13     Q. And how do you know what the criteria is?
14     A. I am quoting this. I'm taking the --
15 extraction out of the policy handbook.
16     Q. What part of the policy handbook?
17     A. Specifically where it says, "... and the
18 Disaster -- and the Disaster Governance Council,
19 dependent upon the severity and disaster of the
20 location."
21         I'm also referring to the intro sentence to
22 the beginning of the paragraph, that explains that it
23 would be in the event of a situation where teammates
24 would not be able to perform their -- their normal job
25 duties.

Page 154

1    Q. Well, the teammates -- were there any
2  teammates within DaVita's 57,000 plus who were unable to
3  perform their normal job duties in March 2020 because of
4  the COVID-19 crisis?
5    A. Sure, if they were sick and unable to come in
6  to work. But there was nothing for an able person who
7  needed to come in, that would prevent them from
8  performing their -- their normal course of duties.
9    Q. Were you aware that Ms. Prockish said that the
10  COVID-19 prevented her from keeping her regular office
11  hours, which were part of her regular duties? Were you
12  aware of that?
13    MS. PETERSEN: Objection. Misstates prior
14  testimony.
15    Q. (By Mr. Jones) Are you --
16    A. I'm not aware of -- of that comment.
17    Q. I mean, surely you're aware that there were
18  people who -- was there anybody --
19    Was there anyone within the DaVita teammates
20  that didn't come to work during the early stages --
21  let's say, March of 2020 -- because they felt that they
22  were -- that they needed to shelter in place?
23    A. I -- I do believe that there were questions
24  about that, yes. I -- I think it's possible teammates
25  may have been confused and not have come in.

Page 155

1    Q. What do you mean "confused"? I mean, if
2  they're told to shelter in place, why would they be
3  confused?
4    A. Yeah, it was -- it was a fluid situation. And
5  so I think there were reactions to -- "Oh, my gosh.
6  We've been told to stay at home." The clarity around
7  that was there waivers for health care workers to
8  come in, so that they could continue to treat sick
9  patients.
10    Q. Not all teammates are health care workers, are
11  they?
12    A. Our -- other teammates would have been still
13  able to come in, if they were not providing direct --
14    Q. You didn't answer my question. You're
15  answering a question you think --
16    A. Can you repeat --
17    Q. -- I'm going to ask. I'll be happy to.
18    Not all DaVita teammates are health care
19  workers?
20    A. Correct. They're not health care workers, not
21  all of them.
22    Q. And by the end of March 2020, most of DaVita's
23  business offices were closed, weren't they?
24    A. That is not the case.
25    Q. No? Were some of them closed?

Page 156

1    A. None of them were closed.
2    Q. Not one of them?
3    A. No.
4    Q. One in Federal Way, Washington?
5    A. They were not closed.
6    Q. Were you aware that Ms. Prockish told you that
7  her office building closed down?
8    She told us that in her deposition.
9    A. We -- we never closed the business office. We
10  encouraged teammates to work from home. We also
11  realized there might be situations where we would still
12  need to either have essential workers come in to operate
13  some of those functional offices.
14    And we did allow teammates to come in, if they
15  did not have a work condition -- for example, at home --
16  where they would have been able to be productive at
17  work. So that remained an option.
18    Q. Do you know whether any of the DaVita
19  teammates were unable to come in to work because schools
20  closed unexpectedly, and they did not have child care?
21    A. We had teammates that did have child care
22  issues, and we provided resources to address that.
23    Q. Okay. I'm sure -- but, in fact, you didn't
24  quite answer my question. And we'll try it again. I'm
25  going to ask you to listen carefully, Mr. Eaves. Answer

Page 157

1  my question because I'm really, really, really growing
2  weary of having to ask you the same questions four/five
3  times before I get a straight answer.
4    And I'm really, really on the cusp of shutting
5  this down and going to the judge. You know what my
6  question is. You're an intelligent man. I've been
7  listening to you for hours. Please answer it, so we can
8  get out of here. Okay?
9    Were there DaVita teammates who were not able
10  to come in to work because their children's schools
11  closed down unexpectedly, and they didn't have child
12  care?
13    A. Sir, I -- I cannot definitively say that a
14  teammate did not come in. I -- I cannot answer that
15  question.
16    Q. What do you think?
17    A. I think there's a possibility that that could
18  have happened.
19    Q. You think -- well, did any of DaVita's
20  teammates -- were they unable to attend work because of
21  the COVID -- because the COVID-19 crisis struck, and
22  they had a family member that was highly at risk, and
23  they did not want to take the chance of bringing home
24  COVID-19 and exposing that family member to the virus?
25    A. I think that possibility could have presented

Page 158

1  itself as well.
2      Q.  Were there DaVita teammates who were unable to
3  come in to work during the COVID-19 crisis because they
4  had an illness in the family, that prevented them from
5  coming in to work or -- and that illness was caused by
6  COVID-19?
7      A.  Yes, that also occurred during -- much like
8  influenza or other communicable diseases that would
9  occur, where people needed to provide care.
10     Q.  You think COVID was very much like other
11 communicable diseases?
12     A.  I -- I think it was a communicable disease
13 that was spread through respiratory droplets, yes.
14     Q.  There you go, Mr. Eaves.  You're doing it
15 again.  I'm going to ask that question again.  I'd like
16 to get a straight answer.
17        Do you think that COVID-19 was like other
18 communicable diseases?
19     A.  Yes.
20     Q.  Do you know of any other communicable
21 diseases, during anyone's lifetime, that's sitting here
22 during this deposition -- and I assure you I'm the
23 oldest person here -- any other communicable diseases
24 that have shut down the United States of America?
25     A.  I -- I am not aware of a communicable disease

Page 159

1  that shut down the United States of America.
2      Q.  Or kill over half a million people?
3        MS. PETERSEN:  Counsel, this is becoming
4  argumentative.
5      Q.  (By Mr. Jones)  You can answer.
6      A.  I -- I would not -- I don't -- I don't know.
7  I -- I would -- I would say -- I would say no.  A big
8  death count with COVID.  I think -- it still continues
9  to be.
10     Q.  Well, so who wrote the original text of the
11 Disaster Relief Policy?
12     A.  From 2017?
13     Q.  Yep.
14     A.  I -- I'm not aware of one specific person who
15 authored that text.  I've -- I've reviewed documents
16 that were made available to you, to try to make that
17 determination.  I've also talked -- or we have talked as
18 an organization to teammates who remain at DaVita, who
19 were part of that process.
20        All of them confirmed that there was no
21 recollection of them having any specific memory of
22 one person writing the text for that specific policy.
23     Q.  Who wrote the addition to the Disaster Relief
24 Policy, known as the COVID-19 crisis?
25     A.  That was constructed by counsel.

