The Honorable James L. Robart

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

JOSEPH J. HESKETH III,
*on his behalf and on behalf of other similarly situated persons*

Plaintiff,

v.

TOTAL RENAL CARE, INC, on its own behalf and on behalf of other similarly situated persons,

Defendants.

Case No: 2:20-cv-01733-JLR

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

NOTED FOR HEARING ON:
JULY 16, 2021

(ORAL ARGUMENT REQUESTED)

## I.   INTRODUCTION

This is a suit by J.J. Hesketh against his employer, Total Renal Care (TRC), for unpaid wages. Mr. Hesketh alleges that TRC, through its published "Pay Practices," promised him that he would be paid premium pay if the facility to which he was assigned was open during a declared emergency and he worked his scheduled hours. ECF No. 40, at p. 8 at par. 39. Mr. Hesketh alleges that the facility to which he was assigned was open during the declared emergency known as the Covid 19 Crisis, that he worked his scheduled hours, but TRC did not pay him premium pay. ECF No. 40, at p. 11 at par. 54-58. Thus, Mr. Hesketh asserts, TRC owes him premium pay for the scheduled hours he worked from January 31, 2020, the date that the President of the United States declared the COVID-19 outbreak to be a public health emergency,

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 1

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

until TRC properly amended its "pay practices" policy to specifically exclude the Covid 19 crisis from the premium pay policy. ECF No. 40, p. 11-13 at par. 54-67.

In his Second Amended Complaint, Mr. Hesketh alleges new facts that clearly show that TRC intended that its employees would read its Pay Practices and see them as a promise: a promise that if an employee braved the dangers of a declared emergencies and worked his or her regular hours, he or she would be paid premium pay. For example, Hesketh alleges that before January 1, 2018, TRC's Disaster Relief Pay Practices policy was unambiguously subjective and discretionary and read that: (1) TRC's Pay Practices provides for premium pay continuance during "an emergency time frame;" and (2) the Emergency Time Frame was defined as a "declared emergency or natural disaster proclaimed by either the President of the United States, a state Governor or other elected official, *and* if local leadership (DVP/Palmer) deems it appropriate." (Emphasis added.) ECF No. 40, at p. 9-10 at par. 42-46. Hesketh then alleges that TRC changed its premium pay policy on January 1, 2018 to make that standard objective and it now reads that: (1) TRC's Pay Practices provides for premium pay continuance during "an emergency time frame;" and (2) the Emergency Time Frame was defined as a "declared emergency or natural disaster proclaimed by either the President of the United States, a state Governor or other elected official, *or* if local leadership (DVP/Palmer) deems it appropriate." (Emphasis added.)  (*Id.* at par. 44.)

The change to an objective standard was made to incentivize TRC employees to appear for their scheduled work hours as soon as an emergency or natural disaster was declared without having to wait for "local leadership" to deem premium pay to be "appropriate."  ECF No.  40, p. 10 at par. 45.)

Respectfully, TRC incorrectly interprets Mr. Hesketh's Second Amended Complaint as a challenge to the "at will" status of Hesketh's employment and thus misstates the very basis of

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 2

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Mr. Hesketh's cause of action as alleged in his Second Amended Complaint. For example, Defendant argues that Mr. Hesketh's Second Amended Complaint fails to state a claim against TRC because it does not allege facts that would: (1) negate the effective disclaimers [found in TRC's Pay Practices Policy]; (2) "show any inconsistency in the discretionary language of the Disaster Relief Policy;" (3) "show Plaintiff was prevented from performing his regular duties during the pandemic;" or (4) "show [Hesketh] relied on the Policy." ECF No. 57, at p. 6.

But, Mr. Hesketh does not challenge his status as an "at will" employee. Rather, Hesketh recognizes he is an at-will employee and alleges that TRC's premium pay policies are "intended to create expectations among TRC's" at will employees and "designed to encourage and incentivize DaVita [TRC] Employees within an area affected by a 'declared emergency' to appear at work rather than exercise their rights as employment-at-will employees and chose to shelter from the emergency or natural disaster rather than show up for work." ECF No.40, at par. 34-36 at p. 8.

Hesketh alleges that the "effective disclaimers" and "discretionary language" of TRC's Pay Practices Section 4 of the Teammate Policies and Procedures Handbook do ***not*** claim that once TRC has promised to pay premium pay and an employee has worked in reliance on that promise, that TRC may then change its mind and "renege" on their premium pay promise. ECF No. 40, par. 29-33 at p. 7. To the contrary, Mr. Hesketh specifically plead that "[n]either TRC nor DaVita reserve to themselves the right to 'renege' on its Pay Practices retroactively after work has been performed." Id. Rather, "[m]anagement personnel of TRC's expect both at will employees and management employees to be familiar with, rely upon and follow (be "governed by") the policies in the Teammates handbook." *Id.* at par. 29.

