UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSEPH J. HESKETH III,

                        Plaintiff,

    v.

TOTAL RENAL CARE INC.,

                        Defendant.

CASE NO. C20-1733JLR

ORDER

## I.  INTRODUCTION

Before the court are three motions:  (1) Defendant Total Renal Care Inc.'s ("TRC") second motion for judgment on the pleadings (2d MJOP (Dkt. # 57)); (2) Plaintiff Joseph J. Hesketh III's motion to certify a plaintiffs' class (Pls. MCC (Dkt. # 50)); and (3) Mr. Hesketh's motion to certify a defendants' class (Defs. MCC (Dkt. # 55)).  Mr. Hesketh opposes TRC's motion for judgment.  (*See* Resp. (Dkt. ## 69 (sealed), 73 (redacted)).)  He also filed a notice of his intent to file a surreply.  (Not. of Surreply (Dkt. # 81).)  The court has considered the motions, the parties' submissions in

1   support of and in opposition to the motions, the relevant portions of the record, and the

2   applicable law.  The court additionally held oral argument on August 12, 2021.  (*See*

3   Min. Entry (Dkt. # 83).)  Being fully advised, the court GRANTS in part and DENIES in

4   part TRC's motion for judgment.  The court further STRIKES the motions for class

5   certification without prejudice and ORDERS the parties to meet and confer on next steps.

## II.   BACKGROUND

7       Mr. Hesketh, an employee of TRC, brings this class action suit for various claims

8   related to TRC's Disaster Relief Policy and its refusal to apply that policy to the

9   COVID-19 pandemic.[1]  (SAC (Dkt. # 40) ¶¶ 7, 36-41, 106-43; Ans. (Dkt. # 41) ¶ 7;

10  Zuckerman Decl. (Dkt. # 42) ¶ 3, Ex. 2 ("Disaster Relief Policy"); *id.* ¶ 4, Ex. 3

11  ("COVID-19 Not.").)  The court details the factual background before reviewing the

12  procedural background.

13  **A.   Factual Background**

14      TRC is a subsidiary of DaVita, Inc. ("DaVita"), a healthcare organization that

15  provides administrative services for a "network of 2,753 outpatient dialysis centers"

16  throughout the United States.  (SAC ¶¶ 2, 5-6.)  DaVita allegedly encourages a "village

17  community" amongst its employees by preaching its mantra "We said. We did." to

18  promote a culture of "trust and confidence that DaVita will do what it says."  (*Id.* ¶¶ 8,

19  22; *see also id.* ¶¶ 3-4 ("Employees of [TRC] . . . are led to be [sic] believe that they [are]

20  //

---

21      [1] The court has previously detailed the background of this matter in its order on TRC's
    first motion for judgment on the pleadings.  (*See* 4/12/21 Order (Dkt. # 35) at 2-4.)  Thus, it
22  reiterates only the pertinent background here.

ORDER - 2

all part of a single 'village.'").)  Toting "Integrity" as a core value, DaVita's corporate

mission statement pledges, "We say, [sic] what we believe, and we do what we say.  We

are trusted because we are trustworthy.  In our personal, team, and organizational values,

we strive for alignment in what we say and do."  (*Id.* ¶ 24.)

DaVita publishes, maintains, and distributes an employee handbook titled

"Teammate Policies" that contains expectations and policies governing employees.  (*Id.*

¶¶ 9-10; Zuckerman Decl. ¶ 2, Ex. 1 ("Teammate Policies").)  The handbook begins, in a

section labeled "Important," with a disclaimer:

> The language used in these policies and any verbal statements made by
> management are not intended to constitute a contract of employment, either
> expressed or implied . . . .  The Teammate Policies have been provided to
> offer guidance in handling many issues, but the policies also allow for
> latitude in their application to individual circumstances or as the needs of our
> business may warrant.  Except for the policy of at-will employment, any
> policy may be canceled or modified at any time, at DaVita's sole discretion,
> with or without prior notice.

(Teammate Policies at 3 (all caps removed).)  Mr. Hesketh alleges that TRC "created an

environment in which [its] employees were led to believes [sic] that the Teammate

Policies . . . purport to be fair, and would be applied consistently and uniformly to each

employee."  (*Id.* ¶ 22.)  Managers supposedly "acknowledge that the Teammates

[Policies] create[] mutual expectations between the employees and DaVita that the

policies will be applied to their relationship."  (*Id.* ¶ 23.)

DaVita and TRC require employees to annually sign an acknowledgment that they

have read and will adhere to the Teammate Policies.  (SAC ¶¶ 12, 16, 18-19; *see*

Zuckerman Decl. ¶ 5, Ex. 4 ("Acknowledgment") at 2.)  The acknowledgment provides:

I understand that I am governed by the contents of the Teammate Policies . . . and I recognize that DaVita reserves the right to interpret, amend, modify, supersede or eliminate policies, practices or benefits (except employment-at-will policies) described in these policies from time-to-time in its sole and absolute discretion.  No oral amendment to any policy or benefit described herein shall be effective.

I understand the Teammate Policies . . . and their contents are not intended to create any contractual or legal obligations, express or implied between DaVita and its teammates; however, these policies do set forth the entire employment arrangement between me and DaVita with respect to the at-will nature of my employment relationship with DaVita.

(SAC ¶ 16; Acknowledgment at 2.)  Mr. Hesketh signed his acknowledgement of the Teammates Policies in January 2020.  (Acknowledgement at 1.)

