1

2

THE HONORABLE JAMES L. ROBART

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11 JOSEPH J. HESKETH III, ON HIS OWN
BEHALF AND ON BEHALF OF OTHER
SIMILARLY SITUATED PERSONS,

No. 2:20-cv-01733-JLR

12

DEFENDANT TOTAL RENAL
CARE, INC.'S MOTION FOR
SUMMARY JUDGMENT

Plaintiff,

13

14 v.

NOTE ON MOTION CALENDAR:
OCTOBER 22, 2021

15 TOTAL RENAL CARE, INC., ON ITS OWN
BEHALF AND ON BEHALF OF OTHER
SIMILARLY SITUATED PERSONS,

16

17 Defendant.

18

19

20

21

22

23

24

25

26

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR)

153641612.16

1

**TABLE OF CONTENTS**

2

Page

3   I.     INTRODUCTION................................................................1

4   II.    STATEMENT OF FACTS ...........................................................2

5          A.     The Teammate Policies and the Disaster Relief Policy...........................2

6          B.     Mr. Hesketh Understood the Policy Was Not A Contract...................................3

7          C.     Mr. Hesketh Admits No One Made Any Statements to Him That Were
                  Contrary to the Disclaimers...................................................4

8          D.     No Activation of the Policy for the COVID-19 Pandemic................................4

9          E.     DaVita's Communications to Teammates About the Policy Were
                  Consistent with the Disclaimers...........................................4

10         F.     DaVita Exercises Discretion in Activating the Disaster Relief Policy.................4

11         G.     Mr. Hesketh Performs His Job Duties As Before, Remotely and Without
                  Disruption................................................................7

12  III.   ARGUMENT.................................................................7

13         A.     Mr. Hesketh Cannot Establish a Valid Contract as a Matter of Law ...................8

14                1.     Mr. Hesketh Cannot Establish the Valid Disclaimers Were
                        Negated...........................................................8

15                2.     Mr. Hesketh Cannot Establish a Contract Ever Formed........................11

16                       a.     Mr. Hesketh Cannot Establish There Was An Offer..................12

17                       b.     Mr. Hesketh Cannot Establish Acceptance .............................13

18                       c.     Mr. Hesketh Cannot Establish Consideration to Support the
                               Alleged Contract Modification...................................14

19         B.     Mr. Hesketh Cannot Establish TRC Breached A Duty to Act in Good
                  Faith.....................................................................14

20                1.     Mr. Hesketh's Claim Seeks to Impose Duties on TRC that
                        Contradict the Clear Terms of the Policy .............................15

21

22                2.     Mr. Hesketh Cannot Establish TRC Breached Any Duty of Good
                        Faith.............................................................17

23         C.     Mr. Hesketh Cannot Establish Cognizable Damages as a Matter of Law ..........19

24  IV.    CONCLUSION................................................................20

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

## TABLE OF AUTHORITIES

2                                                                            **Page(s)**

3    CASES

4    *Badgett v. Sec. State Bank*,
5        807 P.2d 356 (Wash. 1991) ...................................................................7, 15, 16

6    *Baker v. City of SeaTac*,
         994 F. Supp. 2d 1148 (W.D. Wash. 2014) ...................................................9, 12
7
     *Bombardier v. Mitsubishi*,
8        383 F. Supp. 3d 1169 (W.D. Wash. 2019) .................................................14, 15

9    *Burlington Ins. Co. v. Blind Squirrel, LLC*,
         228 F. Supp. 3d 1160 (E.D. Wash. 2017) ...................................................16, 17
10
     *Conway Constr. Co. v. City of Puyallup*,
11       490 P.3d 221 (Wash. 2021) ............................................................................. 18

12   *Craig v. Pillsbury Non-Qualified Pension Plan*,
13       458 F.3d 748 (8th Cir. 2006) ........................................................................... 18

14   *Curtis v. N. Life Ins. Co.*,
         No. 61372-3-I, 2008 WL 4927365 (Wash. Ct. App. Nov. 17, 2008) ................. 18
15
     *Fisher Props. Inc. v. Arden-Mayfair, Inc.*,
16       726 P.2d 8 (Wash. 1986) .................................................................................. 19

17   *Ford v. Trendwest Resorts, Inc.*,
18       43 P.3d 1223 (Wash. 2002) ............................................................................. 20

19   *Hard 2 Find Accessories, Inc. v Amazon.com, Inc.*,
         58 F. Supp. 3d 1166 (W.D. Wash. 2014) ...................................................15, 17
20
     *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*,
21       162 P.3d 1153 (Wash. Ct. App. 2007) ........................................................13, 20

22   *Joern v. Ocwen Loan Servicing, LLC*,
23       No. CV-10-0134, 2010 WL 2813769 (E.D. Wash. July 14, 2010) ..................... 8

24   *Johnson v. Nasi*,
         309 P.2d 380 (Wash. 1957) ............................................................................... 8
25
     *Johnson v. Yousoofian*,
26       930 P.2d 921 (Wash. Ct. App. 1996) ............................................................... 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Keystone Land & Dev. Co. v. Xerox Corp.*,
  94 P.3d 945 (Wash. 2004) ........................................................................................7, 8

4

5

*Labriola v. Pollard Grp., Inc.*,
  100 P.3d 791 (Wash. 2004) ........................................................................................ 14

6

*Lehrer v. State, Dept. of Soc. & Health Servs.*,
  5 P.3d 722 (Wash. Ct. App. 2000) ............................................................................. 8

7

8

*Microsoft Corp. v. Motorola, Inc.*,
  963 F. Supp. 2d 1176 (W.D. Wash. 2013) ......................................................8, 17, 18

9

10

*Nelson v. Southland Corp.*,
  894 P.2d 1385 (Wash. Ct. App. 1995) ...................................................................... 10

11

*NOVA Contracting, Inc. v. City of Olympia*,
  426 P.3d 685 (Wash. 2018) ......................................................................................... 8

12

13

*Payne v. Sunnyside Cmty. Hosp.*,
  894 P.2d 1379 (Wash. Ct. App. 1995) ...................................................................9, 11

14

*Quedado v. Boeing Co.*,
  276 P.3d 365 (Wash Ct. App. 2012) .................................................................8, 11, 12

15

16

*Ross v. Harding*,
  391 P.2d 526 (Wash. 1964) ...................................................................................... 16

17

18

*Scribner v. Worldcom, Inc.*,
  249 F.3d 902 (9th Cir. 2001) .................................................................................... 18

19

*Shokri v. Boeing Co.*,
  311 F. Supp. 3d 1204 (W.D. Wash. 2018) ................................................................ 19

20

21

*Spooner v. Reserve Life Ins. Co.*,
  287 P.2d 735 (Wash. 1955) .............................................................................10, 12, 13

22

23

*Swanson v. Liquid Air Corp.*,
  826 P.2d 664 (Wash. 1992) ......................................................................................9, 11

24

25

*Thompson v. St. Regis Paper Co.*,
  685 P.2d 1081 (Wash. 1984) ..................................................................................... 12

