# EXHIBIT 1

Jeremy Michael Eaves                          May 10, 2021

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

------------------------------------------------------------

JOSEPH J. HESKETH III, on    )
his behalf and on behalf     )
of other similarly           )
situated persons,            )
                             )
              Plaintiff,     )
                             )
        vs.                  )      No. 2:20-cv-01733-JLR
                             )
TOTAL RENAL CARE, INC., on   )
its own behalf and on        )
behalf of other similarly    )
situated persons,            )
                             )
             Defendants.     )

------------------------------------------------------------

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF

JEREMY MICHAEL EAVES

Conducted via Zoom

------------------------------------------------------------

ATTENDANCE OF ALL PARTICIPANTS VIA ZOOM VIDEO CONFERENCE

------------------------------------------------------------

DATE:  May 10, 2021
REPORTED BY:  Olivia Pennella

Jeremy Michael Eaves                                    May 10, 2021

```
 1                  A P P E A R A N C E S
 2
          FOR PLAINTIFF:
 3
                  J. CRAIG JONES
 4                Jones & Hill, LLC
                  131 Highway 165 South
 5                Oakdale, Louisiana 71463
                  318-335-1333
 6                craig@joneshilllaw.com
 7                CHRISTINA L. HENRY
                  Henry & DeGraaff, PS
 8                119 First Avenue South, Suite 500
                  Seattle, Washington 98104
 9                206-330-0595
                  chenry@hdm-legal.com
10
                  SCOTT C. BORISON
11                Borison Firm, LLC
                  1900 South Norfolk Street, Suite 350
12                San Mateo, California 94403
                  301-620-1016
13                scott@borisonfirm.com
14        FOR DEFENDANT:
15                CHELSEA D. PETERSEN
                  MARGO S. JASUKAITIS
16                Perkins Coie LLP
                  1201 Third Avenue, Suite 4900
17                Seattle, Washington 98101
                  206-359-3993
18                cdpetersen@perkinscoie.com
                  mjasukaitis@perkinscoie.com
19
          ALSO PRESENT:
20
                  COLLEEN LUDWIG (DAVITA)
21
22
23
24
25
```

Jeremy Michael Eaves                              May 10, 2021

```
                                              Page 3

 1                  E X A M I N A T I O N

 2  WITNESS                              MR. JONES

 3  JEREMY MICHAEL EAVES                        7

 4

 5

 6

 7                    E X H I B I T S

 8  No.    Description                        Page

 9  1      Amended Class Action Complaint (Jury   18
           Demand)
10
    2      Defendant Total Renal Care, Inc.'s     18
11         Answer to Plaintiff's Amended Complaint

12  3      Declaration of Shawn Zuckerman in      18
           Support of Total Renal Care, Inc.'s
13         Answer to Complaint

14  4      Defendant Total Renal Care, Inc.'s     18
           Initial Disclosures
15
    5      Teammate Policies, Effective January 1, 55
16         2020
           (TRC 000001 - TRC 000148)
17
    6      Email re Daily All Teammate COVID-19   18
18         Update, dated March 27, 2020
           (TRC 000149 - TRC 000151)
19
    7      Teammate Policies Section 4.12         18
20         (Disaster Relief Policy)
           (TRC 000152 - TRC 000154)
21
    8      Teammate Policies, Effective August 19, 18
22         2020
           (TRC 000155 - TRC 000302)
23
    9      DaVita-ese, A Guide to Our Terminology 18
24         and Acronyms
           (TRC 000303 - TRC 000312)
25
```

