The Honorable James L. Robart

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

Joseph J. Hesketh III,
*on his behalf and on behalf of other similarly situated*
*persons*

Plaintiff,

v.

Total Renal Care, Inc, on its own behalf and on
behalf of other similarly situated persons,

Defendants.

Case No: 2:20-cv-01733-JLR

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE
AFFIDAVIT

NOTED FOR HEARING
NOVEMBER 12, 2021

(REQEUST FOR ORAL ARGUMENT)

HENRY & DeGRAAFF, P.S.
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

# I. INTRODUCTION

During an emergency or natural disaster, almost everyone must balance the competing interests of work versus family. On the one hand, we have a duty to be with our family so we can provide them with food, shelter, and security. On the other hand, we need to go to work to earn money to provide for the family. In every emergency these competing interests reach a critical balance where the duty to family is equally weighted against the pressure to go to work. Without more, the family will win almost every time.

In 2017 DaVita created a "Disaster Relief Policy" ("DRP") that was designed to tip this critical balance in favor of its employees choosing to go to work. It did so by promising that if an emergency prevented some, but not all DaVita employees from performing their regular duties, those employees who chose to go to work would be paid Premium Pay (1.5 times regular pay) for working their scheduled hours.

DaVita make this offer "up front," before a crisis struck, so that even those DaVita employees that had only "minimal to no communications capacity" because of the emergency knew that if they soldiered through and showed up to work they would receive premium pay. The DRP promised to establish a Disaster Governance Council ("DGC") to "identify" those DaVita facilities or business offices that had been affected by the emergency or natural disaster and identify the time frame of the disaster, based upon the severity and duration of the emergency.

The DRP included a disclaimer that it was not a "contract," and did not create rights to continued employment or pay or benefits. But, DaVita knew that this disclaimer would not lessen the financial incentive created by the DRP, because DaVita also promised its employees, without reservation, that it would always do the right thing by them because DaVita was a "community first and a company second" and DaVita always "say[s] what we believe and we do what we say." DaVita employees trusted management because DaVita promised that "[w]e are trusted because we are trustworthy".

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Then in March of 2020 the Covid 19 Crisis struck and created for DaVita employees the very "competing priorities at home" that the DRP was intended to tip the scales. DaVita employees were prevented from performing their regular duties on a massive scale when all DaVita business offices were closed, employees became sick and could not work and others sheltered in place. Other DaVita employees chose to brave the pandemic and perform their regular schedules with the expectation that they would receive premium pay.

There was a collective expectation among DaVita employees who worked through the early days of the Covid 19 Crisis, that the Disaster Governance Council (DGC) would soon meet and identify their facilities and business offices affected by the Covid 19 Crisis and pay them premium pay. But, the DGC did not meet because there **was no** DGC: DaVita had never created the DGC. Ever. Instead, DaVita's simply said "no" to premium pay by creating the fiction that the Covid 19 Crisis did not prevent any DaVita Employee from performing his or her regular duties.

These are the material facts that preclude summary judgment and, if decided in favor of Mr. Hesketh and the class he seeks to represent, will result in judgment against DaVita for the small amounts of money owed each one of the employees who reported to work during the early days of the Covid 19 Crisis.

## II.     FACTS

### A.     Origins of the Disaster Relief Policy

In 2017 DaVita created a "Disaster Relief Policy" ("DRP") after Hurricane Harvey hit to replace the 2008 DaVita/TRC "Teammate Emergency Disaster Pay" Policy, which had been "retired" in July 2017. Declaration of Christina L Henry, at ¶ 2, 3, 4, Ex 1("Eaves Deposition" at pp. 29:25 to 30:20), Ex. 2, DAVITA_17, 8 (hereinafter "DAVITA__"). After Harvey, DaVita "made the decision to recognize the spirit of this policy" by retroactively paying Teammates (TMs") who worked in "impacted markets" between August 27-31, 2017, double their regular rate of pay. *Id.* "In addition teammates that were **not able to work** from Sunday 8/27/31 through Sunday 9/3/17

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 3

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

would receive normal pay for their regularly scheduled hours without having to use PTO." *Id.*

On September 1, 2017, Eric Severson, the "Chief People Officer" wrote to Sr. V.P. David Maughan raising his concern about "additional storms this season in other markets" and "it will be difficult not to follow the same very generous practice" of paying double time like happened after Hurricane Harvey. *Eaves Deposition*, at pp. 29:25 to 30:20, at Ex. 2, DAVITA_7 ("hereinafter "DAVITA_"). Severson announced he commissioned an "after-action" review to develop a new and comprehensive DaVita/TRC disaster relief policy to provide incentives for TMs to show up for work during an emergency or natural disaster. DAVITA_7-8. Mr. Severson was very specifically said the new policy was to communicate to DaVita TMs the "minimum remuneration" that TMs could expect in a disaster and "when [and] how they will get it." [1] *Id.*

A team wrote the new DRP. DAVITA_319 – 324. The "Policy workstream" followed DaVita's response to Hurricane Harvey: TMs who could not work because of facility closures were paid regular pay; TMs who worked during the emergency received premium pay; and TMs who did not work but their facilities were open had to use PTO.[2] DAVITA_322. The focus was to incentivize TMs to show up for work during a declared emergency or national disaster. *Id.*[3]
The new policy was drafted. DAVITA_128-129. The new DRP did not call for the designation of Designated/Essential Employees. Rather, the DRP new policy established when TMs could expect to receive Disaster Relief pay. The DRP established that it would go into effect "when a declared emergency or natural disaster" of such severity and duration struck that it "prevented Teammates

---

[1] DaVita has its own language, called "DaVita-ese, and sayings, e.g., "One For All and All for One" is DaVita/TRC's "call-and-response tradition to express dedication to our teams." *See* DaVita's "Guide To Our Terminology and Acronyms" at DAVITA_303 - 310.

[2] PTO is "Personal Time Off," which is the same vacation or sick pay. *See* TRC 98.

[3] The team projected the costs for two types of DaVita facilities: (1) "Pay for closed centers during a disaster": and (2) "Pay for open centers during a disaster." DAVITA_119; 125 (native format); 126; 127 (native format). Only teammates that came to work at the open centers during a declared emergency would receive "Premium Pay" – 1.5 times their regular pay. Id. Robert Ho also discovered that the proposed Disaster Relief Policy actually saved DaVita money. DAVITA_251-258. *See* the "assumptions" Ho used at DAVITA_322.

