UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSEPH J. HESKETH, III,

              Plaintiff,

    v.

TOTAL RENAL CARE, INC.,

              Defendant.

CASE NO. C20-1733JLR

ORDER

## I.   INTRODUCTION

Before the court are:  (1) Defendant Total Renal Care, Inc.'s ("TRC") motion for summary judgment (MSJ (Dkt. # 87); *see also* Reply (Dkt. # 98)), and Plaintiff Joseph J. Hesketh, III's opposition thereto (Resp. (Dkt. # 99-1)[1]); (2) Mr. Hesketh's motion to strike portions of TRC's Chief People Officer ("CPO") Kenny Gardner's declaration (*id.* at 15); and (3) TRC's motion to strike the pages of Mr. Hesketh's opposition that

---

[1] The court cites to the second amended version of Mr. Hesketh's response in this order. (*Compare* Resp., *with* Orig. Resp. (Dkt. # 93), and First Am. Resp. (Dkt. # 97-1).)

1  exceeded the applicable page limit (Reply at 12).  The court has considered the motions,

2  all submissions filed in support of and in opposition to the motions, the relevant portions

3  of the record, and the applicable law.  Being fully advised,[2] the court DENIES Mr.

4  Hesketh's motion to strike, GRANTS TRC's motion to strike, and GRANTS TRC's

5  motion for summary judgment.

6  ## II.    BACKGROUND

7  Mr. Hesketh, an employee of TRC, brings this class action suit for various claims

8  related to TRC's Disaster Relief Policy ("Disaster Relief Policy" or the "Policy") and its

9  refusal to apply that policy to the COVID-19 pandemic.[3]  (See SAC (Dkt. # 40) ¶¶ 7,

10  36-41, 106-43; Ans. (Dkt. # 41) ¶ 7.)  The court sets forth the factual background relevant

11  to the instant motion before turning to the procedural background.

12  **A.    Factual Background**

13      1.  DaVita's Culture

14  TRC is a subsidiary of DaVita, Inc. ("DaVita"), a healthcare organization that

15  provides administrative services for a "network of 2,753 outpatient dialysis centers"

16  throughout the United States.[4]  (SAC ¶¶ 2, 5-6.)  Mr. Hesketh alleges that DaVita

17

18  [2] Mr. Hesketh requests oral argument (see Resp. at 1), but the court finds that oral argument would not be helpful to its disposition of the instant motions, see Local Rules W.D. Wash. LCR 7(b)(4).

19

20  [3] The court has previously detailed the background of this matter in its orders on TRC's motions for judgment on the pleadings.  (See 4/12/21 Order (Dkt. # 35) at 2-4; 8/16/21 Order (Dkt. # 84) at 2-8.)

21  [4] DaVita is not a defendant in this action.  (See generally Dkt.)  However, because TRC is a wholly-owned subsidiary of DaVita, the court uses TRC and DaVita interchangeably

22  throughout this order.

1    encourages a "village community" amongst its employees by preaching its mantra "We

2    said. We did." to promote a culture of "trust and confidence that DaVita will do what it

3    says." (*Id.* ¶¶ 8, 22; *see also id.* ¶¶ 3-4 ("Employees of [TRC] . . . are led to be [sic]

4    believe that they [are] all part of a single 'village.'"); Hesketh Decl. (Dkt. # 94) ¶ 4, Exs.

5    A & B (DaVita documents discussing DaVita's "special language," including its practice

6    of referring to employees as "teammates").)  Toting "Integrity" as a core value, DaVita's

7    corporate mission statement pledges, "We say what we believe and we do what we say.

8    We are trusted because we are trustworthy.  In our personal, team and organizational

9    values, we strive for alignment in what we say and do."  (Hesketh Decl., Ex. B at 6.)

10          2.  The Teammate Policies Handbook and the Disaster Relief Policy

11          DaVita publishes, maintains, and distributes an employee handbook titled

12   "Teammate Policies" that contains expectations and policies governing employees.

13   (Zuckerman Decl. (Dkt. # 42) ¶ 2, Ex. 1 ("Teammate Policies").)  TRC distributes the

14   Teammate Policies to all of its employees.  (*See* Peterson Decl. (Dkt. # 95) ¶ 2, Ex. A

15   ("Hesketh Dep. Tr.") at 72:8-11.)  The handbook begins, in a section labeled "Important,"

16   with a disclaimer:

17          The language used in these policies and any verbal statements made by
             management are not intended to constitute a contract of employment, either
18          expressed or implied . . . .  The Teammate Policies have been provided to
             offer guidance in handling many issues, but the policies also allow for
19          latitude in their application to individual circumstances or as the needs of our
             business may warrant.  Except for the policy of at-will employment, any
20          policy may be canceled or modified at any time, at DaVita's sole discretion,
             with or without prior notice.
21
     (Teammate Policies at 3 (all caps removed).)
22

1    Relevant to this case, the January 2020 Teammate Policies handbook includes a

2    Disaster Relief Policy that was originally added in 2017.  (*See* Hesketh Dep. Tr. at 95:10-

3    22; Zuckerman Decl. ¶ 3, Ex. 2 ("Disaster Relief Policy") at 1.)  The Policy "provides for

4    pay continuance during an emergency time frame when a declared emergency or natural

5    disaster prevents teammates from performing their regular duties."  (Disaster Relief

6    Policy at 1.)  A "declared emergency or natural disaster" can be "proclaimed by either the

7    President of the United States, a state Governor or other elected official, or if local

8    leadership . . . deems it appropriate."[5]  (*Id.*)  What constitutes the "emergency time

9    frame," as well as the "affected facility or business office," is "identified on a case-by-

10   case basis by local leadership . . . and the Disaster Governance Council, dependent on the

11   severity of the disaster and location."  (*Id.* at 2.)  If a designated facility is open during

12   the emergency time frame, employees will receive "premium pay," or 1.5 times the base

13   rate of pay.  (*Id.*)  The Disaster Relief Policy also specifies:

> The language used in this policy is not intended to constitute a contract of
> employment, either express or implied, to give teammates any additional
> rights to continued employment, pay or benefits, or to otherwise change
> DaVita's policy of at-will employment.

16   (*Id.*)  When asked about this disclaimer during his deposition, Mr. Hesketh stated that he

17   understood it to mean TRC can change the Policy whenever it wants "at [its] sole

20   [5] Before January 1, 2018, this portion of the Disaster Relief Policy stated that a declared
     emergency or natural disaster shall be proclaimed by the President, a Governor or elected office,
21   "*and* if local leadership . . . deems it appropriate."  (SAC ¶ 43 (emphasis added).)  Afterwards,
     however, the policy was changed so that the emergency could be proclaimed by the
22   aforementioned public officials "*or* if local leadership . . . deems it appropriate."  (*Id.* ¶ 44
     emphasis added).)

discretion." (*See* Hesketh Dep. Tr. at 101:12-16, 107:18-109:15; *see also id.* at

109:16-110:4 (noting that "similar language is repeated in the teammate

handbook[,] . . . [his] application for work[,] . . . a number of places in the policies book,"

and in his acknowledgement of the handbook).)