Page 160

1      Q.  Counsel is a title.  I want to know a person.
2      A.  I believe it was Kathleen Waters, along with
3  Caitlin Moughon, and with contributions as well by
4  Colleen Ludwig.
5      Q.  Who made the decision that the Disaster Relief
6  Policy needed clarifying?
7        And I'm talking about that decision that was
8  made in 2020.
9      A.  Specific to COVID, with that -- with that
10 insert?
11     Q.  Yeah.
12     A.  Ultimately, Javier Rodriguez.
13     Q.  Why did Kenny Gardner decide to take the
14 Disaster Relief Policy out of the DaVita teammate
15 policies and procedures manual?
16        MS. PETERSEN:  Objection.  Assumes facts not
17 in evidence.
18        MR. JONES:  I can assume any facts not in
19 evidence I want to, Ms. Petersen.  You know that.  And
20 besides, it doesn't assume facts not in evidence.  You
21 just produced me the document today that proved it.  He
22 is the one who requested that the entire policy be wiped
23 out of the COVID-19 -- excuse me -- out of the policies
24 and procedures manual.
25     Q.  (By Mr. Jones)  Did you not know that,

Page 161

1  Mr. Eaves?
2        MS. PETERSEN:  Mr. Jones, I don't believe
3  you're sworn in.  So please stop testifying.
4      Q.  (By Mr. Jones)  Did you not know that,
5  Mr. Eaves?
6      A.  Mr. Jones, I actually believe that I made --
7  I'm trying to think here.
8      Q.  I'm sorry?
9      A.  I think -- give me one second.  I'm trying to
10 go back with my review of documentation here.  Give me a
11 second.
12     Q.  Are you looking at notes, sir?
13     A.  No, no.  Sir, I cannot remember a specific
14 person that's made the recommendation to remove that.
15     Q.  But the recommendation has been made, correct?
16     A.  The recommendation has been made, that's
17 correct.  I just can't tie it to one person, though.
18 But I can acknowledge that the recommendation has been
19 made, yes.
20        MR. JONES:  Apparently I assumed right,
21 Ms. Petersen.
22     Q.  (By Mr. Jones)  Now, let me ask you this.
23 Why?  Why are they doing away with the Disaster Relief
24 Policy?
25        MS. PETERSEN:  Objection.  Foundation.

Page 162

1      THE WITNESS:  Chelsea, can I answer?
2      MS. PETERSEN:  Please do.  My objection for
3  the record is, simply, lack of foundation.
4      THE WITNESS:  Okay.
5      A.  Yeah, I can speak specifically, Mr. Jones, to
6  Storm Uri and why that recommendation's been made.
7      Q.  (By Mr. Jones)  To what?
8      A.  Storm Uri, which occurred in February of 2021.
9      Q.  Yeah, but I'm not interested in that.  I'm
10 interested in why -- why the Disaster Relief Policy has
11 been taken out of the DaVita teammate policies and
12 procedures handbook effective, I believe, in June?
13     MS. PETERSEN:  Objection.  It assumes facts
14 not in evidence.  Foundation.  It's just wrong.
15     A.  The policy still exists in our handbook, sir.
16     Q.  (By Mr. Jones)  I understand that.  And you're
17 taking directions from the witness.
18     Are you aware that the recommendation has been
19 made to remove the Disaster Relief Policy from the
20 DaVita policies and procedures manual, yes or no?
21     A.  Yes, sir, I stated that already.  I have.
22 I -- I --
23     Q.  And the decision's made to remove it, yes or
24 no?
25     A.  That's correct.  I'm -- I'm sorry.

Page 163

1      Q.  So --
2      A.  I thought you wanted why.
3      Q.  I'm asking you why.
4      A.  Yeah, I -- I told you it was due to the
5  experience we had with Storm Uri.  I'm happy to
6  elaborate.
7      Q.  Go ahead.  I'm listening.  I told you I'd give
8  you an opportunity to explain.  I just want an answer
9  first.  Okay?
10     A.  Great.  Yeah, in -- in February, Storm Uri --
11 and if I am getting too in the weeds around this, around
12 the detail -- that was the ice storm that occurred in
13 Texas and some of the fringes of the surrounding states.
14 And at that time we realized that that storm would be
15 significant enough to sit over the top of the state for
16 a period of time.
17     The state of Texas is quite large.  That
18 impacted a very large number of facilities.  And our
19 leaders knew that that was going to disrupt service, and
20 it indeed did.  So in addition to disrupting operations,
21 we had to look at some of the larger scale issues that
22 were associated with it.  There were two things that
23 were happening.
24     Water sources were being contaminated, and
25 there was no immediate clarity on what that would look

Page 164

1  like.  And even if the -- the scope of the storm would
2  start to move through the state, based on the power grid
3  for the state of Texas, we knew there would still be
4  rolling power outages to continue fluctuating and -- and
5  impacting operations.
6      When we -- we made the decision to implement
7  the Disaster Relief Policy because it was disrupting
8  operations and said this will be the time frame, what we
9  realized is that there were facilities within -- within
10 that time frame that were able to operate.
11     And so we started to talk about, boy, for us
12 to make a decision for that grand scale issue -- where
13 operations was disrupted -- that was not fluid enough to
14 actually address what we were able to do from an
15 operations perspective.
16     So as the storm continued to move through the
17 state, we knew that some of those facilities could be
18 operational again.  And we made -- the discussion
19 became, okay, now we have this blanket policy where an
20 emergency time frame exists, when indeed we -- we may
21 have facilities that become operational.
22     So the discussion was, do we have this large
23 scale Disaster Relief Policy, when it might make much
24 more sense for our local leadership to address what
25 those issues look like so that they can be responsive.

Page 165

1      Q.  So who decides whether to call a meeting of
2  the Disaster Relief Council?
3      A.  There's --
4      Q.  I'm sorry.  Disaster Governance Council.
5      A.  Oh, okay.  Yeah.  Thank you.  There's no
6  one person that makes the decision to, quote, unquote,
7  convene it.
8      Q.  Are there records kept of meetings of the
9  Disaster Governance Council?
10     A.  No, there are not.
11     Q.  Well, you know, I mean, do they meet in a
12 boardroom normally?  Do they just get on the telephone?
13 They just chat each other up?  I mean, they send emails?
14 How does it work?
15     MS. PETERSEN:  Object to the form.
16     A.  I can speak to Storm Uri.  In that specific
17 instance, the Palmer indicated that there was going to
18 be operational disruption.  Chakilla Robinson, who sits
19 in Galaxy, she oversees Texas and some of the states
20 that surround it.  She'd indicated that operations would
21 be disrupted and gave a picture of that.
22     It was sent.  There's emails that indicated
23 what the purpose was on that, with a time frame
24 suggestion.  And I believe there's email traffic that
25 you have in your hands that will show that it was

1    approved by the members of the Disaster Governance
2    Council.
3        Q.  (By Mr. Jones)  All right.  I'm -- tell me
4    this.
5            Why is it that the Disaster Relief Policy, in
6    particular the pay practices of the Disaster Relief
7    Policy, will pay a teammate premium time if they can
8    make it to work; but they won't pay premium time if the
9    teammate makes it to work, but their hours have been
10   changed?
11       A.  You know, hours being changed does not mean
12   that your job duties have been changed.  You may need to
13   be flexible with that, but that doesn't mean that your
14   job duties have changed.  There might need to be some
15   flexibility with that.
16       Q.  I don't think that answered my question.
17           Why is it that the Disaster Relief Policy
18   calls for the payment of premium pay to people who make
19   it to their facility, where they work and work their
20   scheduled hours; but they don't pay premium pay to
21   people who make it to the facility, that they work and
22   work their scheduled hours that are either earlier or
23   later than they normally work?
24       A.  I'm having trouble following the question and
25   the scenario, for me to apply an answer.