Hesketh alleges facts that can clearly lead TRC employees to believe the TRC Pay Practices are promises, not vague statement of something TRC may do if it chooses to. For

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 3

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

example, Hesketh alleges that the Section 4 of the Teammate Policies and Procedures titled "Pay Practices" (where the disaster relief pay practice is found) contain all of TRC's pay practices; pay practices such as premium pay for working over 40 hours a week, rest breaks and PTO times ECF No. 40, par. 35 at p. 8. No working person would ever read this section and believe that once they have done the work that TRC could change its mind and renege on its promise to pay premium pay.

Hesketh does *not* allege that he is owed premium pay because he "was prevented from performing his regular duties during the pandemic" as is claimed by TRC. ECF No. 57, at p. 6. To the contrary, Hesketh claims that he is owed premium pay because he *worked* his regularly scheduled hours for TRC and was not paid premium pay as promised. ECF No. 40, at pp. 14-15 at par. 81.

Hesketh alleges that his reliance on the Pay Practices Policy is established by the fact that TRC required Hesketh (and every other TRC employee) to read the Pay Practices changes and sign an acknowledgment that he: (1) "understand[s] I am expected to read, understand and adhere to our Company's policies;" (2) "will familiarize myself with the material in the Teammate Policies, the Code of Conduct and the DaVita Compliance Program, as well as any changes to them;" (3) that [Hesketh is] governed by the contents of the Teammate Policies;" (4) policies that "set forth the entire employment arrangement between [Hesketh] and DaVita [TRC] with respect to the at-will nature of [Hesketh's] employment relationship with DaVita [TRC]." ECF No. 40, par. 15-23 at pp. 4-6. With knowledge of TRC's Pay Practices, Mr. Hesketh worked his regular scheduled hours and rightfully expected to receive premium pay. ECF No. 40, par. 54-55 at p. 11. As stated above, while Mr. Hesketh alleges that while DaVita reserves the right to "interpret, amend, modify, supersede or eliminate policies, practices or benefits," he also alleges

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 4

Henry & DeGraaff, P.S.
119 1st Ave S, Ste 500
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

that TRC does not have the right to "renege" on a promise to pay premium to an employee after that employee has worked hour for which he or she was promised premium pay.

Respectfully, if Mr. Hesketh proves the claims set out in his Second Amended Complaint, he can and should win this case and be paid the small sum that he claims TRC owes to him. If Hesketh wins, the class wins and TRC knows that these individual claims are too small for its employees to pursue individual lawsuits.

During the early days of the COVID-19 crisis, thousands of TRC's nonexempt employees, including Mr. Hesketh, braved the horrors of COVID-19 and worked their scheduled hours at TRC. They did so even though there was a "declared emergency" and they had every right as at-will employee to use PTO time or simply forgo pay in order to shelter themselves and their families' needs from the dangers of COVID-19. ECF No. 40, par. 54 at p. 11. When these thousands of non-exempt, at-will employees began to request the premium pay that they honestly believed was owned to them, TRC quickly changed its premium pay policies to exclude the COVID-19 crisis. ECF No. 40, par. 56-58 at p. 11. Certainly, TRC had the right to change its policy, but equally as certain TRC did not have the right to renege on its promise to pay premium pay to Hesketh and class members after they showed up for work.

The role of pleadings is to provide a defendant notice of the plaintiff's claims and Rule 8 does not require that a party set forth its evidence as part of its pleading. To that end, Mr. Hesketh, on behalf of himself and the putative class members, ask only for his day in court: that he be allowed a forum in which to present his evidence and argue his case.

The evidence that has been developed during the course of discovery shows there are facts that support Hesketh's claims and at a minimum show there are factual issues relating to whether the Plaintiff's claims based on the provisions of an employee handbook can be enforced

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 5

Henry & DeGraaff, P.S.
119 1st Ave S, Ste 500
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

for work performed when Plaintiff was employed by Defendant and the Defendant's position that the claims fails because it included a disclaimer in the handbook.

## II.  THERE ARE FACTUAL ISSUES THAT CANNOT BE DECIDED ON THE PLEADINGS

This case has advanced from the pleading stage and the discovery discussed below shows that there are numerous factual issues surrounding the application of a disclaimer aimed at avoiding converting an employee from an at will employee to a contract employee. The claims here do not seek to extend or alter the at will nature of the employment status of the Plaintiff or any class member. It seeks pay for work performed during employment.

If the disclaimer applies to the claims for wages during a period of employment, there are factual issues as to whether it is enforceable or has been negated. The fact issues include (i) what was the defendant's motivation for the provision, (ii) whether the corporate culture of "we said we did" created and nurtured by the defendant negates any disclaimer, and (iii) whether or not the Defendant acted in good faith in deciding the disaster policy did not apply to COVID-19 because it did not follow the procedures it created for such determinations. The fact that Defendant found it necessary to address whether premium pay was owed under the Disaster Relief Policy also weighs against finding that the disclaimer was applicable to these wage claims. If the disclaimer applied there was no need to amend the Disaster Relief Policy to exclude Covid-19. A motion for judgment on the pleadings is governed by the same standard applied to a motion to dismiss. *Dworkin v. Hustler Mag., Inc*., 867 F.2d 1188, 1192 (9th Cir. 1989) ("Because Rule 12(b) motions to dismiss and Rule 12(c) motions for judgment on the pleadings are "functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog.")