The Teammate Policies handbook contains a Disaster Relief Policy that "provides for pay continuance during an emergency time frame when a declared emergency or natural disaster prevents teammates from performing their regular duties."  (*See* SAC ¶¶ 36-37; Disaster Relief Policy at 1.)  A "declared emergency or natural disaster" can be "proclaimed by either the President of the United States, a state Governor or other elected official, or if local leadership . . . deems it appropriate."  (Disaster Relief Policy at 1; SAC ¶ 38.)  What constitutes the "emergency time frame," as well as the "affected facility or business office," is "identified on a case-by-case basis by local leadership . . . and the Disaster Governance Council, dependent on the severity of the disaster and location."  (Disaster Relief Policy at 2.)  If a designated facility is open during the emergency time frame, employees will receive "premium pay," or 1.5 times the base rate of pay.  (*Id.*; SAC ¶¶ 39, 41.)  The Disaster Relief Policy also specifies:

The language used in this policy is not intended to constitute a contract of employment, either express or implied, to give teammates any additional

rights to continued employment, pay or benefits, or to otherwise change DaVita's policy of at-will employment.

(Disaster Relief Policy at 2.)

This Disaster Relief Policy underwent an edit around 2017.  Before January 1, 2018, the policy stated that a declared emergency or natural disaster shall be proclaimed by the President, a Governor or elected office, "*and* if local leadership . . . deems it appropriate."  (SAC ¶ 43.)  Afterwards, however, the policy was changed so that the emergency could be proclaimed by the aforementioned public officials "*or* if local leadership . . . deems it appropriate."  (*Id.* ¶ 44.)

Mr. Hesketh has worked for TRC for 13 years.  (*Id.* ¶ 7; Ans. ¶ 7.)  He is currently an IT specialist, and he has been working remotely since 2019.  (Ans. ¶ 52.)  Mr. Hesketh alleges that a national emergency was declared in the beginning of January 2020, due to the COVID-19 pandemic.  (SAC ¶¶ 47-53.)  Nonetheless, "not all DaVita teammates [were prevented] from performing their regular duties," and "thousands . . . including [Mr. Hesketh], worked their regularly scheduled hours."  (*Id.* ¶¶ 53-54.)  Mr. Hesketh continued to work on a fully remote basis throughout the pandemic.  (Ans. ¶¶ 7, 52.)

On March 31, 2020, DaVita issued a statement announcing that "the Disaster Relief Policy does not apply to the COVID-19 crisis."  (COVID-19 Not. at 4; SAC ¶ 65.)  It subsequently amended the Disaster Relief Policy to add a paragraph explaining that "the policy is effective upon a decision by local leadership and the Disaster Governance Council that a declared emergency or natural disaster prevents our facilities from operating or prevents our teammates from working."  (COVID-19 Not. at 5 ("The

1    Disaster Relief Policy applies only when teammates are unable to perform their regular

2    duties."); SAC ¶ 66.)  Because "teammates are able to work and are essential" during the

3    COVID-19 crisis, the policy did not apply.  (*Id.*)

4    **B.    Procedural Background**

5          Mr. Hesketh brought the instant suit against TRC on October 22, 2020, in state

6    court, and TRC removed the action.  (*See* Compl. (Dkt. # 1-1); Not. of Removal (Dkt.

7    # 1).)  Mr. Hesketh originally raised three claims:  (1) breach of contract; (2) promissory

8    estoppel; and (3) unjust enrichment.  (Am. Compl. (Dkt. # 19) ¶¶ 61-89.)  On March 11,

9    2021, TRC moved for judgment on the pleadings under Federal Rule of Civil Procedure

10   12(c), arguing for dismissal of all three claims.  (*See* 1st MJOP (Dkt. # 22).)  Specifically,

11   TRC argued that the breach of contract claim fails because the Teammate Policies does

12   not give rise to a contract and even if it did, the conditions precedent never occurred.  (*Id.*

13   at 9-14.)  TRC also argued that the promissory estoppel claim fails because the

14   disclaimers within the Teammate Policies rendered any promise illusory.  (*Id.* at 21-23.)

15   Finally, TRC challenged the unjust enrichment claim for failing to allege that it received

16   any benefit at Mr. Hesketh's expense.  (*Id.* at 24.)

17         The court granted TRC's motion for judgment on the pleadings in part.  (4/12/21

18   Order at 1-2.)  The court agreed with TRC that the policies in the Teammate Policies

19   handbook, including the Disaster Relief Policy, were not binding because the handbook

20   contained "clear and direct language disavowing the handbook as part of the employment

21   contract while retaining discretion or authority to act apart from the handbook on behalf

22   of the employer."  (*Id.* at 6-11.)  The court further found the Disaster Relief Policy was

1  "too discretionary as a matter of law to constitute a promise of specific treatment in a

2  specific situation." (*Id.* at 11-12.)  The lack of a clear and definite promise doomed Mr.

3  Hesketh's promissory estoppel claim.  (*Id.* at 12-13.)  However, the court held that Mr.

4  Hesketh pled sufficient facts for his unjust enrichment claim and that TRC provided "no

5  authority to support dismissal under these circumstances." (*Id.* at 13-14.)  Because there

6  "remain[ed] the possibility that Mr. Hesketh could plead facts to negate [the]

7  disclaimers," the court granted him leave to amend.  (*Id.* at 14-15.)