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

*Trinidad v. Metro. Prop. & Cas. Ins. Co.*,

4
   NO. C13-5191, 2013 WL6729639 (W.D. Wash. Dec. 19, 2013)......................................... 20

5

*Washington Land Dev., LLC v. Lloyds TSB Bank, PLC*,
   No. C14-0179, 2014 WL 3563292 (W.D. Wash. July 18, 2014) ......................................... 8

6

OTHER AUTHORITIES

7

*Ongoing Emergencies & Disasters*, Ctrs. For Medicare & Medicaid Servs.,

8
   https://www.cms.gov/About-CMS/Agency-
   Information/Emergency/EPRO/Current-Emergencies/Ongoing-emergencies

9
   (last visited Sept. 29, 2021) ......................................................................... 11

10

Proclamation No. 19-01 (Jan. 25, 2019),

11
   https://www.governor.wa.gov/sites/default/files/proclamations/19-
   01%20State%20of%20Emergency.pdf ......................................................... 11

12

Restatement (Second) of Contracts § 23 (1981) .................................................... 12

13

Restatement (Second) of Contracts § 50, cmt. a (1981) ......................................... 13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – iv

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

153641612.16

## I.      INTRODUCTION

In Washington, a breach of good faith and fair dealing claim—the last remaining claim in this action—is only viable if a contract exists. DaVita's Disaster Relief Policy is not a contract. In addition, even if the Policy were a contract, Mr. Hesketh cannot establish that TRC had a duty to act in good faith, that TRC breached that duty, or that he suffered resulting damages. Mr. Hesketh's final claim fails as a matter of law for the following four, separate reasons:

First, this Court held that DaVita's contract disclaimers "rise to the level of a clear and conspicuous disclaimer of contractual rights that is effective as a matter of law." Dkt. # 84 at p. 12. This Court allowed Mr. Hesketh's remaining claim to survive based only on the narrow possibility that a contract could conceivably be established for purposes of the good faith and fair dealing claim *if* Mr. Hesketh could establish that the legally-effective disclaimers in the Policy were negated by TRC's *specific* conduct. No such specific evidence exists here. To the contrary: the Policy language, emails and written communications, and the application of the Policy consistently and repeatedly reinforced the discretionary nature of the Policy. Mr. Hesketh cannot meet the Court's straightforward challenge and the disclaimers remain effective as a matter of law.

Second, at the most basic level, no implied contract was formed because Mr. Hesketh cannot meet any of the required elements of offer, acceptance, and consideration. An offer requires an intent to be bound, but the Policy plainly states it "is not intended to constitute a contract of employment, either express or implied." Moreover, TRC's performance under the Policy was purely discretionary, which renders any supposed offer illusory and unenforceable. No meeting of the minds occurred and there is no dispute that Mr. Hesketh did not receive consideration, he simply continued to work after he signed the Policy acknowledgement. As a matter of law, no contract formed.

Third, even if a contract somehow was formed and the disclaimers were negated, DaVita did not breach a duty of good faith and fair dealing because it acted in accordance with the express

---

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

153641612.16

terms of the Policy and exercised its discretion under the Policy reasonably and consistently with how it had done so in other situations. Mr. Hesketh's good faith and fair dealing claim seeks to impose duties on TRC that are inconsistent with and additional to the duties expressly articulated in the Policy. This cannot be done as a matter of law.

Fourth and finally, even if Mr. Hesketh cleared *all* of the above hurdles, it is undisputed that he did not suffer any damage. The Policy provides premium pay during an emergency time frame only to those who report to their location and work their scheduled hours. Remote workers, like Mr. Hesketh, who do not report to their office are not entitled to premium pay under the Policy, even if an emergency time frame is declared for their office.

TRC asks this Court to enter judgment in its favor on Mr. Hesketh's good faith and fair dealing claim. The undisputed material facts demonstrate the Disaster Relief Policy is not a contract, TRC did not breach any duty, and Mr. Hesketh was not damaged. His claim fails as a matter of law.

## II.      STATEMENT OF FACTS

### A.      The Teammate Policies and the Disaster Relief Policy

Defendant Total Renal Care, Inc. ("TRC")[1] provides its employees, or "teammates," with DaVita's handbook (the "Teammate Policies"). Dkt. #40 at p. 3, ¶¶ 9-10. The Teammate Policies include the Disaster Relief Policy (the "Policy"), which was added in 2017. Dkt. # 42 at p. 2, ¶ 3, pp. 10-11 ("DRP"); Declaration of Chelsea Petersen in support of Defendant's Motion for Summary Judgment Decl. ¶ 2, Ex. A ("Hesketh Dep.") 72:8-19; 95:10-22. The Policy provides for pay continuance during an emergency time frame when a declared emergency or natural disaster prevents teammates from performing their regular duties. *See* DRP. As this Court found,

> there are at least two conditions precedent in the Disaster Relief Policy that must be met before premium pay is instituted. First, premium pay is only instituted 'during an emergency time frame,' which is identified 'on a case-by-case basis' by

---

[1] TRC is a subsidiary of DaVita, Inc., and operates dialysis centers that provide life-sustaining care to patients. Dkt. #40 at p. 2, ¶ 3. TRC is the only Defendant in this action. *Id.* Because TRC is a wholly-owned subsidiary of DaVita, TRC and DaVita are used interchangeably throughout this brief.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:20-cv-01733-JLR) – 2

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

DaVita leadership and a Disaster Governance Council 'dependent on the severity of the disaster and location.' [Citations omitted].   Second, the pay practice is implemented 'when a declared emergency or natural disaster prevents teammates from performing their regular duties.'

Dkt. #84 at p. 15; DRP.   Performance under the Policy is discretionary: "The Disaster Relief Policy is not automatically triggered upon the proclamation of an emergency or natural disaster by government officials.   Instead, the company must determine the 'affected facility' or 'business office,' and the emergency time frame during which premium pay applies."   Dkt. #35 at pp. 11-12 (citation omitted); *see* DRP.

Even when the conditions precedent are met and DaVita declares an emergency time frame, premium pay is not automatically paid to all teammates.   Under the Policy, premium pay is paid during the emergency time frame *only* to teammates "who report to their location and work their scheduled hours."   *See* DRP.   Teammates who are unable to report to their designated facility or office but are able and approved to work remotely are paid their regular pay.   *Id.*

**B.     Mr. Hesketh Understood the Policy Was Not A Contract**

The Teammate Policies and Disaster Relief Policy include valid disclaimers stating they are not express or implied contracts.   Dkt. #35 at p. 9; *id.* at pp. 6-11; Dkt. #84 at p. 12; Dkt. # 42 at pp. 8, 11, 21, 26.   Mr. Hesketh acknowledged he understood the Teammate Policies "are not intended to create contractual or legal obligations, express or implied," and that "DaVita reserves the right to interpret, amend, modify, supersede or eliminate policies, practices, or benefits . . . in its sole and absolute discretion." Dkt. #42 at p. 2, ¶ 5, pp. 20-22.   After acknowledging the Policy, he continued working without change.   Hesketh Dep. 175:13-23.