Jeremy Michael Eaves                                    May 10, 2021

Page 4

```
 1                E X H I B I T S (Continued)
 2    No.     Description                              Page
 3    10      Star Learning Certificate for JJ Hesketh    18
              (TRC 000313)
 4
      11      Defendant Total Renal Care, Inc.'s          18
 5            Responses to Plaintiff's First Set of
              Requests for Production
 6
      12      Defendant Total Renal Care, Inc.'s          18
 7            Responses to Plaintiff's First Set of
              Interrogatories
 8
      13      Declaration of Carol Strong in Support      18
 9            of Total Renal Care, Inc.'s Notice of
              Removal
10
      14      Defendant Total Renal Care, Inc.'s          18
11            Supplemental Responses to Plaintiff's
              First Set of Interrogatories
12
      15      Defendant Total Renal Care, Inc.'s          18
13            Supplemental Responses to Plaintiff's
              First Set of Requests for Production
14
      16      Email re Daily Phoenix Group COVID-19       18
15            Update, dated March 27, 2020
              (TRC 000317 - TRC 000319)
16
      17      Notice of 30(b)(6) Deposition of DaVita's   18
17            Corporate Representative
18    18      Subpoena; Third Amended Schedule A to       18
              the Subpoena to Rule 30(b)(6) Corporate
19            Representative to DaVita, Inc.
20    19      Amended Notice of Deposition of Jeremy      18
              Eaves
21
      20      Email string re Disaster Relief Policy;     135
22            top email dated March 19, 2020
              (DAVITA_003368 - DAVITA_003373)
23
      21      Email string re Compensation; top email     136
24            dated March 19, 2020
              (DAVITA_003375 - DAVITA_003376)
25
```