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

from performing their duties." DAVITA_129. Although the new policy said that it provides for pay continuance during a "declared emergency or natural disaster prevents teammates from performing their regular duties," that was not all the policy did. DAVITA_129. The policy also said TMs who "worked their scheduled hours" would be paid premium pay. *Id.*

An Executive Summary was prepared. DAVITA_171; 220, 257–264. Severson explained in (DAVITA 270-271) is that TMs should be told "up front" (i.e. before a disaster struck) who would receive premium pay, how and when:

> If we establish a policy that sets for the minimum that we are willing to commit to in any nationally declared disaster we achieve the following objectives:
> - Teammates who may have minimal to no communications capability during a disaster know whether & how they will be paid;. . . .
>
> - Create an up front incentive for TMs who may have competing priorities loved ones in peril home damage insurance claims to file to show up for work because they know it will financially benefit their family.
>
> If you want to make the pay for teammates who can't report to work situation specific and discretionary we can definitely do that. (Emphasis added.)

There were later changes addressing the rights of Disaster Volunteer Groups. The DRP still charged the DGC with identifying the affected facilities and business office after a declared emergency or natural disaster "by either the President of the United States, a state Governor or other elected official, or if local leadership (DVP/Palmer)[4] deems it appropriate." Henry Dec., at ¶ 5, TRC 49 (hereinafter "TRC_"). The DRP that was in effect on January 1, 2020 provided for two broad categories for pay.

> (1) The Disaster Relief Policy provides for "pay continuance during an emergency time frame when a declared emergency or natural disaster prevents teammates from performing their regular duties;" and
>
> (2) "In the event of a state or federally declared natural disaster, the Disaster Relief Policy provides information relative to pay practices, work schedules, and facility or

---

[4] DaVita has its own Culture, "Symbols, Language and Traditions" and publishes an extensive explanation this phenomenon called "'The DaVita Way Of' Book." HESKETH_194-HESKETH_287. Its language is called DaVita-ese and Glossary is found HESKETH_254 -HESKETH_262. DVP means Divisional Vice President. Palmer refers to a "team" made up of the senior vice presidents (SVPs) of each field (dialysis) operation. The field operations are called "Palmer Groups." *See* HESKETH_218.

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

business office coverage." Id.

In the event of a state or federally declared natural disaster, the policy provides for four (4) basic pay situations including:

1.      If a facility or business office is closed due to a declared emergency or natural disaster non-exempt teammates will be paid for their regularly scheduled hours at their base rate of pay during the designated emergency time frame, even though they cannot work.

2.      If a facility or business office **opens late or closes early** due to a declared emergency or natural disaster as defined above, teammates will be notified promptly of the approved opening or closing time. Nonexempt teammates who arrive or leave at that approved opening or closing time will be paid their hourly rate of pay for their regularly scheduled hours. Any non-exempt teammate who arrives at work after the approved opening time or leaves work before the approved closing time will be paid only for the time actually worked, in which case, the teammate should utilize PTO in accordance with the regular PTO Policy. [5]

3.      If a designated facility or business office is **open** during the emergency time frame, teammates who report to their location and work their scheduled hours will be **paid premium pay** for all hours worked. Unless state law requires otherwise, premium pay will be one-and-one-half (1.5) times the teammate's base rate of pay.

4.      If a designated facility or business office is **open** during the emergency time frame and teammates are unable to work, teammates should utilize PTO in accordance with the PTO.

TRC 000050.

**B.      DaVita Says It Is A Community First, Company Second.**

DaVita has a reputation for supposedly putting its employees first, for which it earned glowing writeups from publications.[6] This culture was implemented deliberately more than twenty years ago by DaVita's former CEO, Kent Thiry,[7] and continues today under Mr. Thiry's successor Javier Rodriguez. DaVita credits this culture with turning the company around from near bankruptcy in 1999, to providing a third of all kidney dialysis treatments in the US just ten years

---

[5] PTO means "Personal Time Off," which is the equivalent of paid vacation and sick leave.
[6] *See, e.g.*, Tina Reed, "DaVita's new CEO Rodriguez talks strategy, style and the future of kidney care," *Fierce Healthcare*, May 22, 2019, https://www.fiercehealthcare.com/hospitals-health-systems/davita-ceo-javier-rodriguez, accessed July 11, 2021.
[7] Bill Taylor, How One Company's Turnaround Came From the Heart," *Harvard Business Review*, March 30, 2010, https://hbr.org/2010/03/how-one-copmanys-turnaround, accessed July 11, 2021.

**Henry & DeGraaff, P.S.**
119 1st Ave, Ste 500
Seattle, Washington  98104
telephone (206) 330-0595
fax (206) 400-7609

later. *Id.*

DaVita's culture is encapsulated in a 94-page publication called *The DaVita "Way Of" Book*, which DaVita distributes to its employees. Many companies publish employee handbooks, of course, full of mission statements and core values, but the Way Of book, and the culture described therein, is far from an afterthought—the ethic permeates DaVita at every level and is expressed through symbols, rituals, and especially the language leadership uses to communicate with employees and vice versa. TMs are graded on the "DaVita Way". Declaration of Joseph J. Hesketh ("Hesketh Dec."), at ¶ 4, Ex B, HESKETH_194-287(hereinafter "Hesketh__"). DaVita rivals religious groups by its use of specialized terms and acronyms, many impenetrable to outsiders, catalogued in eight-page glossary of "DaVita-ese" in the Way Of book. In DaVita's parlance, the company is called the "Village", and CEO Rodriguez is its mayor."[8] HESKETH_261; 258. Employees are "Teammates," abbreviated as "TMs," a term which used nearly universally used by all by the employees themselves. Hesketh Dec., at ¶ 4. The TM break room is an "oasis;" the legal team is the "Justice League"; its central business offices are "neighborhoods," most of which sport colorful and inspiring names. (The "neighborhood" in Washington state is called "Team Evergreen.") Hesketh Dec., at ¶ 4, Ex. B, HESKETH_258-259; HESKETH_234. "Sherpas" conduct tours of the DaVita's Denver world headquarters - the Casa del Mundo. HESKETH_260. Perhaps most curiously, one founding executive of the modern incarnation of DaVita is referred to repeatedly, and mysteriously, throughout the book only as "Yoda." HESKETH_262.

Likewise, rituals are an important part of DaVita life at DaVita, epitomized perhaps none more so than by *crossing the bridge*. Originally a metaphor for making a big decision, the bridge became literal when the company purchased small wooden bridges and TMs were invited at company

---

[8] In another interesting parallel with Scientology, Kent Thiry is referred to throughout the "Way Of" book simply as "KT"—in much the same way that Scientology founder L. Ron Hubbard is usually referred to within that organization as "LRH."