DaVita and TRC require employees to annually sign an acknowledgement that

they have read and will adhere to the Teammate Policies. (Zuckerman Decl. ¶ 5; *id.* Ex.

4 ("Acknowledgement").) The acknowledgement provides:

> I understand that I am governed by the contents of the Teammate
> Policies . . . and I recognize that DaVita reserves the right to interpret,
> amend, modify, supersede or eliminate policies, practices or benefits (except
> employment-at-will policies) described in these policies from time-to-time
> in its sole and absolute discretion. No oral amendment to any policy or
> benefit described herein shall be effective.
>
> I understand the Teammate Policies . . . and their contents are not intended
> to create any contractual or legal obligations, express or implied between
> DaVita and its teammates; however, these policies do set forth the entire
> employment arrangement between me and DaVita with respect to the at-will
> nature of my employment relationship with DaVita.

(Acknowledgement at 2.) Mr. Hesketh signed his acknowledgement of the most recent

Teammate Policies handbook in January 2020. (*See* Acknowledgement at 1-3; *see also*

Hesketh Dep. Tr. at 175:13-23 (noting that Mr. Hesketh continued working without

change after acknowledging the policies).)

Irrespective of the disclaimers in the Teammate Policies, the Disaster Relief

Policy, and the Acknowledgement, Mr. Hesketh alleges that TRC "created an

environment in which [its] employees were led to believes [sic] that the Teammate

Policies . . . purport to be fair, and would be applied consistently and uniformly to each

1    employee." (SAC ¶ 22.)  Managers supposedly "acknowledge that the Teammates

2    [Policies] create[] mutual expectations between the employees and DaVita that the

3    policies will be applied to their relationship." (*Id.* ¶¶ 23, 25 (alleging that TRC "created

4    an atmosphere where its at will employees are expected to abide by the Teammate

5    Policies, the Code of Conduct and the DaVita Compliance Program and where employees

6    made [sic] to believe that [TRC] will abide by those same policies").)

7         3.  The COVID-19 Pandemic

8         Mr. Hesketh alleges that a national emergency was declared in the beginning of

9    January 2020, due to the COVID-19 pandemic, and that he and other employees were

10   entitled to premium pay under the Policy as a result. (*Id.* ¶¶ 47-53.)  However, TRC did

11   not provide him, or any other employees, premium pay because it concluded that the

12   Disaster Relief Policy did not apply to COVID-19. (Gardner Decl. (Dkt. # 88) ¶¶ 3-6

13   (discussing the reasons why he, as TRC's CPO, determined the Disaster Relief Policy did

14   not apply to COVID-19.[6])

15        Mr. Gardner states that the Disaster Relief Policy was not put into effect for the

16   pandemic because TRC's operations were not disrupted; facilities remained open; and

17   teammates continued performing their regular jobs. (*See id.* ¶ 4; *see also* Henry Decl.

18   (Dkt. # 95) ¶ 2, Ex. 1 ("Eaves Dep. Tr.") at 154:1-8 (Testimony by DaVita's Rule

19   30(b)(6) deponent that "there was nothing for an able person who needed to come in, that

20   would prevent them from performing their . . . normal course of duties.").)  Moreover, no

21

22        [6] As discussed in more detail below, the court denies Mr. Hesketh's motion to strike the
     Gardner Declaration.

1    local leadership at any facility or business office requested DaVita enact the Policy for

2    the pandemic for their region, facility, or office, nor did local leadership declare an

3    emergency time frame.  (*See* Gardner Decl. ¶ 4.)  In contrast, according to Mr. Gardner,

4    DaVita has enacted the policy during natural disasters, such as Hurricane Michael and

5    Winter Storm Uri, that caused physical threats to the company's facilities and disrupted

6    employees' ability to do their jobs.  (*See* Gardner Decl. ¶¶ 7-8.)  Mr. Hesketh

7    acknowledges that "not all DaVita teammates [were prevented] from performing their

8    regular duties" during the pandemic and "thousands . . . including [Mr. Hesketh], worked

9    their regularly scheduled hours."[7]  (SAC ¶¶ 53-54; *see also* Hesketh Dep. Tr. at 47:14-17,

10   48:15-25.)

11         On March 27, 2020, DaVita issued a statement to all US-based employees

12   announcing that "the Disaster Relief Policy does not apply to the COVID-19 crisis"

13   because "the COVID-19 pandemic has not created a situation where teammates are

14   prevented from performing their regular duties."  (Zuckerman Decl. ¶ 4, Ex. 3

15   ("COVID-19 Notice") at 4 (noting that the Policy's language requires that teammates be

16   "prevent[ed] . . . from performing their regular duties" for the Policy to apply).)  It

17   amended the Disaster Relief Policy to add a paragraph explaining that:

18         The Disaster Relief Policy does not apply to the COVID-19 crisis.  The
           Disaster Relief Policy applies only when teammates are unable to perform
19         their regular duties.  The policy is effective upon a decision by local
           leadership and the Disaster Governance Council that a declared emergency
20

21         ───────────────
           [7] Mr. Hesketh has worked remotely since 2019 and continued to work on a fully remote
     basis throughout the pandemic.  (*See* Hesketh Dep. Tr. at 46:23-25, 117:4-14; *see also id.* at
22   47:18-48:1, 48:15-25 (noting that his job duties have not changed since the pandemic began and
     he is able to perform all of his job duties remotely).)

1   or natural disaster prevents our facilities from operating or prevents our
2   teammates from working.  Under the COVID-19 crisis, our teammates are
    able to work and are essential in either in [sic] a supporting role for our health
3   care workers or in actually providing healthcare services to patients.

4   (COVID-19 Notice at 4; *id.* at 5; SAC ¶ 66.[8])  In addition to the notice, DaVita provided

5   a guide to its managers with frequently asked questions regarding COVID to ensure

6   managers were providing consistent information to teammates regarding the Policy.  (*See*

7   Gardner Decl. at ¶ 5, Ex. A (containing the question, "Are we offering premium pay or

8   additional pay under the Disaster Relief Policy?," to which DaVita answered, "No. The

9   Disaster Relief Policy does not apply to the COVID-19 crisis. . . .").)

10          Although Mr. Hesketh alleges that he "expected to be paid time and a half as

11  outlined in the D[isaster Relief Policy]," he never asked anyone any questions or raised

12  concerns with management after DaVita stated that the Policy did not apply to the

13  pandemic.  (*See* Hesketh Decl. ¶ 7; Hesketh Dep. Tr. at 100:14-18, 112:14-18, 107:5-9,

14  144:24-145:3, 147:1-24).  He admits that no one ever told him the Disaster Relief Policy

15  did or would apply to the pandemic.  (*See* Hesketh Dep. Tr. at 116:2-9, 119:2-20,

16  121:21-122:2.)

17  //

18  //

19  //

20  //

---

21  [8] Mr. Hesketh alleges that employees were asked to acknowledge the amendment to the
22  Policy in September 2020.  (*See* Hesketh Dep. Tr. at 104:6-1, 144:20-145:3; SAC ¶ 65.)