1        Q.  Well, let me rephrase.  Let me restate it.
2    All right?
3        A.  Thank you.
4        Q.  Hold on one sec.
5        MR. JONES:  Let's put out 3375, Christina.
6    All right.  Back it up a little bit.  There you go.
7        Q.  (By Mr. Jones)  Do you remember this email,
8    Mr. Eaves?  I asked you about it earlier.
9            And we discussed your -- what you wrote in
10   this email, that said, "Paid practices for non-exempt
11   TMs is defined in the pay practices policy.  Facility
12   closed.  Facility open late or closes early.  Facility
13   remains open, but teammates are not able to come in to
14   work -- road -- roads blocked, gas shortages."
15           So let's stop right there.  If the facility
16   is closed, the teammates get regular pay; right?
17       MS. PETERSEN:  Asked and answered.
18       Q.  (By Mr. Jones)  True?
19       A.  Yes.
20       Q.  If the facility opens late or closes early,
21   and the employee shows up and works these changed hours,
22   the employee gets regular time; right?
23       MS. PETERSEN:  Same objection.
24       A.  And -- and I'd like to ask a question.  You
25   know, my -- my email is kind of a summary here.  I'm

1    happy to answer the question, but I think the better
2    reference point would -- for me, would be the actual
3    exhibit with the text from the policy.
4        Q.  (By Mr. Jones)  Well, I know.  But, see, what
5    you wrote right here is important, Mr. Eaves, because
6    what you wrote right here is your interpretation of the
7    policy.
8            So I can read the policy myself.  We have
9    already established that I read it and you read it
10   differently.  I've already established that at least one
11   Palmer, probably two, and at least one teammate read it
12   the way that I read it.
13           Now, I'm going to talk about your
14   interpretation of it, because I had difficulty getting
15   you to talk about your interpretation.  You flatly told
16   me that it wasn't your job; you didn't interpret it.
17   But then I found an email where you're interpreting it.
18       MS. PETERSEN:  Okay.
19       Q.  (By Mr. Jones)  So if you don't mind, let's
20   talk about your interpretation.
21       MS. PETERSEN:  Counsel --
22       MR. JONES:  I'm sorry, Ms. Petersen.  I
23   haven't finished.  I'm going to give you an opportunity
24   to get on the record as soon as I do that.
25       Q.  (By Mr. Jones)  Because I'm not going to

1    change my question for you, and I'm not going to ask you
2    about the documents you want to talk about.
3        MS. PETERSEN:  My patience is --
4        MR. JONES:  Ms. Petersen?
5        MS. HENRY:  I think she froze.
6        MR. JONES:  Sometimes Zoom is like being on a
7    bad episode of the Twilight Zone.  Let's see if she'll
8    come back around.
9        MS. HENRY:  She must realize she froze, right?
10       MR. JONES:  Oh, yeah.  I'm sure she does.
11           When this happens, Mr. Eaves, we just don't go
12   forward.  All right?  And it happens more often than we
13   would like, so -- to everybody who does it.
14           Margo, are you still there?
15       MS. JASUKAITIS:  I am here.  I can check in
16   with Chelsea.
17       MR. JONES:  Would you, please?  And let her
18   know I'm assuming she knows that she is no longer on the
19   Zoom call.
20       MS. JASUKAITIS:  I would assume the same, but
21   I'll shoot her an email now to confirm.
22       MS. PETERSEN:  There we go.  Sorry.  I -- I
23   think I got kicked out mid-sentence.  I don't know what
24   point you all heard me get to.
25       MR. JONES:  You said that your patience was --

1 and that's where you left.
2       MS. PETERSEN: Patience has run out. In the
3 same way that you were asking me to streamline my
4 objections, I'm asking you to please streamline the
5 commentary. And let's just get straight to the
6 questions.
7       MR. JONES: And I'm going to tell you this,
8 Ms. Petersen. Mr. Eaves, although he may not even know
9 it, is being a very difficult witness. All right? And
10 I want my questions answered.
11      We've taken enough depositions. You know,
12 I'll stay here until the roof falls in. But I'll get my
13 questions answered, if we've got to go to the judge. So
14 I'm going to go back to where we were. All right?
15      Q. (By Mr. Jones) Now, you can --
16      MR. JONES: Christina, are you still with us?
17 Put it back up.
18      Q. (By Mr. Jones) So I want to ask you about
19 your email. I don't want to ask you about the policy,
20 because your email is a little different from the
21 policy. But this is your summary of it. Okay?
22      MS. PETERSEN: Is there a question pending?
23      MS. HENRY: Just -- just a second.
24      MR. JONES: I'm waiting for the document,
25 Ms. Petersen.

1       MS. HENRY: Sorry. Just when I shut it down,
2 I have to go all the way back out. Okay.
3       Q. (By Mr. Jones) All right. You remember this
4 email, Mr. Eaves; is that right?
5       A. I do.
6       Q. And so it lists the situations when the --
7 for -- the pay practice for non-exempts and the Disaster
8 Relief Policy. Now, it says here, "Facility closed.
9 Facility open late or closes early. Facility remains
10 open, but teammates are not able to come in to work; for
11 example, roads blocked, gas shortages."
12      Under that, "Teammates not able to work use
13 PTO and approved by supervisor. Teammates able to make
14 it in and get to the facility are paid 1.5 or as defined
15 by state law." Okay?
16      Why is it that the only person that's going to
17 be paid time and a half are the ones that can make it to
18 the facility and work the scheduled hours?
19      A. Mr. Jones, I -- I understand what you're
20 trying to get at. I'm sorry. I just can't answer those
21 based on this email I'm looking at. It's just a bit of
22 mental exhaustion. I'm sorry.
23      Q. Well, I'll ask it in a different way, sir.
24      Now, you realize that the Disaster Relief
25 Policy pays if a facility's closed because of an

1 emergency or natural disaster. And of course there's
2 the predicate, you know, the emergency time frame is
3 declared.
4       If the facility is closed, the teammate can't
5 work, they get regular time; true?
6       A. Mm-hmm.
7       Q. If the facility opens late or closes early,
8 the teammate shows up and works those changed hours,
9 they get regular time; right?
10      A. Yes.
11      Q. If the teammate's not able to -- if the
12 facility is open and the teammate can't make it in to
13 work, they don't get paid at all. They've got to use
14 PTO, or they don't get paid; right?
15      A. (No response.)
16      Q. Yes?
17      A. Yes.
18      Q. But if the facility is open and the teammate
19 makes it into the facility, works their scheduled hours,
20 they get premium time; right?
21      A. Mm-hmm, yes.
22      Q. Okay. Why did DaVita pay premium time only to
23 the teammates who are able to make it into the facility
24 that's open and work their scheduled hours?
25      A. I -- I -- I understand your question. It --

1 it's insensitive -- I mean, it -- it's above and beyond
2 insensitive to say, "Listen, we realize that it is extra
3 tough for you to potentially get in here and -- and we
4 need you here." And so for us to have some additional
5 incentive to motivate those teammates to come in is
6 important.
7       And so during those situations -- where
8 there's this disaster, they're not performing their
9 regular job duties, it's difficult for them to get in --
10 we want to have that additional incentive there to say,
11 "Hey, we got that additional half time on top of what we
12 would normally pay you for the time to come in."
13      Q. Okay. But, see, that's what I'm getting at.
14 You know, that's what I just don't understand where
15 you -- where you're getting that from.
16      So the policy of DaVita is that if teammates
17 are able to make it into the facility that is open and
18 work their scheduled hours, they do not get premium pay
19 unless they're unable to perform their regular duties.
20      Is that your testimony?
21      A. Sorry. Can you repeat the question?
22      MR. JONES: Read it again, Madam Court
23 Reporter, please.
24      (Record as shown on page 173, lines 13 through
25      20, read back.)