Rule 8(a) requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Alt. Corp. v. Twombly*, 550 U.S. 544 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). A motion to dismiss does not resolve factual issues. *MatconUSA LP v. Houston*

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 6

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

*Casualty Company*, 2021 WL 1102064, at *4 (W.D.Wash., 2021) ("The court concludes that the interpretation of the Claim Reporting language and whether it bars Matcon's claim that Marsh assumed a duty pursuant to that language to report Matcon's claims to HCC depend on questions of fact that are inappropriate to resolve at this stage of the proceedings.")

While the Defendant seeks to have this case decided by a motion for a judgment on the pleadings, the Plaintiff's Second Amended Complaint sufficiently set forth facts to meet the notice requirements of Rule 8. The Plaintiff is not required to include all of his evidence in his pleading. The Second Amended Complaint provides the Defendant notice of the claims and sufficient facts are alleged to show entitlement to relief.

Moreover, as set forth below discovery in this action has produced facts that support the Plaintiff's claims. The Plaintiff's allegations in support of his claims are discussed below followed by the discovery that has been obtained, the Court's prior ruling and DaVita's testimony. Many of the Defendant's employees and managers thought the provision applied to Covid-19 and Defendant's own decision that it needed to clarify that the policy supports Plaintiff's claims that the pay policy can be enforced. The pleadings alone do not tell the whole story of the evidence nor are pleadings expected to do so. The motion should be denied.

### III.   PLAINTIFF'S CLAIMS

Plaintiff seeks the premium pay promised under the Disaster Relief Policy (the "Policy") for hours he worked. SAC ¶¶ 76-78. There is no dispute that the pay he seeks is for time he was an employee of Defendant, and he contends that he had the right to be paid for the hours he worked as an employee whether he was an employee at will or contract employee. Plaintiff has asserted claims for Breach of Contract (Count I - SAC ¶¶ 106-114), Good Faith and Fair Dealing (Count II - SAC ¶¶ 115-122), Promissory Estoppel (Count III – SAC ¶¶ 123-135) and Unjust Enrichment (Count IV - SAC ¶¶ 136-143).

Plaintiff has alleged that the disclaimer Defendant points to has been negated by the actions of the Defendant including the expectations that the employees were bound by the terms

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 7

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

of the Handbook (SAC ¶ 21), that for its own interests the terms would be applied fairly to employees (SAC ¶¶ 22 and 33), that its management acknowledges that the Handbook creates mutual expectations (SAC ¶¶ 23 and 29), that DaVita is concerned with its corporate integrity and with doing what it says it will do (SAC ¶ 24), that these facts taken together negate any disclaimer as it applies to employees for work performed while they are employed (SAC ¶¶ 25-26) and employees remained and relied on these factors (SAC ¶ 27), and that DaVita did not have any right to renege on the pay promise after employees worked (SAC ¶ 32).

## IV. EVIDENCE OBTAINED FROM DEFENDANT THAT SUPPORTS PLAINTIFF'S POSITION IS AVAILABLE OUTSIDE THE PLEADINGS

### A. Multiple DaVita Employees and Managers Believed the Disaster Relief Policy Constituted a Promise

DaVita's Disaster Relief Policy provided for enhanced employee pay for employees during declared emergencies. The January 2020 edition of the DaVita Teammate Policies Handbook (the "Handbook") stated in part:

> If a designated facility or business office is open during the emergency time frame, teammates who report to their location and work their scheduled hours will be paid premium pay for all hours worked. Unless state law requires otherwise, premium pay will be one-and-one-half (1.5) times the teammate's base rate of pay.

ECF No. 42 at ¶ 3, Ex. 2 The same edition of the Handbook defined a "declared emergency" as such:

> A declared emergency or natural disaster shall be proclaimed by either the President of the United States, a state Governor *or* other elected official, or if local leadership (DVP/Palmer) deems it appropriate.

*Id.* (emphasis added).

The word "or" is important. As written, the policy plainly states that *any* of the named entities (the President, a governor or other elected official, or local DaVita leadership) can trigger the Policy unilaterally without the consent of any other entity. The word "shall" is equally important: it indicates that, when one of the named entities declares an emergency, the triggering of the Policy is automatic and compulsory, and is not subject to peremptory override by other entities. When President Donald Trump declared a national emergency concerning the COVID-

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 8

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

19 pandemic on March 13, 2020, retroactive to March 1,[1] therefore, by the plain reading of the Handbook, the Disaster Relief Policy went into effect immediately, along with the effects it had on the duties and pay of DaVita and TRC employees.

This is not simply a matter of clever lawyers overly parsing words. Multiple DaVita employees, including members of management, believed at the time that the President's emergency declaration meant or might mean that the pay provisions of the Policy had been activated. On March 16, 2020, Kevin Spring, a regional operations manager with DaVita, sent an email to his superiors inquiring about the policy:

> Ft Belvoir TMs asked if the disaster relief policy would be in effect given the fact that the President has declared an emergency.
>
> I've pasted the entire policy from the TM handbook below and highlighted the 50% premium pay they're asking about. *It could be interpreted that all facilities should get 50% premium pay.* If we're not going to offer any kind of premium pay there should be good talking points about why this policy is not being put into effect.