8        The court also commented on several issues that required more clarification.  For

9  instance, the court pointed out that the line of cases involving disclaimers "focuses

10 largely on whether handbooks have modified the at-will employment relationship" but

11 that "Mr. Hesketh has not provided any argument that this authority would not be

12 applicable" here.  (*Id.* at 8 n.4.)  The court further observed that, in response to TRC's

13 conditions precedent argument, Mr. Hesketh "does not analyze the language in the

14 Disaster Relief Policy and provides no argument on whether he was 'prevented . . . from

15 performing [his] regular duties.'" (*Id.* at 12 n.7.)  Finally, the court warned Mr. Hesketh

16 that for justifiable reliance, his allegations "leave[] unclear whether he relied on the

17 Disaster Relief Policy in" continuing to work through the pandemic, as is required to

18 plausibly allege justifiable reliance for his promissory estoppel claim.  (*Id.* at 12 n.6.)

19       Mr. Hesketh filed his second amended complaint on May 12, 2021, adding a new

20 claim of breach of the implied duty of good faith and fair dealing.  (*See* SAC ¶¶ 115-22.)

21 He subsequently filed motions to certify classes of both plaintiffs and defendants.  (*See*

22 Pls. MCC; Defs. MCC.)  TRC filed a second motion for judgment on the pleadings,

1   arguing that Mr. Hesketh's amendments have not rectified the errors that the court

2   identified and again moving for dismissal. (*See* 2d MJOP at 1.) In its reply regarding the

3   motion for judgment, TRC asks that the court strike extrinsic evidence that Mr. Hesketh

4   attached to and discussed in his response. (Reply (Dkt. # 76) at 11-12.) Although Mr.

5   Hesketh filed a notice of intent to file a surreply, he did not file any surreply. (*See* Not.

6   of Surreply; Dkt.)

### III.   ANALYSIS

8       Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are

9   closed but within such time as not to delay the trial, any party may move for judgment on

10   the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when the

11   moving party clearly establishes on the face of the pleadings that no material issue of fact

12   remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach*

13   *Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990). The standard for

14   dismissing claims under Rule 12(c) is "substantially identical" to the Rule 12(b)(6)

15   standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Chavez v. United*

16   *States*, 683 F.3d 1102, 1008 (9th Cir. 2012).

17       To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

18   sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

19   face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570

20   (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

21   allows the court to draw the reasonable inference that the defendant is liable for the

22   misconduct alleged." *Id*. Although not a "probability requirement," this standard asks

1    for "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  The court

2    construes the complaint in the light most favorable to the nonmoving party, *Livid*

3    *Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), and

4    must accept all well-pleaded allegations of material fact as true, *see Wyler Summit P'ship*

5    *v. Turner Broad. Sys.*, 135 F.3d 658, 661 (9th Cir. 1998).  However, the court need not

6    accept as true a legal conclusion presented as a factual allegation.  *Iqbal*, 556 U.S. at 678.

7            The parties first dispute what materials are properly before the court.  (*See* Reply

8    at 11-12.)  They then dispute whether Mr. Hesketh's claims in his second amended

9    complaint must be dismissed.  (*See generally* 2d MJOP; Resp.)  The court resolves what

10   materials are properly before it before addressing Mr. Hesketh's claims.

11   **A.      Motion to Strike Extraneous Materials**

12           In his response, Mr. Hesketh cites repeatedly to extrinsic information in support of

13   his claims.  (*See* Resp. at 8-15 (arguing that "evidence . . . that supports [his] position is

14   available outside the pleadings") (all caps removed).)  Some of the extrinsic information

15   are documents gathered in discovery, including internal communications between DaVita

16   employees, external petitions, and deposition testimony.  (*See id.*; Henry Decl. (Dkt.

17   # 70) ¶¶ 2-5, Exs. A-D.)  Others are articles or media coverage of DaVita.  (*See, e.g.*,

18   Resp. at 11-12 n.4-6.)  Pursuant to Local Rule 7(g), TRC requests that the court strike this

19   //

20   //

21   //

22   //

1  extrinsic evidence as irrelevant, as none of that evidence was alleged or incorporated by

2  reference in the pleadings.[2]  (Reply at 11-12.)

3       The court agrees with TRC that the extrinsic evidence is inappropriate and should

4  be stricken.  When evaluating a motion for judgment on the pleadings, the court may

5  consider materials attached to or incorporated by reference in the pleadings.  *See Knievel*

6  *v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *World Trading 23, Inc. v. Edo Trading,*

7  *Inc.*, No. 2:12-cv-10886-ODW(PJWx), 2013 WL 1210147, at *1 (C.D. Cal. Apr. 11,

8  2013).  For the latter, the court may consider documents whose authenticity is not

9  contested and upon which the complaint has necessarily relied.  *Chandola v. Seattle*

10 *Hous. Auth.*, No. C13-557 RSM, 2014 WL 4540024, at *1 (W.D. Wash. Sept. 11, 2014).

11 A complaint necessarily relies on a document if (1) it refers to the document; (2) the

12 document is central to the claim; and (3) no party questions the authenticity of the

13 document.  *United States v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2012).

14 Alternatively, the court may take judicial notice of matters of public record.  *Lee v. City*

15 *of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001).