Mr. Hesketh read the disclaimer in the Disaster Relief Policy in January 2020, and he understood it to mean TRC can change the Policy whenever it wants "at [its] sole discretion." Hesketh Dep. 101:12-16; 107:18-109:15.   Mr. Hesketh stated "similar language is repeated in the teammate handbook[,]  . . . [his] application for work[,] . . . a number of places in the policies

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 3

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

book," and in his acknowledgement of the handbook. *Id.* 109:16-110:4. Mr. Hesketh explained bluntly, the disclaimer is "not just [in the handbook.] That's written everywhere." *Id.* 107:10-21.

### C.    Mr. Hesketh Admits No One Made Any Statements to Him That Were Contrary to the Disclaimers

By the end of March 2020, Mr. Hesketh was aware he was not being paid premium pay under the Policy, but did not raise concerns about that determination at that time. Hesketh Dep. 107:5-9. Mr. Hesketh admits no one ever told him the Disaster Relief Policy did or would apply to the pandemic. *Id.* 116: 2-9; 121:21-122:2. Even after reviewing the version of the Disaster Relief Policy that explains the Policy does not apply to the pandemic, Mr. Hesketh did not ask anyone any questions. *Id.* 144:24-145:3; 147:1-24.

### D.    No Activation of the Policy for the COVID-19 Pandemic

No local leadership at any facility or business office requested DaVita enact the Policy for their region, facility, or office. Declaration of Kenny Gardner in support of Defendant's Motion for Summary Judgment ("Gardner Decl.") at ¶ 4. The Company's Chief People Officer, who had experience implementing the Policy during Florida hurricanes, along with other leaders, determined the Policy did not apply to COVID-19. *Id.* ¶ 6. These determinations were based on the plain language of the Policy, which requires teammates be unable to perform their regular job duties before an emergency time frame is defined. *See* DRP. Operations were not disrupted as a result of the pandemic; facilities were open, and teammates continued performing their regular jobs. Gardner Decl. ¶ 4.

### E.    DaVita's Communications to Teammates About the Policy Were Consistent with the Policy's Language

DaVita sent an email to all U.S.-based teammates, which included a link to the following statement:

> We understand that some teammates have raised questions about the application of DaVita's Disaster Relief Policy (section 4.12 in DaVita's Teammate Policies Handbook) to the current COVID-19 pandemic. The Disaster Relief Policy was created to support DaVita's teammates in situations where declared emergencies or

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 4

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

natural disasters prevent our facilities from operating or prevent teammates from working, with a goal of ensuring that DaVita can continue to operate despite the destruction of the disaster. As explained in the first sentence of the policy, it applies "during an emergency time frame when a declared emergency or natural disaster prevents teammates from performing their regular duties."

DaVita provides life-sustaining care to our patients, and it is critical that we continue to do so even during difficult situations like the COVID-19 pandemic. Although we're operating in a changing environment, **at this point the COVID-19 pandemic has not created a situation where teammates are prevented from performing their regular duties. Our facilities remain open, and our teammates are continuing to work and treat patients. Indeed, our facilities and even our central business offices are exempted from any of the state provisions because we are an essential healthcare service. In these circumstances, the special pay rules described in the policy do not apply.** In addition, the policy doesn't apply because there has been no emergency timeframe or specific emergency-affected facilities identified by local leadership (DVP, GVP and PSD), as required by the terms of the existing Policy. **Under the existing Policy, it's not just the declaration of an emergency by the President or a State that triggers application of the Policy;** local leadership and the Disaster Governance Council also must decide that the policy applies during a certain time frame and to certain facilities or offices. That has not happened here.

However, to address questions about the application of the Disaster Relief Policy to the COVID-19 crisis, and consistent with the statement in the Teammate Policies that "any policy may be canceled or modified at any time, at DaVita's sole discretion, with or without prior notice," we are adding the following language explaining how the Policy operates in these particular circumstances:

> COVID-19 CRISIS.
> **The Disaster Relief Policy does not apply to the COVID-19 crisis. The Disaster Relief Policy applies only when teammates are unable to perform their regular duties.** The policy is effective upon a decision by local leadership and the Disaster Governance Council that a declared emergency or natural disaster prevents our facilities from operating or prevents our teammates from working. **Under the COVID-19 crisis, our teammates are able to work and are essential in either in [sic] a supporting role for our health care workers or in actually providing healthcare services to patients.**[2]

To ensure managers were providing consistent information to teammates, DaVita provided a guide to its managers with frequently asked questions regarding COVID. Gardner Decl. at ¶ 5. This guide included the question, "Are we offering premium pay or additional pay under the Disaster Relief Policy?," which included the consistent answer:

---

[2] Dkt. #42 at p.2, ¶ 4, pp. 13-18 (emphasis added). This language was added to the Disaster Relief Policy in late March 2020. *Id.*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**No.  The Disaster Relief Policy does not apply to the COVID-19 crisis.  The Disaster Relief Policy applies only when teammates are unable to perform their regular duties.**  The policy is effective upon a decision by local leadership and the Disaster Governance Council that a declared emergency or natural disaster prevents our facilities from operating or prevents our teammates from working. Under the COVID-19 crisis, our teammates are able to work and are essential in either in [sic] a supporting role for our health care workers or in actually providing healthcare services to patients.  Click here for the full statement.[3]

**F.    DaVita Exercises Discretion in Activating the Disaster Relief Policy**

DaVita's decision not to activate the Policy for the COVID-19 pandemic is consistent with its practice in interpreting and applying the Policy.  DaVita does not activate the Disaster Relief Policy (i.e., declare an emergency time frame and identify affected facilities or business offices) for *every* declared emergency or natural disaster.  Gardner Decl. ¶ 3.  Instead, whether to declare an emergency time frame is determined on a case-by-case basis and is within the Company's discretion.  *See* DRP.  DaVita has only declared an emergency time frame when a declared emergency or natural disaster prevented teammates from performing their regular duties.  Gardner Decl. ¶ 3.[4]  But only facilities where operations were disrupted were designated as subject to an emergency time frame.  *Id.*  Not all facilities had the same emergency time frame; some locations were able to return to normal operations sooner than others.  *Id.*  Teammates who reported to designated facilities and worked their scheduled hours during an emergency time frame were paid premium pay.  *Id.*

---

[3] Gardner Decl. ¶ 5, Ex. A (emphasis added).