Jeremy Michael Eaves                                May 10, 2021

```
                                                    Page 5

  1              E X H I B I T S (Continued)

  2    No.     Description                           Page

  3    22      Email string re Interview Process      137
               Recommendations Updated; top email
  4            dated March 17, 2020
               (DAVITA_003477 - DAVITA_003486)
  5
       23      Email re Disaster policy pay questions 143
  6            dated March 17, 2020; Email re Interview
               Process Recommendations Updated, top
  7            email dated March 17, 2020
               (DAVITA_003131 - DAVITA_003137)
  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Jeremy Michael Eaves                                      May 10, 2021

                                                          Page 6

 1                     Monday, May 10, 2021

 2                      12:10 p.m. PDT

 3           ------------------------------------

 4           THE COURT REPORTER:  We are on the record.

 5           MS. PETERSEN:  Thank you.  This is Chelsea

 6   Petersen for defendant, Total Renal Care.

 7           MS. HENRY:  If you'll wait for a moment,

 8   Chelsea.  As I mentioned, we are about to come on to the

 9   thing.  So just give us one minute, please.

10           MS. PETERSEN:  Okay.  I'm simply introducing

11   myself --

12           MS. HENRY:  Thank you.

13           MS. PETERSEN:  -- and indicating that we are

14   here and ready to begin the deposition.

15           MS. HENRY:  And I understood that.  As I said,

16   I'm trying -- I will be on in a minute.  I'm almost off

17   the phone.  Just a minute.

18           MS. PETERSEN:  Thank you.  We can go off the

19   record.

20           (Recess taken from 12:10 p.m. to 12:48 p.m.)

21   JEREMY MICHAEL EAVES,   witness herein, having been duly

22                          sworn by the Certified Court

23                          Reporter, testified as follows:

24   \\\

25   \\\

Jeremy Michael Eaves                                    May 10, 2021

Page 7

          1              E X A M I N A T I O N

          2    BY MR. JONES:

          3         Q.   Mr. Eaves, I'm Craig Jones.  And I appreciate

          4    your patience.  Quite often in corporate depositions,

          5    things drag early on.  And we'll try not to take up any

          6    more of your time than is necessary.

          7              Now, I'm going to start with the first

          8    question.  It's the one that you always hear in your

          9    lawyer programs.  I'm going to ask you to state your

         10    full name, please.

         11         A.   Sure.  Jeremy Michael Eaves.

         12         Q.   Mr. Eaves, where do you live?

         13         A.   I live in Broomfield, Colorado.

         14         Q.   How far is that from Denver?

         15         A.   I would say about 18 miles from door to

         16    office.

         17         Q.   Where are you right now located, physically?

         18         A.   I'm in my home office in Broomfield, Colorado.

         19         Q.   Okay.  I'd like you to -- well, first of all,

         20    let me tell you how I'm going to take the deposition.

         21    This is a corporate deposition of DaVita.  Are you aware

         22    of that?

         23         A.   I am.

         24         Q.   Have you ever given a deposition before?

         25         A.   I have.

Jeremy Michael Eaves                                  May 10, 2021

Page 29

1    through this -- if you will go through and look at

2    section, I believe it's designated, four -- I just have

3    a cheat sheet.  I don't have a copy of the exact

4    subpoena.  I just have all that's been put down kind of

5    in block form for me.

6              But do you see where it says, "Documents

7    Request -- or Requested"?

8         A.   Yeah.  And --

9              THE WITNESS:  And, Ms. Henry, maybe you can

10   help me -- just so I can look at this a little larger on

11   the document I've received -- would the footer on

12   this be "3rd Amended Schedule A to Subpoena - 10"?

13             MS. HENRY:  Yes.  And I have it on the screen

14   for you, also.

15             THE WITNESS:  It's a little small, but I'm

16   happy to navigate.

17             MS. HENRY:  I can make it a little bigger, if

18   you'd like.  But it's page 10 of the Schedule A attached

19   to the subpoena.

20        A.   Yes, Mr. Jones, I see "Documents Requested."

21        Q.   (By Mr. Jones)  Are you here today to produce

22   these documents on behalf of DaVita?

23        A.   Can you help me understand what you mean by

24   "produce"?

25        Q.   Well, those -- we've been provided -- in the

Jeremy Michael Eaves                              May 10, 2021

Page 30

1   age of COVID-19, we do things remotely.  And in the old

2   days, we used to stroll up into a conference room.  And

3   the corporate representative would drag out boxes of

4   documents that probably have been produced ahead of

5   time.

6           And we would go through each item and say,

7   "Okay.  Which item are you producing in response to

8   this?"  But Counsel has provided us a link, where we

9   were able to download in excess of 7,000 documents

10  today.

11          And my question to you, sir, is that:  Are you

12  here prepared to produce these 7,617 documents that's

13  numbered by, I suppose, Counsel?  Or is there someone

14  else who's going to show up and say, "Hey, I'm going to

15  produce the documents today"?

16      A.   I think what I would say is, I'm -- I'm

17  prepared -- again, a quick glance -- to speak to all of

18  these.  So I don't want to get hung up on the word

19  "produce," but I think I'm prepared to --

20      Q.   Yeah.

21      A.   -- speak to all of these, yes.