HENRY & DEGRAAFF, P.S.
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

meeting attendees to cross them, a symbolic step indicating the employee's commitment to "make DaVita a special place." HESKETH_0000214. Then, CEO Thiry even had a bridge installed at corporate headquarters in Denver and made a point of crossing it every day he was in the office.[9] Company meetings are prime occasions for reinforcing the corporate culture including encouraging TMs ed to perform call-and-response cheers and songs expressing corporate values. HESKETH_216. DaVita has a corporate fight song, "On DaVita," which is sung at all large meetings. HESKETH_242. One of DaVita's most visible symbols is the Three Musketeers, who are said to symbolize DaVita's commitment to the values of "one for all" and "all for one." HESKETH_0000217. The flamboyant Mr. Thiry became famous for roaming the halls at corporate headquarters dressed as one of the Musketeers,[10] and "village leaders" are encouraged to don Musketeer outfits at company meetings. HESKETH_242. "'One for All' is not a motto; it is a way of life," DaVita's COVID-19 Response Team explained to an employee in an email. Eaves Deposition at pp. 29:25 to 30:20), Ex. 2, DAVITA_7486. "We say what we believe, and we do what we say" is another staple at DaVita, often paraphrased as "We said – we did." Hesketh Dec., at ¶ 4, Ex. B, HESKETH_242; 67; 13.

### C. COVID 19 Hits The Nation And DaVita Employees

The full force of the Covid 19 Crisis occurred in March of 2020, with all of its fearsome unknowns, presented all DaVita Teammates the very "competing priorities at home" that the DRP was intended to address. On March 13, 2020, retroactive to March 1,[11] the President declared a

---

[9] Luc Hatlestad, "The Strangest Show On Earth," *5280.com*, September 2012, https://www.5280.com/2012/08/the-strangest-show-on-earth/, accessed October 23, 2021.

[10] Jim Edwards, "Meet the CEO Who Makes His Staff Sing the Company Song," *CBS News*, June 13, 2011, https://www.cbsnews.com/news/meet-the-ceo-who-makes-his-staff-sing-the-company-song/, accessed July 11, 2021.

[11] Strictly speaking, the first such declaration came on January 31, 2020, when the President declared a national public health emergency under the Public Health Service Act. National Conference of State Legislatures, "President Trump Declared State of Emergency for COVID-19," March 25, 2020, https://www.ncsl.org/ncsl-in-dc/publications-and-resources/president-trump-declares-state-of-emergency-for-covid-19.aspx (accessed July 10, 2021).

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 8

**HENRY & DeGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

national health emergency concerning the COVID-19 pandemic, which freed up federal funds that allowed state governors to shut their economies down, close schools, and shutter daycare facilities and non-essential businesses, including hundreds if not thousands of DaVita facilities. [12] Millions of Americans became sick, thousands died, even more millions lost their jobs. Children were displaced; unemployment benefits with no strings attached became available and those who were at risk were encouraged to isolate.

### 1. The Covid 19 Crisis Prevented Some But Not All DaVita TMs From Performing Their Regular Duties. Many Believed The DRP Applied.

The Covid 19 Crisis quickly prevented some, but not all of DaVita's TMs from performing their regular duties. Offices closed and TMs became sick. Declaration of Christina L Henry at ¶ 6, Ex 7 ("Prockish Deposition") at pp. 16:17- 16:19, 16:24-17:5; Eaves Deposition at pp. 154:1- 154:8, 154:17-154:25, 155:1- 155:9. Many were unable to make it into work. Many more soldiered through. *Id.*

There was a collective expectation among TMs and even among DaVita's management, that the DaVita DRP would provide Premium Pay for those TMs who soldiered through and showed up for work.  On March 16, 2020, a regional operations manager with DaVita, sent an email to his superiors inquiring about the policy:

> Ft Belvoir TMs asked if the disaster relief policy would be in effect given the fact that the President has declared an emergency.
>
> I've pasted the entire policy from the TM handbook below and highlighted the 50% premium pay they're asking about. *It could be interpreted that all facilities should get 50% premium pay.* If we're not going to offer any kind of premium pay there should be good talking points about why this policy is not being put into effect.

DAVITA _3368-3373.

That e mail was followed by emails from other DaVita executives, including McKinstry,

---

[12] https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. (accessed October 25, 2021).

Rogers, both Senior Directors, who acknowledged they received multiple inquiries from other DaVita TMs and managers about the Policy. For example, the email thread included a question sent by One TM, a DaVita clinical administrative assistant in Virginia on March 16, 2020:

> I was scrolling through our Teammate Handbook and came up with a question. Governor of Virginia Mr. Ralph Northam and our president Mr. Donald Trump have declared "a state of emergency" last week. In Section 4 of Pay Practices it states that "if a designated facility is open during the emergency time frame, teammates who report to their location and work their scheduled hours will be paid premium pay for all hours worked. Unless state law requires, otherwise, premium pay will be one and one half times the teammates base rate of pay.." Does it not apply to our situation right now? Specially with all other kinds of clinics and businesses are closed due to COVID 19.

DAVITA_3375 - 76.

A rising chorus of TMs sent inquiries through DaVita's e mail system that allows TMs to ask questions. The TMs asked when the DRP would kick in so they received Premium Pay.

### 2. There Was No "Disaster Governance Council."

There was also an expectation that the DGC would soon meet and announce that premium pay was forthcoming as per the DRP. However, there was no DGC and never had been. After the DRP was amended in 2020 to specifically exclude the Covid 19 Crisis, a 2020 Executive Summary Meeting reported "***However, such a body does not appear to exist***. DAVITA_5795; 5786.

### 3. Kenny Gardner ("Gardner") Unilateral Decision.

On March 17, 2020, DaVita's Chief People Person, Kenny Gardner made the unilateral decision that the DRP did not apply to the Covid 19 Crisis. He did so without consulting anyone although the DRP vested that decision with a DGC. DaVita was not acting in good faith.

At 9:13 a.m. on March 17, 2020, Carley St. Clair emailed Gardner, Debbie Wolfe ("Wolfe"), and others to set up a group meeting on "Interview Process Recommendations." DAVITA_3134. Gardner recently replaced Severson as Chief People Officer. Seven minutes later, Wolfe asked the group: "Do we also have disaster pay policy on the list?" *Id.* At 10:23 a.m. Gardner immediately replies: "What is disaster pay policy?" *Id.* Wolfe sent Gardner an excerpt from the policy and writes:

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 10

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Essentially TMs are beginning to ask if the disaster relief policy would be in effect given the fact that the President has declared an emergency. Below is an excerpt from the policy outlining conditions for 50% premium pay. Some feel it could be interpreted that all facilities should get 50% premium pay given the national disaster declaration. Questions have surfaced from Titan and now Endeavor.

DAVITA_3113.