**B.    Procedural Background**

Mr. Hesketh brought the instant suit against TRC on October 22, 2020, in state court, and TRC removed the action.  (*See* Compl. (Dkt. # 1-1); Not. of Removal (Dkt. # 1).)  Mr. Hesketh originally raised three claims:  (1) breach of contract; (2) promissory estoppel; and (3) unjust enrichment.  (*See* Am. Compl. (Dkt. # 19) ¶¶ 61-89.)  On March 11, 2021, TRC moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing for dismissal of all three claims.  (*See* 1st MJOP (Dkt. # 22).)  The court granted TRC's motion for judgment on the pleadings in part and dismissed Mr. Hesketh's breach of contract and promissory estoppel claims.  (*See* 4/12/21 Order at 1-2.)  Relevant to the instant motion, the court dismissed Mr. Hesketh's breach of contract claim after concluding that the policies in the Teammate Policies handbook, including the Disaster Relief Policy, were not binding because the handbook contained "clear and direct language disavowing the handbook as part of the employment contract while retaining discretion or authority to act apart from the handbook on behalf of the employer."  (*Id.* at 6-11.)  But because there "remain[ed] the possibility that Mr. Hesketh could plead facts to negate [the] disclaimers," the court granted him leave to amend.  (*Id.* at 14-15.)

Mr. Hesketh filed his second amended complaint on May 12, 2021, adding a new claim of breach of the implied duty of good faith and fair dealing.  (*See* SAC ¶¶ 115-22.)  Similar to his breach of contract claim (*see id.* ¶¶ 106-14), his implied duty of good faith and fair dealing claim is predicated on the contention that the Disaster Relief Policy is a binding contract.  (*See id.* ¶¶ 115-22.)  Specifically, he alleges that TRC breached its

1   implied duty of good faith and fair dealing by refusing to "perform [its] obligations to

2   identify the emergency time frame" and "pay the premium pay promised to the

3   employees." (*See id.* ¶¶ 116-19.)

4       TRC again moved for judgment on the pleadings on all of Mr. Hesketh's claims,

5   arguing that Mr. Hesketh's amendments had not rectified the errors that the court

6   identified. (*See* 2d MJOP (Dkt. # 57) at 1.) The court granted TRC's motion in part,

7   dismissing Mr. Hesketh's breach of contract, promissory estoppel, and unjust enrichment

8   claims with prejudice.[9] (*See generally* 8/16/21 Order.) Regarding the breach of contract

9   claim, the court concluded that Mr. Hesketh's allegations related to whether TRC negated

10  its effective disclaimers were enough "at the pleading stage" to "allow a reasonable

11  inference that TRC has made oral assurances and acted in ways inconsistent with its

12  disclaimers." (*See id.* at 13-14 (emphasizing that the court was "not passing judgment on

13  whether, in fact, TRC's representations or conduct negated the disclaimers" and that

14  "with more discovery, it is possible that what Mr. Hesketh alleges is not specific

15  enough").) Nevertheless, the court concluded that Mr. Hesketh's breach of contract

16  claim failed because the Policy contained "at least two conditions precedent" that must be

17  met before premium pay is instituted and Mr. Hesketh failed to allege that the conditions

18  precedent occurred. (*See id.* at 15-17.) The court declined to grant TRC's motion on Mr.

19  Hesketh's breach of the implied duty of good faith and fair dealing claim because (1) the

20

21      [9] In its order, the court also struck Mr. Hesketh's pending motions to certify classes of
        both plaintiffs and defendants. (*See* 8/16/21 Order; Pls. MCC (Dkt. # 50); Defs. MCC (Dkt.
22      # 55).)

1  only argument TRC made was that this claim failed because Mr. Hesketh could not

2  establish that the Policy was a binding contract and (2) there existed "a material issue of

3  fact as to whether the disclaimers were negated, which could in turn render the Disaster

4  Relief Policy a binding contract." (*See id.* at 17.)

5      Thus, the only remaining claim in this case is that for breach of the implied duty of

6  good faith and fair dealing. (*See id.*; MSJ at 1.) TRC now moves for summary judgment

7  on that claim. (*See generally* MSJ.) Both parties filed motions to strike portions of the

8  opposing parties' pleadings in support of and in opposition to TRC's motion for summary

9  judgment. (*See generally* Resp. at 15; Reply at 12.)

10                    **III.    ANALYSIS**

11     The court begins by considering the parties' motions to strike. The court then sets

12  forth the standard of review before considering TRC's motion for summary judgment on

13  Mr. Hesketh's claim for breach of the implied duty of good faith and fair dealing.

14  **A.    The Parties' Motions to Strike**

15     Both parties request that the court strike portions of the opposing parties'

16  pleadings. (*See* Resp. at 15; Reply at 12.) The court begins by reviewing Mr. Hesketh's

17  motion to strike portions of Kenny Gardner's declaration before turning to TRC's motion

18  to strike the pages of Mr. Hesketh's opposition that exceeded the applicable page limit.

19        1.  Mr. Hesketh's Motion to Strike

20     Mr. Hesketh moves to strike paragraphs 2 through 4 and 6 through 8 of Mr.

21  Gardner's declaration on the grounds that they are based on hearsay and are therefore

22  inadmissible and cannot raise a genuine issue of material fact. (*See* Resp. at 15.) He

1    asserts that the challenged paragraphs "are conclusory and state legal conclusions without

2    demonstrating any of the requisite knowledge to support them" and "make[] statements

3    about events that allegedly took place without providing any documentation to support

4    them." (*See id.* (noting that Mr. Gardner "says his understanding of the Disaster Relief

5    Policy are [sic] based on his experience with Hurricane Michael in 2018, yet no

6    information regarding Hurricane Michael was provided" in discovery document

7    production or with Mr. Gardner's declaration).)

8         In response, TRC argues Mr. Gardner's declaration is permissible pursuant to

9    Federal Rule of Civil Procedure 56(c)(4) because the statements are "based on [his]

10   personal knowledge," specifically, his "'experience determining whether to activate the

11   Policy when [he] was in local leadership' as well as his involvement in determining

12   whether to activate the Policy for the pandemic and Winter Storm Uri." (*See* Reply at 12

13   (quoting Gardner Decl. ¶¶ 1-2, 7-8).)  TRC also claims that the court should deny Mr.

14   Hesketh's motion to strike because he "does not identify any specific statements in the

15   declaration that are legal conclusions or that would be hearsay if testified to in [c]ourt."

16   (*See id.*)

17        Rule 56(c)(4) provides a declaration may be used to support summary judgment

18   where it is based on personal knowledge, sets out facts that would be admissible if

19   testified to at trial, and shows the declarant is competent to testify.  Fed. R. Civ. P.

20   56(c)(4).  The court addresses each of the challenged paragraphs in turn:

21        • In Paragraph 2, Mr. Gardner sets forth the basis for his understanding of the
            Disaster Relief Policy.  These statements are based on his personal

22          knowledge and are admissible.

1

2

3

4

- In Paragraph 3, Mr. Gardner describes his personal observations and experiences while working at DaVita. He gives examples of when DaVita has and has not activated the Disaster Relief Policy, as well as why it has been activated and what happens when it is. These statements are based on his personal knowledge and are admissible.