## Page 174

1    A.  Yes.  My -- my testimony is that if -- I'm
2  sorry.  I'm just -- I'm not understanding the nuance of
3  what you're asking.  I'm -- I'm sorry.  Can we -- is it
4  possible for us to take a break?  I have not eaten.  I
5  have not had a chance to get any more beverage.  My can
6  of drink is -- I just don't --
7         MR. JONES:  Your pleasure -- your pleasure,
8  Mr. Eaves, is our pleasure.
9         THE WITNESS:  Okay.  Thank you.
10        MR. JONES:  Would you like a break?
11        THE WITNESS:  I -- is it possible for -- I'm
12  happy to be with you throughout the rest of the night.
13  I just -- I need more than five or ten minutes.  I'm
14  sorry.
15        MR. JONES:  Okay.
16        MS. PETERSEN:  Yeah, we -- that's on us.  We
17  ought to have asked earlier, and especially when you
18  said you're exhausted.  So that's on us.
19        THE WITNESS:  I -- I don't -- I don't mean to
20  be difficult.  But tell me when I need to be back,
21  please.
22        MS. PETERSEN:  How about -- if it's -- we're
23  two minutes to 6:00, our time.  How about 6:30?  So you
24  can have a meal break.
25        Does that work for everybody?

## Page 175

1         THE WITNESS:  That works for me.  Thank you.
2  I appreciate that.
3         Mr. Jones, are you okay with that?
4         MR. JONES:  Well, there's a question on the
5  table, Mr. Eaves.  And so I would ask that you don't
6  communicate with anyone about this case during the
7  break.
8         MS. PETERSEN:  Do you want to cover the -- you
9  want to close out --
10        MR. JONES:  No, I don't.
11        MS. PETERSEN:  -- the question that you --
12        MR. JONES:  I don't.  I don't, because I
13  want -- I want to hear your answer when you come back.
14  Okay?
15        MS. PETERSEN:  Counsel --
16        MR. JONES:  So --
17        MS. PETERSEN:  -- that's unnecessary, as is --
18        MR. JONES:  Yes, it is totally necessary,
19  Counsel.
20        MS. PETERSEN:  No.  Enough.
21        MR. JONES:  You want to have -- you want to
22  have that off the record and meet -- a conversation, we
23  can have that right now, so Mr. Eaves doesn't have to
24  listen to this.
25        MS. PETERSEN:  Yeah, I just -- the accusations

## Page 176

1  flying are unnecessary here.  We're all professionals.
2  Let's take a half an hour break.
3         (Recess taken from 5:59 p.m. to 6:39 p.m.)
4         MS. PETERSEN:  So this is Chelsea Petersen.  I
5  don't know if plaintiff's counsel is intending to
6  rejoin.  We had agreed to reconvene at 6:30, after a
7  break.  I received a message from Counsel indicating
8  that they are suspending the remainder of the
9  deposition, pending receipt of a privilege log.
10        The witness is here ready to continue
11  testifying, as is counsel for DaVita and for TRC.  We
12  disagree that there is any need to suspend the
13  deposition.  And we will wait on the record for
14  approximately ten minutes, to see if Counsel will
15  return; and after that point, take it up with the court.
16        (Recess taken from 6:39 p.m. to 6:41 p.m.)
17        MS. PETERSEN:  Going briefly back on the
18  record to indicate that we and the witness and the
19  defendant remain here and willing to continue testimony.
20  We've received correspondence from Counsel that they are
21  suspending the deposition.  And the court reporter has
22  received similar correspondence that the deposition has
23  been suspended, yet no counsel for plaintiff has
24  rejoined to put any of this on the record.
25        So again, to the extent that the purported

## Page 177

1  reason for suspending the deposition is with regard to a
2  privilege log, we do want to make note that there's not
3  been a single privilege objection throughout this entire
4  deposition.  It's a spurious reason for suspending the
5  deposition.  And we object to any form of continuation,
6  and I consider it closed.  So with that, we'll close out
7  the record.
8         THE COURT REPORTER:  Would the witness like to
9  waive or reserve signature?
10        MS. PETERSEN:  We will reserve.
11        (Deposition concluded at 6:45 p.m.)
12        (Signature reserved.)
13              -----
14
15
16
17
18
19
20
21
22
23
24
25

## Page 178

```
 1           S I G N A T U R E
 2
 3
 4
 5           I declare under penalty of perjury
 6   under the laws of the State of Washington that I have
 7   read my within deposition and the same is true and
 8   accurate, save and except for changes and/or
 9   corrections, if any, as indicated by me on the CHANGE
10   SHEET page hereof.
11           Signed in _____,
12   Washington, on the _____ day of _____,
13   2021.
14
15
16
17
18           _____
             JEREMY MICHAEL EAVES
             TAKEN:  May 10, 2021
19
20
21
22
23
24
25   Olivia Pennella
```

## Page 180

```
 1   SEATTLE DEPOSITION REPORTERS, LLC
 2   S600 University Street, Suite 320
 3       Seattle, WA 98101
     (206) 622-6661 * FAX (206) 622-6236
 4       (800) 657-1110
         www.seadep.com
 5
         C H A N G E  S H E E T
 6
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 7   SHOWING PAGE, LINE AND REASON.
     ----------------------------------------------------------------------
 8   PAGE    LINE    CORRECTION AND REASON
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22
23           _____
             JEREMY MICHAEL EAVES
             TAKEN:  May 10, 2021
24
25   Re:  Hesketh v. Total Renal Care, USDC, Western Dist,
```

## Page 179

```
 1           C E R T I F I C A T E
 2   STATE OF WASHINGTON  )
                          ) ss.
 3   COUNTY OF KING       )
 4
 5       I, the undersigned Washington Certified Court
     Reporter, hereby certify that the foregoing deposition
 6   upon oral examination of JEREMY MICHAEL EAVES conducted
     via Zoom was taken stenographically before me on May 10,
 7   2021, and transcribed under my direction;
 8       That the witness was duly sworn by me pursuant
     to RCW 5.28.010 to testify truthfully; that the
 9   transcript of the deposition is a full, true, and
     correct transcript to the best of my ability; that I am
10   neither attorney for nor a relative or employee of any
     of the parties to the action or any attorney or counsel
11   employed by the parties hereto nor financially
     interested in its outcome.
12
         I further certify that in accordance with
13   Washington Court Rule 30(e), the witness is given the
     opportunity to examine, read, and sign the deposition
14   within thirty days upon its completion and submission
     unless waiver of signature was indicated in the record.
15
         IN WITNESS WHEREOF, I have hereunto set my
16   hand this 17th day of May, 2021.
17
18   \S\OLIVIA PENNELLA
19
20   _____
     Washington Certified Court Reporter No. 3337
21   License expires June 4, 2022.
22
23
24
25
```

**EXHIBIT**
**20**
Eaves
5/10/2021
Olivia Pennella, CCR



| | |
|---|---|
| **From:** | Jamie Wise |
| **To:** | Carley St. Clair |
| **CC:** | Kenzie Hassey |
| **Sent:** | 3/19/2020 4:02:08 PM |
| **Subject:** | RE: Disaster Relief Policy |

Thank you!