See Declaration of Christina L Henry ("Henry Dec"), at ¶ 2, Ex. A (Eaves Deposition at p. 135, Ex. 20 (DAVITA_003371) (emphasis added).

Mr. Spring's message touched off an email chain in which several DaVita executives, including Oliver McKinstry, senior director of people services, and Nikki Rogers, senior director of human resources, acknowledged having received multiple inquiries from other DaVita employees and managers about the Policy. A typical example included in the email thread was a question sent by ▮▮▮▮▮▮▮▮, a DaVita clinical administrative assistant in Alexandria, Va., to the covid19questions@davita.com email address on March 16, 2020:

> I was scrolling through our Teammate Handbook and came up with a question. Governor of Virginia Mr. Ralph Northam and our president Mr. Donald Trump have declared "a state of emergency" last week. In Section 4 of Pay Practices it states that "if a designated facility is open during the emergency time frame, teammates who report to their location and work their scheduled hours will be paid premium pay for all hours worked. Unless

---

[1] Strictly speaking, the first such declaration came on January 31, 2020, when the President declared a national public health emergency under the Public Health Service Act. National Conference of State Legislatures, "President Trump Declared State of Emergency for COVID-19," March 25, 2020, https://www.ncsl.org/ncsl-in-dc/publications-and-resources/president-trump-declares-state-of-emergency-for-covid-19.aspx (accessed July 10, 2021).

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 9

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

state law requires, otherwise, premium pay will be one and one half times the teammates base rate of pay..” Does it not apply to our situation right now? Specially with all other kinds of clinics and businesses are closed due to COVID 19.

*See Id.* at ¶ 2, Ex. A, (Eaves Deposition at p. 136, Ex.2 (DAVITA_003376). Eventually, the question of whether the Policy had been activated was elevated to Kenny Gardner, head of human resources for DaVita aka "People Services," who on March 17 responded succinctly (and unilaterally) "The answer is no." *See Id.* at ¶ 2, Ex. A, (Eaves Deposition) at p. 143, Ex. 23 (DAVITA_003131).

As Mr. Gardner's ruling began to filter down to DaVita employees who had contacted the company's COVID Response Team for clarification, many of them expressed anger and disbelief that DaVita had chosen not to follow the Handbook as they understood it. *See Id.* at ¶ 4, Ex. C, (*see, e.g.*, DAVITA_003902, DAVITA_004007, DAVITA_004047, DAVITA_007427, DAVITA_007436, DAVITA_007486). Many employees were adamant that the wording in the Handbook clearly and unambiguously stated that they were entitled to 1.5 times their base pay for working during an emergency declared by the President or local officials. *See, Id. at* ¶ 4, Ex. C, (*see, e.g.*, DAVITA_003902, DAVITA_004047).

Discontent with the company's decision and pronouncement spread rapidly amongst DaVita's employee base. In early to mid-March 2020, DaVita employee Rebecca Haddad started a petition on change.org titled "Disaster Relief Pay for Dialysis Workers."[2] In the petition, Ms. Haddad specifically cited the Disaster Relief Policy from the Handbook as the reason DaVita employees were entitled to enhanced pay during the emergency. By March 31, the petition had garnered more than 11,000 signatures.[3] *See Id. at* ¶ 4, Ex. C, (DAVITA_004505).

It is clear from these records that multiple DaVita employees and managers in different regions around the country arrived independently at the conclusion, based on the plain wording

---

[2] https://www.change.org/p/davita-hazard-pay-for-dialysis-workers, accessed July 11, 2021.

[3] By July 11, 2021, the petition had amassed 14,926 signatures. https://archive.li/8P52q, accessed July 11, 2021. A notice on that page at that time stated that "**At 15,000 signatures**, this petition becomes one of the **top signed on Change.org**!" *Id.* (emphasis in original). At that time, the number of signatories was approximately 27 percent of DaVita's declared US employee base of 55,000. https://www.davita.com/about, accessed July 11, 2021.

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 10

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

in the Handbook, that the Policy should have been triggered by the emergency declarations issued by the President and/or their local authorities.

(It should be noted that, as DaVita management strategized about the formal announcement that on March 27, 2021, some executives took a distinctly lighthearted approach to an issue that was clearly very important to many low-level DaVita employees. On March 27, 2020, in an email discussion with other executives concerning the company's upcoming Disaster Relief Policy response statement, DaVita's Director of Shared Services Shawn Zuckerman sent a meme consisting of a photograph of Oprah Winfrey with the text "YOU GET DISASTER PAY – EVERYONE GETS DISASTER PAY!" – an apparent reference to Ms. Winfrey's 2004 "You get a car!" episode of her talk show. *Id.* at ¶ 4, Ex. C, (DAVITA_004203).