16      None of those circumstances apply here.  It is undisputed that Mr. Hesketh does

17 not attach the extrinsic evidence to his second amended complaint.  (*See* SAC.)  Nor does

18 he incorporate that evidence by reference because his complaint does not refer to it, and

19 the evidence is not central to any of his claims.  (*See id.*); *Corinthian Colls.*, 655 F.3d at

20 //

21     [2] As discussed above, although Mr. Hesketh filed a notice of intent to file a surreply, he
22 never filed that surreply.  (*See* Not. of Surreply; Dkt.)  At oral argument, he stated that he was no longer filing a surreply.

ORDER - 10

998.  Lastly, the evidence is not a matter of public record, so the court may not take

judicial notice.  *See Lee*, 250 F.3d at 689.  Because the court cannot consider any material

outside of the pleadings or not incorporated therein without converting the motion to one

for summary judgment—a request that neither Mr. Hesketh nor TRC has made in their

briefings and one that the court would deny—the court strikes the extrinsic evidence and

will not consider it.[3]  *See Van Hook v. Curry*, No. C 06-3148 PJH (PR), 2008 WL

685646, at *1 (N.D. Cal. Mar. 13, 2008) (striking "factual assertions . . . [in] a declaration

attached to [an] opposition" as "irrelevant when considering a motion to dismiss").

**B.    Mr. Hesketh's Claims**

The court now moves to the merits of TRC's motion.  TRC challenges all four

claims:  1) breach of contract; 2) breach of the implied duty of good faith and fair

dealing; 3) promissory estoppel; and 4) unjust enrichment.  (*See* 2d MJOP at 1; *see*

*generally* SAC.)  The court reviews each in turn.

1.    Breach of Contract Claim

TRC again asserts that the Teammates Policies, and its Disaster Relief Policy, do

not constitute a binding contract due to the disclaimers contained within, and even if they

do, the conditions precedent within the Disaster Relief Policy had not occurred.  (2d

MJOP at 10-18.)  Mr. Hesketh responds that the disclaimers should not apply and even if

_____

[3] To the extent that Mr. Hesketh cites the evidence to support his allegations, the court
reminds him that at this stage, it accepts all well-pleaded allegations as true, thus rendering the
extrinsic evidence unnecessary.  For instance, he submits deposition testimony stating that the
Disaster Governance Council never met regarding the pandemic.  (Resp. at 15 (citing Henry
Decl. ¶ 2, Ex. A at 152:20-22).)  But he has already alleged this fact.  (SAC ¶ 58.)  Thus, the
court will accept this allegation as true even without the accompanying deposition testimony.

they do, his second amended complaint alleges facts that the disclaimers had been

negated.  (Resp. at 2-4; 7-8, 13.)  He also suggests that there are no conditions precedent

other than the President's declaration of an emergency.  (*See id.* at 8.)  The court

concludes that although material issues of fact remain as to whether TRC negated its

disclaimers through inconsistent representations, there is no material issue of fact that the

conditions precedent in the Disaster Relief Policy were not fulfilled.  Thus, the court

dismisses the breach of contract claim.

As the court held previously, the disclaimers in the Teammate Policies, the

Disaster Relief Policy, and the Acknowledgement rise to the level of a clear and

conspicuous disclaimer of contractual rights that is effective as a matter of law."[4]

(4/12/21 Order at 9; *see also id.* at 10-11.)  Mr. Hesketh now offers a new argument:  that

the disclaimers apply only to preserving the at-will employment relationship and not to

wage claims.  (*See* Resp. at 2-3, 13.)  But he cites no authority for this position[5] and

offers close to no argument as to why the language in the Disaster Relief Policy, which

explicitly disavows "giv[ing] teammates any additional rights to . . . pay or benefits,"

applies only to the at-will employment status.  (*See* Resp.; Disaster Relief Policy at 2;

Reply at 3.)  The court recognizes, as it did before, that the line of cases cited by TRC to

support its argument that the disclaimers were effective had only considered modification

//

---

[4] The court incorporates by reference its previous analysis of whether TRC's disclaimers
are effective.  (*See* 4/12/21 Order at 6-12.)

[5] At oral argument, Mr. Hesketh conceded he was not aware of any authority that made
such a distinction.

1    of the at-will employment relationship, but again, Mr. Hesketh proffers no reasoning why

2    this authority would not be applicable here.  (*See* 4/12/21 Order at 8 n.4.)  Under these

3    circumstances, the court rejects his contention.

4         Having found the disclaimers effective, the court now turns to whether there is any

5    material issue of fact regarding whether TRC negated those disclaimers.  "An employer's

6    inconsistent representations can negate the effect of a disclaimer."  *Swanson v. Liquid Air*

7    *Corp.*, 826 P.2d 664, 674 (Wash. 1992).  For instance, "oral assurances" such as

8    "employer statements that contradict the disclaimer . . . may act to negate and override

9    the disclaimer."  *Id.* at 675.  So, too, could contradictory employment practices.  *Id.*  And

10   finally, inconsistent statements within the manual itself can negate an effective

11   disclaimer.  *See Payne v. Sunnyside Community Hosp.*, 894 P.2d 1379, 1384 (Wash. Ct.

12   App. 1995).  The impact of any inconsistent representations "can only be determined

13   after '[a]ll the circumstances, and the representations and practices of the employer' are

14   examined."  *Ritchie v. Fed. Express Corp.*, No. C04-1753RSL, 2007 WL 1140260, at *7

15   (W.D. Wash. Apr. 16, 2007) (quoting *Swanson*, 826 P.2d at 676).