[4] Although not material to the issue presently before this Court, for additional context, DaVita enacted the Policy during natural disasters, including Hurricane Michael in 2018 and Winter Storm Uri in February 2021, both of which disrupted DaVita's operations and teammates' abilities to do their jobs. Gardner Decl. at ¶ 7.  For example, when Hurricane Michael hit Florida in 2018, Kenny Gardner (then in the local role of Group Vice President, now DaVita's Chief People Officer) received information from his reports (Division Vice Presidents) that the resulting damage impaired teammates' abilities to do their jobs as they typically would.  *Id.*  The disruptions were significant: flooding blocked roads, roofs caved in, facilities had leaks and lacked power, and teammates had to use chainsaws to chop fallen trees to clear a path to a facility.  *Id.*  Mr. Gardner worked with DaVita leadership, other members of local leadership, and payroll staff to identify affected facilities.  *Id.*  In another example, when Winter Storm Uri threatened facilities throughout Texas and beyond in February 2021, Group Vice President Chakilla Robinson requested DaVita leadership activate the Disaster Relief Policy.  *Id.* ¶ 8.  Storm Uri impacted every facility in Texas and some facilities in Louisiana.  *Id.*  Teammates who reported to a designated facility and worked their scheduled hours during this emergency time frame were paid premium pay.  *Id.*

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

153641612.16

**G.    Mr. Hesketh Performs His Job Duties As Before, Remotely and Without Disruption**

Mr. Hesketh[5] has worked remotely full time since 2019 (well before the pandemic) and has continued to do so during the pandemic. Hesketh Dep. 46:23-25; 117:4-14. Mr. Hesketh has not physically reported to his assigned facility during the pandemic. *Id*. 47:1-48:6; 105:18-107:9. His job duties have not changed. *Id*. 47:18-48:1; 48:15-25.

## III.    ARGUMENT

Mr. Hesketh's claim relies on four demonstrably false contentions. First, he contends the Disaster Relief Policy is a valid contract. Second, he insists that under the putative contract, TRC had an implied duty to identify an emergency time frame during the pandemic. Third, Mr. Hesketh argues TRC breached its duty when it declined to identify an emergency time frame after a national emergency was declared in connection with the pandemic. Finally, Mr. Hesketh claims he suffered damages because TRC declined to pay him premium pay during the pandemic. Dkt. #40 at p. 20, ¶¶ 116-20.

The Washington Supreme Court has "consistently held there is no 'free-floating' duty of good faith and fair dealing that is unattached to an existing contract." *See, e.g.*, *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004) (citing *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991)); *see also NOVA Contracting, Inc. v. City of Olympia*, 426 P.3d 685, 690 (Wash. 2018) ("A claim of breach of the covenant of good faith and fair dealing sounds in contract, not equity.") (citation omitted). The duty "arises out of the obligations created by a contract and only exists in relation to the performance of specific contract terms." *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013) (citing *Keystone Land*, 94 P.3d at 949). Courts treat the implied duty of good faith and fair dealing as an implied contract term. *See, e.g., Washington Land Dev., LLC v. Lloyds TSB Bank, PLC*, No. C14-0179, 2014 WL

---

[5] Plaintiff Joseph Hesketh is employed by TRC as an IT Specialist. Hesketh Dep. 35:15-36:4. In that role, he monitors data centers, business offices, and facilities for hardware and application failures. *Id.*

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   3563292, at *4 (W.D. Wash. July 18, 2014)); *Joern v. Ocwen Loan Servicing, LLC*, No. CV-10-

2   0134, 2010 WL 2813769, at *3 (E.D. Wash. July 14, 2010).

3       Accordingly, to prove a claim for breach of the implied duty of good faith and fair dealing,

4   Mr. Hesketh must establish: (1) the Disaster Relief Policy is a valid contract; (2) a duty to act in

5   good faith arose in relation to the performance of a specific contract term; (3) TRC breached that

6   duty; and (4) that the breach caused Mr. Hesketh to suffer cognizable damages. *Lehrer v. State,*

7   *Dept. of Soc. & Health Servs.*, 5 P.3d 722 (Wash. Ct. App. 2000) (a plaintiff in a breach of contract

8   action must prove a valid contract between the parties, a duty, a breach, and resulting damage).

9   Mr. Hesketh cannot prove any of these elements, and TRC is entitled to judgment as a matter of

10  law.

11  **A.    Mr. Hesketh Cannot Establish a Valid Contract as a Matter of Law**

12      Mr. Hesketh cannot establish the Disaster Relief Policy is a valid contract because: (1) the

13  Policy contained valid disclaimers that were not negated and (2) there was no offer, acceptance,

14  or consideration required to form a contract. *See Johnson v. Nasi*, 309 P.2d 380, 382 (Wash. 1957)

15  (the burden of proving the existence of a contract is on the party asserting its existence).

16  **1.    Mr. Hesketh Cannot Establish the Valid Disclaimers Were Negated**

17      Under Washington law, employment policies do not create contractual obligations when

18  they include a clear and conspicuous disclaimer. *See Quedado v. Boeing Co.*, 276 P.3d 365, 370,

19  372 (Wash Ct. App. 2012). This Court determined "the disclaimers in the Teammate Policies, the

20  Disaster Relief Policy, and the Acknowledgment rise to the level of a clear and conspicuous

21  disclaimer of contractual rights that is effective as a matter of law." Dkt. #84 at p. 12; Dkt. #35 at

22  pp. 6-11. Thus, the Disaster Relief Policy is not a contract unless Mr. Hesketh can prove DaVita

23  made "inconsistent representations" sufficient to "negate the effect of a disclaimer." Dkt. #84 at

24  p. 13 (citing *Swanson v. Liquid Air Corp.*, 826 P.2d 664, 674 (Wash. 1992)); Dkt. #35 at p. 7

25  (citing *Baker v. City of SeaTac*, 994 F. Supp. 2d 1148, 1158 (W.D. Wash. 2014)). Disclaimers

26  may be negated by: (1) oral assurances such as "employer statements that contradict the

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 8

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  disclaimer;" (2) inconsistent statements within the manual itself; or (3) contradictory employment
2  practices.  Dkt. #84 at p. 13 (citing *Swanson*, 826 P.2d at 675; *Payne v. Sunnyside Cmty. Hosp.*,
3  894 P.2d 1379, 1384 (Wash. Ct. App. 1995)).  Ultimately, "the crucial question is whether the
4  employee has a reasonable expectation the employer will follow the [] procedure [or policy at
5  issue], based upon the language used in stating the procedure and the pattern of practice in the
6  workplace." *Payne*, 894 P.2d at 1384.

7      **Oral Assurances/Contradictory Statements**.  Statements discussing employer policies
8  or practices "in specific … terms" may negate a disclaimer.  *See, e.g.*, *Swanson*, 826 P.2d at 675
9  (oral assurances at meeting with employees that company would abide by mandatory procedures
10  may negate disclaimer).  No contradictory, specific statements exist here.  Mr. Hesketh admits he
11  never received any assurances that DaVita was required to activate the Disaster Relief Policy upon
12  an emergency declaration or that DaVita was required to pay premium pay to teammates under the
13  Policy.  Hesketh Dep. 100:14-18.  In fact, Mr. Hesketh admits he never asked anyone at DaVita
14  any questions about the Policy at all.  *Id*. 144:24-145:3; 147:1-24.