22      Q.   Yeah, I know that's a -- it's a technical

23  jargon because, you know, it's been produced

24  electronically -- or remotely, I should say; right?

25          Okay.  I think that was a clear answer.  Thank

Jeremy Michael Eaves                          May 10, 2021

Page 87

1   lines?

2       Q.   Well, yeah.  The employees are supposed to get

3   an answer to their question 100 percent of the time,

4   true?

5       A.   Sure.  The -- the expectation would be that

6   teammates who operate those inboxes are responding to

7   teammate questions, yes.

8       Q.   And if those questions coming from teammates

9   are directed like to a particular policy or procedure,

10  that may raise a red flag for leadership; isn't that

11  right?

12      A.   I do think that's possible, Mr. Jones.

13      Q.   Not only possible.  It happened with the

14  Disaster Relief Policy in March of 2020, didn't it?

15      A.   What was the question?

16           MR. JONES:  Read it back, please.

17           (Record as shown on page 87, lines 8 through

18            11, read back.)

19      A.   I believe I answered that question.

20           MR. JONES:  Read my next question, please.

21           (Record as shown on page 87, lines 13 and 14,

22            read back.)

23      A.   There were questions about the Disaster Relief

24  Policy, yes.  We had many questions about COVID in

25  general during that time frame, yes.

Jeremy Michael Eaves                                    May 10, 2021

Page 114

1    I'm -- I'm happy to do so.

2        Q.   Yeah, I've forgotten what it is.  What is the

3    question?

4        A.   I think your question was why we had made

5    efforts to clarify the policy.

6        Q.   Well, let me ask you this.  We'll start over

7    on it.  Okay?

8             Do you think that this policy was clear on

9    January 1, 2020?

10       A.   Yes.

11       Q.   You didn't think that it needed any

12   clarification on January 1, 2020?

13       A.   No.

14       Q.   Did you feel that the policy needed

15   clarification after March -- some time after March 15,

16   2020?

17       A.   We -- we did make a decision to put specific

18   language in the policy, yes.  To answer your question, I

19   did feel it necessary, speaking on behalf of DaVita.

20       Q.   Now, what changed DaVita's mind then from --

21   going on January 1, 2020, believing that their policy

22   was clear and then something happened on March 15, which

23   is barely 45 days later, that DaVita felt they had to

24   amend their policy and clarify it?

25             What happened?

Jeremy Michael Eaves                                    May 10, 2021

Page 122

1   I'm doing it so you can see the Bates number.  And then

2   I'd like to make it bigger, if you're all right with it.

3        Q.   (By Mr. Jones)  Can you read it?

4            THE WITNESS:  Thank you, Christina.  I'm

5   prepared for you to make it bigger now.  Thank you.

6        Q.   (By Mr. Jones)  All right.  This is

7   DaVita_003376.  It's one of about 7,600 documents that

8   were produced to us today, most for the first time.

9            MS. PETERSEN:  Is it 75 or 76?  'Cause on the

10  tab it says 003375.

11           MR. JONES:  I know I said 70- -- let me start

12  over.

13       Q.   (By Mr. Jones)  This is found at DaVita

14  003376, part of around 7,800 documents that were

15  provided to us today, some for the first time.

16           MR. JONES:  Scroll back down, Christina.

17       Q.   (By Mr. Jones)  Now, this is Abegail

18  Fontanilla, March 16, 2020.  And have you seen this

19  email before, sir?

20       A.   I -- I would have reviewed them.  I can't say

21  I specifically recall this one, though, sir.

22       Q.   Let me read it to you.  "I was scrolling

23  through our Teammate Handbook and came up with a

24  question.  Governor of Virginia, Mr. Ralph Northam and

25  our president Mr. Donald Trump have declared, quote,

Jeremy Michael Eaves                                    May 10, 2021

Page 123

1   unquote, a state of emergency last week.

2            "In Section 4 of Pay Practices, it states that

3   'if a designated facility is open during the emergency

4   time frame, teammates who report to their location and

5   work their scheduled hours will be paid premium pay for

6   all hours worked.

7            Unless state law requires otherwise, premium

8   pay will be one and one half times the teammates base

9   rate of pay,' close quotes.  Does it not apply to our

10  situation right now?  Specially with all other kinds of

11  clinics and businesses are closed due to COVID 19."

12           Did I read that correctly?

13      A.   You did.

14      Q.   Now, here's a question from Mr. Abegail

15  Fontanilla.  And if you read it as a thinking person, it

16  appears that Abegail, clinical administrative assistant/

17  patient care technician for DaVita, has read the pay

18  practices for non-exempt teammates -- that paragraph

19  that we went over before we took the break.

20           Apparently, she read it the same way I did.

21  Is that how you read this email?

22           MS. PETERSEN:  Objection.  Calls for

23  speculation.

24      A.   Mr. Jones, I read this as a question that we

25  would typically get for clarification.

Jeremy Michael Eaves                                    May 10, 2021

Page 124

1       Q.   (By Mr. Jones)  Okay.  But she says, "Does it
2    not apply to our situation right now?"
3            As a thinking person, does that lead you to
4    believe that perhaps she thinks that it does apply to
5    our situation right now?
6       A.   I -- I think she's got a question about it,
7    yes.
8       Q.   Yeah.  And so -- and she's obviously read the
9    same section of the pay practices for non-exempt
10   teammates of the DaVita Disaster Relief Policy that I
11   read, right?
12      A.   Yes, I -- based on the language she's using