At 10:55 a.m. Kenny Gardner replies: "***The answer is no***." *Id.*

In two minutes, Gardner went from not knowing what the DRP was, to declaring that the DRP policy did not apply to the Covid 19 Disaster. *Id.*

The moment Gardner said "no," DaVita's management swung into action to create a reason for Gardner's decision and "talking points" that the DRP did not apply to the Covid 19 Crisis. For example, Wolfe forwarded Gardner's email to Eaves and McKinstry and suggested that DaVita should claim that: "[t]he Disaster Policy is in place to ensure teammates are supported when a declared emergency or natural disaster prevents teammates from performing their regular duties. While the corona virus has introduced complexities to our normal daily operations in caring for our patients our centers remain open and teammates are able to continue caring for our patients." DAVITA_3155. Wolf candidly admitted that "the more I added the less effective my argument became… the problem is the wording around Emergency declaration if the policy simply referred to natural disasters it would be clear cut." *Id.* Ultimately, DaVita decided to maintain the fiction that the DGC still existed. DaVita announced to its TMs on-line that the DRP did not apply to Covid 19. DAVITA_7608.

But DaVita applied the DRP to the Covid 19 Crisis when DaVita thought that it benefitted DaVita. For example, the DRP provides that "[n]on-exempt traveling teammates, as part of the Disaster Volunteer Group, who provide shift coverage at sites assigned by local Leadership will be paid a 50 percent premium for all compensable straight time hours, including travel time." *See* TRC

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 11

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

000050.[13]  On March 17, 2020, the day that Gardner unilaterally declared that the DRP did not apply to the Covid-19 Crisis, a doctor approved a nurse for pay according to the DRP. DAVITA_7308. The doctor forwarded that email to DaVita Sr. V. P. David Maughan with a note that included:

> "Epidemic type emergencies can bring out the best in people.  Charlene raised her hand to volunteer in clinics if she is needed despite being the sole bread winner and having 3 small children, I did not ask her to do this. Just wanted to share."
> Less than a week later the glow faded, Mr. Maughan wrote that while COVID 19 created

complexities, DaVita's position was the DRP did not apply. DAVITA_7309-10.

### 4.    The Reaction to Gardner's Decision

As Gardner's ruling began to filter down to DaVita TMs, many of them expressed anger and disbelief that DaVita had chosen not to follow the Handbook as they understood it. *See, e.g.,* DAVITA_3902, 4007, 4047, 7427, 7436, 7486. Many employees were adamant the DRP entitled them to 1.5 times their base pay for working during an emergency declared by the President or local officials. *See, e.g.,* DAVITA_3902, 4047. In Washington, an employee from Spokane Valley, WA asked specifically about Governor Inslee's local declaration of emergency but was rebuffed. DAVITA_7440.

A common theme of the employee emails is a sense of betrayal and disillusionment that DaVita, which had touted its values and culture so loudly for so long, had failed to live up to those values. "Does this company pick and choose which policies they follow based on what is convenient for their best self-interest?" asked a registered nurse. DAVITA_4047. "I would think that a company who prides itself on its moral code would stand by their policies even when it is inconvenient." *Id.* The world was still many months away from a COVID-19 vaccine, and many TMs emphasized in emails that, as frontline health care workers, they were putting their own safety on the line by coming to work. "As a village where we are constantly reminded about people first

---

[13] The Disaster Relief Policy was updated in 2019 to create Disaster Volunteer Groups and pay them extra during a crisis.  *See* DAVITA_006356-006357.

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

company second[,]" wrote another employee: "I don't see much added incentive for our TMs to come to work and put themselves and their family at risk." DAVITA_7427. They raised that a competitor, Fresenius Kidney Care, had done what DaVita would not. *See* DAVITA_7540. Discontent with the company's decision and pronouncement spread rapidly amongst DaVita's TMs. In March 2020, DaVita TM Rebecca Haddad started a petition on change.org titled "Disaster Relief Pay for Dialysis Workers."[14] Haddad specifically cited the DRP from the Handbook as the reason DaVita employees were entitled to enhanced pay during the emergency. By March 31, the petition had garnered more than 11,000 signatures.[15] DAVITA_4505.

These records show that multiple DaVita employees and managers in different regions around the country arrived independently at the conclusion, based on the plain wording in the Handbook, that the Policy should have been triggered by the emergency declarations issued by the President and/or their local authorities.

It should be noted that, as DaVita management strategized about the formal announcement that was eventually issued on September 8, 2017, some executives took a distinctly lighthearted approach to an issue that was clearly very important to many low-level DaVita employees. On March 27, 2020, in an email discussion with other executives concerning the company's upcoming DRP response statement, a DaVita Director sent a meme consisting of a photograph of Oprah Winfrey with the text "YOU GET DISASTER PAY – EVERYONE GETS DISASTER PAY!" – an apparent reference to Ms. Winfrey's 2004 "You get a car!" episode of her talk show. DAVITA_4203.

### 5. We Said, We Didn't Do: The Culture Betrayed

---

[14] https://www.change.org/p/davita-hazard-pay-for-dialysis-workers, accessed July 11, 2021.
[15] By July 11, 2021, the petition had amassed 14,926 signatures. https://archive.li/8P52q, accessed July 11, 2021. A notice on that page at that time stated that "**At 15,000 signatures**, this petition becomes one of the **top signed on Change.org!**" *Id.* (emphasis in original). At that time, the number of signatories was approximately 27 percent of DaVita's declared US employee base of 55,000. https://www.davita.com/about, accessed July 11, 2021.

**Henry & DeGraaff, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

DaVita told its employees "Community first, a Company second." deliberately encouraged its employees to think of the company less like a typical for-profit corporation and more like a small town where everyone takes care of each other. It encouraged them to see DaVita as more concerned for their welfare than another company would be, and to take pride in that. So, when President Trump and others issued emergency declarations for COVID-19, many employees read the plain language in the Handbook and came to the quite reasonable conclusion that DaVita would do what it said and follow the policy. DaVita corporate representative testified that he thought the policy was clear in 2020; he confirmed emails raised questions about whether the Policy applied to COVID-19 (Eaves Deposition, at pp. 87:13-25 and 122:13-126:24), that a reading of the policy that if an employee showed up and worked that he would receive premium pay was not unreasonable (*Id.* at pp.108:14-109:05), and DaVita felt it was necessary to clarify the policy (*Id.* at pp.114:08-19). DAVITA_5160, 5166; 5130; 7308.

### D. HESKETH'S CLAIMS

Mr. Hesketh claims he is owed premium pay from the time that the Covid 19 emergency was declared until March 31, 2020, the day that DaVita amended the DRP to exclude the Covid 19 Crisis because the DRP is a contract with non-exempt employees whose facilities were affected by the Covid 19 Crisis and who, rather than shelter with their families chose to come into work. Hesketh Dec., at ¶ 7.