5

6

7

8

- In Paragraph 4, Mr. Gardner discusses his experiences working at DaVita during the pandemic, including his observations of how DaVita's offices stayed open, and individuals remained able to perform their regular job duties. Mr. Gardner also asserts that he is personally unaware of any major disruptions at facilities due to the pandemic, nor is he aware of any local leadership requesting that DaVita implement the Disaster Relief Policy during the pandemic. These statements are based on his personal knowledge and are admissible.

9

10

11

12

13

- In Paragraph 6, Mr. Gardner describes his personal involvement in determining whether to activate the Disaster Relief Policy for the pandemic. He discusses his personal experience in reviewing the language of the policy and his opinion that it did not apply to the pandemic. He also notes that other members of the People Services Team reached the same conclusion, and that the decision was consistent with "the ways in which we have and have not applied the Policy in the past." These statements reflect Mr. Gardner's personal knowledge, experience, and lay opinion and are admissible.

14

15

16

- In Paragraphs 7 and 8, Mr. Gardner recounts his personal experiences and observations serving as Group Vice President and CPO when DaVita implemented the Disaster Relief Policy during natural disasters like Hurricane Michael and Winter Storm Uri. These statements are based on his personal knowledge and are admissible.

17

Accordingly, the court DENIES Mr. Hesketh's motion to strike portions of Mr.

18

Gardner's declaration.

19

    2.  <u>TRC's Motion to Strike</u>

20

TRC moves to strike the pages of Mr. Hesketh's opposition that exceeded the page

21

limit as set forth in Local Rule 7. (*See* Reply at 12 (citing Local Rules W.D. Wash. LCR

22

7(e)(3), 7(e)(6)).) Local Rule 7(e) provides that oppositions to motions for summary

1    judgment "shall not exceed twenty-four pages," and the "court may refuse to consider

2    any text, including footnotes, which is not included within the page limits."  Local Rules

3    W.D. Wash. LCR 7(e)(3), 7(e)(6) (detailing what text is excluded from the page limit).

4    Excluding "[c]aptions, tables of contents, tables of authorities, signature blocks, and

5    certificates of service," Mr. Hesketh's opposition is approximately 25 pages long.

6    Accordingly, the court GRANTS TRC's motion to strike the page of Mr. Hesketh's

7    opposition that exceeds the applicable page limit and does not consider the text on page

8    26 of Mr. Hesketh's response.

9    **B.    Summary Judgment Standard**

10           Summary judgment is appropriate if the evidence viewed in the light most

11   favorable to the non-moving party shows "that there is no genuine dispute as to any

12   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

13   56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beaver v. Tarsadia Hotels*,

14   816 F.3d 1170, 1177 (9th Cir. 2016).  A fact is "material" if it might affect the outcome

15   of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute

16   is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the

17   non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)

18   (citing *Anderson*, 477 U.S. at 248-49).

19           The moving party bears the initial burden of showing there is no genuine dispute

20   of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

21   323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

22   show the absence of such a dispute in two ways:  (1) by producing evidence negating an

1   essential element of the nonmoving party's case, or (2) by showing that the nonmoving

2   party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

3   *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

4   meets its burden of production, the burden then shifts to the nonmoving party to identify

5   specific facts from which a factfinder could reasonably find in the nonmoving party's

6   favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

7   **C.      TRC's Motion for Summary Judgment**

8   　　　　TRC argues that it is entitled to summary judgment on Mr. Hesketh's breach of

9   the implied duty of good faith and fair dealing claim because the undisputed material

10  facts establish that:  (1) the Disaster Relief Policy is not a binding contract because the

11  Policy and Teammate Policies contained valid disclaimers that were not negated and the

12  prerequisites of contract formation were not met; (2) the duty to act in good faith never

13  arose in connection with TRC's performance of its obligations under the Policy because

14  the "plain terms of the Policy do not require TRC to declare an emergency time frame

15  where, as here, teammates are not prevented from doing their duties"; (3) "TRC acted in

16  good faith because its actions were consistent with the actual terms of the Policy and its

17  decisions whether to activate the Policy in other situations"; and (4) Mr. Hesketh was not

18  damaged.  (*See generally* MSJ.)

19  　　　　In Washington, there is no "free-floating" duty of good faith and fair dealing.

20  *Barrett v. Weyerhauser Co. Severance Pay Plan*, 700 P.2d 338, 342 n.6 (Wash. Ct. App.

21  1985); *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004).

22  Instead, the implied duty of good faith and fair dealing "arises out of the obligations

ORDER - 15

1   created by a contract and only exists in relation to the performance of specific contract

2   terms." *Keystone*, 94 P.3d at 949; *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash.

3   1991).  A claim for breach of the implied duty exists "where the contract gives a party

4   discretion or leeway in determining how to act and that party exercises its discretion in a

5   manner inconsistent with the reasonable expectations of the parties or in some other

6   objectionable manner." *See Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176,

7   1190 (W.D. Wash. 2013) (first citing *Craig v. Pillsbury Non-Qualified Pension Plan*, 458

8   F.3d 748, 752 (8th Cir. 2006); and then citing *Aventa Learning, Inc. v. K12, Inc.*, 830 F.

9   Supp. 2d 1083, 1101 (W.D. Wash. 2011)).  Thus, to avoid summary judgment on his

10  claim for breach of the implied duty of good faith and fair dealing, Mr. Hesketh must

11  show a genuine issue of material fact as to each of the following elements:  (1) the

12  Disaster Relief Policy is a binding contract; (2) a duty to act in good faith arose in

13  relation to the performance of a specific contract term; (3) TRC breached that duty; and

14  (4) the breach caused Mr. Hesketh to suffer cognizable damages. *See, e.g.*, *Microsoft*

15  *Corp.*, 963 F. Supp. 2d at 1184-86 (discussing the elements of a claim for breach of the

16  implied duty of good faith and fair dealing).

17      The court concludes that the undisputed material facts establish that the Disaster

18  Relief Policy is not a binding contract as a matter of law.  Moreover, even if the Policy

19  was a binding contract, the court concludes that there is no genuine dispute of material

20  fact as to whether a duty to act in good faith arose in relation to the performance of a

21  specific contract term.  Accordingly, the court GRANTS TRC's motion for summary

22  judgment.

1       1.  <u>Whether the Disaster Relief Policy is a Binding Contract</u>

2           The court first considers whether the Disaster Relief Policy is a binding contract.[10]

3       TRC asserts that Mr. Hesketh cannot establish that its Disaster Relief Policy constitutes a

4       binding contract because the Policy contains valid disclaimers that were not negated.

5       (*See* MSJ at 8.)  Additionally, it argues that, even if the disclaimers were negated, the

6       Policy is not a binding contract because there was no offer, acceptance, or consideration

7       to form a contract.  (*See id.*)  Mr. Hesketh argues that any disclaimers in the handbook

8       were negated by DaVita's "culture of community."  (*See* Resp. at 18-19.)  He also claims

9       that a contract was formed when provisions of the handbook were explained to him and

10      he was required to "sign a form acknowledging receipt of the manual and agreeing to

11      abide by the rules."  (*See id.* at 17-18.)  The court concludes that Mr. Hesketh has not

12      established a material issue of fact regarding whether TRC negated its effective

13      disclaimers.  Thus, because the Disaster Relief Policy is not a binding contract, Mr.