**Jamie Wise**
Executive Assistant to:
**Debbie Wolfe,** Vice President | People Services Operations
**Tiffany Bishop**, Senior Director | People Services | Total Rewards
**Shannon Gibbons**, Senior Director | People Services Neighborhoods

**DaVita Kidney Care**
2001 16th Street | Floor 17 | Denver, CO 80202
Phone #: 720.631.6096 | Cell #: 303.907.9432

  

**From:** Carley St. Clair <Carley.StClair@davita.com>
**Sent:** Thursday, March 19, 2020 10:01 AM
**To:** Jamie Wise <Jamie.Wise@davita.com>
**Cc:** Kenzie Hassey <Kenzie.Hassey@davita.com>
**Subject:** RE: Disaster Relief Policy

Kenzie,

Can you confirm?

Thanks!

**From:** Jamie Wise <Jamie.Wise@davita.com>
**Sent:** Thursday, March 19, 2020 9:06 AM
**To:** Carley St. Clair <Carley.StClair@davita.com>
**Subject:** FW: Disaster Relief Policy

Hi,

Has this been added to the spreadsheet?

**Jamie Wise**
Executive Assistant to:
**Debbie Wolfe,** Vice President | People Services Operations
**Tiffany Bishop**, Senior Director | People Services | Total Rewards
**Shannon Gibbons**, Senior Director | People Services Neighborhoods

**DaVita Kidney Care**

2001 16th Street | Floor 17 | Denver, CO 80202
Phone #: 720.631.6096 | Cell #: 303.907.9432

 

**From:** Oliver McKinstry <Oliver.McKinstry@davita.com>
**Sent:** Wednesday, March 18, 2020 4:07 PM
**To:** Debbie Wolfe <Debbie.Wolfe@davita.com>
**Cc:** Jamie Wise <Jamie.Wise@davita.com>
**Subject:** RE: Disaster Relief Policy

I also sent the answer to Carley, so she may have already added to Smartsheets.  Sorry to duplicate work!

Oliver McKinstry
Senior Director, People Services
(612) 963-2393 OLIVER.mckinstry@davita.com

**From:** Debbie Wolfe
**Sent:** Wednesday, March 18, 2020 4:05 PM
**To:** Oliver McKinstry <Oliver.McKinstry@davita.com>
**Cc:** Jamie Wise <Jamie.Wise@davita.com>
**Subject:** RE: Disaster Relief Policy

Thank you.

Jamie- pls input the question and answer below into smartsheets  thx

**From:** Oliver McKinstry <Oliver.McKinstry@davita.com>
**Sent:** Wednesday, March 18, 2020 4:58 PM
**To:** Nikki Rogers <Nikki.Rogers@davita.com>; Elisabeth Wright <Elisabeth.Wright@davita.com>
**Cc:** Debbie Wolfe <Debbie.Wolfe@davita.com>
**Subject:** RE: Disaster Relief Policy

Hi Nikki and Elisabeth,

Thanks for your patience on this.  A very similar question came in from several different sources, so I needed some time to coordinate with the right folks on our answer.  Below is what we came up with.  The gist is that the Disaster Relief policy is really designed to address situations that prevent our clinics from operating or prevent our teammates from being able to get to work.  That hasn't happened yet with COVID-19 and we're providing TMs letters to help them come to work even in jurisdictions that are on shelter in place.  Let me know if you have any questions/concerns with the answer below.