### B. DaVita's Corporate Culture Encouraged Employees' Belief That What DaVita Said, DaVita Would Do.

DaVita has gained a reputation for a corporate culture that supposedly puts its employees first, an approach that has earned it glowing writeups from business publications.[4] This culture was implemented deliberately more than twenty years ago by DaVita's former CEO, Kent Thiry,[5] and continues today under Mr. Thiry's successor Javier Rodriguez. The ethic permeates DaVita at every level and is expressed through symbols, rituals, and especially the language leadership uses to communicate with employees and vice versa. In DaVita's parlance, the company is called the "Village", and CEO Rodriguez is its "mayor." Employees are "teammates," abbreviated as "TMs," a term which email records demonstrate is used nearly universally by the employees themselves. "One for All," a longtime DaVita motto, is so ingrained in the company's culture that former CEO Thiry became famous for roaming the halls

---

[4] *See, e.g.*, Tina Reed, "DaVita's new CEO Rodriguez talks strategy, style and the future of kidney care," *Fierce Healthcare*, May 22, 2019, https://www.fiercehealthcare.com/hospitals-health-systems/davita-ceo-javier-rodriguez, accessed July 11, 2021.

[5] Bill Taylor, How One Company's Turnaround Came From the Heart," *Harvard Business Review*, March 30, 2010, https://hbr.org/2010/03/how-one-copmanys-turnaround, accessed July 11, 2021.

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 11

Henry & DeGraaff, P.S.
119 1st Ave S, Ste 500
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

at corporate headquarters dressed like one of the Three Musketeers.[6] "'One for All' is not a motto; it is a way of life," DaVita's COVID-19 Response Team explained to an employee in an email. *See Id.* at ¶ 4, Ex. C, (DAVITA_007486). "We say what we believe, and we do what we say" is another familiar phrase at DaVita, often paraphrased as "We said – we did." *See Id.* at ¶ 5, Ex. D, (Hesketh Deposition at p. 5, 172:19-174:3:24).

DaVita deliberately encouraged its employees to think of the company less like a typical for-profit corporation than like a small town where everyone helps take care of each other. It encouraged them to see DaVita as being more concerned for their welfare than another company would be, and to take pride in that. When President Trump and various state governors issued emergency declarations for COVID-19, therefore, many employees read the plain language in the Handbook and came to the quite reasonable conclusion that DaVita would do what it said and follow the policy as delineated. While Mr. Eaves also testified that he thought the policy was clear in 2020, he confirmed emails raised questions about whether the Policy applied to COVID-19 *See Id.* at ¶ 2, Ex. A, (Eaves Deposition at 87:13-25 and 122:13-126:24), that a reading of the policy that if an employee showed up and worked that he would receive premium pay was not unreasonable *Id.* at 108:14-109:05) and DaVita felt it was necessary to clarify the policy *Id.* at ¶ 2, Ex. A, (Eaves Deposition at 114:08-19).

When informed that DaVita did not in fact intend to honor the plain language in the Handbook, many employees expressed puzzlement and disillusionment that DaVita did not appear to be living up to its vaunted standards of integrity. One particular sticking point for some was that a competitor, Fresenius Kidney Care, had done what DaVita would not, as employee ▮▮▮▮▮▮ explained to the DaVita COVID Response Team in an email on March 28, 2020:

---

[6] Jim Edwards, "Meet the CEO Who Makes His Staff Sing the Company Song," *CBS News*, June 13, 2011, https://www.cbsnews.com/news/meet-the-ceo-who-makes-his-staff-sing-the-company-song/, accessed July 11, 2021.

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 12

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

> Through this COVID-19 pandemic, Fresinius [sic] (our major competitor) has been paying their employees time and a half compensating them for their increased risk during a National Emergency such as this. It just seems like Davita would be trying to be as equally generous in appreciation for its teammates.

*See Id.*, at ¶ 4, Ex. C, (DAVITA_007540).

### V. DEFENDANT RELIES ON THE COURT'S PRIOR RULING FOR ITS CURRENT MOTION. THE DEFICIENCIES SET FORTH IN THE PRIOR RULING ARE ADDRESSED BY THE SECOND AMENDED COMPLAINT.

The Defendant's latest motion again argues that the provisions of the Disaster Relief Policy do not support Plaintiff's contract, promissory estoppel and good faith claims because there is no enforceable promise to support them. ECF No. 57, p. 15. Defendant claims that a disclaimer takes away from any contractual relationship or promise to pay premium pay for hours worked during the term of employment. As explained above, Plaintiff contends that a disclaimer directed at preserving the at will status of an employee does not apply to the claims for wages asserted by Hesketh. However, if the disclaimer applies, Plaintiff has alleged sufficient facts to support that the disclaimer has been negated.

#### A. The Second Amended Complaint Alleges Facts That Support the Disclaimer Has Been Negated.

Plaintiff's Second Amended Complaint sets forth facts concerning the culture of "we said, we did". SAC ¶¶ 22-26. Further, DaVita determined it was necessary to amend the Policy to exclude COVID 19 (SAC ¶¶ 66-67), outweighed any finding that the disclaimer resolved the issue since if it did, there would be no need to amend the pay policy. Plaintiff has also obtained discovery that supports that the disclaimer was negated.