16        The court finds that Mr. Hesketh's allegations on this issue, albeit a close call,

17   survive the motion for judgment.  Mr. Hesketh alleges that employees "acknowledge that

18   the Teammates [Policies] create[s] mutual expectations . . . that the policies will be

19   applied"—that is, contrary to the disclaimers, the Disaster Relief Policy is binding.  (SAC

20   ¶ 23; *see also id.* ¶ 29 (alleging that management wanted employees to "rely upon and

21   follow" policies).)  He further alleges that TRC created the policies "to incentivize those

22   employees to work" under undesirable conditions.  (*Id.* ¶ 34.)  To that end, he claims that

1    DaVita and TRC created a "carefully formulated corporate culture" interpreted by

2    employees to mean that "if DaVita says something . . . DaVita will do what it says."  (*Id.*

3    ¶ 8; *see also id.* ¶ 24 (alleging that DaVita prizes "Integrity" and "strive[s] for alignment

4    in what we say and do.").  Thus, Mr. Hesketh maintains that TRC "created an

5    atmosphere" where "employees are made to believe that [it] will abide by [the Teammate

6    Policies]."  (*Id.* ¶ 25; *see also id.* ¶ 21 (alleging that "corporate culture and management

7    directives" led employees to believe that TRC was bound by Teammate Policies).)

8            While the court agrees with TRC that these allegations are not as specific as those

9    discussed in previous cases (*see* 2d MJOP at 11), the court finds that at this early stage,

10   these allegations are enough to allow the reasonable inference that TRC has made oral

11   assurances and acted in ways inconsistent with its disclaimers.  The court emphasizes that

12   it is not passing judgment on whether, in fact, TRC's representations or conduct negated

13   the disclaimers.  Indeed, with more discovery, it is possible that what Mr. Hesketh alleges

14   is not specific enough.  But because these allegations at the pleading stage create a

15   material issue of fact, the court declines to grant judgment on this basis.[6]  *See Swanson*,

16   826 P.2d at 672 ("Ascertaining the effect of a disclaimer will often involve factual

17   determinations which must be resolved by the trier of fact if . . . there is more than one

18   reasonable inference from the evidence.").

19   //

20

21       [6] Many of the cases analyzing the negation of disclaimers were at the summary judgment
     stage, thus allowing the opportunity to submit more detailed evidence.  *See, e.g.*, *Ritchie*, 2007
22   WL 1140260, at *7.  The advanced stage of proceedings in these other cases only supports the
     court's conclusion that dismissal here is premature.

1    The court cannot say the same for Mr. Hesketh's allegations regarding the

2    conditions precedent.  A condition precedent is "a fact or event included in a contract that

3    must take place before a right to immediate performance arises."  *Lokan v. Assocs., Inc.*

4    *v. Am. Beef Processing, LLC*, 311 P.3d 1285, 1289 (Wash. Ct. App. 2013).  Whether a

5    provision is a condition precedent can be ascertained from "a fair and reasonable

6    construction of the language."  *Ross v. Harding*, 391 P.2d 526, 531 (Wash. 1964).  Words

7    that "express . . . the performance of a promise is dependent on some other event"—such

8    as "on condition," "provided that," "so that," "when," "while," "after," or "as soon as"—

9    will create a condition precedent.  *Id.*  When there is doubt as to whether the parties have

10   created an express condition, the court interprets the language to have created such a

11   condition.  *Lokan*, 311 P.3d at 1289.  The plaintiff bears the burden of alleging that a

12   condition precedent was met.  *Ross*, 391 P.2d at 240.

13       Applied here, there are at least two conditions precedent in the Disaster Relief

14   Policy that must be met before premium pay is instituted.  First, premium pay is only

15   instituted "during an emergency time frame," which is identified "on a case-by-case

16   basis" by DaVita leadership and a Disaster Governance Council "dependent on the

17   severity of the disaster and location."  (Disaster Relief Policy at 1-2; *see also id.* at 2 ("*If*

18   *a designated facility or business office is open during the emergency time frame*,

19   teammates who report to their location and work their scheduled hours will be paid

20   premium pay.") (emphasis added).)  Second, the pay practice is implemented "when a

21   declared emergency or natural disaster prevents teammates from performing their regular

22   duties."  (*Id.* at 1.)  Thus, although Mr. Hesketh insists that "the triggering of the

1    [Disaster Relief] Policy is automatic and compulsory" when an emergency is declared,

2    the plain language of the policy indicates otherwise.  (*See* Resp. at 8.)

3           As with his previous response to TRC's motion for judgment (*see* 4/12/21 Order at

4    12 n.7), Mr. Hesketh provides very little argument on these conditions precedent, cites no

5    applicable law, and has not alleged that either of these conditions precedent occurred,

6    (*see* Resp.)  Instead, he seems to concede that neither condition was fulfilled.  First, he

7    highlights that the Disaster Governance Council "never even met regarding the COVID-

8    19 global pandemic."  (Resp. at 15; SAC ¶ 58 (alleging that TRC "never convened a

9    meeting of the 'Disaster Governance Counsel [sic]'").)  It follows that DaVita never

10   announced an emergency time frame.[7]  (*See* Disaster Relief Policy at 2.)  Second, Mr.

11   Hesketh emphasizes that he "does ***not*** allege that he is owed premium pay because he

12   'was prevented from performing his regular duties.'"  (Resp. at 4 (emphasis in original);

13   *see generally* SAC.)  But if that were the case, then there is no dispute that the Disaster

14   Relief Policy would not have been triggered, as it only provides pay continuance "when a

15   declared emergency or natural disaster prevents teammates from performing their regular

16   duties."[8]  (*See* Disaster Relief Policy at 1.)