15      It is undisputed that all statements by Company leadership about the Policy during the
16  pandemic were (and remain) consistent with the language of the Policy, including its disclaimers.
17  *See, e.g.*, Dkt. # 42 at p.2, ¶ 4, pp. 13-18.  DaVita also issued guidance to its mangers, ensuring
18  they too provided consistent information to teammates.  Gardner Decl. ¶ 5, Ex. A.  In short: No
19  one ever told Mr. Hesketh the Policy did, would, or should apply to the pandemic and he never
20  received a communication stating as much.  Hesketh Dep. 112:14-18; 119:2-19; 116: 2-9; 121:21-
21  122:2.

22      In the absence of any specific statement, Mr. Hesketh points to DaVita's core value of
23  "Integrity" and its slogan "We Said. We did."[6]  However, the Washington Supreme Court held an

24

25      [6] In the literal sense, the disclaimers say DaVita does not intend to create a contractual obligation and DaVita
26  consistently repeats that very thing: there is no contractual obligation.  The disclaimers also say DaVita retains
   discretion with respect to activating the Policy, and DaVita exercised that discretion on multiple occasions.  In other
   words: It said, it did.

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 9

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    employer did not breach a contract when it "act[ed] within the terms of its [policy]" that "permitted

2    it to withhold the bonus which it seemed to promise." *Spooner v. Reserve Life Ins. Co.*, 287 P.2d

3    735, 738 (Wash. 1955). This is so even when employees continued working because they thought

4    the company's conscience would lead it to honor the alleged promise. *Id.* ("[I]f [employees] were

5    in any instance induced to stay with the company until the termination of the bonus period, it was

6    because they were relying on the corporate conscience of the appellant and not upon an enforceable

7    contract.") Generalized corporate values are not the type of detailed, specific statements or

8    practices that can create a contractual obligation. *See e.g., id.*

9            **Inconsistent Statements Within the Manual Itself/Language Used in Stating the**

10   **Procedure.** No statements within the Disaster Relief Policy or Teammate Policies negate the

11   disclaimers. *See generally* DRP. On the contrary, as Mr. Hesketh testified, the disclaimer is

12   "written everywhere:" "similar language is repeated in the teammate handbook[,] . . . [his]

13   application for work[,] . . . a number of places in the policies book," and in his attestation of the

14   handbook. Hesketh Dep. 104:6-11; 107:10-21; 109:16-110:4. Moreover, Mr. Hesketh understood

15   the disclaimers to mean TRC can change the policies in its discretion. *Id.* 107:22-108:16.

16           Rather than create a contradiction, the Policy's language *reinforces* the disclaimer. The

17   Policy explicitly retains discretion to DaVita to determine whether to trigger the policy on a "case-

18   by-case basis . . . dependent on the severity of the disaster and location." DRP; *compare Nelson*

19   *v. Southland Corp.*, 894 P.2d 1385, 1389 (Wash. Ct. App. 1995) (upholding efficacy of disclaimer

20   where progressive discipline policy "was initiated at the discretion of the employee's supervisor")

21   *with, e.g., Swanson*, 826 P.2d at 675-76 ("*detailed* grievance or disciplinary procedures" that *must*

22   be followed before someone is terminated may negate a disclaimer stating someone is employed

23   at will) (emphasis added) *and Payne*, 894 P.2d at 1384 (mandatory language like "the steps to be

24   followed in … progressive discipline" negated the disclaimer).

25           **Pattern of Practice/Contradictory Employment Practices.** No practices contradict the

26   discretionary application of the Policy or the basic principle that the Policy only applies where a

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 10

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

natural disaster or emergency prevents teammates from performing their duties.   In some declared disasters or emergencies, DaVita activates the Policy; in others it does not.  Gardner Decl. ¶ 3.  For example, the Policy was not activated for wildfires in California; nor for any other public health emergency, such as when President Trump declared the opioid crisis a public health emergency in October 2017,[7] or when Governor Inslee declared a state of emergency on January 25, 2019 for a measles outbreak.[8]  *Id.*  Instead, TRC has exercised its discretion, determining on a case-by-case basis whether to declare an emergency time frame, for how long, and for which facilities.  *Id.* DaVita also has only activated the policy in situations where teammates were prevented from performing their duties.  *Id.*  In short, just as it did here, DaVita has historically exercised wide discretion in enacting the Policy.

The Policy is not a contract because it contains legally valid disclaimers and there is no evidence that DaVita negated those disclaimers.  Summary judgment is therefore appropriate.  *See Quedado*, 276 P.3d at 370, 372 (granting summary judgment on breach of implied contract claim because no contract existed due to valid disclaimers).

### 2.     Mr. Hesketh Cannot Establish a Contract Ever Formed

No contract exists for the separate reason that the elements of an implied contract are not met.  *See Baker v. City of SeaTac*, 994 F. Supp. 2d 1148, 1161 (W.D. Wash. 2014) (J. Robart) (requiring plaintiff establish offer, acceptance, and consideration for implied contract claims based on employment policies) (citing *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1087 (Wash. 1984)).  Mr. Hesketh must prove "a reasonable person looking at the objective manifestations of the parties' intent could find that they have intended the obligations listed in the handbook be part of the employee contract."  *Baker*, 994 F. Supp. 2d at 1159 (citations omitted).  Mr. Hesketh cannot offer such evidence here; he cannot establish a valid (1) offer, (2) acceptance, or (3) consideration.

---

[7] *Ongoing Emergencies & Disasters*, Ctrs. For Medicare & Medicaid Servs., https://www.cms.gov/About-CMS/Agency-Information/Emergency/EPRO/Current-Emergencies/Ongoing-emergencies (last visited Sept. 29, 2021).

[8] Proclamation No. 19-01 (Jan. 25, 2019), https://www.governor.wa.gov/sites/default/files/proclamations/19-01%20State%20of%20Emergency.pdf.

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 11

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

### a.   Mr. Hesketh Cannot Establish There Was An Offer

"An offer must evidence an intent to be bound by the terms of the proposal." Restatement (Second) of Contracts § 23 (1981). DaVita's alleged "offer" here does just the opposite. The disclaimer in the Disaster Relief Policy is an objective manifestation of DaVita's intent <u>not</u> to be contractually bound: "[t]he language used in this policy is not intended to constitute a contract of employment, either express or implied, to give teammates any additional rights to continued employment, pay, or benefits . . . ." DRP.  The disclaimer in the Teammate Policies similarly evidences an objective manifestation of an intent not to be bound. Dkt. #42 at p. 1, ¶ 2, at p. 8 ("The language used in these policies and any verbal statements made by management are not intended to constitute a contract of employment, either expressed or implied… ."). No reasonable person could find DaVita intended the contents of the Policy be part of the terms and conditions of Mr. Hesketh's employment. The Policy is not an offer.