13   here, it looks like she looked at that policy, yes.
14           MR. JONES:  Christina, let's go to 003375 and
15   scroll all the way to the bottom.  There you go.  At the
16   bottom, we have now Ms. Lindsay Burns on March 18, 2020,
17   to Jeremy Eaves -- that's you, Mr. Eaves -- "Subject:
18   FW" -- I guess that's forward -- "Compensation."
19           "Hey Jeremy, this is an example where TMs are
20   referencing an emergency situation.  We explained that
21   we are not paying hazard pay but this may be where
22   confusion is coming from."  Do you remember receiving
23   this email, Mr. Eaves?
24      A.   I -- I do -- I do remember I -- I saw this
25   email.

Jeremy Michael Eaves                                    May 10, 2021

                                                        Page 125

1        Q.    Did you see this email when it came in?

2        A.    From Lindsay, yes, I did.   And I --

3        Q.    Who is Lindsay Burns?

4        A.    Lindsay is a director on our operations

5    innovation team.   And she was set up to run the help

6    desk for the influx of questions we have related to the

7    COVID-19 pandemic.

8        Q.    Okay.   She sent this to you as an example,

9    where TMs -- that stands for teammates -- are

10   referencing an emergency situation and may be where the

11   confusion is coming from.

12             Is that what you thought, when you saw her

13   email?

14       A.    That's what I read, yes.   That's what I

15   thought at the time.

16       Q.    So then you write back to her about 29 minutes

17   later.   You say, "Ah, I see.   Okay.   Quote, the Disaster

18   Relief Policy provides for pay continuance during an

19   emergency time frame when a declared emergency or

20   natural disaster prevents teammates from performing

21   their regular duties, close quotes.

22             "Pay practice for non-exempt TMs as defined in

23   the pay practices policy."   And these are all caps.

24   "Facility closed.   Facility opens late or closes early.

25   Facility remains open but teammates not able to come

Jeremy Michael Eaves                                    May 10, 2021

Page 126

1    into work (e.g." -- meaning, for example -- "roads

2    blocked, gas shortages).  Teammates not able to work --

3    use PTO, and approved by supervisor.  Teammates able to

4    make it in and get to the facility are paid at 1.5 or as

5    defined by state law.

6              "With this pandemic, teammates are not

7    disrupted in their abilities to perform their regular

8    duties.  All facilities remain open (you may get

9    pushback that we closed the CBOs -- but that is not the

10   case -- those offices remain open and we are encouraging

11   TMs to work from home).  I hope that helps.  J."

12             Did you write those words, sir?

13        A.   Yes.

14        Q.   Now, I want to take you to the pay practices

15   for non-exempt TMs as defined in the pay practices

16   policy.  And the two bullet points that are indented,

17   the first says, "Teammates not able to work -- use PTO,

18   and approved by supervisor."

19             Was that the policy, when you wrote this?

20        A.   Yes.

21        Q.   "Teammates able to make it in and get to the

22   facility are paid 1.5 or as defined by state law."  Was

23   that the policy, when you wrote this?

24        A.   Yes.

25        Q.   Now, in this she writes, "Okay.  Thank you.  I

Jeremy Michael Eaves                                    May 10, 2021

Page 154

1      Q.   Well, the teammates -- were there any
2  teammates within DaVita's 57,000 plus who were unable to
3  perform their normal job duties in March 2020 because of
4  the COVID-19 crisis?
5      A.   Sure, if they were sick and unable to come in
6  to work.  But there was nothing for an able person who
7  needed to come in, that would prevent them from
8  performing their -- their normal course of duties.
9      Q.   Were you aware that Ms. Prockish said that the
10 COVID-19 prevented her from keeping her regular office
11 hours, which were part of her regular duties?  Were you
12 aware of that?
13         MS. PETERSEN:  Objection.  Misstates prior
14 testimony.
15     Q.   (By Mr. Jones)  Are you --
16     A.   I'm not aware of -- of that comment.
17     Q.   I mean, surely you're aware that there were
18 people who -- was there anybody --
19         Was there anyone within the DaVita teammates
20 that didn't come to work during the early stages --
21 let's say, March of 2020 -- because they felt that they
22 were -- that they needed to shelter in place?
23     A.   I -- I do believe that there were questions
24 about that, yes.  I -- I think it's possible teammates
25 may have been confused and not have come in.

Jeremy Michael Eaves                                    May 10, 2021

Page 155

1        Q.   What do you mean "confused"?  I mean, if
2    they're told to shelter in place, why would they be
3    confused?
4        A.   Yeah, it was -- it was a fluid situation.  And
5    so I think there were reactions to -- "Oh, my gosh.
6    We've been told to stay at home."  The clarity around
7    that was there were waivers for health care workers to
8    come in, so that they could continue to treat sick
9    patients.
10       Q.   Not all teammates are health care workers, are
11   they?
12       A.   Our -- other teammates would have been still
13   able to come in, if they were not providing direct --
14       Q.   You didn't answer my question.  You're
15   answering a question you think --
16       A.   Can you repeat --
17       Q.   -- I'm going to ask.  I'll be happy to.
18            Not all DaVita teammates are health care
19   workers?
20       A.   Correct.  They're not health care workers, not
21   all of them.
22       Q.   And by the end of March 2020, most of DaVita's
23   business offices were closed, weren't they?