Hesketh claims that there are issues of material fact that preclude summary judgment because: (1) The disclaimers found in the DRP and elsewhere were negated by DaVita's unequivocal promises to treat DaVita employees fairly and act as a community first and the atmosphere it had created, DaVita asks this court to make credibility calls between competing interpretations of the policy and whether any disclaimers have been negated by DaVita's conduct and culture of community first, company second; and (2) whether DaVita failed to apply its DRP in good faith and did not deal fairly with Plaintiff or the putative class. DaVita failed to establish a DGC but that

HENRY & DEGRAAFF, P.S.
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

failure does not provide it an out. DaVita simply declaring that the DRP did not apply to the Covid 19 Crisis violated its duty of good faith and fair dealing.

### III.  **MOTION TO STRIKE**

Declarations based on hearsay are inadmissible and cannot raise a genuine issue of material fact. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012). All information offered into evidence to prove the truth of the matter asserted and not made by the declarant at trial or hearing is hearsay. Fed. R. Evid. 801(c) unless it falls under a hearsay exception. Fed. R. Evid. 801(c). In support of TRC's motion for summary judgment, TRC submits a declaration from Kenny Gardner. Factual statements in Mr. Gardner's declaration at ¶¶ 2-4, 6-8 are conclusory and state legal conclusions without demonstrating any of the requisite knowledge to support them. He makes statements about events that allegedly took place without providing any documentation to support them.

Additionally, Gardner says his understanding of the Disaster Relief Policy are based on his experience with Hurricane Michael in 2018, yet no information regarding Hurricane Michael was provided by TRC in any discovery document production nor does he provide them with his affidavit.

In *Marable v. Nitchman*, 2006 WL 2572065 *6 (W.D. WA. 2006), the Court struck paragraphs of an affidavit submitted in support of summary judgment because they were based on documents concerning employee time sheets and contract provisions since the documents were not provided nor did the affiant state how he has expertise to draw the conclusions. Here, no documents have been provided with Gardner's affidavit and there is no showing of his expertise despite the evidence here that shows he was not familiar with the policy when presented to him in 2020. asked about it, Gardner asked what the policy was in 2020. *See* DAVITA_3113.

### IV.  **ARGUMENT**

#### A.  **Issues of Material Fact Entitle Mr. Hesketh and The Class to a Trial On The Merits.**

DaVita claims to be entitled to summary judgment based upon "four, separate reasons:

(1) that the contract disclaimers "rise to the level of a clear and conspicuous disclaimer of contractual rights that is effective as a matter of law." Dkt. # 84 at p. 12. This Court allowed Mr.

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Hesketh's remaining claim to survive to establish a good faith and fair dealing claim if Mr. Hesketh could find that the disclaimers in the Policy were negated by TRC's specific conduct;

(2) that no implied contract was formed because Mr. Hesketh cannot meet any of the required elements of offer, acceptance, and consideration because the Teammates Policies Handbook "is not intended to constitute a contract of employment, either express or implied" and as a matter of law, no contract formed;

(3) that if a contract somehow was formed and the disclaimers were negated, DaVita did not breach a duty of good faith and fair dealing because it acted in accordance with the express terms of the Policy and exercised its discretion under the Policy reasonably and consistently with how it had done so in other situations. Hesketh's seeks to impose duties on TRC that are inconsistent with those in the DRP Policy. This cannot be done as a matter of law;

(4) that even if Mr. Hesketh cleared *all* of the above hurdles, it is undisputed that he did not suffer any damage. Remote worker like Mr. Hesketh, who do not report to an office are not entitled to premium pay under the Policy, even if an emergency time frame is declared for their office.

Each of these reasons fail because they require that the Court to decide factual issues. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 524, 826 P.2d 664, 670 (1992). Whether there was a contract formed. *See* Sec. IV.A.1 below. Whether the disclaimers were negated by DaVita's actions and culture including finding it necessary to add a COVID 19 disclaimer. *See* Sec. IV.A.2 below. Whether TRC violated its duty of good faith and fair dealing when it failed to act in accordance with the DRP that vested identification of a timeframe and locations with a DGC that DaVita never formed and allowed a rash decision made in 2 minutes by one person. Whether Hesketh was improperly denied the premium pay that was promised when he chose to report to work rather than focus on his personal obligations. *See* IV.B. below. Whether Hesketh is entitled to recover the premium pay as damages for breach of the duty of good faith and fair dealing.

### 1. A Contract Was Formed

In denying the judgment on the pleadings as to Hesketh's claim based on TRC's duty of good faith and fair dealing, the Court held that the sole argument presented - that there was no

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 16

**Henry & DeGraaff, P.S.**
119 1ˢᵀ Ave, Ste 500
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

contract and given the Court's findings that there was a contract albeit unenforceable due to the failure to the failure of condition precedents – did not support dismissal. The condition precedents identified by the Court are discussed below. TRC now seeks to contest the Court's conclusion that there was a contract and Hesketh had made a sufficient showing that the disclaimers had been negated.

DaVita's Teammates Handbook formed a contract between defendant and plaintiff. An employer and employee can contractually obligate themselves under provisions in an employee policy manual. *DePhillips v. Zolt Const. Co., Inc.*, 136 Wash.2d 26, 34, (1998) (citing *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 228–29 (1984)). When reviewing handbook policies, courts look at the objective manifestations of the parties' to determine their intent to form a contract. *Swanson v. Liquid Air Corp.,* 118 Wash.2d 512, 528, (1992). In an employment context, a contract may arise when an employer provides a manual (offer), the employee agrees to abide by its provisions (acceptance), and the employee proceeds to perform his or her job duties (consideration). *Multicare Medical Center v. State, Dept. of Social and Health Services,*114 Wash. 2d 572, (1990). However, to the extent TRC's argument depends upon the "plain meaning rule" (that parol evidence is inadmissible for purposes of interpreting a contract apparently unambiguous on its face) the plain meaning rule was rejected in *Berg v. Hudesman*, 115 Wash.2d 657, 671, (1990)*("*As noted, the trial court refused to consider evidence as to the circumstances surrounding the contract under the now disapproved "plain meaning rule."). Thus, whether the parties *intended* policies in an employment document to be part of their employment is an issue of fact. *Berg*, 115 Wash.2d at 667. Under the *Berg* Rule, extrinsic evidence is admissible as to the entire circumstances under which the contract was made, to aid in determining the parties' intent. *Swanson*, 118 Wash.2d at 528.