14      Hesketh cannot point to any specific contract term with respect to which TRC breached a

15      duty of good faith and fair dealing.

16          a.  *Washington Employment Law*

17          Under Washington law, policies within an employee handbook may be binding on

18      the employer.  *See Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1087 (Wash. 1984).

19

20          _____
        [10] Contrary to Mr. Hesketh's assertions, the court has not already concluded that "there
21      was a contract" in this case.  (*See* Resp. at 16-17.)  As discussed above, in its order on TRC's
        second motion for judgment on the pleadings, the court concluded only that there was a material
22      issue of fact regarding whether TRC negated the otherwise effective disclaimers.  (*See* 8/16/21
        Order at 11-17.)

1    This rule "rests on the principle that by using a manual or handbook, an employer secures

2    promises from the employees which create a loyal, orderly and cooperative work force,

3    such that the employer should be equally bound to its promises." *Drobny v. Boeing Co.*,

4    907 P.2d 299, 302 (Wash. Ct. App. 1995).  Policies within a handbook may be binding in

5    two situations:  (1) where the policy creates a contract through the traditional requisites of

6    contract formation, offer, acceptance, and consideration; or (2) where the policy creates

7    "an atmosphere of job security and fair treatment with promises of specific treatment in

8    specific situations and an employee is induced thereby to remain on the job and not

9    actively seek other employment." *Thompson*, 685 P.2d at 1087.

10        If the "written terms amount only to 'general statements of company policy,' then

11    the document does not create an implied contract." *Quedado v. Boeing Co.*, 276 P.3d

12    365, 369 (Wash. Ct. App. 2012) (citing *Thompson*, 685 P.2d 1081; *Drobny*, 907 P.2d

13    299).  "Only those statements in employment manuals that constitute promises of specific

14    treatment in specific situations are binding." *Id.* (quoting *Stewart v. Chevron Chem. Co.*,

15    762 P.2d 1143 (Wash. 1988)).  Further, "statements made in employee handbooks are not

16    binding if the employer provides an appropriate written disclaimer." *See Baker v. City of

17    SeaTac*, 994 F. Supp. 2d 1148, 1155 (W.D. Wash. 2014).  An employer escapes

18    obligation if it states "in a conspicuous manner" in the written materials that "nothing

19    contained therein is intended to be part of the employment relationship," or "if the

20    employer specifically reserves a right to modify the policies, or writes them 'in a manner

21    that retains discretion to the employer.'" *Quedado*, 276 P.3d at 369 (quoting *Thompson*,

22    685 P.2d 1081).  However, inconsistent or contradictory employer representations and

1    practices can negate the effect of a disclaimer.  *Id.* at 1162 (citing *Swanson v. Liquid Air*

2    *Corp.*, 826 P.2d 664, 676 (Wash. 1992)).

3              *b.  The Effect of the Disclaimers*

4              As the court previously held, "the disclaimers in the Teammate Policies, the

5    Disaster Relief Policy, and the Acknowledgement rise to the level of a clear and

6    conspicuous disclaimer of contractual rights that is effective as a matter of law." (*See*

7    4/12/21 Order at 9-11 (citing *Quedado*, 276 P.3d at 369 (finding the employer's

8    disclaimer effective as a matter of law)); 8/16/21 Order at 11-12.)  While the court

9    struggles to understand Mr. Hesketh's argument on this point, he seems to ask the court

10   to conclude that the Policy's disclaimer applies only to preserving the at-will employment

11   relationship and not to pay practices, which is an argument that the court already rejected.

12   (*See* Resp. at 23; 8/16/21 Order at 12-13.)  The cases Mr. Hesketh cites do not support the

13   position that the disclaimer only applies to at-will employment and he offers no

14   meritorious argument as to why the language in the Disaster Relief Policy, which

15   explicitly disavows "giv[ing] teammates any additional rights to continued employment,

16   pay or benefits," applies only to the at-will employment status.  (*See* Resp.; Disaster

17   Relief Policy at 2); *cf. Spooner v. Reserve Life Ins. Co.*, 287 P.2d 735 (Wash. 1955)

18   (applying a disclaimer to pay practices and concluding that an employer's alleged

19   promise to pay a bonus was not a contract because the disclaimer stated that the bonus

20   "may be withheld, increased, decreased, or discontinued, . . . with or without notice").)

21   The court recognizes, as it did before, that the line of cases cited by TRC to support its

22   argument that the disclaimers were effective had only considered modification of the at-

1    will employment relationship, but again, Mr. Hesketh proffers no reasoning why this

2    authority would not be applicable here.  (*See* 4/12/21 Order at 8 n.4; 8/16/21 Order at

3    12-13.)  Under these circumstances, the court rejects his argument.[11]

4           Because the Teammate Policies handbook and the Disaster Relief Policy contain

5    clear and conspicuous disclaimers that disavow any legal obligations on the part of TRC,

6    the Policy cannot be considered a binding contract unless Mr. Hesketh establishes a

7    material issue of fact regarding whether TRC negated those disclaimers.  "An employer's

8    inconsistent representations can negate the effect of a disclaimer."  *Swanson*, 826 P.2d at

9    674.  For instance, "oral assurances" such as "employer statements that contradict the

10   disclaimer . . . may act to negate and override the disclaimer."  *Id.* at 675.  So, too, could

11   contradictory employment practices.  *Id.*  And finally, inconsistent statements within the

12   manual itself can negate an effective disclaimer.  *See Payne v. Sunnyside Community*

13   *Hosp.*, 894 P.2d 1379, 1384 (Wash. Ct. App. 1995).  The impact of any inconsistent

14   representations "can only be determined after '[a]ll the circumstances, and the

15   representations and practices of the employer' are examined."  *Ritchie v. Fed. Express*

16   *Corp.*, No. C04-1753RSL, 2007 WL 1140260, at *7 (W.D. Wash. Apr. 16, 2007)

17   (quoting *Swanson*, 826 P.2d at 676).  The effectiveness of a disclaimer may be decided as

18   a matter of law when reasonable minds cannot differ.  *See Flores v. Walmart Stores, Inc.*,

19

20   ──────────────────

21   [11] Mr. Hesketh's argument also ignores the disclaimers in the introduction of the
     Teammate Policies handbook and in his Acknowledgment, neither of which are limited to
     preserving a teammate's at-will status.  (*See* Acknowledgment at 2; Teammate Policies at 3;

22   ("[A]ny policy may be canceled or modified at any time, at DaVita's sole discretion, with or
     without prior notice.").)

1   No. C11-0334TOR, 2012 WL 5929957, at *6 (E.D. Wash. Nov. 27, 2012) (citing *Nelson*

2   *v. Southland Corp.*, 894 P.2d 1385 (Wash. Ct. App. 1995)); *see also Swanson*, 826 P.2d

3   at 672.