DAVITA_003369

~~~~~~~~~~~~

While COVID-19 has introduced complexities into our operations, our centers remain open, teammates remain able to get to work, and the Disaster Relief policy has not gone into effect. If your area experiences emergency travel restrictions, you can find a letter that allows you to come to work here. We take your health and safety seriously. If you become unable to get to work, please notify your leadership as soon as possible.

We provide life-sustaining care to our patients and need to continue doing so even during difficult situations, like the COVID-19 pandemic. The Disaster Relief policy was created to make sure we can continue to provide that care when declared emergencies or natural disasters prevent our facilities from operating or our teammates from being able to get to work. Local leadership (DVP, GVP, and PSD) and the Disaster Governance Council determine when and where the policy goes into effect based on the severity of the situation in their location. At this time, the policy has not gone into effect.

Oliver McKinstry
Senior Director, People Services
(612) 963-2393 OLIVER.mckinstry@davita.com

**From:** Oliver McKinstry
**Sent:** Monday, March 16, 2020 7:25 PM
**To:** Nikki Rogers <Nikki.Rogers@davita.com>; Elisabeth Wright <Elisabeth.Wright@davita.com>
**Cc:** Debbie Wolfe <Debbie.Wolfe@davita.com>
**Subject:** RE: Disaster Relief Policy

Agreed. I just sent my email to Legal. I'll keep you posted. Ultimately, this message may need to come from executives in more of a reminder of our mission, rather than a TM-level discussion about pay. In any case, we have good minds on it, so stay tuned.

Oliver McKinstry
Senior Director, People Services
(612) 963-2393 OLIVER.mckinstry@davita.com

**From:** Nikki Rogers
**Sent:** Monday, March 16, 2020 7:18 PM
**To:** Oliver McKinstry <Oliver.McKinstry@davita.com>; Elisabeth Wright <Elisabeth.Wright@davita.com>
**Cc:** Debbie Wolfe <Debbie.Wolfe@davita.com>
**Subject:** RE: Disaster Relief Policy

HI Oliver and Debbie-

I have had 2 RODs' call and discuss this with me tonight outside of Atlantic Stars Leadership team – I think, teammates are pulling up the handbook and starting to ask questions about pay – It was bound to happen with families starting to be impact by COVID 19 –

Just think, this is going to become a question, we need to answer-

Thanks for taking this one – appreciate it-


**From:** Oliver McKinstry <Oliver.McKinstry@davita.com>
**Sent:** Monday, March 16, 2020 9:11 PM
**To:** Nikki Rogers <Nikki.Rogers@davita.com>; Elisabeth Wright <Elisabeth.Wright@davita.com>
**Cc:** Debbie Wolfe <Debbie.Wolfe@davita.com>
**Subject:** RE: Disaster Relief Policy

Hi team,

DAVITA_003370

First of all, thanks for your patience on this. I know we're all swamped and I've only finally had time to think about this question.

I received a similar question from a few sources today and my inclination was to respond with some of Mandy Hale's talking points on needing to pull together to care for our patients, many of whom have infectious diseases other than COVID-19 as well. But in looking at this exchange and the others, I think folks want a response to the text of the actual policy. I'm going to need to run that by legal. I'm going to do that tonight and hope to get back to you tomorrow. If you think the other talking points are sufficient, let me know and I can get you a bit more on that.

PS-Hi Elisabeth, long time! Hope you've been well!

Oliver McKinstry
Senior Director, People Services
(612) 963-2393 OLIVER.mckinstry@davita.com

**From:** Nikki Rogers
**Sent:** Monday, March 16, 2020 2:14 PM
**To:** Elisabeth Wright <Elisabeth.Wright@davita.com>
**Cc:** Oliver McKinstry <Oliver.McKinstry@davita.com>; Debbie Wolfe <Debbie.Wolfe@davita.com>
**Subject:** RE: Disaster Relief Policy

Oliver-

You have been involved more than I have in these conversations around pay – I am curious, what your talking points would be around this ?

I am certain , I am not the first Palmer, who has bought this up –

Thank you

**From:** Elisabeth Wright <Elisabeth.Wright@davita.com>
**Sent:** Monday, March 16, 2020 3:32 PM
**To:** Kevin Spring <Kevin.Spring@davita.com>; Heather Sconce <Heather.Sconce@davita.com>
**Cc:** Nikki Rogers <Nikki.Rogers@davita.com>
**Subject:** RE: Disaster Relief Policy

Nikki- can you help with these talking points?

**From:** Kevin Spring
**Sent:** Monday, March 16, 2020 3:26 PM
**To:** Elisabeth Wright <Elisabeth.Wright@davita.com>; Heather Sconce <Heather.Sconce@davita.com>
**Subject:** Disaster Relief Policy

Ft Belvoir TMs asked if the disaster relief policy would be in effect given the fact that the President has declared an emergency.

I've pasted the entire policy from the TM handbook below and highlighted the 50% premium pay they're asking about. It could be interpreted that all facilities should get 50% premium pay. If we're not going to offer any kind of premium pay, there should be good talking points about why this policy is not being put into effect.

# 4.12 Disaster Relief Policy

The Disaster Relief Policy provides for pay continuance during an emergency time

frame ████████████████████████████████ ████████████████████████████████ ████████████████. A declared emergency or natural disaster shall be proclaimed by either the President of the United States, a state Governor or other elected official, or if local leadership (DVP/Palmer) deems it appropriate. In the event of a state or federally declared natural disaster, this policy provides information relative to pay practices, work schedules, and facility or business office coverage. This policy supersedes and replaces any past practice or policy relating to pay practices, work schedules, and facility coverage in the event of a declared emergency or natural disaster.

The language used in this policy is not intended to constitute a contract of employment, either express or implied, to give teammates any additional rights to continued employment, pay or benefits, or to otherwise change DaVita's policy of at-will employment.

## EMERGENCY TIME FRAME



## PAY PRACTICE FOR NON-EXEMPT TEAMMATES

If a facility or business office is closed due to a declared emergency or natural disaster as defined above, non-exempt teammates will be paid for their regularly scheduled hours at their base rate of pay during the designated emergency time frame.

If a facility or business office opens late or closes early due to a declared emergency or natural disaster as defined above, teammates will be notified promptly of the approved opening or closing time. Nonexempt teammates who arrive or leave at that approved opening or closing time will be paid their hourly rate of pay for their regularly scheduled hours, unless state law provides otherwise. Any non-exempt teammate who arrives at work after the approved opening time or leaves work before the approved closing time will be paid only for the time

DAVITA_003372

actually worked, in which case, the teammate should utilize PTO in accordance with the regular PTO Policy.

If a designated facility or business office is open during the emergency time frame, teammates who report to their location and work their scheduled hours will be paid premium pay for all hours worked. Unless state law requires otherwise, premium pay will be one-and-one-half (1.5) times the teammate's base rate of pay.

**Non-exempt traveling teammates, as part of the Disaster Volunteer Group, who provide shift coverage at sites assigned by local Leadership will be paid a 50 percent premium for all compensable straight time hours, including travel time.**

If a designated facility or business office is open during the emergency time frame and teammates are unable to work, teammates should utilize PTO in accordance with the PTO policy.

Non-exempt teammates who are unable to report to their facility or business office should not perform any work remotely unless approved by a supervisor. If any work is done remotely, teammates must report time worked via time stamps in the timekeeping system and will be paid accordingly.

**Kevin Spring**
Regional Operations Director, Atlantic Stars Regions 1 and 4
Cell: 202.870.7743
Fax: 833.762.6068
WebEx: https://village.webex.com/meet/kevin.spring
Email: kevin.spring@davita.com



DAVITA_003373



EXHIBIT
21
Eaves
5/10/2021
Olivia Pennella, CCR

| From: | Lindsay Burns |
|---|---|
| To: | Jeremy Eaves |
| Sent: | 3/19/2020 8:07:18 PM |
| Subject: | RE: Compensation |

Okay thank you. I am going to work with Mandy to use some of the talking points she had on the VOV call on Tuesday to remind people that they are essential. Thanks!

**From:** Jeremy Eaves
**Sent:** Wednesday, March 18, 2020 10:17 AM
**To:** Lindsay Burns <Lindsay.Burns@davita.com>
**Subject:** RE: Compensation

Ah, I see.

Okay. . .

"The Disaster Relief Policy provides for pay continuance during an emergency time frame when a declared emergency or natural disaster <u>prevents teammates from performing their regular duties</u>. . ."

PAY PRACTICE FOR NON-EXEMPT TMS as defined in the pay practices policy
·     FACILITY CLOSED
·     FACILITY OPENS LATE OR CLOSES EARLY
·     FACILITY REMAINS OPEN BUT TEAMMATES NOT ABLE TO COME INTO WORK (e.g., roads blocked, gas shortages)
  o   Teammates not able to work—use PTO, and approved by supervisor
  o   Teammates able to make it in and get to the facility are paid at 1.5 or as defined by state law

With this pandemic, teammates are not disrupted in their ability to perform their regular duties. All facilities remain open (you may get pushback that we closed the CBOs—but that is not the case—those offices remain open and we are encouraging tms to work from home).