DaVita representative Jeremy Eaves was deposed on May 10, 2021. In that deposition, Mr. Eaves confirmed he understood he was being deposed as a representative of DaVita. *See Henry Dec.*, at ¶ 2, Ex. A, (Eaves, Deposition, 7:19-23, 11:16-19, 13:18-26, 14:1-4, P. 24:18-24). The deposition provided answers to many of the issues raised by the complaint. Mr. Eaves testified the Teammates Polices provided to employees set expectations both of what DaVita expects of its employees, and what employees can expect from DaVita:

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 13

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

> [T]here are guidelines and expectations we have about behaviors and conduct as a teammate. And that, similarly, there are benefits and resources that are available to teammates that are also defined in that handbook. So the -- the entirety of the two of those, as they come together, are the arrangement.

*See Id.*, at ¶ 2, Ex. A, (Eaves Deposition at 88:1-25, 89:1).

Eaves testified as to DaVita's willingness to pay premium pay to its employees:

> Q. [Plaintiff's attorney J. Craig Jones] . . . If [DaVita says] they're going to pay under these circumstances and that employee shows up for work and they work under the exact circumstances that DaVita's policies and procedures say, they're going to get paid time and a half. Does DaVita believe that it's reserved to its right to renege and not pay that employee what they promised to pay him?
>
> A. [Mr. Eaves] No. They would pay the time.

*Id.*, at ¶ 2, Ex. A, (Eaves Deposition130:25-131:10).

While Mr. Eaves also testified that he thought the Policy was clear in 2020, he confirmed emails raised questions about whether the Policy applied to COVID-19 (Eaves 87:13-25 and 122:13-126:24), that a reading of the policy that if an employee showed up and worked that he would receive premium pay was not unreasonable *See Id.*, at ¶ 2, Ex. A, (Eaves Deposition at 108:14-109:05) and DaVita felt it was necessary to clarify the policy (*Id.*, at ¶ 2, Ex. A, (Eaves Deposition at 114:08-19).

Mr. Eaves also explained that the policy to pay premium pay was because it was "beyond being insensitive"[7] to their employees to say we need you here and it gave "some additional incentive to motivate those teammates to come in…" *See Id.*, at ¶ 2, Ex. A, (Eaves Deposition at, 172:22-173:12).

Plaintiff does not contest that DaVita had the right to change the policy but until it changed the policy the Plaintiff and others were entitled to the promise of premium pay for

---

[7] In his errata sheet, Mr. Eaves sought to twice change the word "insensitive" to "incentive". See Exhibit XXX. As originally reported, Mr. Eaves testified:

> I -- I -- I understand your question. It -- it's insensitive -- I mean, it -- it's above and beyond insensitive to say, "Listen, we realize that it is extra tough for you to potentially get in here and -- and we need you here.

*Id.*, at ¶ 2, Ex. A, (Eaves Deposition at, 172:25 – 173:1-4).

The change submitted does not appear to be consistent with the context or the court reporter's certification as to what he testified to in his deposition.

OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS - 14

Henry & DeGraaff, P.S.
119 1st Ave S, Ste 500
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

working during a period where an emergency was declared. *Duncan v. Alaska USA Fed. Credit Union, Inc.*, 148 Wn. App. at 76–77 & 78 n.100 (explaining that an at-will employer's unilateral changes may be applied *prospectively*, not retroactively. Indeed, DaVita itself recognized that the policy applied to the situation and felt compelled to modify the policy to exclude COVID-19 from the policy. *See* SAC ¶¶ 65-66.

**B.     The Disaster Relief Policy Was a Specific Promise For Specific Relief.**

The Court also found that the Disaster Pay Policy was not a specific promise for a specific situation. The Court found that the policy was so discretionary that it could not be the basis for promissory estoppel stating:

> The Disaster Relief Policy is not automatically triggered upon the proclamation of an emergency or natural disaster by government officials. (Disaster Relief Policy at 1.) Instead, the company must determine the "affected facility," "business office," and the "emergency time frame" during which premium pay applies. (*Id.* at 2.) These determinations are made "on a case-by-case basis" and are "dependent on the severity of the disaster and location." (*Id.*)
>
> These statements give the employer discretion in applying the Disaster Relief Policy and thus do not provide a promise of specific treatment in a specific circumstance as a matter of law.

This was not a localized emergency. It affected the entire country. There was no single or even multiple affected facilities or business offices to be identified since all were affected by the national emergency. Moreover, the Court's view that it was too discretionary is undercut by the history of the policy that amended it from providing for a conjunctive requirement to a disjunctive requirement in 2018. See SAC ¶¶ 42-46.