17

18          [7] At base, Mr. Hesketh seems to argue that DaVita should have or had to identify an
     emergency time frame.  (*See* Resp. at 8-9, 15.)  But he does not point to any aspect of the
19   Disaster Relief Policy or applicable case law to support this position.  (*See id.*)  Regardless of
     how the company should have responded to the pandemic, the court's role is to interpret the
20   language of the alleged contract, not to judge the soundness of the company's business decisions.
     *See Fisher Props. Inc. v. Arden-Mayfair, Inc.*, 726 P.2d 8, 15 (Wash. 1986).

21          [8] Mr. Hesketh does allege that "some, but not all DaVita teammates" were prevented
     from performing their regular duties.  (SAC ¶ 53.)  But he makes no argument as to whether that
22   fulfills the condition precedent.  (*See* Resp.); *see United States v. Sineneng-Smith*, 140 S. Ct.

1    In sum, the court concludes that there is a material issue of fact regarding whether

2  TRC negated the otherwise effective disclaimers.  However, even if there were a contract,

3  Mr. Hesketh has not alleged that the conditions precedent occurred.  Therefore, no

4  material issue of fact remains to be resolved regarding the conditions precedent, and TRC

5  is entitled to judgment as a matter of law on Mr. Hesketh's breach of contract claim.

6    2.    Breach of Implied Duty of Good Faith and Fair Dealing Claim

7    Mr. Hesketh brings a new claim for breach of the implied duty of good faith and

8  fair dealing, alleging that the premium pay offer was "made in bad faith and performed in

9  bad faith by failing to abide by the offer's objective standard of an emergency

10  declaration, and subjectively refusing to identify the emergency time frame and failing to

11  pay the premium pay promised to the employees."  (SAC ¶ 118; *see also id* ¶¶ 64, 115-

12  22.)  TRC's only argument for dismissal of this claim, as confirmed during oral

13  arguments, is that Mr. Hesketh "fails to establish the existence of a contract."  (2d MJOP

14  at 20-21.)  As discussed above, there is a material issue of fact as to whether the

15  disclaimers were negated, which could in turn render the Disaster Relief Policy a binding

16  contract.  *See supra* § III.B.1.  Thus, the court rejects this argument and denies TRC's

17  motion for judgment on this claim.

18    3.    Promissory Estoppel Claim

19    TRC next moves for judgment and dismissal of Mr. Hesketh's promissory

20  estoppel claim.  (2d MJOP at 10-16, 18-20.)  Promissory estoppel requires the employee

21

22  1575, 1579 (2020) (requiring "the parties to frame the issues for decision and assign to courts the
role of neutral arbiter of matters the parties present").

to allege three elements: (1) that the statements within the policy amounted to "promises of specific treatment in specific situations"; (2) that the employee "justifiably relied on any of these promises"; and (3) that those promises were breached.[9] *Bulman v. Safeway, Inc.*, 27 P.3d 1172, 1174-75 (Wash. 2001) (en banc). TRC argues that Mr. Hesketh has failed to allege the first two elements. (*See* 2d MJOP at 10-16, 18-20.)

The court previously held that the Disaster Relief Policy did not amount to a promise of specific treatment in a specific circumstance because of the discretion within the policy. (4/12/21 Order at 11-13.) Mr. Hesketh responds that his new allegations demonstrate that the Disaster Relief Policy was not so discretionary as to render the promise illusory. (Resp. at 15-17.) In particular, he notes that (1) DaVita's 2017 amendment of the policy undercuts the discretion within; and (2) DaVita's decision not to exercise discretion was a violation of its obligations of good faith and fair dealing. (*Id.*) Neither of these arguments are availing, and the court again holds that that the Disaster Relief Policy is too discretionary as a matter of law to constitute a promise of specific treatment in a specific situation.

First, although DaVita amended the Disaster Relief Policy in 2017 to allow either political officials or local leadership to proclaim a declared emergency, that amendment did not remove the discretion the court previously recognized. (SAC ¶¶ 42-45.) As the court discussed in its last order (4/12/21 Order at 11-13), a "supposed promise" may be

---

[9] Again, it is unclear whether Mr. Hesketh brings an independent promissory estoppel claim or the promissory estoppel exception under the framework laid out in *Thompson v. St. Regis Paper Company*, 685 P.2d 1081 (Wash. 1984). (*See* 4/12/21 Order at 12.) Regardless, the identified deficiencies render either avenue unavailing.

1    illusory if it is "discretionary on the part of the promisor," *Stewart v. Chevron Chem. Co.*,

2    762 P.2d 1143, 1145 (Wash. 1988).  Policies that allowed the employer to determine on a

3    case-by-case basis whether to implement the promise did not provide a promise of

4    specific treatment in a specific circumstance.  *See Quedado v. Boeing Co.*, 276 P.3d 365,

5    371 (Wash. Ct. App. 2012).  Here, changing who gets to proclaim a declared emergency

6    does not alter the fact that DaVita must still determine the "affected facility," "business

7    office," and "emergency time frame" during which premium pay applies, all of which are

8    made "on a case-by-case basis" and are "dependent on the severity of the disaster and

9    location." (Disaster Relief Policy at 2.)  Such discretion is not a promise of specific

10   treatment in a specific circumstance.