Moreover, where an alleged offer includes, as here, a provision that makes performance optional or entirely discretionary on the part of the promisor, it is illusory and unenforceable. *See, e.g., Quedado*, 276 P.3d at 370, 372 (granting summary judgment on implied contract claim and holding employer's policies "do not offer new employment terms" because they "retain too much discretion in the hands of the company"); *Spooner*, 287 P.2d at 738 (collecting cases). When an employer told employees "in plain English that the company could withhold or decrease the bonus, with or without notice," Washington's Supreme Court held the alleged promise to pay was not enforceable. *Spooner*, 287 P.2d at 738. Here, the Disaster Relief Policy clearly and plainly tells teammates that performance (i.e., paying some teammates premium pay) is entirely discretionary on the part of DaVita.  DaVita determines "on a case-by-case basis" whether to declare an emergency time frame and offer premium pay. *See* DRP.  Additionally, the Teammate Policies tell teammates the company can cancel or modify any policy "at any time, at DaVita's sole discretion, with or without prior notice." Dkt. #42 at p. 1, ¶ 2, at p. 8.  Thus, TRC's "performance"

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 12

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    is "entirely discretionary on the part of the promisor." *See Spooner*, 287 P.2d at 738. As such, the

2    "promise" Mr. Hesketh seeks to enforce as a contract is illusory and unenforceable.

3         **b.    Mr. Hesketh Cannot Establish Acceptance**

4         Beyond DaVita's express intent not to be bound, Mr. Hesketh cannot establish *he* intended

5    to be contractually bound, or that he accepted DaVita's alleged "offer." Instead, Mr. Hesketh's

6    acknowledgment of the Teammate Policies confirms he did not: "I understand that the Teammate

7    Policies . . . and their contents are not intended to create any contractual or legal obligations,

8    express or implied." Dkt. # 42 at p. 2, ¶ 5, at p. 21. He understood DaVita could change the Policy

9    whenever it wants "at [its] sole discretion." Hesketh Dep. 107:10-109:15.

10        Even if, contrary to the plain language of the policies, DaVita extended an offer which

11   Mr. Hesketh accepted, the acceptance is not valid because there was no proverbial "meeting of the

12   minds." To form a valid contract, there must be a "manifestation of mutual assent to its essential

13   terms." *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1160 (Wash. Ct.

14   App. 2007) (citations omitted); *see also* Restatement (Second) of Contracts § 50, cmt. a (1981)

15   ("[A]cceptance must manifest assent to *the same* bargain proposed by the offer.") (emphasis

16   added). Mr. Hesketh contends he accepted an "offer" from DaVita to pay premium pay any time

17   there is a government-declared emergency or disaster. Hesketh Dep. 99:12-17; 119:21-120:20.

18   Mr. Hesketh "accepted" a bargain DaVita had not proposed; the objective manifestation of

19   DaVita's "proposal" is to pay premium pay upon declaring an emergency time frame if the

20   employee is prevented from performing their regular duties. *See* Dkt. #84 at p. 15 (finding "there

21   are at least two conditions precedent in the Disaster Relief Policy that must be met before premium

22   pay is instituted."); Dkt. #35 at pp. 11-12; DRP. There was no acceptance manifesting mutual

23   assent to the same bargain.

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1
2

       **c.**     **Mr. Hesketh Cannot Establish Consideration to Support the Alleged Contract Modification**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

       Finally, Mr. Hesketh cannot establish consideration or a bargained-for exchange. It is undisputed the Disaster Relief Policy was issued in 2017, ten years after Plaintiff began his employment with TRC in 2007. *See* Hesketh Dep. 15:22-23, 95:10-22. Modifications to employment contracts after an employee is hired require additional consideration beyond the employee's continued employment. *Bombardier v. Mitsubishi*, 383 F. Supp. 3d 1169, 1192 (W.D. Wash. 2019) (J. Robart) (citation omitted). To determine whether there is sufficient consideration for an alleged post-hire contract, "the court analyzes whether the employment relationship materially changed at the time of contracting, with both parties taking on new obligations." *Id.* (citations omitted). "[A] promise to continue an at-will employment relationship with no increase in wages, change in responsibilities, promise of training, or other material alteration in the relationship, is not consideration for a post-employment modification or additional agreement." *Id.*; *see also Labriola v. Pollard Grp., Inc.*, 100 P.3d 791, 794 (Wash. 2004) ("Independent consideration involves new promises or obligations previously not required of the parties" and "may include increased wages, a promotion, a bonus, a fixed term of employment, or perhaps access to protected information.")

18
19
20
21
22

       Here, it is undisputed there was no additional consideration for the putative offer and acceptance. Mr. Hesketh simply acknowledged the Policy and continued working. Hesketh Dep. 175:13-23. And simply "continu[ing] an at-will employment relationship," without more, cannot be consideration for TRC's post-hire addition of the Policy to its handbook. *See Bombardier*, 383 F. Supp. 3d at 1192.

23

       Accordingly, Mr. Hesketh cannot establish a contract was formed as a matter of law.

24

**B.**     **Mr. Hesketh Cannot Establish TRC Breached A Duty to Act in Good Faith**

25
26

       Mr. Hesketh claims that during the pandemic TRC had a duty to "perform their ministerial obligation to identify an emergency time frame" upon a declaration of a national emergency, and

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:20-cv-01733-JLR) – 14

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    breached that duty by failing to declare an emergency time frame or to inform teammates that they

2    would not do so.  Dkt. #40 at p. 20, ¶¶ 116-18.  Even if Mr. Hesketh can show there is a contract—

3    that is, even if he can establish offer, acceptance, consideration, *and* a genuine issue of material

4    fact that could negate the valid disclaimers—his claim still fails because he cannot establish

5    DaVita breached any duty of good faith and fair dealing for two reasons.

6         First, good faith and fair dealing only requires a party to act in accordance with the

7    substantive terms of a contract, and Mr. Hesketh's claim would impose a new substantive term not

8    present in the contract.  The plain terms of the Policy do not require TRC to declare an emergency

9    time frame where, as here, teammates are not prevented from doing their duties.  Good faith and

10   fair dealing cannot add a term requiring TRC to do so.  Second, TRC acted in good faith because

11   its actions were consistent with the actual terms of the Policy and its decisions whether to activate

12   the Policy in other situations.

13         **1.    Mr. Hesketh's Claim Seeks to Impose Duties on TRC that Contradict the**
14               **Clear Terms of the Policy**

15        A party's obligation is only to "perform in good faith the obligations imposed by their

16   agreement."  *Badgett*, 807 P.2d at 360 (internal quotations and citations omitted).  "The implied

17   covenant of good faith and fair dealing cannot add or contradict the express contract terms . . [it]

18   arises only in connection with the terms agreed to by the parties."  *See Hard 2 Find Accessories,*

19   *Inc. v Amazon.com, Inc.*, 58 F. Supp. 3d 1166, 1173-74 (W.D. Wash. 2014) (quoting *Badgett*, 807

20   P.2d at 360 and citing *Johnson v. Yousoofian*, 930 P.2d 921, 925 (Wash. Ct. App. 1996)).  "As a

21   matter of law, there cannot be a breach of the duty of good faith and fair dealing when a party

22   simply stands on its rights to require performance of a contract according to its terms."  *Burlington*

23   *Ins. Co. v. Blind Squirrel, LLC*, 228 F. Supp. 3d 1160, 1169 (E.D. Wash. 2017) (quoting *Badgett*,

24   807 P.2d at 360).