24       A.   That is not the case.
25       Q.   No?  Were some of them closed?

Jeremy Michael Eaves                                    May 10, 2021

                                                          Page 172

1    emergency or natural disaster.  And of course there's

2    the predicate, you know, the emergency time frame is

3    declared.

4              If the facility is closed, the teammate can't

5    work, they get regular time; true?

6         A.   Mm-hmm.

7         Q.   If the facility opens late or closes early,

8    the teammate shows up and works those changed hours,

9    they get regular time; right?

10        A.   Yes.

11        Q.   If the teammate's not able to -- if the

12   facility is open and the teammate can't make it in to

13   work, they don't get paid at all.  They've got to use

14   PTO, or they don't get paid; right?

15        A.   (No response.)

16        Q.   Yes?

17        A.   Yes.

18        Q.   But if the facility is open and the teammate

19   makes it into the facility, works their scheduled hours,

20   they get premium time; right?

21        A.   Mm-hmm, yes.

22        Q.   Okay.  Why did DaVita pay premium time only to

23   the teammates who are able to make it into the facility

24   that's open and work their scheduled hours?

25        A.   I -- I -- I understand your question.  It --

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com       206.622.6661 * 800.657.1110   FAX: 206.622.6236

Jeremy Michael Eaves                                    May 10, 2021

Page 173

1    it's insensitive -- I mean, it -- it's above and beyond

2    insensitive to say, "Listen, we realize that it is extra

3    tough for you to potentially get in here and -- and we

4    need you here."  And so for us to have some additional

5    incentive to motivate those teammates to come in is

6    important.

7           And so during those situations -- where

8    there's this disaster, they're not performing their

9    regular job duties, it's difficult for them to get in --

10   we want to have that additional incentive there to say,

11   "Hey, we got that additional half time on top of what we

12   would normally pay you for the time to come in."

13       Q.   Okay.  But, see, that's what I'm getting at.

14   You know, that's what I just don't understand where

15   you -- where you're getting that from.

16           So the policy of DaVita is that if teammates

17   are able to make it into the facility that is open and

18   work their scheduled hours, they do not get premium pay

19   unless they're unable to perform their regular duties.

20           Is that your testimony?

21       A.   Sorry.  Can you repeat the question?

22       MR. JONES:  Read it again, Madam Court

23   Reporter, please.

24           (Record as shown on page 173, lines 13 through

25            20, read back.)

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110   FAX: 206.622.6236

Jeremy Michael Eaves                                    May 10, 2021

                                                         Page 177

1    reason for suspending the deposition is with regard to a

2    privilege log, we do want to make note that there's not

3    been a single privilege objection throughout this entire

4    deposition.  It's a spurious reason for suspending the

5    deposition.  And we object to any form of continuation,

6    and I consider it closed.  So with that, we'll close out

7    the record.

8              THE COURT REPORTER:  Would the witness like to

9    waive or reserve signature?

10             MS. PETERSEN:  We will reserve.

11             (Deposition concluded at 6:45 p.m.)

12             (Signature reserved.)

13                        -----

14

15

16

17

18

19

20

21

22

23

24

25

Jeremy Michael Eaves                                    May 10, 2021

Page 178

1                    S I G N A T U R E

2

3

4

5            I declare under penalty of perjury

6    under the laws of the State of Washington that I have

7    read my within deposition and the same is true and

8    accurate, save and except for changes and/or

9    corrections, if any, as indicated by me on the CHANGE

10   SHEET page hereof.

11           Signed in _____,

12   Washington, on the _____ day of _____,

13   2021.

14

15

16

17                        _____

18                        JEREMY MICHAEL EAVES
                          TAKEN:  May 10, 2021
19

20

21

22

23

24

25   Olivia Pennella

Jeremy Michael Eaves                                    May 10, 2021

Page 179

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON   )
                           ) ss.
3    COUNTY OF KING        )

4

5            I, the undersigned Washington Certified Court
     Reporter, hereby certify that the foregoing deposition
6    upon oral examination of JEREMY MICHAEL EAVES conducted
     via Zoom was taken stenographically before me on May 10,
7    2021, and transcribed under my direction;

8            That the witness was duly sworn by me pursuant
     to RCW 5.28.010 to testify truthfully; that the
9    transcript of the deposition is a full, true, and
     correct transcript to the best of my ability; that I am
10   neither attorney for nor a relative or employee of any
     of the parties to the action or any attorney or counsel
11   employed by the parties hereto nor financially
     interested in its outcome.

12

13           I further certify that in accordance with
     Washington Court Rule 30(e), the witness is given the
     opportunity to examine, read, and sign the deposition
14   within thirty days upon its completion and submission
     unless waiver of signature was indicated in the record.

15

16           IN WITNESS WHEREOF, I have hereunto set my
     hand this 17th day of May, 2021.

17

18        \S\OLIVIA PENNELLA

19

20   _____
     Washington Certified Court Reporter No. 3337
21   License expires June 4, 2022.

22

23

24

25