While DaVita claims there was no contract, DaVita TMs felt it was reasonable to believe they were entitled to premium pay under the DRP as stated in the employee handbook for working during the COVID-19 national emergency *Brown v. Scott Paper Worldwide Co.*, 143 Wash. 2d 349, 364–65, (2001). While denied by Gardner, there are emails from TMs and suggestions by other managers that the DRP applied to Covid 19. Absent a specific contractual agreement to the contrary, an

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 17

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

employer's issuance of an employee policy manual or handbook may lead to obligations governing the employment relationship. *Thompson*, 102 Wash.2d at 229.

Provisions of the handbook were explained to Hesketh, and he was required to sign a form acknowledging receipt of the manual and agreeing to abide by the rules. *See* Hesketh Deposition, Dkt No. 90-1 at pp. 101:12-16; *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 428, 815 P.2d 1362, 1366 (1991).

Under these facts, this court found that a contract had been formed between the defendant and the plaintiff. This is consistent with Washington law. *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wash.2d 426, 433 (1991). In *Gagliardi*, the court found that a contract had been formed between the defendant and the plaintiff by providing the handbook, with explanation, the company had made an offer which the plaintiff accepted by signing an acknowledgment and agreement form. *Id. at* 433*; see Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 633-34 (1985) (employee's at-will status did not preclude enforcement of severance plan).

### 2. Any Disclaimers Were Negated.

The pervasive nature of DaVita's culture of community first, company second is set forth above. There is no question that the culture creates an atmosphere that confirms one of its many mottos that it will do what it says. DaVita Teammates are indoctrinated in an atmosphere that teaches them to trust one another and to trust upper management at DaVita. The front page of DaVita's "Code of Conduct" contains a single quote: Dr. Martin Luther King, Jr.'s admonition that "[t]he time is always right to do the right thing." TRC 000540. CEO Javier Rodriguez informs DaVita Teammates that while "[o]ur Code of Conduct is central to our Mission and Core Values and is an integral part of who we are as a Village . . . our policies and procedures, [] provide additional, more detailed, guidance on expected behaviors." TRC 000521. To the extent TRC relies on *Spooner v Reserve Life Ins. Co.,* 287 P.2d 735, 738 (Wash. 1995) to claim corporate values are too generalized, Plaintiff maintains that few if any companies have a corporate culture as all-encompassing as DaVita, see HESKETH_265-277, thus, whether these facts negate the disclaimers presents a fact issue. *Swanson*, 118 Wash.2d at 528.

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Also, in determining whether actions or an atmosphere can overcome disclaimers, Washington courts consider "the employer's reason for unilaterally issuing an employee policy manual or handbook…" In *Thompson v. St. Regis Paper Co.*, 102 Wash.2d at 229 the Court held that "… absent specific contractual agreement to the contrary, we conclude that the employer's act in issuing an employee policy manual can lead to obligations that govern the employment relationship. Thus, the employer's reason for unilaterally issuing an employee policy manual or handbook, purporting to contain the company policy vis-a-vis employee relations, becomes relevant."). TRC succinctly explained in the following response concerning why it distributed the DaVita's handbook to Plaintiff and other TRC employees:

> TRC distributes the Teammate Policies document to provide its employees with helpful guidelines and information about its policies, programs, tools, and resources. The Teammate Policies are provided to offer guidance in handling   many issues, but the policies contained therein also allow for latitude in their application to individual circumstances or as business needs may warrant. The Teammate Policies are periodically revised and updated.

*See* Answer to Interrogatory No. 3 at Dkt. 24-1. And, as noted above, the pay practices and disaster relief policy were there to meet an important corporate need for their employees to show up for work, so they provide the premium pay as an incentive. *See also* Eaves Deposition, pp. at 172:22-173:12. The reference to the terms as guidance or guidelines is not determinative under Washington law. *In Carlson v. Lake Chelan Community Hosp.*, 116 Wash.App. 718, 733 (Wash.App. Div. 3 2003) the court rejected that the term resolves the factual issue finding "despite Mr. Carlson's use of the word "guidelines," the evidence establishes that both parties proceeded under the assumption that the Handbook set forth enforceable procedures that were applicable to Mr. Carlson's employment relationship with LCCH." Thus, the fact issues on whether the disclaimers were negated should not be decided by summary judgment.

**B.      B. There Are Genuine Issues of Material Fact Whether DaVita Acted In Good Faith And Fair Dealing.**

Given the Court's prior ruling, the issue before the Court is whether TRC is entitled to summary judgment on Hesketh's good faith claim. To succeed on summary judgment, TRC must show there are no genuine issues as to any material facts. TRC has failed to show that its actions

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 19

HENRY & DEGRAAFF, P.S.
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

were done in good faith and fairly as a matter of law. The source of Hesketh's claim is Washington Law that imposes a duty of good faith and fair dealing for issues arising during employment. In *Rekhter v. State, Dept. of Social and Health Services*, 323 P.3d 1036, 1041, 180 Wash.2d 102, 113 (Wash.,2014) the Court found that DHS owed a duty of good faith and fair dealing relating to the determination of the terms of future service plans. The Washington Supreme Court explained it applied whenever one party has discretionary authority. In *Bill & Melinda Gates Foundation v. Pierce*, 475 P.3d 1011, 1018–19, 15 Wash.App.2d 419, 433–34 (Wash.App. Div. 1, 2020) the court reached the same conclusion applying the duty to any employment issues short of termination of an at will employee. *See also Badgett v Security State Bank*, 116 Wash.2d at 569, 807 P.2d 356 (1991).

In granting TRC judgment on his contract claims, the court held he could not enforce any contracts because two conditions precedents to the DRP had not been satisfied. One condition precedent identified by the Court was that there had been no identification of time frames or offices as required by the DRP. Given this was a discretionary act within DaVita's control, it had to be exercised in good faith and fairly. Moreover, a court may excuse a contract condition if its occurrence has been prevented or hindered through a breach of the covenant of good faith and fair dealing. *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wash. App. 630, 635–36 (1985). In *Barrett*, the employer claimed the employee was not entitled to severance benefits because it had not followed the procedures relating to the severance plan the employee relied on. The Court rejected the employer's argument since the employer was not entitled to rely on its inaction to show a condition precedent was not met. This is why Hesketh pointed out that the DRP called for a DGC to make the decisions under the DRP but that DaVita had failed to establish a DGC. Any failure was of DaVita's own doing.

The court applied and interpreted this fact differently finding this "… highlights that the Disaster Governance Council "never even met regarding the COVID-19 global pandemic." (Resp. at 15; SAC ¶ 58 (alleging that TRC "never convened a meeting of the 'Disaster Governance Counsel [sic]'").) It follows that DaVita never announced an emergency time frame. (*See* Disaster Relief Policy at 2.). Dkt No. 84.