4          Mr. Hesketh argues that the disclaimers were negated by:  (1) DaVita's "culture of

5   community," which created an atmosphere where employees believed TRC would "abide

6   by the Teammate Policies [h]andbook"; (2) the inconsistencies in language regarding

7   discretion between the Disaster Relief Policy and other Teammate Polices related to pay;

8   and (3) DaVita leadership's "suggest[ions]," "thought[s]," or "expect[ations]" that the

9   Policy applied to the pandemic.  (*See* Resp. at 18-19, 24-25.)  He also contends that the

10  court should consider the employer's reason for issuing the Policy to determine whether

11  the disclaimers have been negated, and that DaVita issued the Teammate Policies "to

12  offer guidance" and created the Disaster Relief Policy to incentivize employees to report

13  to work during a disaster.  (*See id.* at 18-19 (first citing *Thompson*, 685 P.2d at 1087; and

14  then citing Henry Decl. ¶ 3, Ex. 2 ("Eaves Dep. Docs.") at 43-44).)

15         Addressing Mr. Hesketh's contention about intent, TRC notes that an employer's

16  reason for issuing a policy is irrelevant to determining whether the disclaimers were

17  negated.  (*See* Reply at 5.)  Turning to Mr. Hesketh's alleged evidence of negation, TRC

18  first claims that nothing in DaVita's corporate culture constitutes a representation that is

19  inconsistent with the disclaimers or retention of discretion and that DaVita's decision that

20  the Policy did not apply to the pandemic was not contradictory of its past discretionary

21  practices regarding when to apply the Policy.  (*See id.* at 3-4 (citing Gardner Decl. ¶ 2).)

22  Next, TRC argues that there is no inconsistency between the Disaster Relief Policy and

1    other Teammate Policies, as they all provide managers with some level of discretion, and

2    that the distinction in levels of discretion is immaterial because Mr. Hesketh fails to

3    identify any language in the Teammate Policies that is inconsistent with either the

4    disclaimer or the procedure of the Policy.  (*See id.* at 3 (citing *Payne*, 894 P.2d at 1384).)

5    Finally, TRC contends that there is no evidence that contradictory or inconsistent

6    representations or assurances were made to Mr. Hesketh regarding the Policy.  (*See id.* at

7    1-2 (noting that it is undisputed that no DaVita representative said that the disclaimers

8    were invalid or that the Policy required DaVita to pay premium pay during the pandemic

9    (citing Hesketh Dep. Tr. at 116:2-9; Gardner Decl. ¶ 5; COVID-19 Notice)).)  It also

10   argues that the emails Mr. Hesketh cites do not establish that DaVita managers "thought"

11   the Policy applied to the pandemic and, even if they did, the emails are immaterial to the

12   question of whether inconsistent representations were made to Mr. Hesketh.  (*See id.*

13   (citing Eaves Dep. Docs. at 89-96).)

14        To begin, the court agrees with TRC that an employer's reason for issuing a policy

15   is irrelevant to determining whether the disclaimers were negated.  Mr. Hesketh relies on

16   *Thompson v. St. Regis Paper Co.*, but that case only addresses intent in relation to its

17   holding that policies can lead to binding obligations in certain situations.  *See Thompson*,

18   685 P.2d at 1087.  It does not, however, say that an employer's intent in issuing a policy

19   is relevant to the issue of negation.  *See generally id.*

20        The court now turns to its analysis of the evidence of negation.  Viewing the

21   evidence in the light most favorable to Mr. Hesketh, the court concludes that he has not

22   produced sufficient evidence to raise a genuine dispute of material of fact as to whether

1    the valid disclaimers were negated.  Mr. Hesketh admits that that he never received any

2    assurances that DaVita was required to activate the Disaster Relief Policy upon any

3    emergency declaration.  (*Compare* Hesketh Dep. Tr. at 119:2-20, 120:1-20,

4    121:21-122:2, *with Swanson*, 826 P.2d at 675 (stating that oral assurances at meeting with

5    employees that the company would abide by certain mandatory procedures may negate a

6    policy's disclaimer).)  As it relates to the pandemic, the record demonstrates that, while

7    Mr. Hesketh expected the Policy to apply to the pandemic, no one ever told Mr. Hesketh

8    that the Policy did, would, or should apply to the pandemic, nor did he receive any

9    communication stating as much.  (*See* Hesketh Decl. ¶ 7 (stating that he "expected" that

10   DaVita would activate the Policy); Hesketh Dep. Tr. at 112:14-18, 119:2-19, 116: 2-9,

11   121:21-122:2 (admitting that no one from DaVita told him the Policy does or would

12   apply to the pandemic).)  Mr. Hesketh also admits that he never asked anyone in

13   management any questions following DaVita's statement that the Policy did not apply to

14   the pandemic.  (*See* Hesketh Dep. Tr. at 100:14-18, 107:5-9, 144:24-145:3, 147:1-24.)

15        Moreover, the undisputed material facts establish that the statements made by

16   DaVita and TRC leadership about the Policy during the pandemic were consistent with

17   its language and the disclaimers' language.  (*See* COVID-19 Notice; Gardner Decl.

18   ¶¶ 5-6.)  As TRC makes clear, Mr. Hesketh's assertion that DaVita managers

19   "suggest[ed]," "thought," or "expected" that the Policy applied to the pandemic is

20   unsupported by the intra-management emails that he cites.  (*See* Eaves Dep. Docs. at

21   89-94 (containing emails from director-level employees noting that they received

22   inquiries about the Policy, and discussing the need to prepare talking points explaining

ORDER - 23

1    that the Policy does not apply); *id.* at 95-96 (containing an email from an assistant about

2    the Policy and a discussion from the Director and the Vice President that the Policy does

3    not apply).)  Further, even if the emails did reflect that certain managers expressed

4    thoughts to other members of management that the Policy applied to the pandemic, these

5    facts are immaterial to the issue of whether inconsistent representations were made to Mr.

6    Hesketh.  *See Swanson*, 826 P.2d at 676 (considering whether inconsistent

7    representations were made to the plaintiff in determining if the disclaimer was negated).

8         The uncontroverted evidence also establishes that there are no inconsistent

9    statements within the Disaster Relief Policy or the Teammate Policies handbook.  First,

10   the Policy, like other pay related Teammate Policies, is discretionary:  it provides that

11   determinations about whether to trigger the policy will be made on a "case-by-case

12   basis . . . dependent on the severity of the disaster and location."  (*Compare* Disaster

13   Relief Policy at 1, *with* Henry Decl. ¶ 5, Ex. 4 (Dkt. # 96-1) at 38-39 (including the

14   following language in the facility closures policy:  "the teammate's supervisor has the

15   sole discretion to decide whether to pay" and "[m]anagers have discretion to provide

16   additional compensation to teammates who work during a facility closure").)  Second, the

17   relevant inquiry is not whether there are variances between policies, but whether the

18   disclaimer is inconsistent with the language used in stating the procedure at issue or if

19   inconsistent language is used with respect to the Policy itself.  *See Payne*, 894 P.2d at

20   1384.  For example, in *Payne v. Sunnyside Community Hosp.*, the court concluded that

21   the disclaimer, which stated employees could be terminated "without notice, for any

22   //

ORDER - 24

1  reason or no reason," was inconsistent with the mandatory procedure laid out in the

2  manual's progressive discipline policy.  *See id.* at 1384.