I hope that helps.

--J

**From:** Lindsay Burns
**Sent:** Wednesday, March 18, 2020 9:48 AM
**To:** Jeremy Eaves <Jeremy.Eaves@davita.com>
**Subject:** FW: Compensation

Hey Jeremy,

This is an example where TMs are referencing an emergency situation. We explained that we are not paying hazard pay but this may be where confusion is coming from.

Thanks,

**Lindsay Burns**
Director, Operations Innovation

**DaVita Kidney Care**
2000 16th Street | Denver, CO 80202
(720) 631-6681 office | (720) 839-1136 mobile



**From:** Abegail Fontanilla
**Sent:** Monday, March 16, 2020 12:55 PM
**To:** covid19questions <covid19questions@davita.com>
**Cc:** Compensation Wage and Hour <CompensationWageandHour@davita.com>
**Subject:** Compensation

Hello,

I was scrolling through our Teammate Handbook and came up with a question. Governor of Virginia, Mr. Ralph Northam and our president Mr. Donald Trump have declared "a state of emergency" last week. In Section 4 of Pay Practices, it states that "if a designated facility is open during the emergency time frame, teammates who report to their location and work their scheduled hours will be paid premium pay for all hours worked. Unless state law requires, otherwise, premium pay will be one and one half times the teammates base rate of pay.." Does it not apply to our situation right now? Specially with all other kinds of clinics and businesses are closed due to COVID 19.

Thank you,
**Abegail Fontanilla**
Clinical Administrative Assistant
Patient Care Technician

**DaVita Kidney Care**
**Continental Dialysis Center of Alexandria #00687**
5999 Stevenson Ave Suite 100 Alexandria, Virginia 22304
(703) 751-6115 office | (703) 751-3892 fax

"Confidentiality Notice: This message is confidential intended for the named recipient(s) and may contain information that is (I) proprietary to the sender, and/or (II) privileged, confidential, and/or otherwise exempt from disclosure under applicable state and federal law, including but not limited to, privacy standards imposed pursuant to the federal health insurance portability and accountability act of 1996 ("HIPAA"). If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify me immediately by reply email or telephone, remove it from your system, and destroy the original transmission and its attachments without reading or saving them. Thank you."



| From: | Debbie Wolfe |
| To: | Jeremy Eaves; Oliver McKinstry |
| CC: | Shawn Zuckerman |
| Sent: | 3/17/2020 4:27:08 PM |
| Subject: | Disaster policy/ pay questions |

FYI below-  I'm thinking we should add a question/answer about this to the FAQs:  Oliver, I know you were looped in over the last couple of days regarding disaster pay.  Essentially, questions are starting to bubble up around premium pay during disaster/emergencies.  Relevant part of the policy is captured in email trail below:

My stab:
The Disaster Policy is in place to ensure teammates are supported when a declared emergency or natural disaster prevents teammates from performing
their regular duties.  While the corona virus has introduced complexities to our normal daily operations in caring for our patients, our centers remain open and teammates are able to continue caring for our patients.

We could probably add more to this but the more I added, the less effective my argument became.  The problem is the wording around Emergency declaration- if the policy simply referred to natural disasters, it would be clear cut.

You guys are experts at this-  feel free to take any or none of my attempt

**From:** Kenny Gardner <kenny.gardner@davita.com>
**Sent:** Tuesday, March 17, 2020 10:55 AM
**To:** Debbie Wolfe <Debbie.Wolfe@davita.com>; Carley St. Clair <Carley.StClair@davita.com>; Erica Edwards <Erica.Edwards@davita.com>; Colleen Arthur <Colleen.Arthur@davita.com>; Jeremy Eaves <Jeremy.Eaves@davita.com>
**Subject:** RE: Interview Process Recommendations Updated

The answer is no.  But I'm copying Colleen so that it is on her radar, I don't want to make sure the President's declaration does not conflict with our own policy.

Kenny

**From:** Debbie Wolfe
**Sent:** Tuesday, March 17, 2020 9:53 AM
**To:** Kenny Gardner <kenny.gardner@davita.com>; Carley St. Clair <Carley.StClair@davita.com>; Erica Edwards <Erica.Edwards@davita.com>
**Subject:** RE: Interview Process Recommendations Updated

Essentially,  TMs are beginning to ask if the disaster relief policy would be in effect given the fact that the President has declared an emergency.

Below is an excerpt from the policy outlining conditions for 50% premium pay. Some feel it could be interpreted that all facilities should get 50% premium pay given the national disaster declaration.

Questions have surfaced from Titan and now Endeavor

**If a designated facility or business office
is open during the emergency time frame,
teammates who report to their location
and work their scheduled hours will be paid
premium pay for all hours worked. Unless state
law requires otherwise, premium pay will be
one-and-one-half (1.5) times the teammate's**

none
none

none
none

**base rate of pay.**

**Non-exempt traveling teammates, as part of the Disaster Volunteer Group, who provide shift coverage at sites assigned by local Leadership will be paid a 50 percent premium for all compensable straight time hours, including travel time.**

## 4.12 Disaster Relief Policy

The Disaster Relief Policy provides for pay continuance during an emergency time frame when a declared emergency or natural disaster prevents teammates from performing their regular duties. A declared emergency or natural disaster shall be proclaimed by either the President of the United States, a state Governor or other elected official, or if local leadership (DVP/Palmer) deems it appropriate. In the event of a state or federally declared natural disaster, this policy provides information relative to pay practices, work schedules, and facility or business office coverage. This policy supersedes and replaces any past practice or policy relating to pay practices, work schedules, and facility coverage in the event of a declared emergency or natural disaster.

The language used in this policy is not intended to constitute a contract of employment, either express or implied, to give teammates any additional rights to continued employment, pay or benefits, or to otherwise change DaVita's policy of at-will employment.

EMERGENCY TIME FRAME
The emergency time frame (and affected facility or business office) will be identified on a case-by-case basis by local leadership (DVP, GVP and PSD) and the Disaster Governance Council, dependent on the severity of the disaster and location.

PAY PRACTICE FOR NON-EXEMPT TEAMMATES
If a facility or business office is closed due to a declared emergency or natural disaster as defined above, non-exempt teammates will be paid for their regularly scheduled hours at their base rate of pay during the designated emergency time frame.

DAVITA_003132

If a facility or business office opens late or closes early due to a declared emergency or natural disaster as defined above, teammates will be notified promptly of the approved opening or closing time. Nonexempt teammates who arrive or leave at that approved opening or closing time will be paid their hourly rate of pay for their regularly scheduled hours, unless state law provides otherwise. Any non-exempt teammate who arrives at work after the approved opening time or leaves work before the approved closing time will be paid only for the time actually worked, in which case, the teammate should utilize PTO in accordance with the regular PTO Policy.

**If a designated facility or business office is open during the emergency time frame, teammates who report to their location and work their scheduled hours will be paid premium pay for all hours worked. Unless state law requires otherwise, premium pay will be one-and-one-half (1.5) times the teammate's base rate of pay.**

**Non-exempt traveling teammates, as part of the Disaster Volunteer Group, who provide shift coverage at sites assigned by local Leadership will be paid a 50 percent premium for all compensable straight time hours, including travel time.**

If a designated facility or business office is open during the emergency time frame and teammates are unable to work, teammates should utilize PTO in accordance with the PTO policy.

Non-exempt teammates who are unable to report to their facility or business office should not perform any work remotely unless approved by a supervisor. If any work is done remotely, teammates must report time worked via time stamps in the timekeeping system and will be paid accordingly.

## 4.3 Overtime Pay

Non-exempt teammates may be required to work overtime, depending on patient or business needs, consistent with state laws (see Teammate Classifications policy). Non-exempt teammates will be paid one-andone-half times their regular rate of pay for

hours worked in excess of 40 in any workweek. The workweek begins at 12:00 a.m. on Sunday morning and ends at 11:59 p.m. on the following Saturday night. Absences (with or without pay) will not count as hours worked in computing overtime pay.

In certain locations, state or local regulations or other contractual agreements may supersede this policy and require overtime to be paid differently.

All overtime must be authorized in advance by the teammate's supervisor. If teammates work unauthorized overtime, they will be subject to disciplinary action, up to and including