To the extent that discretion was to be exercised by DaVita, it was to be exercised by a governance council. However, Mr. Eaves testified that the council never even met regarding the COVID-19 global pandemic. *See* Henry Dec, at ¶ 2, Ex. A, (Eaves Deposition at 152:20-22). In fact, in an errata sheet to his deposition, Mr. Eaves stated that there were no members of the governance council in 2020.[8] *See Id.* at ¶ 3, Ex. B, (Eaves Deposition errata sheet)

---

[8] In fact, as a number of DaVita employees noted, this apathetic attitude toward the global pandemic contrasts poorly with the decision of a major competitor to offer enhanced pay to its employees at almost exactly the

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 15

HENRY & DeGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

Further, the Court's conclusion that the discretionary nature of the provision made it illusory and therefore served to relieve DaVita of any obligation does not appear to appropriately factor in the obligation of good faith and fair dealing. DaVita had an obligation to act in good faith and deal fairly when it approached any discretionary tasks. Just because DaVita retained the right to unilaterally modify the pay arrangements for disaster pay in the Handbook did not render the agreements with their employees illusory, because the performance obligations remained fixed. *See Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.,* 135 Wash.App. 760, 145 P.3d 1253, *1257; see also Duncan,* 199 P.3d at 1002 (noting that "[i]t is beyond dispute that Washington law provides that a terminable-at-will contract may be unilaterally modified") However, that circumstance did not render the contract illusory. *See Cascade,* 145 P.3d at 1257. An employer who offers to compensate an at-will employee for work performed, retains the only change the terms of compensation *prospectively, not retroactively* if the employee is notified of the changes and continues working. *Duncan*, 148 Wn. App. at 76–77 & 78 n.100.

Therefore, finding that a promise may be illusory does not end the inquiry. Whether or not DaVita met its obligations of good faith and fair dealing in connection with the discretion it retained in deciding whether the Disaster Relief Policy applied to COVID 19 is an open question For instance, beyond the pleadings we know from testimony that the decision as to whether or not the Disaster Relief Policy of premium pay applied to COVID-19 was arrived at by a single person who stated "No". *See* Henry Dec, at ¶ 2, Ex. A, (Eaves Deposition at p. 143), Ex. 23 (DAVITA_003131). No decision was made by the "governance council" to whom the task was delegated to under the Teammates Policies.

If an employer can be relieved of obligations if they include discretionary decisions that must be made before the promise will be performed and then the employer chooses to not make

---

same time that DaVita was informing its employees that it did not intend to honor the plain language in the Handbook. Fresenius Medical Care North America, "Fresenius Medical Care North America Announces Ongoing Support for Direct Patient Care Staff to Address Financial Challenges and Wellbeing," March 27, 2020, https://fmcna.com/company/our-company/news-releases/fresenius-medical-care-north-america-announces-ongoing-support-f/, accessed July 12, 2021.

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 16

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

those decisions does indeed create an illusory promise, but such a result cannot stand when a party's is obliged to act in good faith and fair dealing.

### C. DaVita Issued an Employee Handbook with the Intention that the Employer and Employees Be Bound by its Terms

Another factor that plays a role in deciding whether an employer is bound by the terms of policies despite disclaimers is "the employer's reason for unilaterally issuing an employee policy manual or handbook…". In *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1087, 102 Wash.2d 219, 229 (Wash.,1984) the Court held that "… absent specific contractual agreement to the contrary, we conclude that the employer's act in issuing an employee policy manual can lead to obligations that govern the employment relationship. Thus, the employer's reason for unilaterally issuing an employee policy manual or handbook, purporting to contain the company policy vis-a-vis employee relations, becomes relevant."). TRC's intent cannot be gleaned from the pleadings. But TRC succinctly explained in the following response concerning why it distributed the DaVita's handbook to Plaintiff and other TRC employees:

> TRC distributes the Teammate Policies document to provide its employees with helpful guidelines and information about its policies, programs, tools, and resources. The Teammate Policies are provided to offer guidance in handling many issues, but the policies contained therein also allow for latitude in their application to individual circumstances or as business needs may warrant. The Teammate Policies are periodically revised and updated.

*See* Dkt No. 24-1(Answer to Interrogatory No. 3 at Dkt. 24-1). [9]

And, as noted above, DaVita's corporate representative further explained in his deposition that the pay practices and disaster relief policy were there to meet an important corporate need for their employees to show for work, so they provide the premium pay as an incentive. *See* Henry Dec, at ¶ 2, Ex. A, (Eaves Deposition, 172:22-173:12).

---

[9] The reference to the terms as guidance or guidelines is not determinative under Washington law. In *Carlson v. Lake Chelan Community Hosp.*, 75 P.3d 533, 541, 116 Wash. App. 718, 733 (Div. 3, 2003) the court rejected that the term resolves the factual issue finding "despite Mr. Carlson's use of the word "guidelines," the evidence establishes that both parties proceeded under the assumption that the Handbook set forth enforceable procedures that were applicable to Mr. Carlson's employment relationship with LCCH."