11          Mr. Hesketh's second argument fares no better.  First, it is unclear whether this

12   argument applies to his promissory estoppel claim or his breach of good faith and fair

13   dealing claim, as he does not focus on the elements of promissory estoppel but instead the

14   need to "appropriately factor in the obligation of good faith and fair dealing."  (*See* Resp.

15   at 16.)  Moreover, his cited authorities do not support this proposition and are entirely

16   beside the point.  *See Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.*, 156 P.3d

17   1253, 1257 (Wash. Ct. App. 2006); *Duncan v. Alaska USA Fed. Credit Un., Inc.*, 199 .3d

18   991, 1003-04 (Wash. Ct. App. 2008).  Neither *Cascade* nor *Duncan* dealt with a

19   promissory estoppel claim; instead, both concerned the unilateral modification of a

20   terminable-at-will contract.  *See Cascade*, 156 P.3d at 1257; *Duncan*, 199 P.3d at 1002.

21   Here, although the disclaimers allow DaVita to modify the policies (Teammates Policies

22   at 3; Acknowledgment at 2), what sinks Mr. Hesketh's promissory estoppel claim is the

1  discretion within the Disaster Relief Policy, regardless of whether DaVita exercises its

2  modification powers. *See Quedado*, 276 P.3d at 371.  Thus, Mr. Hesketh's appeal to

3  good faith and fair dealing is unavailing.

4  But even if the Disaster Relief Policy amounted to promises of specific treatment

5  in specific situations, Mr. Hesketh's promissory estoppel claim still fails because he does

6  not claim to have justifiably relied on the Disaster Relief Policy.  As the court remarked,

7  Mr. Hesketh's "sole allegation" in his previous complaint regarding reliance was

8  insufficient because it merely stated that he "continued to work his regularly scheduled

9  hours" without specifying "whether he relied on the Disaster Relief Policy in doing so."

10 (4/12/21 Order at 12 n.6 (citing *Baker v. City of SeaTac*, 994 F. Supp. 2d 1148, 1159

11 (W.D. Wash. 2014)).)  His second amended complaint again alleges that he "worked . . .

12 regularly scheduled hours" through the pandemic but adds elsewhere in summary fashion

13 that employees "rel[ied] on DaVita's Disaster Relief Policy regarding premium pay."

14 (SAC ¶¶ 54, 67; *see also id.* ¶¶ 127-28 (alleging that employees "continued to work

15 during the emergency" in reliance on "DaVita's promises").)  This general statement is

16 not only the type of legal conclusion that the court need not accept as true, but it is also

17 not specific to Mr. Hesketh. *See Iqbal*, 556 U.S. at 678.  Mr. Hesketh's briefing is of no

18 help either, as it is silent on both his specific reliance on the Disaster Relief Policy and

19 whether that reliance was justifiable.  (*See* Resp.)  Indeed, when asked at oral argument,

20 he could not identify where in his briefing he addresses justifiable reliance.

21 Because the court finds no material issue of fact remains regarding the first and

22 second elements of promissory estoppel, it grants judgment as a matter of law to TRC.

1          4.      Unjust Enrichment Claim

2          Lastly, TRC moves for judgment on Mr. Hesketh's unjust enrichment claim.  (2d

3    MJOP at 21-24.)  To establish unjust enrichment, Mr. Hesketh must allege that "(1) the

4    defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3)

5    the circumstances make it unjust for the defendant to retain the benefit without payment."

6    *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008).  TRC argues that he cannot show a

7    benefit to TRC at his expense or that any injustice resulted from TRC not paying him

8    premium pay.  (2d MJOP at 21-24.)  Mr. Hesketh makes no response to TRC's

9    arguments, relying instead on the court's previous order upholding his unjust enrichment

10   claim.  (*See* Resp. at 19.)  But TRC has made different and more complete arguments this

11   time around—ones that the court did not have an occasion to consider in its previous

12   order.  (*See* 4/12/21 Order at 13-14; *compare* 1st MJOP at 24, *with* 2d MJOP at 21-24.)

13   Thus, it is not enough for Mr. Hesketh to rest entirely on the court's prior order.

14         Unjust enrichment occurs "when one retains money or benefits which in justice

15   and equity belong to another."  *Bailie Comms. v. Trend Bus. Sys.*, 810 P.2d 12, 18 (Wash.

16   Ct. App. 1991).  The benefit conferred cannot be one given pursuant to an existing

17   contract for which regular payment was delivered.  *Mastaba, Inc. v. Lamb Weston Sales,*

18   *Inc.*, 23 F. Supp. 3d 1283, 1295-96 (E.D. Wash. 2014).  Moreover, the benefit must be

19   one the plaintiff was entitled to, as "[t]he core of unjust enrichment is the notion that a

20   defendant has received a right or benefit that *belonged to the plaintiff*."  *BOFI Fed. Bank*

21   *v. Adv. Funding LLC*, No. C14-0484BJR, 2015 WL 5008860, at *2 (W.D. Wash. Aug.

22   20, 2015) (emphasis in original).

1    *Pengbo Xiao v. Feast Buffet, Incorporated*, 387 F. Supp. 3d 1181 (W.D. Wash.

2    2019) is instructive.  There, the employees alleged unjust enrichment based on an

3    employer's oral promise that it would reimburse them for travel expenses.  *Id.* at 1190.