25        Here, Mr. Hesketh argues that TRC breached its duty by failing to "abide by the offer's

26   objective standard of an emergency declaration, and subjectively refusing to identify the

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 15

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    emergency time frame and failing to pay the premium pay promised to the employees." Dkt. # 40

2    at ¶ 118. However, Mr. Hesketh cannot establish that the pandemic triggered an obligation for

3    TRC to identify an emergency time frame. The duty to exercise discretion to declare an emergency

4    time frame—and any attending obligation to exercise it in good faith—is not triggered upon an

5    elected official's emergency declaration. Dkt. # 84 at pp. 15-16. Rather, the duty only arises when

6    certain conditions are met. As this Court found, one such condition is that a declared emergency

7    or natural disaster must prevent teammates from performing their regular duties. Dkt. #84 at p.

8    15; *see also* DRP (the Policy only "provides for pay continuance during an emergency time frame

9    *when a declared emergency or natural disaster prevents teammates from performing their regular*

10   *duties*") (emphasis added); *Ross v. Harding*, 391 P.2d 526, 531 (Wash. 1964) ("when" is a phrase

11   commonly used to express a condition precedent when performance is dependent on some other

12   event).

13          It is undisputed the COVID-19 pandemic did not prevent teammates from performing their

14   usual job duties. *See* Hesketh Dep. 48:20-25; Gardner Decl. ¶ 4. Mr. Hesketh himself admits this

15   condition precedent was not met. When asked whether he was able to perform his job duties while

16   working remotely during the pandemic, Mr. Hesketh responded "Absolutely." Hesketh Dep. at

17   47:14-17; *see also id.* 47:18-24; 48:20-25; Dkt. # 69 at p.4.

18          Because the conditions precedent are indisputably not satisfied, no contractual duty to

19   perform (i.e., identify an emergency time frame) ever arose for TRC. *See Badgett*, 807 P.2d at

20   360 ("[T]he duty arises only in connection with terms agreed by the parties."). Where there is no

21   duty to perform, a party cannot "perform" in bad faith—they do not perform at all. *See Hard 2*

22   *Find Accessories*, 58 F. Supp. 3d at 1173-74 ("Because the Court has determined that no …

23   contractual duties existed, there is also no duty to perform such obligations in good faith").

24   Moreover, imposing a duty on TRC to determine whether to declare an emergency time frame

25   when the condition precedent indisputably was not met would impose a new substantive term that

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   contradicts the clear terms of the Policy.  The implied covenant of good faith and fair dealing

2   cannot contradict the Policy's express terms.  *See id.* (citations omitted).

3          Mr. Hesketh also claims that TRC breached its duty because it "made no effort to inform

4   employees that [it] would not identify an emergency time frame as promised." Dkt. # 40 at ¶ 119.

5   There is no language in the Policy that requires TRC to inform teammates of its decision to identify

6   an emergency time frame, much less any decision to refrain from identifying an emergency time

7   frame.  *See* DRP.  Mr. Hesketh's claim would require the wholesale addition of this term to the

8   Policy, which goes far beyond the duty of good faith and fair dealing.  *Microsoft Corp.*, 963 F.

9   Supp. 2d at 1184 (the duty "only exists in relation to the performance of specific contract terms").

10         As established above, there cannot be a breach of the duty of good faith and fair dealing as

11  a matter of law here because DaVita stood on its rights under the alleged contract terms.

12  *Burlington Ins.*, 228 F. Supp. 3d at 1169.  Mr. Hesketh's claim therefore fails as a matter of law.

13         **2.      Mr. Hesketh Cannot Establish TRC Breached Any Duty of Good Faith**

14         Even if TRC was obligated to perform—that is, even if the policies created a contract, the

15  disclaimers were negated, *and* the conditions precedent were met—Mr. Hesketh cannot show TRC

16  failed to act in good faith.  Although there is "no one-size-fits-all definition of good faith and fair

17  dealing," it is generally understood to require parties "cooperate with each other so that each may

18  obtain the full benefit of performance." *Microsoft Corp.*, 963 F. Supp. 2d at 1184.  In determining

19  whether a party has breached the implied duty, courts look to a variety of factors, including

20  "whether the defendant's actions were contrary to the reasonable and justified expectations of other

21  parties," "whether and to what extent the defendant's conduct conformed with ordinary custom or

22  practice in the industry," and, as is relevant here, "to the extent the contract vested the defendant

23  with discretion in deciding how to act, whether that discretion was exercised reasonably." *Id.* at

24  1184-85 (citing, *e.g.*, *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 909 (9th Cir. 2001); *Curtis v. N.*

25  *Life Ins. Co.*, No. 61372-3-I, 2008 WL 4927365, at *6 (Wash. Ct. App. Nov. 17, 2008); and *Craig*

26  *v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006) (applying Washington

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 17

153641612.16

1  law)). At its core, the question of whether a party acted in good faith when exercising discretion

2  is a question of whether the party acted reasonably. *See Craig*, 458 F.3d at 752. Here, TRC did.

3        Mr. Hesketh cannot offer any evidence the Company exercised the discretion afforded to

4  it under the Policy in bad faith. A party exercises discretion in bad faith when it refuses to engage

5  in the decision-making process reserved to its discretion under the contract. *See Conway Constr.*

6  *Co. v. City of Puyallup*, 490 P.3d 221, 226 (Wash. 2021). For example, the Washington Supreme

7  Court found the City of Puyallup exercised its discretion in bad faith when the city refused to

8  discuss or consider a contractor's efforts to remedy inadequate work before terminating the

9  contract. *See id.* In that case, the contract allowed the city to terminate "based on defective work

10  only if the contractor 'neglects or refuses to correct rejected [w]ork.'" *Id.* (citations omitted).

11  After being notified its work was defective, the contractor took steps to remedy the defaulting

12  conditions, but the City refused to review the contractor's proposed solutions, declined the

13  contractor's requests to meet and discuss potential remedies, and terminated the contractor's work.

14  *Id.* This complete refusal to engage under the terms of the contract constituted a breach of the

15  implied duty of good faith and fair dealing. *Id.*

16        Unlike the City of Puyallup, TRC engaged in a decision-making process consistent with

17  the terms of the Policy and its practice in applying the Policy. Gardner Decl. ¶¶ 4, 6. As a result

18  of that process, DaVita determined the Policy did not apply. *Id.* ¶ 6.

19        Mr. Hesketh cannot establish that process was not in good faith or was unreasonable. The

20  Policy by its plain language only applies to situations where teammates are prevented from

21  performing their regular job duties, and it is undisputed the pandemic did not create that situation.

22  Hesketh Dep. 47:14-23; 48:20-25; Gardner Decl. ¶ 4. DaVita relied on this plain language when

23  it determined the Policy did not apply. Gardner Decl. ¶ 6.