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 20

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

While the Court found that Mr. Hesketh's factual allegations seemed to concede that the condition had not been met, Mr. Hesketh's factual allegations raised the "prevention doctrine." Under the prevention doctrine, a condition precedent may be excused when the condition is within the control of the party who seeks to avoid its contractual duty. *See e.g.* Restatement (Second) of Contracts § 245 (1981) (Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.) *See also* § 39:4. Nonperformance of a condition, 13 Williston on Contracts § 39:4 (4th ed.) Thus, TRC's reliance on the failure of that condition precedent to prevent its obligations under the contract was barred by the prevention doctrine. The Court's conclusion to excuse performance of this condition precedent was not "to judge the soundness of [TRC's] business decisions" (ECF 84 at fn 7), but instead a legal issue squarely presented by the facts before the court in the context of a good faith claim.

Further, interpretating that the DRP vests discretion whether the policy applies at all as opposed to the identification of time frames and locations is inconsistent with the history of the policy. Hesketh has set forth the history of the current DRP above. In short, the DRP was established to "[c]reate an upfront incentive for TMs who may have competing priorities loved ones in peril home damage insurance claims to file to show up for work because they know it will financially benefit their family." DAVITA_270-271.

The second condition precedent identified by the Court was that the DRP required that Mr. Hesketh was prevented from performing his regular duties, and Hesketh admits that he was able to perform his regular duties and therefore his claim failed because "… the Disaster Relief Policy would not have been triggered, as it only provides pay continuance "when a declared emergency or natural disaster prevents teammates from performing their regular duties.". ECF 84 at p. 16. Hesketh's allegations that he was not claiming to have been prevented from working were asserted because the provision of the DRP that he was seeking to enforce only offered premium pay to employees if they worked. The provision stated:

> If a designated facility or business office is open during the emergency time frame, teammates who report to their location and work their scheduled hours will be paid premium pay for all hours worked. Unless state law requires otherwise, premium pay will be one-and-one-half (1.5) times the teammate's base rate of pay.

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

1        When considering the first sentence in the DRP with this provision, it can only mean that

2 when a declared emergency of natural disaster prevents some, but not all teammates from

3 performing their regular duties because if this were not true, then the DRP would create a "Catch

4 22:" i.e., only TMs who were prevented from working collect premium pay, but no premium pay is

5 paid unless the TM works. Under DaVita's reading, no TM would ever be able to collect premium

6 pay during a declared emergency or natural disaster.

7        There are other provisions of the DRP that only are effective if the employee is unable to

8 work but that requirement could not logically apply to the provision Hesketh sought to enforce –

9 which required the employee to work to be entitled to premium pay for the hours worked. But the

10 Court's ruling that the provisions of the DRP only applied if the employees could not work makes

11 this provision ineffective since the pay is only promised if they worked. This does not comply with

12 Washington law that provides "[a]n interpretation of a contract that gives effect to all provisions is

13 favored over an interpretation that renders a provision ineffective, and a court should not disregard

14 language that the parties have used. *Snohomish County Public Transp. Benefit Area Corp. v. FirstGroup*

15 *America, Inc.*, 173 Wash.2d 829, 840 (Wash.,2012).

16        Notwithstanding the Court's conclusions on the condition precedents, whether the Court

17 continues to hold that these were condition precedents were not excused by the prevention doctrine

18 or did not apply to the provision sought to be enforced by Hesketh, the Washington case law

19 imposes a duty of good faith and fair dealing on TRC. *Rekhter v. State, supra; Bill & Melinda Gates*

20 *Foundation v. Pierce, supra.* TRC's failure to have a governance council in place that renders the

21 promise illusory, if one is not in place, can be found to violate TRC's duty of good faith and fair

22 dealing. *Barrett, supra; Rekhter v. State,* 180 Wash.2d at 132–33 ("The … obligation of good faith and

23 fair dealing is to preserve the mutuality of obligations in a contract by assuring that the party who

24 retains authority to specify the manner of a certain performance cannot thereby render a promise

25 illusory.") Similarly, if it offers its employees premium pay for the hours, they make the effort to

26 work when there is a national disaster declared only payable if they cannot work is a deceptive and

unobtainable offer to its employees that is inconsistent with TRC's duty of good faith.

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

At a minimum, the determination of whether TRC's actions or inactions relating to the condition precedent of identifying a time frame under the DRP has been excused under the prevention doctrine or breaches a duty of good faith and fair dealing presents factual issues. Similarly, whether TRC's policy that offers premium pay for working during a national emergency can be thwarted by a condition precedent that limits the policy to times when an employee cannot work also presents factual issues whether such an approach violates a duty of good faith.

### C.    Pay Practices That Affect Existing Employment

In the prior ruling, the Court stated that Hesketh had offered "close to no argument as to why the language in the Disaster Relief Policy, which explicitly disavows "giv[ing] teammates any additional rights to . . . pay or benefits," applies only to the at-will employment status." Hesketh contends that there is a factual distinction drawn between employment issues during the employment, such as pay for services already rendered by an employee since employees are paid in arrears and whether there will be future employment that is addressed by clauses directed at preserving employment at will. The clause partially quoted by the court also made a distinction because it stated, "any additional rights *to continued employment,* pay or benefits, *or to otherwise change DaVita's policy of at-will employment.*" Hesketh submits that the reference to "continued" as opposed to past pay and the clause being cabined by reference to DaVita's employment at will supports his position.

The Washington Courts have made a distinction between practices that affect existing employment and whether there is a right to continued employment by imposing a duty of good faith on employers concerning the former but not the latter. *Bill & Melinda Gates Foundation v. Pierce, supra.* In *Barrett, supra,* 40 Wash.App. 630, 633 (Wash.App.,1985). This is consistent with the factual difference between services performed as an employee and whether to retain an employee to perform future services. The difference between current and future services provides an explanation for the Washington cases enforcing promises made to an existing employee for services performed.

**Henry & DeGraaff, P.S.**
119 1st Ave, Ste 500
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

#### D.    D. Contradictory Employment Practices[16]

DaVita Teammates are indoctrinated in an atmosphere that teaches them to trust one another and to trust upper management at DaVita.  The front page of DaVita's "Code of Conduct" contains a single quote:  Dr. Martin Luther King, Jr.'s admonition that "[t]he time is always right to do the right thing." TRC 000540. CEO Javier Rodriguez informs DaVita Teammates that while "[o]ur Code of Conduct is central to our Mission and Core Values and is an integral part of who we are as a Village . . .  our policies and procedures, [] provide additional, more detailed, guidance on expected behaviors." TRC 000521. The TMs are promised that "At DaVita we take great pride in . . . holding ourselves to a high standard as a corporate citizen. We are committed to doing the right thing and conducting our business activities in compliance with our policies, procedures and applicable laws and regulations. Our Mission—to be the Provider, Partner, and Employer of Choice—can be achieved only if each of us lives these commitments."