3        Unlike the policy at issue in *Payne*, the Disaster Relief Policy does not mandate

4  when premium pay will be implemented.  Instead, it explicitly retains discretion with

5  DaVita to determine whether to apply the policy on a "case-by-case basis."  (*See* Disaster

6  Relief Policy at 1.)  Rather than create any inconsistencies, the discretionary language

7  used in stating the Policy's procedure reinforces the disclaimers, which provide, in

8  relevant part, that the Policy is not intended to be a contract and that DaVita reserves the

9  right to amend, modify, or eliminate the policies in its sole discretion.[12]  (*See* Disaster

10  Relief Policy at 1-2; Acknowledgment at 2; Teammate Policies at 3); *see also Nelson*,

11  894 P.2d at 1389 (finding no inconsistencies between a disclaimer retaining discretion

12  with the employer to terminate employees for any reason and a progressive discipline

13  policy that could be "initiated at the discretion of the employee's supervisor").

14        The court further concludes that Mr. Hesketh fails to produce sufficient evidence

15  to raise a material issue of fact as to whether TRC acted inconsistently with the

16  disclaimers.  It is undisputed that TRC has historically exercised its discretion regarding

17  the Policy's application, determining on a case-by-case basis whether to declare an

18  emergency time frame, for how long, and for which facilities.  (*See* Gardner Decl. ¶¶ 3,

19

20        [12] Mr. Hesketh understood the disclaimers to mean that TRC can change the policies, including the Disaster Relief Policy, in its discretion.  (*See* Hesketh Dep. Tr. at 107:22-108:16;

21  *see also id.* at 104:6-11, 107:10-21, 109:16-110:4 (testifying that the Policy's disclaimer's language is "written everywhere:" "similar language is repeated in the teammate

22  handbook[,] . . . [his] application for work[,] . . . a number of places in the policies book," and in his acknowledgment of the handbook").)

7-8.)  The record also establishes that DaVita does not activate the Policy during every disaster or emergency; it has only activated the policy in situations where teammates were prevented from performing their duties.  (*See id.* ¶¶ 3, 7-8.)  These practices demonstrate that DaVita has historically exercised wide discretion in deciding when to apply the Policy, just as it did during the pandemic.  While Mr. Hesketh argues that DaVita's corporate culture is contradictory of the disclaimers, he provides no authority establishing that a general corporate culture can negate a valid disclaimer.  (*See* Resp. at 24.)  Although DaVita's culture allegedly led Mr. Hesketh to believe DaVita would enact premium pay under the Policy (*see* Hesketh Decl. ¶ 7; Resp. at 24), the court concludes that DaVita's generalized corporate values, without evidence of any specific inconsistent statements or practices, are insufficient to negate the valid disclaimers.  *See, e.g.*, *Spooner*, 287 P.2d at 738 (concluding that an employer did not breach a contract when it "act[ed] within the terms of its [policy]" that "permitted it to withhold the bonus which it seemed to promise" even when employees continued working because they believed that the employer's corporate conscience would lead it to honor the alleged promise).

The disclaimers, when viewed in conjunction with TRC's practices and representations, do not lead reasonable minds to differing conclusions about the existence of contractual rights to premium pay.  Accordingly, the court concludes that the Disaster Relief Policy is not a binding contract as a matter of law based on the undisputed material facts regarding the effectiveness of the disclaimers.

//

//

1      2.  <u>Whether a Duty to Act in Good Faith Arose</u>

2          Even if Mr. Hesketh could establish that the Policy was a binding contract, the

3   court concludes that he has not established a material issue of fact as to whether TRC's

4   duty to act in good faith related to the performance of a specific contract term ever arose.

5   Although the duty of good faith and fair dealing is implied in every contract, it "is

6   derivative, in that it applies to the performance of specific contract obligations."[13]

7   *Johnson v. Yousoofian*, 930 P.2d 921, 925 (Wash. Ct. App. 1996).  "If there is no

8   contractual duty, there is nothing that must be performed in good faith."  *Id.*  A party's

9   obligation is only to "perform in good faith the obligations imposed by their agreement."

10  *Badgett*, 807 P.2d at 360 (citing *Barrett*, 700 P.2d 338).  Moreover, the "implied

11  covenant of good faith and fair dealing cannot add or contradict the express contract

12  terms"; instead, it "'arises only in connection with the terms agreed to by the parties.'"

13  *See Hard 2 Find Accessories, Inc. v Amazon.com, Inc.*, 58 F. Supp. 3d 1166, 1173-74

14  (W.D. Wash. 2014) (quoting *Badgett*, 807 P.2d at 360).  "As a matter of law, there cannot

15  be a breach of the duty of good faith and fair dealing when a party simply stands on its

16  rights to require performance of a contract according to its terms."  *Burlington Ins. Co. v.*

17  //

18

19
20         [13] Mr. Hesketh argues that cases have concluded that the duty of good faith and fair
   dealing exists in relation to "any employment issues short of termination of an at will employee."
21  (*See* Resp. at 20.)  In support of his argument, he discusses *Rekher v. State Department of Social
   and Health Services*, 323 P.3d 1036, 1041 (Wash. 2014) and *Bill & Melinda Gates Foundation v.
   Pierce*, 475 P.3d 1101 (Wash. Ct. App. 2020).  (*See* Resp. at 20.)  However, both of those cases
22  involved an enforceable employment contract, and the issue was whether the employer exercised
   good faith related to their performance of the substantive terms of those contracts.

1   *Blind Squirrel, LLC*, 228 F. Supp. 3d 1160, 1169 (E.D. Wash. 2017) (quoting *Badgett*,

2   807 P.2d at 360).

3          Because a duty to perform in good faith arises only in connection with the terms

4   agreed by the parties, the issue is whether TRC had a duty to identify an emergency time

5   frame and implement premium pay under the Policy, to which a duty to act in good faith

6   would attach.  *See Badgett*, 807 P.2d at 359-60.  TRC argues that a duty to act in good

7   faith never arose because the "plain terms of the Policy do not require TRC to declare an

8   emergency time frame where, as here, teammates are not prevented from doing their

9   duties." (*See* MSJ at 15-17.)  In support of its argument, it notes that "imposing a duty on

10  TRC to determine whether to declare an emergency time frame when the condition

11  precedent indisputably was not met would impose a new substantive term that contradicts

12  the clear terms of the Policy." (*See id.*)  TRC contends that it had no duty to declare an

13  emergency time frame or implement premium pay under the Policy, to which a duty of

14  good faith would attach, because the undisputed evidence establishes that teammates

15  were not prevented from doing their regular duties. (*See id.*; Reply at 8-10.)