**From:** Kenny Gardner <kenny.gardner@davita.com>
**Sent:** Tuesday, March 17, 2020 10:23 AM
**To:** Debbie Wolfe <Debbie.Wolfe@davita.com>; Carley St. Clair <Carley.StClair@davita.com>; Erica Edwards <Erica.Edwards@davita.com>
**Subject:** RE: Interview Process Recommendations Updated

What is disaster pay policy?

**From:** Debbie Wolfe
**Sent:** Tuesday, March 17, 2020 9:22 AM
**To:** Carley St. Clair <Carley.StClair@davita.com>; Kenny Gardner <kenny.gardner@davita.com>; Erica Edwards <Erica.Edwards@davita.com>
**Subject:** RE: Interview Process Recommendations Updated

Do we also have disaster pay policy on the list?

**From:** Carley St. Clair <Carley.StClair@davita.com>
**Sent:** Tuesday, March 17, 2020 9:13 AM
**To:** Debbie Wolfe <Debbie.Wolfe@davita.com>; Kenny Gardner <kenny.gardner@davita.com>; Erica Edwards <Erica.Edwards@davita.com>
**Subject:** RE: Interview Process Recommendations Updated

I have this on our leads check in agenda for this morning.

Thanks!

**From:** Debbie Wolfe <Debbie.Wolfe@davita.com>
**Sent:** Tuesday, March 17, 2020 8:07 AM
**To:** Kenny Gardner <kenny.gardner@davita.com>; Erica Edwards <Erica.Edwards@davita.com>
**Cc:** Carley St. Clair <Carley.StClair@davita.com>
**Subject:** RE: Interview Process Recommendations Updated

In addition to interview protocol, a few additional questions are starting to pop:
1. Onboarding/training- should we delay?
2. Starting wage- should we reduce in light of potential recession

DAVITA_003134

**From:** Kenny Gardner <kenny.gardner@davita.com>
**Sent:** Monday, March 16, 2020 11:51 PM
**To:** Erica Edwards <Erica.Edwards@davita.com>; Debbie Wolfe <Debbie.Wolfe@davita.com>
**Cc:** Carley St. Clair <Carley.StClair@davita.com>
**Subject:** RE: Interview Process Recommendations Updated

Let's carve out time to figure this out, need to move this up the priority list.

Kenny

**From:** Erica Edwards
**Sent:** Monday, March 16, 2020 9:57 PM
**To:** Kenny Gardner <kenny.gardner@davita.com>; Debbie Wolfe <Debbie.Wolfe@davita.com>
**Cc:** Carley St. Clair <Carley.StClair@davita.com>
**Subject:** FW: Interview Process Recommendations Updated

I apologize for multiple emails.  Received some additional feedback from Elise and Priya moments ago.

Updated guidance provides additional clarity on :
·   Recruiter Screen
·   Live interview options
·   Considerations – include training bandwidth, TM wages and candidate guidance

Open questions to task force:
·   Revisit interviews in clinics with appropriate parameters
·   Allowing hiring decisions to be made via virtual Interviews (by Palmer discretion, limited ability to conduct live interviews)
·   Consider wage adjustments where needed
·   Discuss training bandwidth/accommodating delayed starts

Updated Guidance:


1.   Recruiter phone screen
     a.   Recruiters will assist with any scheduling or technology needs/preferences
     b.   Ensure Recruiter screen is thorough enough to increase pass through ratio to alleviate burden on FAs
2.   Hiring Manager Interview Options:
     a.   Live Interviews
                    i.   Off-site live interview in preferred centralized location (e.g. regional/divisional office or other open public business)
                         1.   Designated Regional hiring decision maker preferred (takes fewer people off the floor)
                              a.   Live interviews could be conducted by various leaders other than FA dependent upon availability (PSM, CSS, ROD, etc)
                         2.   Panel Interview (could be one person 'live' with others virtual)
                    ii.   Off-hours live interview in clinic (revisit with taskforce)
                         1.   DeNovos and closed clinics prioritized for cohort hiring
                         2.   Non-cohort hiring executed at operational facility (end of day or Sundays)
                         3.   Follow current process or streamline to fit needs
                         4.   We need guidance on wearing masks, pre-screening and cleaning practice
     b.   Virtual/Video Interview (e.g. WebEx, FaceTime, Google Duo)
                    i.   When live interviews are not possible
                         1.   Could be panel or 1:1
                    ii.   Palmer discretion to make hiring decisions based on video only

DAVITA_003135

Decisions Needed:
- Revisit allowing off-hours interviewing in clinics (operational, DeNovos, closed facilities)
  - Finalize procedure for cleaning (before/after)
- Will leaders be allowed to make hiring decision via video interviewing only?
  - Many of our leaders seem to have a comfort level with this approach
  - San Francisco Bay area first to "shelter in place"

Other considerations:
- Do we have bandwidth to train new TMs?  Should we consider delaying start dates to accommodate appropriate training?
- Review starting rates for new TMs.  Are we competitive enough given current demand?
- Medical risk on live interviewing for TMs or Candidates.  Provide additional guidance to candidates on what to expect/procedures
- Candidates may have reservations to interview in person, candidates are starting to cancel in person interviews
- Other organizations are starting to move to virtual hiring process (not requiring live interviews)

Next Steps:
- Review with Debbie, Kenny and Task Force
- RMs to work with business leaders to determine local processes by region

**From:** Priya Sequeira
**Sent:** Monday, March 16, 2020 7:57 PM
**To:** Elise Duke <Elise.Duke@davita.com>; Erica Edwards <Erica.Edwards@davita.com>
**Subject:** RE: Interview Process Recommendations

Elise – I agree with those points.

Erica – On bullet 2a.i. – the DeNovos and closed clinics are the ones we'll be using for cohorts. If divisional offices are not available, we should try for end of day at an operational, non-cohort facility.

I escalated to Rebecca over the weekend, but one other question is if we should be delaying start dates at all. If we have a skeleton staff, I'm not sure we'll be able to properly train new teammates. Lastly, a question on rates has come up: given the current and predicted downturn, do we revisit rates for new TMs...

**From:** Elise Duke <Elise.Duke@davita.com>
**Sent:** Monday, March 16, 2020 10:42 PM
**To:** Erica Edwards <Erica.Edwards@davita.com>; Priya Sequeira <Priya.Sequeira@davita.com>
**Subject:** RE: Interview Process Recommendations

This looks like a good summary,
Few things:
1. In terms of prioritization, I would have put divisional office ahead of clinic after hours
2. Do we adjust the recruiter phone screen to beef up the phone component to reduce the number of "misses" we pass on to FAs?
3. Should we mention the in person interviews may be handled by someone other than the hiring manager – CSS, PSM, other FA depending on availability
Let me know if this resonates

**From:** Erica Edwards <Erica.Edwards@davita.com>
**Sent:** Monday, March 16, 2020 5:14 PM
**To:** Elise Duke <Elise.Duke@davita.com>; Priya Sequeira <Priya.Sequeira@davita.com>
**Subject:** Interview Process Recommendations

DAVITA_003136

Elise & Priya,

I tried to capture our conversation from earlier this afternoon. Can you provide a quick review? The attachments show the options and guidance for virtual interviews.

I am speaking with Debbie in twenty minutes to get her thoughts as well before this is sent to the task force.

1. Recruiter phone screen
   a. Recruiters will assist with any scheduling or technology needs/preference
   b. Ensure Recruiter screen is thorough enough to increase pass through ratio to alleviate burden on FAs
2. Hiring Manager Interview Options:
   a. Live Interviews
      i. Off-site live interview in preferred centralized location (e.g. regional/divisional office or other open public business)
         1. Designated Regional hiring decision maker preferred (takes fewer people off the floor)
            a. Live Interviews could be conducted by various leaders other than FA dependent upon availability (PSM, CSS, ROD, etc)
         2. Panel Interview (could be one person 'live' with others virtual)
      ii. Off-hours live interview in clinic (revisit with taskforce)
         1. Denovos and closed clinics prioritized for cohort hiring
         2. Non-cohort hiring executed at operational facility (end of day or Sundays)
         3. Follow current process or streamline to fit needs
         4. We need guidance on wearing masks, pre-screening and cleaning practice
   b. Virtual/Video Interview (e.g. WebEx, FaceTime, Google Duo)
      i. When live interviews are not possible
         1. Could be panel or 1:1
      ii. Palmer discretion to make hiring decisions based on video only

Decisions Needs:
- Revisit allowing off-hours interviewing be allowed in clinics?
  o Finalize procedure for cleaning (before/after)
- Will leaders be allowed to make hiring decision via video interviewing only?
  o Many of our leaders seem to have a comfort level with this approach
  o San Francisco Bay area first to "shelter in place"

Other considerations:
- Do we have bandwidth to train new TMs? Should we consider delaying start dates to accommodate appropriate training?
- Review starting rates for new TMs. Are we competitive enough given current demand?
- Medical risk on live interviewing for TMs or Candidates
- Candidates may have reservations to interview in person, candidates are starting to cancel in person interviews
- Other organizations are starting to move to virtual hiring process (not requiring live interviews)

Next Steps:
- Review with Debbie, Kenny and Task Force
- RMs to work with business leaders to determine local processes by region

DAVITA_003137