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 17

Henry & DeGraaff, P.S.
119 1st Ave S, Ste 500
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

### D. Plaintiff Has Set Forth a Claim Based on Good Faith and Fair Dealing

Recently, the Washington Courts held that the duty of good faith and fair dealing applies in *Bill & Melinda Gates Foundation v. Pierce*, 475 P.3d 1011, 1018–19, 15 Wash.App.2d 419, 433–34 (Wash.App. Div. 1, 2020). The Court addressed illusory promises in the context of one party's exercise of discretion concerning an issue that arose during employment. The employer, like DaVita, believed it did not owe any duty of good faith and fair dealing to its employee. The Court rejected that argument insofar as it related to any employment issues short of terminating an at will employee:

> the context of employment contracts in Two of the Foundation's key arguments are that Pierce's job responsibilities could be modified by his supervisor at any time due to his status as an at-will employee and that there is no duty of good faith and fair dealing in the context of at-will employment. However, when considering that assertion within the framework of a bilateral contract such as this one, this latter argument in particular is incorrect. "There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 116 Wash.2d 563, 569, 807 P.2d 356 (1991). This duty does not require a party to accept a material change to the contract terms; "it requires only that the parties perform in good faith the obligations imposed by their agreement." Id. While the Foundation is correct that it retained the ability to modify Pierce's job duties because of his status as an at-will employee, what they could not do, based on the duty of good faith and fair dealing, was fundamentally change what it meant to be the CDO of the Bill & Melinda Gates Foundation. To do so would render that fundamental promise illusory.
>
> 10¶25 We acknowledge what, on cursory review, could appear to be a conflict in Washington law as to the duty of good faith and fair dealing in contracts that provide for employment at-will.3 We understand the body of case law to reflect a rather simple principle: there is no duty of good faith and fair dealing as to termination of at-will employment. By accepting at-will employment, the parties have expressly bargained away any right to good faith and fair dealing with regard to a decision to terminate the employment. However, as to the other terms and conditions of employment, our case law is clear that a duty of good faith and fair dealing does apply. *See also Badgett*, 116 Wash.2d at 569, 807 P.2d 356.

475 P.3d at 1018–19, 15 Wash.App.2d at 433–34.

The Plaintiff has alleged that the Defendant did not exercise any discretion under its Teammates Policies in good faith. As noted above, this claim is further supported by the fact that the exercise of any discretion concerning the application of the Disaster Relief Policy was to be considered by the governance council but there was none in 2020. Whether the policy applied or

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 18

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

any time frame for it to be applied was never considered in accordance with the terms of the Teammates Policies.

### E. The Court Prior Ruling on The Unjust Enrichment Claim Adjudicated That It Stated a Claim.

This Court previously held that the complaint sufficiently stated a claim for unjust enrichment. As discussed in the prior briefing, since there are issues of fact, an unjust enrichment claim should not be adjudicated. *Kingston v. Int'l Bus. Machines Corp.*, C19-1488 MJP, 2021 WL 779117, at *9 (W.D. Wash. Mar. 1, 2021).[10] The defendant's latest motion again contests whether a claim has been stated. Given the prior ruling, the Plaintiff has sufficiently stated an unjust enrichment claim and the Plaintiff reiterates that the factual issues associated with this claim cannot be decided by TRC's motion

## VI.   CONCLUSION

For the foregoing reasons, the Defendant's 12(c) Motion for Judgment on the Pleadings should be denied.

---

n earlier decision in the *Kingston* case, the Court dismissed the employee's breach of contract claims. *See Kingston v. Int'l Bus. Machines Corp.*, 454 F. Supp. 3d 1054 (W.D. Wash. 2020). That case is distinguishable from the facts before this court because the Kingston agreement included specific provisions in a policy between Kingston and IBM that gave the employer specific rights to change the terms of the specific pay provisions that the employee sought to enforce as a contract. There are no specific rights mentioned in the DaVita Teammates handbook that specifically address the Disaster Relief Policy. In the absence of specific provisions governing the Disaster Relief Policy, it presents factual issues as to whether TRC "create[d] an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship." *Thompson*, 102 Wash.2d at 230. TRC could have provided specifics as to this policy as IBM did but chose not to. It cannot reasonably expect the Court to add provisions.

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 19

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Respectfully submitted,

Dated this 12th day of July, 2021.

/s/ Christina L Henry
Christina L Henry, WSBA# 31273
Counsel for Plaintiff
HENRY & DEGRAAFF. PS
119 1st Ave S, Ste 500
Seattle, WA 98104
Tel# 206-330-0595
Fax# 206-400-7609
chenry@hdm-legal.com

/s/ Scott C. Borison
Scott C. Borison
(Pro Hac Vice)
BORISON FIRM, LLC
1900 S. Norfolk Rd., Suite 350
San Mateo, CA 94403
Tel# 301-620-1016
Fax# 301-620-1018
scott@borisonfirm.com

/s/ J. Craig Jones
J. Craig Jones
(Pro Hac Vice)
JONES & HILL, LLC
131 Highway 165 South
Oakdale, LA 71463
Tel# 318-335-1333
Fax# 318-335-1934
craig@joneshilllaw.com

OPPOSITION TO MOTION FOR JUDGMENT ON
THE PLEADINGS - 20

HENRY & DEGRAAFF, P.S.
119 1ST AVE S, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609