4    The court rejected the employer's argument that "there were no written contracts

5    requiring reimbursement," as unjust enrichment does not require a contractual

6    relationship.  *Id.* at 1190-91.  Nevertheless, the court found that the employees "never

7    possessed any right to the cost of" travel, only an "inchoate right."  *Id.* at 1191.  Thus, the

8    court granted judgment to the employer because the employees had not sufficiently

9    showed that they were entitled to the benefit.  *See id.*

10   Mr. Hesketh pleads two potential benefits, neither of which is availing.  First, he

11   alleges that TRC benefited by his continuing to work during the pandemic.  (SAC ¶ 140.)

12   But his regular work, for which TRC paid his regular wage, related to his existing

13   employment and thus cannot sustain an unjust enrichment claim.  *See Mastaba*, 23 F.

14   Supp. 3d at 1296 (dismissing unjust enrichment claim when benefit related to existing

15   contract).  Second, he alleges that TRC benefited by retaining the premium pay that

16   should have been paid.  (SAC ¶¶ 138-39.)  But as discussed above, Mr. Hesketh was not

17   entitled to premium pay.  *See supra* § III.B.1, 3.  Even when the facts are viewed in the

18   light most favorable to him, Mr. Hesketh does not allege that he was prevented by the

19   pandemic from performing his regular duties or that an emergency time frame was

20   declared—in fact, he alleges the opposite.  (*See* SAC ¶¶ 54, 58.)  Like the employees in

21   *Pengbo Xiao*, Mr. Hesketh has not shown that he "possessed any right to" premium pay

22   and thus has not shown the requisite entitlement to that benefit.  *See* 387 F. Supp. 3d at

1190-91.  Again, Mr. Hesketh makes no argument otherwise in his briefing or at oral

argument.  (*See* Resp. at 19.)

Because Mr. Hesketh has not shown a cognizable benefit, his unjust enrichment

claim fails.  Accordingly, the court grants judgment on this claim to TRC.

**C.    Leave to Amend**

As a general rule, when a court grants a motion to dismiss, the court should

dismiss the complaint with leave to amend.  *See Eminence Cap., LLC v. Aspeon, Inc.*, 316

F.3d 1048, 1051-52 (9th Cir. 2003) (citing Fed. R. Civ. P. 15(a)).  "A district court,

however, does not abuse its discretion in denying leave to amend where amendment

would be futile."  *Flowers v. First Hawaiian Bank*, 295 F.3d 966, 976 (9th Cir. 2002).

Leave to amend may be denied for "failure to cure deficiencies by previous amendment."

*Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008).

Mr. Hesketh has now had two previous chances to amend his claims, the most

recent of which was in direct response to a partially successful motion for judgment that

is almost identical to the instant motion.  (*See* Am. Compl.; SAC; 4/12/21 Order at 14-15;

*compare* 1st MJOP, *with* 2d MJOP.)  For instance, TRC raised the same disclaimer,

conditions precedent, specific promise, and reliance arguments regarding Mr. Hesketh's

breach of contract and promissory estoppel claims.  (*See* 1st MJOP at 9-23.)  The court

also commented on these arguments, seeking clarification on several issues including the

conditions precedent and justifiable reliance.  (*See* 4/12/21 Order at 12 n.6-7.)

Nevertheless, Mr. Hesketh's second amended complaint again fails to state a breach of

contract or promissory estoppel claim as a matter of law.  Under these circumstances, the

1    court denies leave to amend for those claims.  *See Johnson v. JP Morgan Chase Bank*

2    *N.A.*, No. C14-5607RJB, 2014 WL 7156862, at *3 (W.D. Wash. Dec. 15, 2014) (denying

3    leave to amend second time for deficient claims); *Abagninin*, 545 F.3d at 742.

4        The court also denies leave to amend for the unjust enrichment claim because

5    amendment would be futile.  *See Flowers*, 295 F.3d at 976.  Although Mr. Hesketh has

6    not previously amended this claim, his claim fails not because of insufficient facts but as

7    a matter of law.  *See supra* § III.B.4.  In fact, his pleading presents undisputed facts that

8    directly defeat his claim, as they illustrate his lack of entitlement to premium pay.  (*See*

9    SAC ¶¶ 54, 58; Ans. ¶¶ 7, 52.)  Accordingly, the court dismisses Mr. Hesketh's unjust

10   enrichment claim with prejudice and without leave to amend.

11       The court recognizes that there are two pending motions for class certification.

12   (*See* Pls. MCC; Defs. MCC.)  As the briefing illustrates, those motions are intractably

13   intertwined with the claims discussed here and thus have been impacted by this decision.

14   (*See id.*)  At oral argument, both parties acknowledged that new briefing on class

15   certification may be necessary if this order modifies the claims at issue.  Accordingly, the

16   court STRIKES the pending motions without prejudice and instructs the parties to meet

17   and confer on what next steps, if any, should be taken.  The parties may jointly or

18   separately file a statement of no more than three pages within seven days of this order.

## IV.   CONCLUSION

20       For the foregoing reasons, the court GRANTS in part and DENIES in part TRC's

21   motion for judgment on the pleadings (Dkt. # 57).  Specifically, the court dismisses Mr.

22   Hesketh's breach of contract, promissory estoppel, and unjust enrichment claims with

prejudice and without leave to amend.  The court also STRIKES the pending motions for

class certification (Dkt. ## 50, 55) and ORDERS the parties to meet and confer.  The

parties must submit a joint or separate three-page statement detailing what next steps

would be appropriate within seven days of the filing of this order.

      Dated this 16th day of August, 2021.


JAMES L. ROBART
United States District Judge