24        Further, DaVita's decision that the Policy did not apply to the pandemic was reasonable

25  and consistent with its past actions. DaVita has historically only declared an emergency time

26  frame when a declared emergency or natural disaster prevented teammates from performing their

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 18

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    regular duties.  Gardner Decl. ¶ 3.  In instances where the declared emergency did not disrupt

2    teammates' abilities to perform their normal job duties—such as in the pandemic—DaVita did not

3    activate the Policy.  *Id.*  For example, DaVita activated the Policy in 2018 because damage from

4    Hurricane Michael prevented teammates from performing their regular job duties.  *Id.*  But DaVita

5    has never activated the Policy where teammates were not prevented from performing their regular

6    job duties, including for other public health emergencies.  *Id.*

7         Although this is not Mr. Hesketh's preferred conclusion, he cannot show it was arrived at

8    unreasonably or in bad faith.  Every step of the way, DaVita told its teammates the Policy did not

9    apply for the reasons identified by DaVita leadership. Dkt. #42 at p.2, ¶ 4, pp. 13-18.  At no point

10   did the Company change its explanation or alter its analysis.  Mr. Hesketh does not have any

11   evidence DaVita's decision-making process was arbitrary; he cannot show, for example, that

12   DaVita flipped a coin to decide whether to declare an emergency time frame.  And Mr. Hesketh's

13   disagreement with the Company's decision is not itself enough to sustain a good faith and fair

14   dealing claim.  *See* Dkt. #84 at p. 16, n. 7 (this Court acknowledging its "role is to interpret the

15   language of the alleged contract, not to judge the soundness of the company's business decisions")

16   (citing *Fisher Props. Inc. v. Arden-Mayfair, Inc.*, 726 P.2d 8, 15 (Wash. 1986)); *cf. Shokri v.*

17   *Boeing Co.*, 311 F. Supp. 3d 1204, 1220–21 (W.D. Wash. 2018) (explaining in discrimination

18   cases, the Court's role is not to "assume the role of a 'super personnel department[], assessing the

19   merits—or even rationality—of employers'" decisions).

20        As such, Mr. Hesketh cannot establish as a matter of law that TRC breached any implied

21   duty to act in good faith.

22        C.    **Mr. Hesketh Cannot Establish Cognizable Damages as a Matter of Law**

23        Finally, Mr. Hesketh cannot show he suffered cognizable damage.  *Jacob's Meadow*, 162

24   P.3d at 1160 (a plaintiff in a breach of contract case must prove resulting damage); *cf. Ford v.*

25   *Trendwest Resorts, Inc.*, 43 P.3d 1223, 1229 (Wash. 2002) (holding nominal damages in a breach

26   of contract claim are only appropriate "where, from the nature of the case, some injury has been

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 19

153641612.16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   done, the amount of which proof fails to entirely show"). Where, as here, a suit seeks only

2   damages, a court may dismiss a breach of contract action if a plaintiff did not suffer any damages.

3   *Id.* at 1160 (citations omitted) (affirming summary judgment where plaintiff failed to demonstrate

4   resulting damage from defendant's alleged breach of contract).

5         Here, Mr. Hesketh must show damages necessary to place him in the position he would

6   have been in if TRC exercised its discretion in good faith. *Jacob's Meadow,* 162 P.3d at 1161, n.3

7   (citations omitted). No such damages exist. Even if an emergency time frame was declared and

8   Mr. Hesketh's office was identified as an affected facility, Mr. Hesketh would not have been

9   entitled to premium pay during the pandemic because it is undisputed that Mr. Hesketh never

10  reported to his office. Hesketh Dep. 44:25-45:9; 46:23-25 ("Q: And since you began working

11  away from the office in 2019, have you worked remotely ever since?  A: Yes."). It is also

12  undisputed that remote workers who do not report to their office are not entitled to premium pay,

13  even if an emergency time frame is declared for their office. DRP. Thus, Mr. Hesketh is already

14  in the position he would have been in if the "contract" had been "fulfilled": he has been paid at his

15  regular rate for the hours he worked. *See Ford,* 43 P.3d at 1228 ("[A] contract confers no greater

16  rights on a party than it bargains for.").

17        Because Mr. Hesketh cannot show that he suffered any cognizable damage as a result of

18  any alleged breach of the implied duty of good faith and fair dealing, his claim fails as a matter of

19  law. *See Trinidad v. Metro. Prop. & Cas. Ins. Co*., NO. C13-5191, 2013 WL 6729639, at *4 (W.D.

20  Wash. Dec. 19, 2013) (granting motion for summary judgment on breach of contract claim where

21  no evidence plaintiff suffered cognizable damage).

22                            **IV.   CONCLUSION**

23        For the foregoing reasons, TRC respectfully requests that the Court grant summary

24  judgment its favor.

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

Dated: September 30, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

By: s/ Chelsea Dwyer Petersen

Chelsea Dwyer Petersen, Bar No. 33787
Heather L. Shook, Bar No. 56610
Margo S. Jasukaitis, Bar No. 57045
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
CDPetersen@perkinscoie.com
HShook@perkinscoie.com
MJasukaitis@perkinscoie.com

Attorneys for Defendant
Total Renal Care, Inc.

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(No. 2:20-cv-01733-JLR) – 21

153641612.16

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I hereby certify under penalty of perjury that on September 30, 2021, I electronically filed

3

the foregoing document with the Clerk of the Court using the CM/ECF system, which will send

4

notification of such filing to the following:

5

6

Christina L Henry, WSBA 31273
Email: chenry@hdm-legal.com

7

HENRY & DEGRAAFF, PS
787 Maynard Ave S

8

Seattle, WA 98104
Telephone: 206-330-0595

9

Facsimile: 206-400-7609
*Attorney for Plaintiffs*

10

11

J. Craig Jones
*Pro Hac Vice Forthcoming*

12

Email: craig@joneshilllaw.com
JONES & HILL, LLC

13

131 Highway 165 South
Oakdale, LA 71463

14

Telephone: 318-335-1333
Facsimile: 318-335-1934

15

*Attorney for Plaintiffs*

16

17

Scott C. Borison
*Pro Hac Vice Forthcoming*

18

Email: scott@borisonfirm.com
BORISON FIRM, LLC

19

1900 S. Norfolk Rd. Suite 350
San Mateo CA 94403

20

Telephone: 301-620-1016
Facsimile: 301-620-1018

21

*Attorney for Plaintiffs*

22

____Via Hand Delivery
____Via U.S. Mail, 1st Class, Postage
         Prepaid
____Via Overnight Courier
____Via Facsimile
__X__Via E-Filing



____Via Hand Delivery
____Via U.S. Mail, 1st Class, Postage
         Prepaid
____Via Overnight Courier
____Via Facsimile
__X__Via E-Filing



____Via Hand Delivery
____Via U.S. Mail, 1st Class, Postage
         Prepaid
____Via Overnight Courier
____Via Facsimile
__X__Via E-Filing

23

DATED this 30th day of September 2021 in Seattle, Washington.

24

25

*s/ Janet Davenport*
Janet Davenport, Legal Practice Assistant

26

CERTIFICATE OF SERVICE
(No. 2:20-cv-01733-JLR)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

153641612.16