The DRP was specifically designed to be objective enough that "Teammates who may have minimal to no communications capability during a disaster know whether & how they will be paid." The impact of any inconsistent representations "can only be determined after '[a]ll the circumstances, and the representations and practices of the employer' are examined." *Ritchie v. Fed. Express Corp.*, No. C04-1753RSL, 2007 WL 1140260, at *7 (W.D. Wash. Apr. 16, 2007) (quoting *Swanson*, 826 P.2d at 676). There can be no doubt that TRC created an atmosphere where employees are made to believe that it will abide by the Teammate Policies Handbook.

#### E.    DaVita Found It Necessary to Add An Exclusion

Finally, actions often speak louder than words. While DaVita argues that the policy did not apply to Covid-19 based on the two-minute conclusion of Kenny Gardner, DaVita felt it necessary to add a specific exclusion to the DRP to exclude Covid 19. This is not a products case where subsequent remedial measures can be excluded from evidence. This is evidence that creates a reasonable inference that DaVita amended the policy to add an exclusion because at a minimum it was ambiguous as to whether the existing DRP applied to Covid-19. Under Washington law, "[I]t is

---

[16] "So, too, could contradictory employment practices. *Id. See Payne v. Sunnyside Community Hosp.*, 894 P.2d 1379, 1384 (Wash. Ct. App. 1995).

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

well established that subsequent acts and conduct of the parties to the contract are admissible to assist in ascertaining their intent. *Stender v. Twin City Foods, Inc.,* 82 Wash.2d 250, 254, 510 P.2d 221 (1973); *Carlyle v. Majewski,* 174 Wash. 687, 690, 26 P.2d 79 (1933); Restatement (Second) of Contracts § 202(4) (1981)." *Berg v. Hudesman*, 801 P.2d 222, 234, 115 Wash.2d 657, 677–78 (Wash.,1990). A trier of act can consider DaVita's actions in amending its policy in determining whether it acted in good faith and fair dealing.

### F.    Inconsistent Treatment of Pay Policies Within The Manual Itself:

An employer's inconsistent representations also can negate or override a disclaimer. *Swanson*, 118 Wash.2d 519. DaVita's Teammates Handbook includes inconsistent policies in its pay policies that are directly relevant to this court's interpretation of the DRP. TRC_40-51. Under 4.8 Facility Closures – "the teammate's supervisor has the sole discretion to decide whether to pay….," and "[m]anagers have discretion to provide additional compensation to teammates who work during a facility closure (TRC_47-48). Under 4.10 – Subject to Call – DaVita may choose to provide… subject to call teammates with a lump-sum payment … TRC_49. In contrast, under 4.12 -Disaster Pay Policy, DaVita does not give managers discretion, and determines compensation based on an emergency time from …. [that] "will" be identified… *Payne v. Sunnyside Cmty. Hosp.*, 78 Wn. App. 34, 43, 894 P.2d 1379, 1384 (1995) (mandatory language in a handbook raises an issue of fact to negate disclaimers).

### G.    The Nature of The Opiod Crisis and Limited Natural Disasters Do Not Control The Application of the DRP To Coivd-19

DaVita argues that the DRP does not apply because it would open the DRP up to other crisis like the Opiod crisis. Respectfully, there are marked differences between a pandemic that does not arise from the in gestation of drugs and that can be addressed through treatment and a pandemic that everyone was vulnerable to regardless of their actions and began with no cure or sure treatment. There were no lockdowns imposed for the Opiod cirsis. The COVID 19 pandemic was unique and differed from the opiod crisis in these ways. This claim concerns only the COVID 19 issue and the response to it in light of

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Davita's Teammates Handbook, its actions and corporate culture.

**H.    Hesketh May Recover Damages Proximately Caused by TRC's Breach of The Duty of Good Faith and Fair Dealing.**

Hesketh contends that TRC failed to exercise good faith and fair dealing and as a result, he did not receive premium pay promised under the DRP. Under TRC's theory no employee would ever be able to recover on a claim for enhanced pay offered by an employer because the employee already is being compensated for his or her services. Yet, that theory does not take into account that a violation of an employer's duty of good faith and fair dealing can provide an employee the right to recover the damages proximately caused by the employer's violation of the duty.

The Washington Pattern Jury Instructions comments concerning damages for the breach of the duty of good faith in the insurance context found it impractical to draft a pattern damage instruction for such claims. *See* Washington Pattern Jury instructions, Chapter 320, 320.07.

Hesketh submits the same rationale applies here and he would be entitled to request any damages that the jury may determine were proximately caused by TRC's breach of the duty and that would include the premium pay that was promised by the DRP.

**I.    The Language used by DaVita is Repeated So Often That It Loses Its Effectiveness.**

The language used in this policy is not intended to constitute a contract of employment either express or implied to give teammates any additional rights to continued employment pay or benefits or to otherwise change DaVita's policy of at-will employment. This was virtually the same language that DaVita used in 2007 letter in which it offered Mr. Hesketh a Job.

> It is understood and agreed that your employment will be at-will, and either you or DaVita may terminate the relationship at any time, for any or no reason, with or without notice. The terms of this letter, therefore, do not, and are not intended to, create an express or implied contract of employment. Your at-will employment relationship may only be modified by a written agreement, signed by an officer or director of DaVita.

TRC_000458.

**V.    CONCLUSION**

For the foregoing reasons, the Defendant's Motion for Summary Judgment should be denied and the Plaintiff's Motion to Strike should be granted.

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 26

**HENRY & DEGRAAFF, P.S.**
119 1ST AVE, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

Respectfully submitted,

Dated this 25th day of October, 2021.

/s/ Christina L Henry
Christina L Henry, WSBA 31273
HENRY & DEGRAAFF, PS
119 1st Ave S, Ste 500
Seattle, WA 98104
TEL 206-330-0595
FAX 206-400-7609
chenry@hdm-legal.com

/s/ J. Craig Jones
J. Craig Jones
(Pro Hac Vice)
Craig Hill
JONES & HILL, LLC
131 Highway 165 South
Oakdale, LA 71463
TEL 318-335-1333
FAX 318-335-1934
craig@joneshilllaw.com

/s/ Scott C. Borison
Scott C. Borison
(Pro Hac Vice)
BORISON FIRM, LLC.
1900 S. Norfolk Rd. Suite 350
San Mateo CA 94403
TEL 301-620-1016
FAX 301-620-1018
scott@borisonfirm.com

OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND MOTION TO STRIKE AFFIDAVIT - 27

HENRY & DeGRAAFF, P.S.
119 1ST AVE, STE 500
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609