16         As the court previously identified, the Policy contains at least two condition

17  precedents that must occur before TRC has a duty to provide premium pay.  (*See* 8/16/21

18  Order at 15 ("A condition precedent is 'a fact or event included in a contract that must

19  take place before a right to immediate performance arises.'" (quoting *Lokan v. Assocs.,*

20  *Inc. v. Am. Beef Processing, LLC*, 311 P.3d 1285, 1289 (Wash. Ct. App. 2013))).)  First,

21  premium pay is only instituted "during an emergency time frame," which is identified

22  "on a case-by-case basis" by DaVita leadership and a Disaster Governance Council

1   "dependent on the severity of the disaster and location." (*See id.* (citing Disaster Relief

2   Policy at 1-2 ("If a designated facility or business office is open *during the emergency*

3   *time frame*, teammates who report to their location and work their scheduled hours will

4   be paid premium pay." (emphasis added))).)  Second, the pay practice is only

5   implemented "when a declared emergency or natural disaster prevents teammates from

6   performing their regular duties." (*See id.* (citing Disaster Relief Policy at 1).)

7           Here, the undisputed evidence establishes that the second condition precedent—"a

8   disaster prevents teammates from performing their regular duties"—was not satisfied.[14]

9   (*See* Disaster Relief Policy at 1; Hesketh Dep. Tr. at 47:14-48:1, 48:15-25.)  Mr. Hesketh

10  concedes that he was not prevented from performing his regular duties during the

11  COVID-19 pandemic.  (*See* Hesketh Dep. Tr. at 47:14-48:1, 48:15-25.)  Additionally,

12  TRC's Chief People Officer, Kenny Gardner, states that "[t]hroughout the pandemic,

13  DaVita's dialysis clinics, labs, and business offices have stayed open, and teammates

14  remained able to perform their regular job duties." (*See* Gardner Decl. ¶ 4; *see also*

15  Eaves Dep. Tr. at 154:1-8.)

16          Mr. Hesketh attempts to rebut this evidence in two ways.  First, he contends that

17  the court should excuse the nonoccurrence of the Policy's conditions precedent because

18  _____

19          [14] In the fact section of his response, Mr. Hesketh does allege that "some, but not all of"
    DaVita's teammates were prevented from performing their regular duties. (*See* Resp. at 9.)  This
    assertion, however, is unsupported and insufficient to create a genuine dispute of material fact.

20  *See Anderson*, 477 U.S. at 250.  The deposition testimony Mr. Hesketh cites in support of this
    argument confirms "there was nothing for an able person who needed to come in, that would

21  prevent them from performing their . . . normal course of duties." (*See* Resp. at 9 (citing Eaves
    Dep. Tr. at 154:1-8).)  Moreover, Mr. Hesketh makes no argument as to whether the condition

22  precedent is satisfied if "some, but not all DaVita teammates" are prevented from performing
    their regular duties.  (*See id.*)

1   whether they occurred was within DaVita's control and DaVita acted in bad faith by not

2   satisfying the conditions.  (*See* Resp. at 20-22 (discussing the prevention doctrine as

3   support for his argument that the court should excuse the conditions precedent).)  The

4   occurrence of the second condition precedent, however, is not within DaVita's control;

5   instead, it is dependent on the nature of the emergency or natural disaster.  (*See* Gardner

6   Decl. ¶¶ 3, 7-8.)  Second, Mr. Hesketh argues that the court should not treat the phrase

7   "prevents teammates from performing their regular duties" as a condition precedent

8   because, considering the entire Policy, it creates a "'Catch 22': i.e., only [teammates]

9   who were prevented from working collect premium pay, but no premium pay is paid

10  unless the [teammate] works."  (*See* Resp. at 21-22.)  This argument also fails, as it

11  misinterprets the Policy's plain language.  The Policy does not impose a condition

12  precedent that teammates be "unable to work" or "prevented from working," but instead

13  that they are "prevent[ed] . . . from performing their regular duties."  (*See* Disaster Relief

14  Policy at 1.)  Moreover, the record shows that DaVita has paid premium pay to

15  employees under the Policy in other disaster situations where the employees were able to

16  report to work but could not perform their regular job duties.  (*See* Gardner Decl. ¶ 7.)

17  Therefore, the court's treatment of the "prevents teammates from performing their regular

18  duties" provision as a condition precedent does not create a "Catch 22," nor does it render

19  other portions of the Policy ineffective.

20      Viewing the evidence in the light most favorable to Mr. Hesketh, the court

21  concludes that there is no genuine dispute of material fact that at least one of the Policy's

22  //

1    conditions precedent was not satisfied.[15]  Specifically, Mr. Hesketh cannot establish that

2    the COVID-19 pandemic prevented him from performing his regular job duties.  (*See,*

3    *e.g.*, Hesketh Dep. Tr. at 47:14-48:1, 48:15-25.)  Thus, no contractual duty to perform—

4    i.e., identify an emergency time frame or implement premium pay—ever arose for TRC

5    under the express terms of the Policy.  *See Badgett*, 807 P.2d at 360 ("[T]he duty arises

6    only in connection with terms agreed by the parties.").  Where the court determines that

7    there is no contractual duty to perform, there is nothing that must be performed in good

8    faith.  *See Hard 2 Find Accessories*, 58 F. Supp. 3d at 1173-74 ("Because the [c]ourt

9    determined that no such contractual duties existed, there is also no duty to perform such

10   obligations in good faith.").  Accordingly, TRC had no duty to perform in good faith

11   because it had no duty to perform under the Policy.[16]

12           In sum, the Disaster Relief Policy is not a binding contract as a matter of law, and

13   even if it was, the undisputed material facts establish that the duty to act in good faith

14   never arose in connection with TRC's performance of a specific term in the Policy.[17]

15

16           [15] The court declines to address the parties' arguments as to whether the Prevention

17   Doctrine excuses the nonoccurrence of the first condition precedent—specifically, the
     identification of "an emergency time frame" by "DaVita leadership and a Disaster Governance

18   Council"—because it concludes that the undisputed evidence establishes that the second
     condition precedent was not satisfied, and thus, TRC had no duty to perform under the Policy.

19           [16] To conclude that TRC had a duty to declare an emergency time frame or institute
     premium pay here would require the court to impose a substantive term that contradicts the

20   express terms of the Policy.  The implied duty of good faith and fair dealing cannot, however,
     "add or contradict the express contract terms."  *See Hard 2 Find Accessories*, 58 F. Supp. 3d at

21   1173 74.

22           [17] Because the court concludes that Mr. Hesketh has not established a genuine dispute of
     material fact as to the first two elements, it does not address the issues of breach and damages.

1    Accordingly, the court GRANTS TRC's motion for summary judgment on Mr. Hesketh's

2    claim for breach of the implied duty of good faith and fair dealing.

3                          **IV.    CONCLUSION**

4            For the foregoing reasons, the court DENIES Mr. Hesketh's motion to strike (Dkt.

5    # 99-1); GRANTS TRC's motion to strike (Dkt. # 98); and GRANTS TRC's motion for

6    summary judgment (Dkt. # 87).

7            Dated this 3rd day of December, 2021.

8

9    _____

10                          JAMES L. ROBART
                          United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22